UNITED STATES DISTRICT COURT

DISTRICT OF COLUMBIA

| | |
|---|---|
| IN RE APPLICATION OF SHERVIN PISHEVAR FOR AN ORDER TO TAKE DISCOVERY FOR USE IN FOREIGN PROCEEDINGS PURSUANT TO 28 U.S.C. § 1782, | Case No. _____ |

# DECLARATION OF JENNY CAMPBELL AFIA

I, Jenny Campbell Afia, pursuant to 28 U.S.C. § 1746, hereby declare under penalty of perjury under the laws of the United States, as follows:

1. I submit this Declaration in support of Mr. Shervin Pishevar ("Petitioner")'s *Ex Parte* Application and Petition For An Order to Conduct Discovery For Use In Foreign Proceedings Pursuant To 28 U.S.C. § 1782 (the "1782 Application").

2. Unless otherwise indicated, all facts set forth in this declaration are based upon: (a) my personal knowledge; (b) my review of relevant documents, including the proposed subpoena; and (c) information supplied to me by Petitioner or professionals retained by Petitioner.

## QUALIFICATIONS

3. I am a Partner and head of the legal team at Schillings International LLP, I am licensed to practice law in England and Wales, I graduated with Post-Graduate Diploma in Law and the Legal Practice Course at The College of Law, London.

4. I have worked as a solicitor at Schillings from 2006 and became a partner in 2012.

5. I therefore have significant extensive experience of acting in media law matters.

6. I attached my Curriculum Vitae as **Exhibit 1**.

## FACTUAL BACKGROUND

7. In addition to the details set out below I refer to the Declaration of Lord Macdonald of River Glaven KT QC dated July 30, 2021 ("Lord Macdonald's Declaration") also made in support of the 1782 Application, in particular to the Factual Background included therein.

8. The Petitioner is an Iranian-American entrepreneur, venture capitalist and angel investor. The Petitioner is a US citizen and frequently travels to the United Kingdom for business.

9. On May 27, 2017, the Petitioner was woken by police officers in his hotel room in London and arrested by City of London Police ("COLP") on suspicion of sexual assault.

10. The arrest was a total shock to the Petitioner, who was understandably distressed and traumatized by it. There was no substance to the claim whatsoever.

11. On May 28, 2017, the Petitioner was released from custody under police bail (which meant that he had not been charged with any offence and was free to leave the police station) to return to the police station on June 23, 2017. On June 19, 2017, the Petitioner was released from police bail but remained under investigation until July 28, 2017, when COLP confirmed to the Petitioner that they would be taking no further action against him due to insufficient evidence.

12. After he received enquiries into the arrest by a journalist for a UK newspaper, the *Sun*, the Petitioner instructed our firm to represent him. On June 21, 2017, our firm obtained an injunction preventing the *Sun* from naming or identifying the Petitioner in relation to the arrest in any future publications (the "Injunction"). The Injunction was granted on the basis that if the *Sun* published an article speculating about the Petitioner's arrest it would have been a gross invasion of his privacy rights as protected by Article 8 of the Human Rights Act 1998.

13. On August 1, 2017, COLP released a press statement which stated: "*Following an investigation into a report of a rape at a location on Poultry, EC2 [London] on Saturday 27 May*

*2017, we can confirm that no further action will be taken,  A 43-year-old man from San Francisco was initially arrested on suspicion of rape before being released under investigation*".  The Petitioner was not named and as per the press statement on August 1, 2017, COLP announced the investigation had ended.  A true and correct copy of the COLP's press statement is attached hereto as **Exhibit 2**.

14. On October 13, 2017, Marcus Baram of Fast Company Magazine, a US publication, contacted the COLP press team to enquire further about the arrest on May 27, 2017.  COLP responded to say that the investigation into the arrest was no longer ongoing and as such no further action would be taken.  On October 15, 2017, Mr. Baram contacted COLP again to ask whether they would confirm it was the Petitioner that was arrested.  The following day COLP responded to say that, as per COLP policy, they could neither confirm nor deny any name put to them in connection with an arrest.  At the same time they also confirmed that the investigation was not being reviewed and would not be reopened.

15. On October 18, 2017, Mr. Baram then emailed COLP attaching a copy of a police report that he had obtained which named the Petitioner and contained false information (the "Forged Police Report").  Due to the details contained in the Forged Police Report, anyone that read it would wrongly associate Petitioner with disreputable or notorious conduct.  Mr. Baram requested that COLP confirm whether the Forged Police Report was authentic.  On October 20 2017 in an email addressed to Mr. Baram, a true and correct copy of which is attached as **Exhibit 3**, the COLP informed Mr. Baram that in respect of his enquiry regarding the Forged Police Report it did not use "documents such as this and did not believe it to be authentic."

16. Upon receipt of the Forged Police Report, COLP conducted an internal investigation into its authenticity.  In an email dated October 23, 2017, a true and correct copy of

which is attached as **Exhibit 4**, COLP responded to Mr. Baram in an email which stated that following their investigation, due to inaccuracies in the Forged Police Report it led them "*to believe it is false*".

17. On October 24, 2017, COLP produced a report which stated that it was "*unlikely*" that the Forged Police Report had been created within COLP or leaked by COLP to the media. Thereafter, on or around October 24, 2017, COLP confirmed to Mr. Baram and others that the report was a fake. In another email in response to Mr. Baram, dated October 31, 2017, COLP confirmed that it was not true that the case had been reopened.

18. On November 7, 2017, Mr. Baram contacted COLP again, and enquired whether they could provide further details. COLP again confirmed the case had not been reopened and stated they had no further comment on the matter.

19. After being contacted by various media organizations requesting comment on the Forged Police Report, on November 8, 2017, the Petitioner had no choice but to release a statement in which he confirmed that in May 2017 he was detained briefly in London in connection with an alleged sexual assault, an allegation categorically denied by the Petitioner. The statement also confirmed that in July 2017 he was informed that no further action would be taken against him.

20. Notwithstanding the fact that COLP stated to them that the Forged Police Report was false, on November 8, 2017, Fast Company published an article entitled "'*Smear Campaign' or not tech investor Shervin Pishevar really was arrested earlier this year*", a true and correct copy of which is attached as **Exhibit 5**. The article made reference to details contained in the Forged Police Report, including private information about the Petitioner as well as false information about the arrest. The article was wrongly afforded greater credibility by referring to the details of the Forged Police Report.

21. The following day, on November 9, 2017, more publications released articles referring to the contents of the Forged Police Report. The NY Post published an article entitled "*Billionaire ally of ex-Uber CEO busted on rape charge*" which included details from the Forged Police Report stating "*according to a police report obtained by The Post*". Forbes published an article entitled "*Shervin Pishevar, arrested but never charged over alleged rape, says he's a victim of 'smear campaign'*" which stated "*a copy of the police report obtained by Forbes, confirms the details of the arrest and the identity of the suspect.*"

22. On November 9, 2017, Hickman & Rose, UK criminal counsel for the Petitioner, contacted COLP to enquire whether any private information relating to the Petitioner had been disclosed to the media following the arrest. On November 10, 2017, they confirmed that no such disclosure had been made and Hickman & Rose responded with a request for a copy of the Forged Police Report. On November 13, 2017, COLP declined the request due to ongoing enquiries as to the purported commission of any criminal offences related to the Forged Police Report.

23. On November 10, 2017, following the Petitioner's statement on November 8 the Court lifted the Injunction.

24. In an email to COLP dated September 28, 2018, Hickman & Rose renewed their request for a copy of the Forged Police Report as well as confirmation as to the source that provided it to COLP. In a response dated October 25, 2018, a true and correct copy of which is attached as **Exhibit 6**, COLP's in-house lawyer stated that they "*can confirm that there is no criminal investigation in respect of the document in question, The City of London Police is content for me to inform you that the screenshot of the document was supplied to them by Marcus Baram of Fast Company, The City of London Police is not prepared to provide a copy of the screenshot without a court order requiring disclosure.*"

25. On November 1, 2018, Hickman & Rose made a Subject Access Request to the COLP for the Forged Police Report. They subsequently made a *Norwich Pharmacal* Application (a type of third-party disclosure application) to the court on April 4, 2019 compelling COLP to disclose the information that had been requested.

26. COLP consented to the *Norwich Pharmacal* Order and provided a copy of the Forged Police Report to Hickman & Rose on May 29, 2019. On June 11, 2019, COLP then provided further documents, detailing their internal investigation into the Forged Police Report's authenticity as well as contact with media following enquiries into the Petitioner's arrest.

27. COLP confirmed, by way of a witness statement from Detective Sergeant ("DS") Jonathan Witt ("Witt Witness Statement") dated 17 May 2019, that on 24 October 2017 whilst based at the COLP's Professional Standards Directorate he had been informed that an "arrest report" had possibly been leaked to the media. DS Witt was then provided with a screenshot of the document in question. DS Witt was then instructed to undertake a scoping exercise into the "arrest report" to determine its authenticity. DS Witt concluded that the document was "not authentic" and produced the report referred to at paragraph 17 herein, on October 24 2017 setting out the investigations undertaken and the reasons for his conclusions.[1]

28. I would also refer to paragraph 19 of Lord Macdonald's Declaration which refers to the witness statement of Teresa La Tangue, Communications Director for COLP dated May 23, 2019 which states that "*the 'arrest report' was sent to the [COLP]'s Professional Standards Directorate who were able to confirm that the document was not a [COLP] document*" and "*thereafter Marcus Baram was told, along with other journalists who enquired, that it was a fake,*

---

[1] As the Witt Witness Statement exhibits the Forged Police Report, I have not attached it to this declaration to prevent further dissemination of the forged document. However, Petitioner is prepared to submit the Witt Witness Statement and the Forged Police Report for *in camera* review.

*explaining that it was not a document that is used by the [COLP] and that the officer named does not work and has not worked for the [COLP]."*

29. Following the successful 1782 application, the Petitioner obtained an Order dated August 9, 2019 a true and correct copy of which is attached as **Exhibit 7,** which resulted in material being disclosed by Mr. Baram and Fast Company (the "Disclosure").

30. Pursuant to the provision of the Disclosure on September 18, 2019, the Petitioner's lawyers have established the following:

    a. Marcus Baram obtained the Forged Police Report from an individual who messaged him using a mobile application called "Signal" ("D.C. Source");[2]

    b. When Mr. Baram met the D.C. Source at a café in Washington DC in September 2017, a copy of the file containing the Forged Police Report was transferred to Mr. Baram's laptop using a USB pen drive;[3]

    c. Mr. Baram was informed by the D.C. Source that he obtained the report from a source in the UK, whom he identified as "a male lawyer based in the UK" ("UK Source").[4]

    d. Based on information shared by Fast Company, the Petitioner's lawyers have now also established that the UK Source also falsely alleged to DC Source the following false information ("Other False Information"):

---

[2] *See* **Exhibit 8**
[3] *See* **Exhibit 8**
[4] *See* **Exhibit 9**

    i.  the Petitioner paid the complainant in the rape allegation the sum of £300,000;[5]

    ii.  the allegation was being handled by City of London Police "Gold Command" for assessments of forensic evidence and other supporting evidence;[6] and

    iii.  police at Bishopsgate police station were outraged over the situation and were demanding a review of police procedures in the case.[7]

31. It is my understanding that, while the Petitioner subsequently initiated a Section 1782 proceeding against Mr. Baram to obtain the name of the D.C. Source, Mr. Baram refused to provide the name of the D.C. Source despite a court order compelling him to do so. I understand that Mr. Baram then filed objections to that order.

32. I understand that while those objections were pending, a private investigator communicated to Petitioner that the investigator had information to identify the D.C. Source but could not disclose the information absent a subpoena. Petitioner subsequently initiated a further Section 1782 application in the U.S. District Court for the Central District of California to obtain that information from the investigator, which was eventually produced on June 18, 2021. I understand that the investigator identified Fusion GPS as the D.C. Source and that Petitioner has therefore commenced the present 1782 Application in order to obtain information to identify the UK Source and anyone else involved in the creation and direction of the Forged Police Report and Other False Information.

---

[5] *See* **Exhibit 9**
[6] *See* **Exhibit 9**
[7] *See* **Exhibit 9**

## THE CONTEMPLATED ENGLISH PROCEEDINGS

33. As a result of the circumstances described in the above paragraphs, *supra* ¶¶8-32, the Petitioner is contemplating proceedings in England for civil claims including (without limitation) negligent misstatement and libel and/or slander (as well as misuse of private information and civil conspiracy).

34. First, negligent misstatement is a common law tort in which party A owes a duty of care to Party B and carelessly makes a false statement to Party B on which Party B relies and, consequently, Party B suffers loss. It is not necessary for the duty to have been created pursuant to a contract. The Petitioner is contemplating bringing proceedings on the grounds of negligent misstatement given that the author(s) and malicious disseminator(s) of the Forged Police Report owe him a duty of care not to publish private information about him which they knew to be false, which the media (and possibly others) have relied on which has caused him loss ("Contemplated Civil Proceedings").[8] To this end, the Petitioner has retained our firm in order to advise on and pursue civil claims in England, including (without limitation) negligent misstatement and libel/slander. Accordingly, our firm has begun drafting the necessary filings to initiate this claim, including the Claim Form.

35. Under English civil procedure, a complainant may initiate a civil claim against "Persons Unknown" (similar to John Doe defendants in the United States).

36. In order to establish whether the tort of negligent misstatement has been committed, the English Courts require the Petitioner to demonstrate there was a duty of care, a breach of that duty and the Petitioner suffered as a result of that breach.

---

[8] For the avoidance of doubt, the Respondent here will not be a party to any of Petitioner's contemplated proceedings.

37. *Caparo v Dickman*,[9] a true and correct copy of which is attached as **Exhibit 10**, is the leading case in determining whether a duty of care exists. The test is three-fold, in which it must be established that:

    a.    it was foreseeable that Persons Unknown's conduct would cause loss to the Petitioner;

    b.    there was a sufficient degree of proximity between Persons Unknown (also known as a "special relationship") and

    c.    It would be fair, just and reasonable to impose a duty of care in the circumstances.

38. In the contemplated proceedings, the Petitioner will submit to the English Court that in providing the Forged Police Report to the media, it would have been foreseeable to Persons Unknown that this would cause loss to the Petitioner.

39. Further, it would have been foreseeable that the media, in their professional capacity of reporting news, would have relied on the Forged Police Report in their publications. Providing the Forged Police Report, whether carelessly or knowingly as to its falsity, created a sufficient degree of proximity notwithstanding the fact that the negligent misstatement was not made to the Petitioner directly.

40. The Supreme Court of Ireland in *Harold Wildgust and another v Bank of Ireland and another*[10], a true and correct copy of which is attached as **Exhibit 11**, established that that it was not necessary for the negligent misstatement to be made directly to the plaintiff, provided there was sufficient proximity between the parties.

---

[9] [1990] UKHL 2.
[10] [2006] 2 ILRM 28.

41. Secondly, pursuant to the Disclosure and the evidence that the UK Source published the Forged Police Report and that UK Source made the statements at the above paragraph 30(d) to the D.C. Source, who relayed them to Mr. Baram, the Petitioner intends to bring proceedings against any malicious purveyors of the information, including the UK Source, in libel and/or slander on the following basis.

42. Libel is a civil claim which Party A can bring against Party B, where Party B has published to Party C something that adversely affects Party A's reputation. An action for libel requires that there was a defamatory statement that was published to a third party, which identifies the party bringing the claim and has caused or is likely to cause them serious harm to their reputation.

43. Slander is a similar action to libel, save that slander relates to transient types of communications such as oral conversations or physical gestures, that are not recorded. The requirements for a slander action to be successful are similar to libel and must ultimately require that the transient communication caused or is likely to cause serious harm to someone's reputation. Given that the Forged Police Report was ultimately obtained by a journalist, it would have been reasonably foreseeable that such an action would lead to serious harm to the Petitioner's reputation

44. By publishing the Forged Police Report and Other False Information, the creators and knowing disseminators are liable for libel and/or slander, as it has caused the Petitioner serious harm to his reputation, as is required to bring a defamation action, under section 1(1) of the Defamation Act 2013. Further, the Petitioner has also been told by Fast Company that they understand the UK Source to be a lawyer based in England and Wales. A well-established principle of English common law is that the courts of England and Wales must accept jurisdiction if the

defendant in the action is resident in England and Wales. *Alexander Tugushev v Vitaly Orlov, Magnus Roth, Andrey Petrik* [2019] EWHC 645 (Comm).

45. Following the above the Petitioner has a good arguable case that the UK Source is usually resident in England and that, as a consequence, the English courts must accept jurisdiction.

### **THE DISCOVERY SOUGHT BY THE 1782 APPLICATION**

46. I am the Partner with day to day management of the Contemplated Civil Proceedings. I consider that the discovery sought from the Respondent here will be relevant to the Contemplated Civil Proceedings, including for the reasons summarized below.

47. The information provided by the Respondent, pursuant to the 1782 Application, will be used to identify the UK Source who received the Forged Police Report from one of the Persons Unknown (i.e. the author(s) and/or malicious disseminators of the Forged Police Report, such as the UK Source) in order to adequately conduct the civil proceedings through resolution. Petitioner will use the identity of the authors and malicious disseminators of the Forged Police Report to:

48. For a negligent misstatement action:

   a. adequately plead that a duty of care has been breached; and

   b. enforce any relief obtained by the court.

49. For a libel and/or slander action:

   a. Adequately identify who published the defamatory Forged Police Report;

   b. Enforce any relief obtained by the court.

50. Petitioner has no other way to obtain this information other than through the 1782 assistance of the US court. Petitioner will be able to use and introduce any information obtained pursuant to the 1782 Application at any stage of the English civil proceedings, though it would be preferable to obtain the information prior to filing the Contemplated Civil Proceedings in order to

issue proceedings against the actual author(s) or knowing disseminators of the Forged Police Report and Other False Information rather than "Persons Unknown" (and then have to amend pleadings to substitute Persons Unknown with the name(s) of the report's author(s) and/or malicious disseminators).

### ENGLISH COURTS ACCEPT EVIDENCE OBTAINED THROUGH SECTION 1782

51.     I am not aware of any reason that the Courts of England and Wales will not be receptive to the judicial assistance requested in the 1782 Application.

52.     In fact, English Courts have declared their willingness to accept evidence obtained through Section 1782 applications, In *South Carolina Co v Assurantie N V.*, a true and correct copy of which is attached as **Exhibit 12**, the House of Lords rejected a finding by the Court of Appeal that use of information obtained from a 1782 application was inherently objectionable and abusive because it interfered with the court's control of its own procedure.  The House of Lords held that it did not consider that a party to English proceedings, "by seeking to exercise a right potentially available to them under the Federal law of the United States [*i.e.*, seeking discovery through a 1782 application], have in any way departed from, or interfered with, the procedure of the English court."[11]  "All they have done is what any party preparing his case in the High Court here is entitled to do, namely to try to obtain in a foreign country, by means lawful in that country, documentary evidence which they believe they need in order to prepared and present their case."[12]

53.     A similar decision was reached in *Nokia Corporation v. Interdigital Technology Corp.* a true and correct copy of which is attached at **Exhibit 13**,  There the Court denied a request to restrain a party from making a 1782 application in the United States and stated that "it cannot

---

[11]   *South Carolina Co v Assurantie N V*. [1987] 1 A.C. 24 (HL) at 42.

[12]   *Id.*

be said a priori or that the material which would be obtained on discovery in this case, as sought in the section 1782 proceedings, would not be capable of being deployed in these proceedings."[13] The Court further stated that "the English court should not seek to circumscribe the discretion possessed by the [US] district court by imposing its own view as to the appropriateness of the classes of documents sought by reference to the issues in proceedings as they stand.  It is legitimate for the requesting party to use the request to ascertain facts and obtain documents of which the requesting party is unaware, but which may be in the future deployed in the English proceedings, if necessary after appropriate amendment."[14]

54. In short, the 1782 Application does not seek to circumvent foreign proof-gathering restrictions or other policies of the Courts of England and Wales, and I believe that there is no basis under English law to assert otherwise.

**LIMITATION PERIODS**

55. The limitation period for a negligent misstatement claim (and for misuse of private information and civil conspiracy) is six years. It is, however, one year for libel and slander claims, but I believe the Petitioner would have a good prospect of succeeding in postponing the limitation period because of the fraud of the Persons Unknown and/or deliberate concealment under s.32(1) of the Limitation Act 1980. Alternatively, the Petitioner has a similarly good prospect in getting the court to exercise its discretion to disapply the limitation period under s.32A of the Limitation Act 1980.

---

[13] *Nokia Corporation v. Interdigital Technology Corp.* [2004] EWHC 2920 at 8.
[14] *Id.*

56. I declare under the penalty of perjury pursuant to 28 U.S.C. § 1746 under the laws of the United States that the foregoing is true and correct.

Executed on this 6th day of August, 2021 in London, England.

_____
Jenny Campbell Afia