# Exhibit 10

605

2 A.C.                  Lord Advocate v. Dumbarton D.C. (H.L.(Sc.))          Lord Jauncey
                                                                            of Tullichettle

A  Crown in any given circumstances could depend not upon the terms of
   the statute but upon matters extraneous thereto, namely the relevant
   common law rights of the Crown at the time. Such a result would, in my
   view, be wholly illogical.

   LORD LOWRY.  My Lords, I have had the advantage of reading in
   draft the speech of my noble and learned friend, Lord Keith of Kinkel. I
B  agree with it and for the reasons which he gives I, too, would allow both
   appeals and restore the interlocutors of the Lord Ordinary, under
   deletion of the orders for interdict.

                                              *Appeals allowed with costs.*

      *Solicitors: Treasury Solicitor for Solicitor for Secretary of State for*
C  *Scotland; Dunlavey-Rosin for Allan McDougall & Co., S.S.C., Edinburgh,*
   *and for Simpson & Marwick, W.S., Edinburgh.*

                                                          C. T. B.


D                              ————————


E                          [HOUSE OF LORDS]

   CAPARO INDUSTRIES PLC.      .      .      .      .  RESPONDENTS

                                  AND

   DICKMAN AND OTHERS .     .      .      .      .      .  APPELLANTS


F  1989  Nov. 16, 20, 22, 23, 27, 28;        Lord Bridge of Harwich, Lord Roskill,
   1990  Feb. 8                         Lord Ackner, Lord Oliver of Aylmerton and
                                                 Lord Jauncey of Tullichettle

   *Negligence—Duty of care to whom?—Auditor—Appointment by
      company to audit and certify company's accounts—Statutory duty
      to make report to shareholders—Another company making take-*
G  *over bid by initial purchase of shares—Claim that subsequent
      completion of take-over by purchase of total issued shares made
      in reliance on negligently made audit—Whether auditor owing
      duty of care to shareholders—Whether duty owed to non-
      shareholding investor—Companies Act 1985 (c. 6), ss. 236(1)(2),
      237(1)*

         The plaintiffs, a public limited company, which had
H     accomplished the take-over of F. Plc., brought an action against
      its directors alleging fraudulent misrepresentation and against its
      auditors claiming that they were negligent in carrying out the
      audit and making their report, which they were required to do
      within the terms of sections 236 and 237 of the Companies Act

1985. In the statement of claim the plaintiffs alleged that they    A
had begun purchasing shares in F. Plc. a few days before the
annual accounts had been published to shareholders, that in
reliance on those accounts they made further purchases of
shares so as to take over the company, and that the auditors
owed both shareholders and potential investors a duty of care in
respect of the certification of the accounts and should have
known that as F. Plc.'s profits were not as high as projected and
its share price had fallen significantly, that it was susceptible to    B
a take-over bid and that reliance on the accuracy of the accounts
would be placed by any potential bidder such as the plaintiffs.
On the trial of a preliminary issue against the auditors, on the
facts as alleged, the judge determined that the auditors did not
owe the plaintiffs a duty of care at common law either as a
shareholder of F. Plc. or as an investor holding no shares. On
appeal by the plaintiffs the Court of Appeal, by a majority,    C
held that a duty of care was owed to the plaintiffs as shareholders
but not as investors.

On appeal by the auditors and cross-appeal by the plaintiffs:—

*Held*, allowing the appeal and dismissing the cross-appeal,
that liability for economic loss due to negligent mis-statement
was confined to cases where the statement or advice had been
given to a known recipient for a specific purpose of which the
maker was aware and upon which the recipient had relied and    D
acted to his detriment; that since the purpose of the statutory
requirement for an audit of public companies under the Act of
1985 was the making of a report to enable shareholders to
exercise their class rights in general meeting and did not extend
to the provision of information to assist shareholders in the
making of decisions as to future investment in the company,
and since, additionally, there was no reason in policy or
principle why auditors should be deemed to have a special    E
relationship with non-shareholders contemplating investment in
the company in reliance on the published accounts, even when
the affairs of the company were known to be such as to render
it susceptible to an attempted take-over, the auditors had not
owed any duty of care to the plaintiffs in respect of their
purchase of F. Plc.'s shares (post, pp. 621D–G, 623D, 626C–E,
F—627D, E–G, 628H—629A, E, 631E–G, 638C–E, 649H—650C,    F
654B–F, 658F–G, 661H—662F).

*Hedley Byrne & Co., Ltd. v. Heller & Partners Ltd.* [1964]
A.C. 465, H.L.(E.) and *Smith v. Eric S. Bush* [1990] 1 A.C.
831, H.L.(E.) applied.

Dicta of Denning L.J. in *Candler v. Crane, Christmas & Co.*
[1951] 2 K.B. 164, 179–182 and *Al Saudi Banque v. Clarke
Pixley* [1990] Ch. 313 approved.

*Scott Group Ltd. v. McFarlane* [1978] N.Z.L.R. 553    G
considered.

*JEB Fasteners Ltd. v. Marks, Bloom & Co.* [1981] 3 All
E.R. 289 and *Twomax Ltd. v. Dickson, McFarlane & Robinson*,
1982 S.C. 113 distinguished.

*Per* Lord Bridge of Harwich, Lord Roskill, Lord Ackner
and Lord Oliver of Aylmerton. Whilst recognising the
importance of the underlying general principles common to    H
the whole field of negligence, the law has now moved in the
direction of attaching greater significance to the more traditional
categorisation of distinct and recognisable situations as guides to
the existence, the scope and the limits of the varied duties of

2 A.C.                        Caparo Plc. v. Dickman (H.L.(E.))

A    care which the law imposes (post, pp. 618c–D, 628D–F, 629E,
     633E–G, 635B–C).
        Dicta of Brennan J. in *Sutherland Shire Council v. Heyman*
     (1985) 60 A.L.R. 1, 43–44 considered.
        Decision of the Court of Appeal [1989] Q.B. 653; [1989] 2
     W.L.R. 316; [1989] 1 All E.R. 798 reversed in part.

B    The following cases are referred to in their Lordships' opinions:

     *Al Saudi Banque v. Clarke Pixley* [1990] Ch. 313; [1990] 2 W.L.R. 344;
        [1989] 3 All E.R. 361
     *Anns v. Merton London Borough Council* [1978] A.C. 728; [1977] 2 W.L.R.
        1024; [1977] 2 All E.R. 492, H.L.(E.)
     *Candler v. Crane, Christmas & Co.* [1951] 2 K.B. 164; [1951] 1 All E.R.
        426, C.A.
C    *Candlewood Navigation Corporation Ltd. v. Mitsui O.S.K. Lines Ltd.* [1986]
        A.C. 1; [1985] 3 W.L.R. 381; [1985] 2 All E.R. 935, P.C.
     *Cann v. Willson* (1888) 39 Ch.D. 39
     *Cattle v. Stockton Waterworks Co.* (1875) L.R. 10 Q.B. 453
     *Clayton v. Woodman & Son (Builders) Ltd.* [1962] 2 Q.B. 533; [1961] 3
        W.L.R. 987; [1961] 3 All E.R. 249; [1962] 1 W.L.R. 585; [1962] 2 All
        E.R. 33, Salmon J. and C.A.
D    *Donoghue v. Stevenson* [1932] A.C. 562, H.L.(Sc.)
     *Dorset Yacht Co. Ltd. v. Home Office* [1970] A.C. 1004; [1970] 2 W.L.R.
        1140; [1970] 2 All E.R. 294, H.L.(E.)
     *Elliott Steam Tug Co. Ltd. v. Shipping Controller* [1922] 1 K.B. 127, C.A.
     *Glanzer v. Shepard* (1922) 135 N.E. 275
     *Grant v. Australian Knitting Mills Ltd.* [1936] A.C. 85, P.C.
     *Hedley Byrne & Co. Ltd. v. Heller & Partners Ltd.* [1964] A.C. 465; [1963]
        3 W.L.R. 101; [1963] 2 All E.R. 575, H.L.(E.)
E    *Hill v. Chief Constable of West Yorkshire* [1989] A.C. 53; [1988] 2 W.L.R.
        1049; [1988] 2 All E.R. 238, H.L.(E.)
     *JEB Fasteners Ltd. v. Marks, Bloom & Co.* [1981] 3 All E.R. 289
     *Junior Books Ltd. v. Veitchi Co. Ltd.* [1983] 1 A.C. 520; [1982] 3 W.L.R.
        477; [1982] 3 All E.R. 201, H.L.(Sc.)
     *Leigh and Sillavan Ltd. v. Aliakmon Shipping Co. Ltd.* [1986] A.C. 785;
        [1986] 2 W.L.R. 902; [1986] 2 All E.R. 145, H.L.(E.)
F    *Le Lievre v. Gould* [1893] 1 Q.B. 491, C.A.
     *McLoughlin v. O'Brian* [1983] 1 A.C. 410; [1982] 2 W.L.R. 982; [1982] 2
        All E.R. 298, H.L.(E.)
     *Ministry of Housing and Local Government v. Sharp* [1970] 2 Q.B. 223;
        [1970] 2 W.L.R. 802; [1970] 1 All E.R. 1009, C.A.
     *Mutual Life and Citizens' Assurance Co. Ltd. v. Evatt* [1971] A.C. 793;
        [1971] 2 W.L.R. 23; [1971] 1 All E.R. 150, P.C.
G    *Peabody Donation Fund (Governors of) v. Sir Lindsay Parkinson & Co.
        Ltd.* [1985] A.C. 210; [1984] 3 W.L.R. 953; [1984] 3 All E.R. 529,
        H.L.(E.)
     *Perl (P.) (Exporters) Ltd. v. Camden London Borough Council* [1984] Q.B.
        342; [1983] 3 W.L.R. 769; [1983] 3 All E.R. 161, C.A.
     *Rondel v. Worsley* [1969] 1 A.C. 191; [1967] 3 W.L.R. 1666; [1967] 3 All
        E.R. 993, H.L.(E.)
H    *Ross v. Caunters* [1980] Ch. 297; [1979] 3 W.L.R. 605; [1979] 3 All E.R.
        580
     *Rowling v. Takaro Properties Ltd.* [1988] A.C. 473; [1988] 2 W.L.R. 418;
        [1988] 1 All E.R. 163, P.C.
     *Scott Group Ltd. v. McFarlane* [1978] 1 N.Z.L.R. 553

Caparo Plc. v. Dickman (H.L.(E.))                                     [1990]

*Smith v. Eric S. Bush* [1990] 1 A.C. 831; [1989] 2 W.L.R. 790; [1989] 2 All     A
  E.R. 514, H.L.(E.)
*Smith v. Littlewoods Organisation Ltd.* [1987] A.C. 241; [1987] 2 W.L.R.
  480; [1987] 1 All E.R. 710, H.L.(Sc.)
*Sutherland Shire Council v. Heyman* (1985) 60 A.L.R. 1
*Twomax Ltd. v. Dickson, McFarlane & Robinson,* 1982 S.C. 113
*Ultramares Corporation v. Touche* (1931) 174 N.E. 441; 255 N.Y. 170
*Wagon Mound, The* [1961] A.C. 388; [1961] 2 W.L.R. 126; [1961] 1 All     B
  E.R. 404, P.C.
*Yuen Kun Yeu v. Attorney-General of Hong Kong* [1988] A.C. 175; [1987] 3
  W.L.R. 776; [1987] 2 All E.R. 705, P.C.


The following additional cases were cited in argument:

*Allen, Craig and Co. (London) Ltd., In re* [1934] Ch. 483                      C
*Aswan Engineering Establishment Co. (M/S) v. Lupdine Ltd.* [1987] 1
  W.L.R. 1; [1987] 1 All E.R. 135, C.A.
*Blue Bell Inc. v. Peat Marwick, Mitchell & Co.* (1986) 715 S.W.2d 408
*Clarke v. Bruce Lance & Co.* [1988] 1 W.L.R. 881; [1988] 1 All E.R. 364,
  C.A.
*Clay v. A. J. Crump & Sons Ltd.* [1964] 1 Q.B. 533; [1963] 3 W.L.R. 866;
  [1963] 3 All E.R. 687, C.A.
*Credit Alliance Corporation v. Arthur Andersen & Co.* (1985) 483 N.E.2d     D
  110
*Customs and Excise Commissioners v. Hedon Alpha Ltd.* [1981] Q.B. 818;
  [1981] 2 W.L.R. 791; [1981] 2 All E.R. 697, C.A.
*Dutton v. Bognor Regis Urban District Council* [1972] 1 Q.B. 373; [1972] 2
  W.L.R. 299; [1972] 1 All E.R. 462, C.A.
*Farr v. Butters Brothers and Co.* [1932] 2 K.B. 606, C.A.
*Haig v. Bamford* (1976) 72 D.L.R. (3d) 68                                      E
*Hickman v. Kent or Romney Marsh Sheepbreeders' Association* [1915] 1 Ch.
  881
*McInerny v. Lloyds Bank Ltd.* [1974] 1 Lloyd's Rep. 246, C.A.
*Otto v. Bolton and Norris* [1936] 2 K.B. 46
*Pacific Associates Inc. v. Baxter* [1990] 1 Q.B. 993; [1989] 3 W.L.R. 1150;
  [1989] 2 All E.R. 159, C.A.
*Prudential Assurance Co. Ltd. v. Newman Industries Ltd. (No. 2)* [1982]     F
  Ch. 204; [1982] 2 W.L.R. 31; [1982] 1 All E.R. 354, C.A.
*Rosenblum (H.) Inc. v. Adler* (1983) 461 A.2d 138
*S.C.M. (United Kingdom) Ltd. v. W. J. Whittal and Son Ltd.* [1971] 1 Q.B.
  337; [1970] 3 W.L.R. 694; [1970] 3 All E.R. 245, C.A.
*Spartan Steel & Alloys Ltd. v. Martin & Co. (Contractors) Ltd.* [1973] Q.B.
  27; [1972] 3 W.L.R. 502; [1972] 3 All E.R. 557, C.A.
*Toro Co. v. Krouse, Kern & Co. Inc.* (1987) 827 F.2d 155                       G


APPEAL from the Court of Appeal.

This was an appeal by the third defendants, Touche Ross & Co., a
firm of accountants, and a cross-appeal by the plaintiffs, Caparo
Industries Plc., in respect of the trial of a preliminary issue in an action
by the plaintiffs against the first and second defendants, Steven Graham
Dickman and Robert Anthony Dickman, two directors of Fidelity Plc.,     H
alleging fraudulent misrepresentation, and against the third defendants
alleging negligence in the carrying out of an audit of the accounts of
Fidelity for the year ended 31 March 1984, whereby (1) the third

A   defendants appealed against that part of the order of the Court of
    Appeal (Bingham and Taylor L.JJ., O'Connor L.J. dissenting) [1989]
    Q.B. 653 allowing the plaintiffs' appeal against the decision of Sir Neil
    Lawson, sitting as a judge of the Queen's Bench Division [1988]
    B.C.L.C. 387, that the third defendants did not owe a duty of care to
    the plaintiffs as shareholders of Fidelity; and (2) the plaintiffs cross-
    appealed against that part of the order of the Court of Appeal dismissing
B   their appeal against the decision of Sir Neil Lawson that the third
    defendants did not owe them a duty of care as non-shareholding buyers.

    The facts are set out in the opinion of Lord Bridge of Harwich.

        *Peter Goldsmith Q.C.* and *Stephen Moriarty* for the auditors. Three
    elements are needed for a duty of care to exist: there must be reasonable
C   foreseeability, a close and direct relationship of "proximity" between the
    parties and it must be fair, just and reasonable to impose liability. No
    duty of care was owed to Caparo as a potential acquirer of shares
    because of lack of proximity and because it would not be fair, just and
    reasonable. If so, Caparo's ability to recover is not improved by the
    fortuity of ownership of shares because: (i) its loss is qua potential
D   investor; (ii) Caparo was not a relevant shareholder at the relevant time;
    and (iii) in any event, auditors owe no duty of care to an individual
    shareholder because of lack of proximity and because it would not be
    fair, just and reasonable.

        Foreseeability can be assumed in the present case, and so is not in
    issue. However, suggestions based on the well-known passage from the
    speech of Lord Wilberforce in *Anns v. Merton London Borough Council*
E   [1978] A.C. 728, 751, that, subject only to a public policy test,
    foreseeability of damage is enough to give rise to a duty of care, can no
    longer be supported. [Reference was made to *Yuen Kun Yeu v.
    Attorney-General of Hong Kong* [1988] A.C. 175; *Hill v. Chief Constable
    of West Yorkshire* [1989] A.C. 53; *Governors of Peabody Donation Fund
    v. Sir Lindsay Parkinson & Co. Ltd.* [1985] A.C. 210 and *Rowling v.
    Takaro Properties Ltd.* [1988] A.C. 473.]
F
        As to proximity, it may be difficult to define exhaustively, but it
    clearly involves more than the mere facts that a defendant has acted in
    performance of a contract between himself and a person other than the
    plaintiff in circumstances where reliance by, and harm to, the plaintiff
    was reasonably foreseeable. The requirement cannot be satisfied by the
    assumed facts of this case. In the context of a claim for economic loss
G   flowing from a negligent statement proximity has been strictly required
    both in economic claims generally and negligent statement claims
    specifically so as, importantly, to avoid liability being imposed upon a
    person which is out of all proportion to culpability, the fee earned or the
    ability to insure against the consequence of any negligence. To do
    otherwise would be to expose defendants to "liability in an indeterminate
    amount, for an indeterminate time, to an indeterminate class": *Ultramares
H   Corporation v. Touche* (1931) 174 N.E. 441, 444, *per* Cardozo C.J.
    *Candlewood Navigation Corporation Ltd. v. Mitsui O.S.K. Lines Ltd.*
    [1986] A.C. 1; *Leigh and Sillavan Ltd. v. Aliakmon Shipping Co. Ltd.*
    [1986] A.C. 785; *S.C.M. (United Kingdom) Ltd. v. W. J. Whittal and*

*Son Ltd.* [1971] 1 Q.B. 337 and *Spartan Steel & Alloys Ltd. v. Martin & Co. (Contractors) Ltd.* [1973] Q.B. 27 all show that the courts have sought to limit economic loss on policy grounds.                                        A

In the case of a negligent statement it is even more important to be circumspect about imposing liability: see *Hedley Byrne & Co. Ltd. v. Heller & Partners Ltd.* [1964] A.C. 465, 534 *per* Lord Pearce. In negligent statement cases proximity will not be established unless at least the following conditions are satisfied. Usually, the plaintiff must be (i)   B the person directly intended by the maker of the statement to act upon the statement (ii) in a specific transaction of which the maker knows and (iii) for the purpose for which the statement is made. Exceptionally, conditions (i) and (iii) may be relaxed provided the plaintiff is a person of whose actual existence (if not name) the maker knows, to whom he knows the statement will be communicated, and who it is likely with a   C high degree of certainty will act upon the statement in a specific transaction of which the maker knows. Probably, in such a case, there should be satisfied a further requirement that there be some factor more closely linking the maker of the statement to the plaintiff: for example, the payment, to the knowledge of the valuers, by the intending purchasers in *Smith v. Eric S. Bush* [1990] 1 A.C. 831 of their valuation fee. [Reference was made to the judgment of Denning L.J. in *Candler*   D *v. Crane, Christmas & Co.* [1951] 2 K.B. 164; *Al Saudi Banque v. Clarke Pixley* [1990] Ch. 313; *Clarke v. Bruce Lance & Co.* [1988] 1 W.L.R. 881; *Ross v. Caunters* [1980] Ch. 297; *Ultramares Corporation v. Touche,* 174 N.E. 441; *Credit Alliance Corporation v. Arthur Andersen & Co.* (1985) 483 N.E.2d 110; *Toro Co,. v. Krouse, Kern & Co. Inc.* (1987) 827 F. 2d 155; *H. Rosenblum Inc. v. Adler* (1983) 461 A. 2d.   E 138; *Haig v. Bamford* (1976) 72 D.L.R. (3d) 68; *Scott Group Ltd. v. McFarlane* [1978] 1 N.Z.L.R. 553.] The statement of principle in *JEB Fasteners Ltd. v. Marks, Bloom & Co.* [1981] 3 All E.R. 289 goes too far and is unjustified; nor is the reasoning in *Twomax Ltd. v. Dickson, McFarlane & Robinson,* 1982 S.C. 113 supportable.

The relevant statutory provisions are to be found in the Companies Act 1985. The primary responsibility for a company's accounts lies on   F the company and its directors. The primary purpose of the accounts is to report on the stewardship of the directors to the shareholders as a body, rather than to provide information for the investing public.

In the light of the requirement of "proximity," the relationship between an auditor and a third party investor like Caparo who buys shares in reliance upon an audit report is not such as to give rise to a   G duty of care. There was no special relationship between Caparo and the auditors: the ability to inspect the accounts and the chance to buy shares are enjoyed by the world at large. Nor were the accounts audited by the auditors with a specific transaction in mind. To impose liability in such circumstances would open up the very prospect of "indeterminate liability" which it is the purpose of the proximity requirement to avoid.

Even were the proximity requirement to be satisfied on the assumed   H facts of this case, it could not be "fair, just or reasonable" to impose a duty of care owed to Caparo, qua investor. [Reference was made to the vulnerability of the professional man, the problems of obtaining cover in

A the professional indemnity market, and the danger of overkill in imposing a duty which might lead to "defensive auditing."]

On the issue of the duty of care in relation to shareholders, if a duty of care be owed to Caparo as a shareholder at all, the scope of that duty is limited to loss suffered by it in that capacity and does not extend to losses incurred qua potential investor. There is nothing unusual in a person being owed an obligation in one capacity, in respect of which he

B is unable to sue in another capacity: *Hickman v. Kent or Romney Marsh Sheepbreeders' Association* [1915] 1 Ch. 881. In any event, the shareholders to whom any duty of care is owed by an auditor should be limited to those who are registered shareholders at the date the audit work in question is done, alternatively, at the date of the auditors' report; at the latest it should be those registered when the published

C accounts are distributed to shareholders. At none of those dates was Caparo a registered shareholder. [Reference was made to *In re Allen, Craig & Co. (London) Ltd.* [1934] Ch. 483; and to *Prudential Assurance Co. Ltd. v. Newman Industries Ltd. (No. 2)* [1982] Ch. 204.] An auditor does not owe a duty of care to the individual shareholder at all, in any event. In auditing the accounts and making his report to the shareholders, the auditor's purpose is not to give guidance to individual shareholders

D about their private investment decisions, nor does he have any specific transactions in mind when doing so.

*Christopher Bathurst Q.C., Michael Brindle* and *Craig Orr* for the plaintiffs, Caparo Industries Plc. The correct approach is to start with an examination of the statutory framework within which auditors operate. The Companies Act 1985 (and its predecessors) make it clear that an

E auditor reports to every shareholder. A duty to report must be a duty to report carefully. That duty extends to each shareholder; a duty of care to the company alone would conflict with the policy of the Act and would leave many types of loss wholly without remedy. If the duty is owed to the individual shareholder, then it cannot be purely for the purposes of "stewardship." It cannot be limited to loss by selling for too little and not extend to loss from buying for too much. Such a distinction

F would be illogical, since all shareholders are investors and since buying selling and retaining are all the same type of loss. It would also be undesirable in its consequences. There is a natural tendency for directors to seek to present the company in a positive way. The danger, particularly if the company is vulnerable, is that the asset value or profitability will be overstated, unless the auditors exercise due care: see

G *Candler v. Crane, Christmas & Co.* [1951] 2 K.B. 164, 184 as to the law failing to serve the best interests of the community. Such a distinction would also be contrary to the proper approach for determining what damages are recoverable. The essential question in considering the duty of care is whether the duty is owed *to the plaintiff*; that is then subject to the type of loss being within the scope of the duty and the type of loss being non-remote. In the instant case, buying, selling and retaining

H shares all fall within the scope of the duty arising from the statutory function of auditors; and the loss claimed is of a type which is a non-remote consequence of a breach of duty. Certain general probabilities may be assumed.

1. In many instances, accounts which do not give a true and fair   A
view of the state of the company's affairs at the end of the financial year
and/or of the company profit or loss for that year will not, and will be
inherently unlikely to, cause any damage to the company itself. 2. Equity
shareholders in a company are likely to make decisions to buy, retain or
sell shares in the company in reliance on the accounts. 3. It is likely that
if accounts materially understate the true and fair view, shareholders
selling shares will do so at less than their true value. If they materially   B
overstate the true and fair view, shareholders buying shares will do so at
more than their true value. 4. An equity shareholder with no peculiar
features is inherently much more likely to make an investment decision
based on the accounts than to so make a decision to lend to, or trade
with, the company. 5. A competent auditor will realise these facts.
Reliance is placed on *Mutual Life and Citizens' Assurance Co. Ltd. v.*   C
*Evatt* [1971] A.C. 793, 801.

As to the "timing" point raised by the auditors, the annual general
meeting has always been the principal date when the auditor reports to
the members. The fact that the date when the report is sent to the
shareholder may *also* be relevant does not detract from that. In any
event, there is no need to limit the duty to registered shareholders; a
shareholding may be beneficial.   D

There is no single test or formula for determining what constitutes
"proximity." Certain types of cases are different in principle. There are
cases like *Hedley Byrne* [1964] A.C. 465 where there is no nexus
between the plaintiff and defendant save a voluntary assumption of
responsibility. There are cases involving public functions, where discretion
is involved and a possible conflict between different interests (e.g. *Yuen*   E
*Kun Yeu* [1988] A.C. 175 or *Rowling v. Takaro Properties Ltd.* [1988]
A.C. 473). There are cases which attempt to "short-circuit" the
contractual chain; and cases where there is an established rule of law
(e.g. *Leigh and Sillavan* [1986] A.C. 785). The present case is different.
The auditors are performing a statutory function designed to be for the
benefit of certain classes of person. In such cases the concept of
voluntary assumption of responsibility, on which the auditors founded   F
their case in the Court of Appeal, is unhelpful. In any event, it is
satisfied here, if it needs to be. The test is whether performance of the
duty is required by policy in order that, inter alia, reliance can be placed
on the work done. Crucial factors are that there is positive reliance
which is central to the decision to buy; and that such reliance is direct
and without opportunity of intermediate examination. (Another factor is   G
that the duty creates no conflict).

Ever since *Donoghue v. Stevenson* [1932] A.C. 562 it has been
established that a duty is owed where there is no reasonable likelihood
of, or opportunity for, intervening examination either by the plaintiff or
a third party. The rationale behind this is that where there cannot
realistically be any intervening examination between the defendant's
work and the plaintiff's use of that work, then the plaintiff and the   H
defendant are proximate: *Farr v. Butters Brothers and Co.* [1932] 2 K.B.
606, 614–615, and *Otto v. Bolton and Norris* [1936] 2 K.B. 46, 57. For
this purpose it makes no difference whether the work in question is

A   manufacture of an article, repair of a building, or the examination of a
    building or a company's records so as to produce a report on that
    building or that company. [Reference was made to *Dutton v. Bognor
    Regis Urban District Council* [1972] 1 Q.B. 373; *Smith v. Eric S. Bush*
    [1990] 1 A.C. 831, 872B–C, *per* Lord Jauncey of Tullichettle; *Pacific
    Associates Inc. v. Baxter* [1990] 1 Q.B. 993, 1031B–H *per* Ralph Gibson
    L.J.; *McInerny v. Lloyds Bank Ltd.* [1974] 1 Lloyd's Rep. 246, 254 *per*
B   Denning M.R.] Just because a very high degree of foreseeability is a
    strong pointer towards proximity does not mean that our case equates
    proximity with foreseeability. Although there has to be a sufficiently
    definable class of person who is likely to be injured (as opposed to the
    world at large), in this limited class the *identity* of the plaintiff cannot
    matter: what is required is a *definable* type and class. It would be wrong
C   to equate "limited" with "small": provided the class is definable (limited)
    at the time when the damage may be suffered, it does not matter that
    the class was potentially much larger at the time that the negligent act
    was committed.

       Apart from shareholders, a duty is owed to unwelcome bidders.
    They form a special class since it is known that they will rely on the
    accounts and nothing else. They will not be shown other documents, as
D   a "white knight" would be. Thus where (as here) a company is
    particularly vulnerable, the auditor foresees a plain risk of a bid and the
    virtual certainty of reliance. The degree of vulnerability is a question of
    fact, but the situation of Fidelity on the assumed facts was very grave.
    There are many cases which fall between (a) the facts in *Candler* [1951]
    2 K.B. 164 and (b) the categories where Denning L.J. in that case
E   considered that there was no duty. While it is accepted that an
    unwelcome bidder is not within (a), neither is he within (b). [Reference
    was made to *JEB Fasteners Ltd. v. Marks, Bloom & Co.* [1981] 3 All
    E.R. 289; *Twomax Ltd. v. Dickson, McFarlane & Robinson*, 1982 S.C.
    113; *Scott Group Ltd. v. McFarlane* [1978] 1 N.Z.L.R. 553; *Ultramares
    Corporation v. Touche*, 174 N.E. 441; *H. Rosenblum Inc. v. Adler*, 461
    A.2d 138 and *Blue Bell Inc. v. Peat Marwick, Mitchell & Co.* (1986) 715
F   S.W.2d 408.] The United States authorities present no coherent picture,
    and authority can be found for any proposition. Nonetheless the recent
    general tendency (save in New York) is to a test wider than that
    contended for by the auditors.

       If the other requirements of a duty exist, public policy should only
    defeat that duty in rare cases where cogent reasons are plainly
G   established. The ill-consequences for which the auditors contend are not
    the consequences of a duty to a bidder, but of unlimited liability, which
    can only be remedied by legislation. If a duty is recognised, then in
    respect of any set of accounts the number of plaintiffs in a potential
    claim will be very limited. The amount of the claim will be the amount
    by which the shares drop in value when the true position is revealed.
    Liability cannot extend beyond the "currency" of those accounts. There
H   are cogent policy reasons in favour of a duty. It is in the interests both
    of the company and others that audited accounts should be and should
    be seen to be reliable. Without a duty such as that for which we contend
    over-optimistic accounts will normally not give rise to any liability.

Further, it is in the interests of shareholders that bids should be made;   A
and thus that a bidder has accounts on which he can rely and for which
he has a remedy.

*Goldsmith Q.C.* in reply referred to *Clay v. A. J. Crump & Sons
Ltd.* [1964] 1 Q.B. 533 and *Aswan Engineering Establishment Co. (M/S)
v. Lupdine Ltd.* [1987] 1 W.L.R. 1.

*Bathurst Q.C.* in rejoinder.

The first and second defendants did not appear and were not   B
represented.

Their Lordships took time for consideration.

8 February 1990. LORD BRIDGE OF HARWICH. My Lords, the
appellants are a well known firm of chartered accountants. At all times   C
material to this appeal, they were the auditors of a public limited
company, Fidelity Plc. ("Fidelity"), which carried on business as
manufacturers and vendors of electrical equipment of various kinds and
whose shares were quoted on the London Stock Exchange. On 22 May
1984 the directors of Fidelity announced the results for the year ended
31 March 1984. These revealed that profits for the year fell well short   D
of the figure which had been predicted, and this resulted in a dramatic
drop in the quoted price of the shares which had stood at 143p per share
on 1 March 1984 and which, by the beginning of June 1984, had fallen
to 63p. Fidelity's accounts for the year to 31 March 1984 had been
audited by the appellants and had been approved by the directors on the
day before the results were announced. On 12 June 1984 they were
issued to the shareholders, with notice of the annual general meeting,   E
which took place on 4 July 1984 and at which the auditor's report was
read and the accounts were adopted.

Following the announcement of the result, the respondents Caparo
Industries Plc. ("Caparo") began to purchase shares of Fidelity in the
market. On 8 June 1984 they purchased 100,000 shares but they were
not registered as members of Fidelity until after 12 June 1984 when the
accounts were sent to shareholders although they had been registered in   F
respect of at least some of the shares which they purchased by the date
of the annual general meeting, which they did not attend. On 12 June
1984, they purchased a further 50,000 shares, and by 6 July 1984 they
had increased their holding in Fidelity to 29.9 per cent. of the issued
capital. On 4 September 1984 they made a bid for the remainder at
120p per share, that offer being increased to 125p per share on 24   G
September 1984. The offer was declared unconditional on 23 October
1984, and two days later Caparo announced that it had acquired 91.8
per cent. of the issued shares and proposed to acquire the balance
compulsorily, which it subsequently did.

The action in which this appeal arises is one in which Caparo alleges
that the purchases of shares which took place after 12 June 1984 and the
subsequent bid were all made in reliance upon the accounts and that   H
those accounts were inaccurate and misleading in a number of respects
and in particular in overvaluing stock and underproviding for after-sales
credits, with the result that an apparent pre-tax profit of some £1.3m.

2 A.C.                        Caparo Plc. v. Dickman (H.L.(E.))                        Lord Bridge
                                                                                      of Harwich

A   should in fact have been shown as a loss of over £400,000. Had the true
    facts been known, it is alleged, Caparo would not have made a bid at
    the price paid or indeed at all. Caparo accordingly commenced
    proceedings on 24 July 1985 against two of the persons who were
    directors at the material time, claiming that the overvaluations were
    made fraudulently, and against the appellants, claiming that they
    were negligent in certifying, as they did, that the accounts showed a true
B   and fair view of Fidelity's position at the date to which they related.
    The substance of the allegation against the appellants is contained in
    paragraph 16 of the statement of claim which is in the following terms:

        "Touche Ross, as auditors of Fidelity carrying out their functions
    as auditors and certifiers of the accounts in April and May 1984,
    owed a duty of care to investors and potential investors, and in
C   particular to Caparo, in respect of the audit and certification of the
    accounts. In support of that duty of care Caparo will rely upon the
    following matters: (1) Touche Ross knew or ought to have known
    (a) that in early March 1984 a press release had been issued stating
    that profits for the financial year would fall significantly short of
    £2.2m., (b) that Fidelity's share price fell from 143p per share on 1
D   March 1984 to 75p per share on 2 April 1984, (c) that Fidelity
    required financial assistance. (2) Touche Ross therefore ought to
    have foreseen that Fidelity was vulnerable to a take-over bid and
    that persons such as Caparo might well rely on the accounts for the
    purpose of deciding whether to take over Fidelity and might well
    suffer loss if the accounts were inaccurate."

E       On 6 July 1987, Sir Neil Lawson, sitting as judge in chambers, made
    an order for the trial of a preliminary issue, as follows:

        "Whether on the facts set out in paragraphs 4 and 6 and in sub-
    paragraphs (1) and (2) of paragraph 16 of the statement of claim
    herein, the third defendants, Touche Ross & Co., owed a duty of
    care to the plaintiffs, Caparo Industries Plc., (a) as potential
F   investors in Fidelity Plc.; or (b) as shareholders in Fidelity Plc. from
    8 June 1984 and/or from 12 June 1984; in respect of the audit of the
    accounts of Fidelity Plc. for the year ended 31 March 1984 published
    on 12 June 1984."

    Paragraphs 4 and 6 of the statement of claim are those paragraphs in
    which are set out the purchases of shares by Caparo to which I have
G   referred and in which it is claimed that the purchases made after 12 June
    1984 were made in reliance upon the information contained in the
    accounts. There is, however, one correction to be made. Paragraph 4
    alleges that the accounts were issued on 12 June 1984 "to shareholders,
    including Caparo" but it is now accepted that at that date Caparo,
    although a purchaser of shares, had not been registered as a shareholder
    in Fidelity's register of members.
H       On the trial of this preliminary issue Sir Neil Lawson, sitting as a
    judge of the Queen's Bench Division [1988] B.C.L.C. 387, held (i) that
    the appellants owed no duty at common law to Caparo as investors and
    (ii) that, whilst auditors might owe statutory duties to shareholders as a

class, there was no common law duty to individual shareholders such as would enable an individual shareholder to recover damages for loss sustained by him in acting in reliance upon the audited accounts. A

Caparo appealed to the Court of Appeal [1989] Q.B. 653 which, by a majority (O'Connor L.J. dissenting) allowed the appeal holding that, whilst there was no relationship between an auditor and a potential investor sufficiently proximate to give rise to a duty of care at common law, there was such a relationship with individual shareholders, so that an individual shareholder who suffered loss by acting in reliance on negligently prepared accounts, whether by selling or retaining his shares or by purchasing additional shares, was entitled to recover in tort. From that decision the appellants now appeal to your Lordships' House with the leave of the Court of Appeal, and the respondents cross-appeal against the rejection by the Court of Appeal of their claim that the appellants owed them a duty of care as potential investors. B C

In determining the existence and scope of the duty of care which one person may owe to another in the infinitely varied circumstances of human relationships there has for long been a tension between two different approaches. Traditionally the law finds the existence of the duty in different specific situations each exhibiting its own particular characteristics. In this way the law has identified a wide variety of duty situations, all falling within the ambit of the tort of negligence, but sufficiently distinct to require separate definition of the essential ingredients by which the existence of the duty is to be recognised. Commenting upon the outcome of this traditional approach, Lord Atkin, in his seminal speech in *Donoghue v. Stevenson* [1932] A.C. 562, 579– 580, observed: D E

"The result is that the courts have been engaged upon an elaborate classification of duties as they exist in respect of property, whether real or personal, with further divisions as to ownership, occupation or control, and distinctions based on the particular relations of the one side or the other, whether manufacturer, salesman or landlord, customer, tenant, stranger, and so on. In this way it can be ascertained at any time whether the law recognises a duty, but only where the case can be referred to some particular species which has been examined and classified. And yet the duty which is common to all the cases where liability is established must logically be based upon some element common to the cases where it is found to exist." F

G

It is this last sentence which signifies the introduction of the more modern approach of seeking a single general principle which may be applied in all circumstances to determine the existence of a duty of care. Yet Lord Atkin himself sounds the appropriate note of caution by adding, at p. 580:

"To seek a complete logical definition of the general principle is probably to go beyond the function of the judge, for the more general the definition the more likely it is to omit essentials or to introduce non-essentials." H

A   Lord Reid gave a large impetus to the modern approach in *Dorset Yacht
    Co. Ltd. v. Home Office* [1970] A.C. 1004, 1026–1027, where he said:

        "In later years there has been a steady trend towards regarding
    the law of negligence as depending on principle so that, when a new
    point emerges, one should ask not whether it is covered by authority
    but whether recognised principles apply to it. *Donoghue v.*
B   *Stevenson* [1932] A.C. 562 may be regarded as a milestone, and the
    well known passage in Lord Atkin's speech should I think be
    regarded as a statement of principle. It is not to be treated as if it
    were a statutory definition. It will require qualification in new
    circumstances. But I think that the time has come when we can
    and should say that it ought to apply unless there is some
    justification or valid explanation for its exclusion."
C
        The most comprehensive attempt to articulate a single general
    principle is reached in the well known passage from the speech of Lord
    Wilberforce in *Anns v. Merton London Borough Council* [1978] A.C.
    728, 751–752:

        "Through the trilogy of cases in this House—*Donoghue v.*
D   *Stevenson* [1932] A.C. 562, *Hedley Byrne & Co. Ltd. v. Heller &
    Partners Ltd.* [1964] A.C. 465, and *Dorset Yacht Co. Ltd. v. Home
    Office* [1970] A.C. 1004, the position has now been reached that in
    order to establish that a duty of care arises in a particular situation,
    it is not necessary to bring the facts of that situation within those of
    previous situations in which a duty of care has been held to exist.
    Rather the question has to be approached in two stages. First one
E   has to ask whether, as between the alleged wrongdoer and the
    person who has suffered damage there is a sufficient relationship of
    proximity or neighbourhood such that, in the reasonable contem-
    plation of the former, carelessness on his part may be likely to
    cause damage to the latter—in which case a prima facie duty of care
    arises. Secondly, if the first question is answered affirmatively, it is
F   necessary to consider whether there are any considerations which
    ought to negative, or to reduce or limit the scope of the duty or the
    class of person to whom it is owed or the damages to which a
    breach of it may give rise: see *Dorset Yacht* case [1970] A.C. 1004
    *per* Lord Reid at p. 1027."

        But since the *Anns* case a series of decisions of the Privy Council and of
G   your Lordships' House, notably in judgments and speeches delivered by
    Lord Keith of Kinkel, have emphasised the inability of any single
    general principle to provide a practical test which can be applied to
    every situation to determine whether a duty of care is owed and, if so,
    what is its scope: see *Governors of Peabody Donation Fund v. Sir
    Lindsay Parkinson & Co. Ltd.* [1985] A.C. 210, 239F–241C; *Yuen Kun
    Yeu v. Attorney-General of Hong Kong* [1988] A.C. 175, 190E–194F;
H   *Rowling v. Takaro Properties Ltd.* [1988] A.C. 473, 501D–G; *Hill v.
    Chief Constable of West Yorkshire* [1989] A.C. 53, 60B–D. What
    emerges is that, in addition to the foreseeability of damage, necessary
    ingredients in any situation giving rise to a duty of care are that there

should exist between the party owing the duty and the party to whom it   A
is owed a relationship characterised by the law as one of "proximity" or
"neighbourhood" and that the situation should be one in which the
court considers it fair, just and reasonable that the law should impose a
duty of a given scope upon the one party for the benefit of the other.
But it is implicit in the passages referred to that the concepts of
proximity and fairness embodied in these additional ingredients are not
susceptible of any such precise definition as would be necessary to give   B
them utility as practical tests, but amount in effect to little more than
convenient labels to attach to the features of different specific situations
which, on a detailed examination of all the circumstances, the law
recognises pragmatically as giving rise to a duty of care of a given scope.
Whilst recognising, of course, the importance of the underlying general
principles common to the whole field of negligence, I think the law has   C
now moved in the direction of attaching greater significance to the more
traditional categorisation of distinct and recognisable situations as guides
to the existence, the scope and the limits of the varied duties of care
which the law imposes. We must now, I think, recognise the wisdom of
the words of Brennan J. in the High Court of Australia in *Sutherland
Shire Council v. Heyman* (1985) 60 A.L.R. 1, 43–44, where he said:

D
    "It is preferable, in my view, that the law should develop novel
    categories of negligence incrementally and by analogy with
    established categories, rather than by a massive extension of a
    prima facie duty of care restrained only by indefinable 'considerations
    which ought to negative, or to reduce or limit the scope of the duty
    or the class of person to whom it is owed.'"

E
    One of the most important distinctions always to be observed lies in
the law's essentially different approach to the different kinds of damage
which one party may have suffered in consequence of the acts or
omissions of another. It is one thing to owe a duty of care to avoid
causing injury to the person or property of others. It is quite another to
avoid causing others to suffer purely economic loss. A graphic
illustration of the distinction is embodied in the proposition that:   F

    "In case of a wrong done to a chattel the common law does not
    recognise a person whose only rights are a contractual right to have
    the use or services of the chattel for purposes of making profits or
    gains without possession of or property in the chattel. Such a
    person cannot claim for injury done to his contractual right:" see
    *Elliott Steam Tug Co. Ltd. v. Shipping Controller* [1922] 1 K.B. 127,   G
    139 *per* Scrutton L.J.

The proposition derives from *Cattle v. Stockton Waterworks Co.* (1875)
L.R. 10 Q.B. 453. It has recently been reaffirmed in *Candlewood
Navigation Corporation Ltd. v. Mitsui O.S.K. Lines Ltd.* [1986] A.C. 1
and *Leigh & Sillavan Ltd. v. Aliakmon Shipping Co. Ltd.* [1986] A.C.
785. In the former case Lord Fraser of Tullybelton, delivering the   H
judgment of the Privy Council, said, at p. 25:

    "Their Lordships consider that some limit or control mechanism
    has to be imposed upon the liability of a wrongdoer towards those

A        who have suffered economic damage in consequence of his
         negligence. The need for such a limit has been repeatedly asserted
         in the cases, from *Cattle's* case, L.R. 10 Q.B. 453, to *Caltex* [*Oil
         (Australia) Pty. Ltd. v. Dredge "Willemstad"* (1976)], 136 C.L.R.
         529, and their Lordships are not aware that a view to the contrary
         has ever been judicially expressed."

B        The damage which may be caused by the negligently spoken or
         written word will normally be confined to economic loss sustained by
         those who rely on the accuracy of the information or advice they receive
         as a basis for action. The question what, if any, duty is owed by the
         maker of a statement to exercise due care to ensure its accuracy arises
         typically in relation to statements made by a person in the exercise of
         his calling or profession. In advising the client who employs him the
C        professional man owes a duty to exercise that standard of skill and care
         appropriate to his professional status and will be liable both in contract
         and in tort for all losses which his client may suffer by reason of any
         breach of that duty. But the possibility of any duty of care being owed
         to third parties with whom the professional man was in no contractual
         relationship was for long denied because of the wrong turning taken by
D        the law in *Le Lievre v. Gould* [1893] 1 Q.B. 491 in overruling *Cann v.
         Willson* (1888) 39 Ch.D. 39. In *Candler v. Crane, Christmas & Co.*
         [1951] 2 K.B. 164, Denning L.J., in his dissenting judgment, made a
         valiant attempt to correct the error. But it was not until the decision of
         this House in *Hedley Byrne & Co. Ltd. v. Heller & Partners Ltd.* [1964]
         A.C. 465 that the law was once more set upon the right path.

         Consistently with the traditional approach it is to these authorities
E        and to subsequent decisions directly relevant to this relatively narrow
         corner of the field that we should look to determine the essential
         characteristics of a situation giving rise, independently of any contractual
         or fiduciary relationship, to a duty of care owed by one party to another
         to ensure that the accuracy of any statement which the one party makes
         and on which the other party may foreseeably rely to his economic
F        detriment.

         In *Cann v. Willson*, 39 Ch.D. 39 mortgagees advanced money in
         reliance on a valuation of the mortgaged property supplied to them by a
         valuer employed by the mortgagor. On the mortgagor's default, the
         property, having been negligently undervalued, proved insufficient to
         cover the mortgage loan. The mortgagees recovered their loss from the
         valuer. In his judgment, Chitty J. said, at pp. 42–43:

G            "In this case the document called a valuation was sent by the
             defendants direct to the agents of the plaintiff for the purpose of
             inducing the plaintiff and his co-trustee to lay out the trust money
             on mortgage. It seems to me that the defendants knowingly placed
             themselves in that position, and in point of law incurred a duty
             towards him to use reasonable care in the preparation of the
H            document called a valuation."

         In *Candler v. Crane, Christmas & Co. Ltd.* [1951] 2 K.B. 164 the
         plaintiff invested money in a limited company in reliance on accounts of
         the company prepared by the company's accountants at the request of

the managing director, which were shown to the plaintiff and discussed with him by the accountants in the knowledge that he was interested as a potential investor in the company. The accounts were inaccurate and misleading and the plaintiff, having invested in the company in reliance upon them, lost his money. Denning L.J., in his dissenting judgment, held the plaintiff entitled to recover damages for the accountants' negligence. A

In *Hedley Byrne & Co. Ltd. v. Heller & Partners Ltd.* [1964] A.C. 465 bankers were asked about the financial stability of a customer of the bank. They gave a favourable reference, albeit with a disclaimer of responsibility. The circumstances of the inquiry made it clear to the bankers that the party on whose behalf the inquiry was made wanted to know if they could safely extend credit to the bank's customer in a substantial sum. Acting on the reference given, the plaintiffs extended credit to the bank's customer who in due course defaulted. Although the House held that the bankers were protected by the disclaimer of responsibility, the case provided the opportunity to review the law, which led to the reinstatement of *Cann v. Willson*, the overruling of the majority decision in the *Candler* case and the approbation of the dissenting judgment of Denning L.J. in that case. B C

The most recent decision of the House, which is very much in point, is that of the two appeals heard together of *Smith v. Eric S. Bush* and *Harris v. Wyre Forest District Council* [1990] 1 A.C. 831. The plaintiffs in both cases were house purchasers who purchased in reliance on valuations of the properties made by surveyors acting for and on the instructions of the mortgagees proposing to advance money to the plaintiffs to enable them to effect their purchases. In both cases the surveyors' fees were paid by the plaintiffs and in both cases it turned out that the inspections and valuations had been negligently carried out and that the property was seriously defective so that the plaintiffs suffered financial loss. In the case of *Smith* the mortgagees were a building society, the surveyors who carried out the inspection and valuation were a firm employed by the building society and their report was shown to the plaintiff. In the case of *Harris* the mortgagees were the local authority who employed a member of their own staff to carry out the inspection and valuation. His report was not shown to the plaintiff, but the plaintiff rightly assumed from the local authority's offer of a mortgage loan that the property had been professionally valued as worth at least the amount of the loan. In both cases the terms agreed between the plaintiff and the mortgagee purported to exclude any liability on the part of the mortgagee or the surveyor for the accuracy of the mortgage valuation. The House held that in both cases the surveyor making the inspection and valuation owed a duty of care to the plaintiff house purchaser and that the contractual clauses purporting to exclude liability were struck down by section 2(2) and section 11(3) of the Unfair Contract Terms Act 1977. D E F G

The salient feature of all these cases is that the defendant giving advice or information was fully aware of the nature of the transaction which the plaintiff had in contemplation, knew that the advice or information would be communicated to him directly or indirectly and H

A  knew that it was very likely that the plaintiff would rely on that advice or information in deciding whether or not to engage in the transaction in contemplation. In these circumstances the defendant could clearly be expected, subject always to the effect of any disclaimer of responsibility, specifically to anticipate that the plaintiff would rely on the advice or information given by the defendant for the very purpose for which he did in the event rely on it. So also the plaintiff, subject again to the

B  effect of any disclaimer, would in that situation reasonably suppose that he was entitled to rely on the advice or information communicated to him for the very purpose for which he required it. The situation is entirely different where a statement is put into more or less general circulation and may foreseeably be relied on by strangers to the maker of the statement for any one of a variety of different purposes which the

C  maker of the statement has no specific reason to anticipate. To hold the maker of the statement to be under a duty of care in respect of the accuracy of the statement to all and sundry for any purpose for which they may choose to rely on it is not only to subject him, in the classic words of Cardozo C.J. to "liability in an indeterminate amount for an indeterminate time to an indeterminate class:" see *Ultramares Corporation v. Touche* (1931) 174 N.E. 441, 444; it is also to confer on

D  the world at large a quite unwarranted entitlement to appropriate for their own purposes the benefit of the expert knowledge or professional expertise attributed to the maker of the statement. Hence, looking only at the circumstances of these decided cases where a duty of care in respect of negligent statements has been held to exist, I should expect to find that the "limit or control mechanism . . . imposed upon the liability

E  of a wrongdoer towards those who have suffered economic damage in consequence of his negligence"* rested in the necessity to prove, in this category of the tort of negligence, as an essential ingredient in the "proximity" between the plaintiff and the defendant, that the defendant knew that his statement would be communicated to the plaintiff, either as an individual or as a member of an identifiable class, specifically in

F  connection with a particular transaction or transactions of a particular kind (e.g. in a prospectus inviting investment) and that the plaintiff would be very likely to rely on it for the purpose of deciding whether or not to enter upon that transaction or upon a transaction of that kind.

    I find this expectation fully supported by the dissenting judgment of Denning L.J. in *Candler v. Crane, Christmas & Co.* [1951] 2 K.B. 164, 179, 180–181, 182–184 in the following passages:

G        "Let me now be constructive and suggest the circumstances in which I say that a duty to use care in statement does exist apart from a contract in that behalf. First, what persons are under such duty? My answer is those persons such as accountants, surveyors, valuers and analysts, whose profession and occupation it is to examine books, accounts, and other things, and to make reports on

H        which other people—other than their clients—rely in the ordinary course of business."

    * *Reporter's note. Candlewood Navigation Corporation Ltd. v. Mitsui O.S.K. Lines Ltd.* [1986] A.C. 1, 25.

"Secondly, to whom do these professional people owe this duty?  A
I will take accountants, but the same reasoning applies to the
others. They owe the duty, of course, to their employer or client;
and also I think to any third person to whom they themselves show
the accounts, or to whom they know their employer is going to
show the accounts, so as to induce him to invest money or take
some other action on them. But I do not think the duty can be      B
extended still further so as to include strangers of whom they have
heard nothing and to whom their employer without their knowledge
may choose to show their accounts. Once the accountants have
handed their accounts to their employer they are not, as a rule,
responsible for what he does with them without their knowledge or
consent. . . . The test of proximity in these cases is: did the
accountants know that the accounts were required for submission to  C
the plaintiff and use by him?"

"Thirdly, to what transactions does the duty of care extend? It
extends, I think, only to those transactions for which the accountants
knew their accounts were required. For instance, in the present
case it extends to the original investment of £2,000. which the
plaintiff made in reliance on the accounts, because the accountants  D
knew that the accounts were required for his guidance in making
that investment; but it does not extend to the subsequent £200.
which he made after he had been two months with the company.
This distinction, that the duty only extends to the very transaction
in mind at the time, is implicit in the decided cases. . . . It will be
noticed that I have confined the duty to cases where the accountant
prepares his accounts and makes his report for the guidance of the  E
very person in the very transaction in question. That is sufficient
for the decision of this case. I can well understand that it would be
going too far to make an accountant liable to any person in the land
who chooses to rely on the accounts in matters of business, for that
would expose him to 'liability in an indeterminate amount for an
indeterminate time to an indeterminate class': see *Ultramares*  F
*Corporation v. Touche,* per Cardozo C.J. Whether he would be
liable if he prepared his accounts for the guidance of a specific class
of persons in a specific class of transactions, I do not say. I should
have thought he might be, just as the analyst and lift inspector
would be liable in the instances I have given earlier. It is perhaps
worth mentioning that Parliament has intervened to make the
professional man liable for negligent reports given for the purposes  G
of a prospectus: see sections 40 and 43 of the Companies Act 1948.
That is an instance of liability for reports made for the guidance of
a specific class of persons—investors, in a specific class of
transactions—applying for shares. That enactment does not help,
one way or the other, to show what result the common law would
have reached in the absence of such provisions; but it does show  H
what result it ought to reach. My conclusion is that a duty to use
care in statement is recognised by English law, and that its
recognition does not create any dangerous precedent when it is

A       remembered that it is limited in respect of the persons by whom
        and to whom it is owed and the transactions to which it applies."

        It seems to me that this masterly analysis, if I may say so with
respect, requires little, if any, amplification or modification in the light
of later authority and is particularly apt to point the way to the right
conclusion in the present appeal.

B       Some of the speeches in the *Hedley Byrne* case derive a duty of care
in relation to negligent statements from a voluntary assumption of
responsibility on the part of the maker of the statements. In his speech
in *Smith v. Eric S. Bush* [1990] 1 A.C. 831, 862, Lord Griffiths
emphatically rejected the view that this was the true ground of liability
and concluded that:

C           "The phrase 'assumption of responsibility' can only have any
        real meaning if it is understood as referring to the circumstances in
        which the law will deem the maker of the statement to have
        assumed responsibility to the person who acts upon the advice."

        I do not think that in the context of the present appeal anything turns
upon the difference between these two approaches.

D       These considerations amply justify the conclusion that auditors of a
public company's accounts owe no duty of care to members of the public
at large who rely upon the accounts in deciding to buy shares in the
company. If a duty of care were owed so widely, it is difficult to see
any reason why it should not equally extend to all who rely on the
accounts in relation to other dealings with a company as lenders or
merchants extending credit to the company. A claim that such a duty
E   was owed by auditors to a bank lending to a company was emphatically
and convincingly rejected by Millett J. in *Al Saudi Banque v. Clarke
Pixley* [1990] Ch. 313. The only support for an unlimited duty of care
owed by auditors for the accuracy of their accounts to all who may
foreseeably rely upon them is to be found in some jurisdictions in the
United States of America where there are striking differences in the law
in different states. In this jurisdiction I have no doubt that the creation
F   of such an unlimited duty would be a legislative step which it would be
for Parliament, not the courts, to take.

        The main submissions for Caparo are that the necessary nexus of
proximity between it and the appellants giving rise to a duty of care
stems (1) from the pleaded circumstances indicating the vulnerability of
Fidelity to a take-over bid and from the consequent probability that
G   another company, such as Caparo, would rely on the audited accounts
in deciding to launch a take-over bid, or (2) from the circumstance that
Caparo was already a shareholder in Fidelity when it decided to launch
its take-over bid in reliance on the accounts. In relation to the first of
these two submissions, Caparo applied, in the course of the hearing, for
leave to amend paragraph 16(2) of the statement of claim by adding the
words "or alternatively that it was highly probable that such persons
H   would rely on the accounts for that purpose."

        The case which gives most assistance to Caparo in support of this
submission is *Scott Group Ltd. v. McFarlane* [1978] 1 N.Z.L.R. 553.
The audited consolidated accounts of a New Zealand public company

and its subsidiaries overstated the assets of the group because of an   A
admitted accounting error. Under the relevant New Zealand legislation
its accounts were, as in England, accessible to the public. The
circumstances of the group's affairs were such as to make it highly
probable that it would atttract a take-over bid. The plaintiffs made such
a bid successfully and when the accounting error was discovered claimed
from the auditors in respect of the shortfall in the assets. Quilliam J.
held that the auditors owed the plaintiffs no duty of care. The majority   B
of the New Zealand Court of Appeal (Woodhouse and Cooke JJ.) held
that the duty of care arose from the probability that the company would
attract a take-over bid and the bidder would rely on the audited
accounts, although Cooke J. held that the shortfall in the assets below
that erroneously shown in the accounts did not amount to a loss
recoverable in tort. Richmond P. held that no duty of care was owed.   C
He said, at p. 566:

> "All the speeches in *Hedley Byrne* seem to me to recognise the
> need for a 'special' relationship: a relationship which can properly
> be treated as giving rise to a special duty to use care in statement.
> The question in any given case is whether the nature of the
> relationship is such that one party can fairly be held to have   D
> assumed a responsibility to the other as regards the reliability of the
> advice or information. I do not think that such a relationship
> should be found to exist unless, at least, the maker of the statement
> was, or ought to have been, aware that his advice or information
> would in fact be made available to and be relied on by a particular
> person or class of persons for the purposes of a particular transaction
> or type of transaction. I would especially emphasise that to my   E
> mind it does not seem reasonable to attribute an assumption of
> responsibility unless the maker of the statement ought in all the
> circumstances, both in preparing himself for what he said and in
> saying it, to have directed his mind, and to have been able to direct
> his mind, to some particular and specific purpose for which he was
> aware that his advice or information would be relied on. In many   F
> situations that purpose will be obvious. But the annual accounts of
> a company can be relied on in all sorts of ways and for many
> purposes."

I agree with this reasoning, which seems to me to be entirely in line with
the principles to be derived from the authorities to which I have earlier
referred and not to require modification in any respect which is relevant   G
for present purposes by reference to anything said in this House in
*Smith v. Eric S. Bush* [1990] 1 A.C. 831. I should in any event be
extremely reluctant to hold that the question whether or not an auditor
owes a duty of care to an investor buying shares in a public company
depends on the degree of probability that the shares will prove attractive
either en bloc to a take-over bidder or piecemeal to individual investors.
It would be equally wrong, in my opinion, to hold an auditor under a   H
duty of care to anyone who might lend money to a company by reason
only that it was foreseeable as highly probable that the company would
borrow money at some time in the year following publication of its

A   audited accounts and that lenders might rely on those accounts in
    deciding to lend. I am content to assume the high probability of a take-
    over bid in reliance on the accounts which the proposed amendment of
    the statement of claim would assert but I do not think it assists Caparo's
    case.

        The only other English authority to which I need refer in this context
    in *JEB Fasteners Ltd. v. Marks, Bloom & Co.* [1981] 3 All E.R. 289, a
B   decision at first instance of Woolf J. This was another case where the
    plaintiffs, who had made a successful take-over bid for a company in
    reliance on audited accounts which had been negligently prepared, sued
    the accountants for damages. Woolf J. held that the auditors owed the
    plaintiffs a duty of care in the preparation of the accounts. He relied on
    both the *Anns* case [1978] A.C. 728 and *Scott Group Ltd. v. McFarlane*
C   [1978] 1 N.Z.L.R. 553, in reaching the conclusion that the duty could be
    derived from foreseeability alone. For the reasons already indicated, I
    do not agree with this. It may well be, however, that the particular
    facts in the *JEB* case were sufficient to establish a basis on which the
    necessary ingredient of proximity to found a duty of care could be
    derived from the actual knowledge on the part of the auditors of the
    specific purpose for which the plaintiffs intended to use the accounts.
D       The position of auditors in relation to the shareholders of a public
    limited liability company arising from the relevant provisions of the
    Companies Act 1985 is accurately summarised in the judgment of
    Bingham L.J. in the Court of Appeal [1989] Q.B. 653, 680–681:

            "The members, or shareholders, of the company are its owners.
        But they are too numerous, and in most cases too unskilled, to
E       undertake the day to day management of that which they own. So
        responsibility for day to day management of the company is
        delegated to directors. The shareholders, despite their overall
        powers of control, are in most companies for most of the time
        investors and little more. But it would of course be unsatisfactory
        and open to abuse if the shareholders received no report on the
        financial stewardship of their investment save from those to whom
F       the stewardship had been entrusted. So provision is made for the
        company in general meeting to appoint an auditor (section 384 of
        the Companies Act 1985), whose duty is to investigate and form an
        opinion on the adequacy of the company's accounting records and
        returns and the correspondence between the company's accounting
        records and returns and its accounts: section 237. The auditor has
G       then to report to the company's members (among other things)
        whether in his opinion the company's accounts give a true and fair
        view of the company's financial position: section 236. In carrying
        out his investigation and in forming his opinion the auditor
        necessarily works very closely with the directors and officers of the
        company. He receives his remuneration from the company. He
        naturally, and rightly, regards the company as his client. But he is
H       employed by the company to exercise his professional skill and
        judgment for the purpose of giving the shareholders an independent
        report on the reliability of the company's accounts and thus on their
        investment. 'No doubt he is acting antagonistically to the directors

**Caparo Plc. v. Dickman (H.L.(E.))**   **[1990]**

in the sense that he is appointed by the shareholders to be a check   A
upon them:' *In re Kingston Cotton Mill Co.* [1896] 1 Ch. 6, 11, *per*
Vaughan Williams J. The auditor's report must be read before the
company in general meeting and must be open to inspection by any
member of the company: section 241. It is attached to and forms
part of the company's accounts: sections 238(3) and 239. A copy of
the company's accounts, including the auditor's report, must be sent
to every member: section 240. Any member of the company, even   B
if not entitled to have a copy of the accounts sent to him, is entitled
to be furnished with a copy of the company's last accounts on
demand and without charge: section 246."

No doubt these provisions establish a relationship between the
auditors and the shareholders of a company on which the shareholder is   C
entitled to rely for the protection of his interest. But the crucial
question concerns the extent of the shareholder's interest which the
auditor has a duty to protect. The shareholders of a company have a
collective interest in the company's proper management and in so far as
a negligent failure of the auditor to report accurately on the state of the
company's finances deprives the shareholders of the opportunity to
exercise their powers in general meeting to call the directors to book   D
and to ensure that errors in management are corrected, the shareholders
ought to be entitled to a remedy. But in practice no problem arises in
this regard since the interest of the shareholders in the proper
management of the company's affairs is indistinguishable from the
interest of the company itself and any loss suffered by the shareholders,
e.g. by the negligent failure of the auditor to discover and expose a   E
misappropriation of funds by a director of the company, will be recouped
by a claim against the auditors in the name of the company, not by
individual shareholders.

I find it difficult to visualise a situation arising in the real world in
which the individual shareholder could claim to have sustained a loss in
respect of his existing shareholding referable to the negligence of the
auditor which could not be recouped by the company. But on this part   F
of the case your Lordships were much pressed with the argument that
such a loss might occur by a negligent undervaluation of the company's
assets in the auditor's report relied on by the individual shareholder in
deciding to sell his shares at an undervalue. The argument then runs
thus. The shareholder, qua shareholder, is entitled to rely on the
auditor's report as the basis of his investment decision to sell his existing   G
shareholding. If he sells at an undervalue he is entitled to recover the
loss from the auditor. There can be no distinction in law between the
shareholder's investment decision to sell the shares he has or to buy
additional shares. It follows, therefore, that the scope of the duty of
care owed to him by the auditor extends to cover any loss sustained
consequent on the purchase of additional shares in reliance on the
auditor's negligent report.   H

I believe this argument to be fallacious. Assuming without deciding
that a claim by a shareholder to recover a loss suffered by selling his
shares at an undervalue attributable to an undervaluation of the

A    company's assets in the auditor's report could be sustained at all, it would not be by reason of any reliance by the shareholder on the auditor's report in deciding to sell; the loss would be referable to the depreciatory effect of the report on the market value of the shares before ever the decision of the shareholder to sell was taken. A claim to recoup a loss alleged to flow from the purchase of overvalued shares, on the other hand, can only be sustained on the basis of the purchaser's

B    reliance on the report. The specious equation of "investment decisions" to sell or to buy as giving rise to parallel claims thus appears to me to be untenable. Moreover, the loss in the case of the sale would be of a loss of part of the value of the shareholder's existing holding, which, assuming a duty of care owed to individual shareholders, it might sensibly lie within the scope of the auditor's duty to protect. A loss, on

C    the other hand, resulting from the purchase of additional shares would result from a wholly independent transaction having no connection with the existing shareholding.

     I believe it is this last distinction which is of critical importance and which demonstrates the unsoundness of the conclusion reached by the majority of the Court of Appeal. It is never sufficient to ask simply whether A owes B a duty of care. It is always necessary to determine

D    the scope of the duty by reference to the kind of damage from which A must take care to save B harmless. "The question is always whether the defendant was under a duty to avoid or prevent that damage, but the actual nature of the damage suffered is relevant to the existence and extent of any duty to avoid or prevent it:" see *Sutherland Shire Council v. Heyman*, 60 A.L.R. 1, 48, *per* Brennan J. Assuming for the purpose

E    of the argument that the relationship between the auditor of a company and individual shareholders is of sufficient proximity to give rise to a duty of care, I do not understand how the scope of that duty can possibly extend beyond the protection of any individual shareholder from losses in the value of the shares which he holds. As a purchaser of additional shares in reliance on the auditor's report, he stands in no different position from any other investing member of the public to

F    whom the auditor owes no duty.

     I would allow the appeal and dismiss the cross-appeal.

     LORD ROSKILL. My Lords, I have had the advantage of reading in draft the speeches prepared by three of your Lordships. I agree with them and would allow the appeal and dismiss the cross-appeal for the

G    reasons there given. I only add some observations of my own out of respect for the two Lords Justices from whom your Lordships are differing and because of the importance of this case in relation to the vexed question of the extent of liability of professional men, especially accountants, for putting into circulation allegedly incorrect statements whether oral or in writing which are claimed to have been negligently made or prepared and which have been acted on by a third party to that

H    third party's detriment.

     That liability for such negligence if established can exist has been made clear ever since the decision of this House in *Hedley Byrne & Co. v. Heller & Partners Ltd.* [1964] A.C. 465 in which the well known

628

dissenting judgment of Denning L.J. in *Candler v. Crane, Christmas &*   A
*Co.* [1951] 2 K.B. 164 was held to have stated the law correctly.
Thenceforth it was clear that such a duty of care could be owed by a
professional man to third parties in cases where there was no contractual
relationship between them, a view of the law long denied as the result of
a succession of late 19th century cases of which this House then took the
opportunity of disapproving.

But subsequent attempts to define both the duty and its scope have   B
created more problems than the decisions have solved. My noble and
learned friends have traced the evolution of the decisions from *Anns v.
Merton London Borough Council* [1977] A.C. 728 until and including
the most recent decisions of your Lordships' House in *Smith v. Eric S.
Bush* [1990] 1 A.C. 831. I agree with your Lordships that it has now to
be accepted that there is no simple formula or touchstone to which   C
recourse can be had in order to provide in every case a ready answer to
the questions whether, given certain facts, the law will or will not
impose liability for negligence or in cases where such liability can be
shown to exist, determine the extent of that liability. Phrases such as
"foreseeability," "proximity," "neighbourhood," "just and reasonable,"
"fairness," "voluntary acceptance of risk," or "voluntary assumption of
responsibility" will be found used from time to time in the different   D
cases. But, as your Lordships have said, such phrases are not precise
definitions. At best they are but labels or phrases descriptive of the
very different factual situations which can exist in particular cases and
which must be carefully examined in each case before it can be
pragmatically determined whether a duty of care exists and, if so, what
is the scope and extent of that duty. If this conclusion involves a return   E
to the traditional categorisation of cases as pointing to the existence and
scope of any duty of care, as my noble and learned friend Lord Bridge
of Harwich, suggests, I think this is infinitely preferable to recourse to
somewhat wide generalisations which leave their practical application
matters of difficulty and uncertainty. This conclusion finds strong
support from the judgment of Brennan J. in *Sutherland Shire Council v.
Heyman*, 60 A.L.R. 1, 43–44 in the High Court of Australia in the   F
passage cited by my noble and learned friends.

My Lords, I confess that like my noble and learned friend, Lord
Griffiths, in *Smith v. Eric S. Bush* [1990] 1 A.C. 831, 862, I find
considerable difficulty in phrases such as "voluntary assumption of
responsibility" unless they are to be explained as meaning no more than
the existence of circumstances in which the law will impose a liability   G
upon a person making the allegedly negligent statement to the person to
whom that statement is made; in which case the phrase does not help to
determine in what circumstances the law will impose that liability or
indeed, its scope. The submission that there is a virtually unlimited and
unrestricted duty of care in relation to the performance of an auditor's
statutory duty to certify a company's accounts, a duty extending to
anyone who may use those accounts for any purpose such as investing in   H
the company or lending the company money, seems to me untenable.
No doubt it can be said to be foreseeable that those accounts may find
their way into the hands of persons who may use them for such purposes

A    or indeed other purposes and lose money as a result. But to impose a
     liability in those circumstances is to hold, contrary to all the recent
     authorities, that foreseeability alone is sufficient, and to ignore the
     statutory duty which enjoins the preparation of and certification of those
     accounts.
        I think that before the existence and scope of any liability can be
     determined, it is necessary first to determine for what purposes and in
B    what circumstances the information in question is to be given. If a
     would-be investor or predator commissions a report which he will use,
     and which the maker of the report knows he will use. as a basis for his
     decision whether or not to invest or whether or not to make a bid, it
     may not be difficult to conclude that if the report is negligently prepared
     and as a result a decision is taken in reliance upon it and financial losses
C    then follow, a liability will be imposed upon the maker of that report.
     But I venture to echo the caution expressed by my noble and learned
     friend, Lord Oliver of Aylmerton, that because different cases may
     display certain common features, they are necessarily all cases in which
     the same consequences regarding liability or the scope of liability will
     follow. Moreover, there may be cases in which the circumstances in
     which the report was commissioned justify the inclusion of and reliance
D    upon a disclaimer such as succeeded in the *Hedley Byrne* case but by
     reason of subsequent statutory provisions failed in *Smith v. Eric S.
     Bush*.
        My Lords it is for these reasons, in addition to those given by my
     noble and learned friends, that, as already stated, I would allow this
     appeal and dismiss the cross-appeal.

E
        LORD ACKNER.   My Lords, I have had the advantage of reading the
     speeches of Lord Bridge of Harwich, Lord Roskill, Lord Oliver of
     Aylmerton and Lord Jauncey of Tullichettle and for the reasons they
     give I, too, would allow this appeal and dismiss the cross-appeal.

F       LORD OLIVER OF AYLMERTON.   My Lords, this appeal, having come
     to this House on a preliminary point, involves the making of a number
     of assumptions of fact which might or might not be substantiated at the
     trial of the action. To begin with, it is to be assumed against the
     appellants that they showed a lack of reasonable care in certifying that
     the accounts of Fidelity for the year ended 31 March 1984 gave a true
     and fair view of Fidelity's position. It is also to be assumed that, when
G    they certified the accounts, the appellants knew or would, if they had
     thought about it, have known that Fidelity was vulnerable to take-over
     bids, that a potential bidder would be likely to rely upon the accuracy of
     the accounts in making his bid and that investors in the market generally,
     whether or not already members of Fidelity, would also be likely to or
     might well rely upon the accounts in deciding to purchase shares in that
     company.
H       Your Lordships are not, however, either required or entitled to
     make any assumption that the purpose of the certification was anything
     other than that of fulfilling the statutory duty of carrying out the annual
     audit with a view to the circulation of the accounts to persons who were

**Lord Oliver**
**of Aylmerton**                    Caparo Plc. v. Dickman (H.L.(E.))                    [1990]

either registered shareholders or debenture-holders of Fidelity and the    A
subsequent laying of the accounts before the annual general meeting of
that company.

Thus, if and so far as the purpose for which the audit was carried out
is a relevant consideration in determining the extent of any general duty
in tort owed by the appellants to persons other than the company which
is their immediate employer, that purpose was simply that of fulfilling
the statutory requirements of the Companies Act 1985. That, in turn,    B
raises the question—and it is one which lies at the threshold of the
inquiry upon which your Lordships are invited to embark—of what is
the purpose behind the legislative requirement for the carrying out of an
annual audit and the circulation of the accounts. For whose protection
were these provisions enacted and what object were they intended to
achieve?                                                                C

My Lords, the primary purpose of the statutory requirement that a
company's accounts shall be audited annually is almost self-evident. The
structure of the corporate trading entity, at least in the case of public
companies whose shares are dealt with on an authorised Stock Exchange,
involves the concept of a more or less widely distributed holding of
shares rendering the personal involvement of each individual shareholder
in the day-to-day management of the enterprise impracticable, with the    D
result that management is necessarily separated from ownership. The
management is confided to a board of directors which operates in a
fiduciary capacity and is answerable to and removable by the shareholders
who can act, if they act at all, only collectively and only through the
medium of a general meeting. Hence the legislative provisions requiring
the board annually to give an account of its stewardship to a general    E
meeting of the shareholders. This is the only occasion in each year
upon which the general body of shareholders is given the opportunity to
consider, to criticise and to comment upon the conduct by the board of
the company's affairs, to vote upon the directors' recommendation as to
dividends, to approve or disapprove the directors' remuneration and, if
thought desirable, to remove and replace all or any of the directors. It
is the auditors' function to ensure, so far as possible, that the financial    F
information as to the company's affairs prepared by the directors
accurately reflects the company's position in order, first, to protect the
company itself from the consequences of undetected errors or, possibly,
wrongdoing (by, for instance, declaring dividends out of capital) and,
secondly, to provide shareholders with reliable intelligence for the
purpose of enabling them to scrutinise the conduct of the company's    G
affairs and to exercise their collective powers to reward or control or
remove those to whom that conduct has been confided.

The requirement of the appointment of auditors and annual audit of
the accounts, now contained in sections 235 to 246 of the Companies
Act 1985, was first introduced by the Companies Act 1879 (25 & 26
Vict. c. 76) in relation to companies carrying on the business of banking
and was extended to companies generally by the Companies Act 1900.    H
Section 23 of that Act required the auditors to make a report to the
shareholders on the company's balance sheet laid before the company in
general meeting, stating whether the balance sheet exhibited a true and

A    correct view of the state of the company's affairs. By the same section,
     the report was required to be read before the company in general
     meeting. Section 19 of the Companies Act 1907 substituted a new
     section 23 which, whilst repeating the requirement that the auditors'
     report should be read before the company in general meeting, added a
     requirement that it should be open to inspection by any shareholder,
     who was entitled, on payment of the fee, to be furnished with a copy of

B    the balance sheet and report. The new section also made it an offence
     for any officer of the company to be party to issuing, circulating or
     publishing any copy of the balance sheet which did not either append or
     contain a reference to the auditors' report. The matter was carried one
     stage further by section 130 of the Companies Act 1929 (consolidating
     provisions contained in sections 39 and 41 of the Companies Act 1928)

C    which required the annual balance sheet and auditors' report of a public
     company to be sent not less than seven days before the date of the
     meeting to every member of the company entitled to receive notice of
     the meeting and entitled any member of the company and any debenture
     holder to be furnished on demand and without charge with a copy of the
     last balance sheet and the auditors' report. Finally, for relevant
     purposes, section 158 of the Companies Act 1948 required the accounts

D    and report to be sent to every member of the company and to every
     debenture holder not less than 21 days before the general meeting
     before which the accounts are to be laid.

         Thus the history of the legislation is one of an increasing availability
     of information regarding the financial affairs of the company to those
     having an interest in its progress and stability. It cannot fairly be said

E    that the purpose of making such information available is solely to assist
     those interested in attending general meetings of the company to an
     informed supervision and appraisal of the stewardship of the company's
     directors, for the requirement to supply audited accounts to, for instance,
     preference shareholders having no right to vote at general meetings and
     to debenture holders cannot easily be attributed to any such purpose.
     Nevertheless, I do not, for my part, discern in the legislation any

F    departure from what appears to me to be the original, central and
     primary purpose of these provisions, that is to say, the informed exercise
     by those interested in the property of the company, whether as
     proprietors of shares in the company or as the holders of rights secured
     by a debenture trust deed, of such powers as are vested in them by
     virtue of their respective proprietary interests.

         It is argued on behalf of the respondent that there is to be discerned
G    in the legislation an additional or wider commercial purpose, namely
     that of enabling those to whom the accounts are addressed and
     circulated, to make informed investment decisions, for instance, by
     determining whether to dispose of their shares in the market or whether
     to apply any funds which they are individually able to command in
     seeking to purchase the shares of other shareholders. Of course, the

H    provision of any information about the business and affairs of a trading
     company, whether it be contained in annual accounts or obtained from
     other sources, is capable of serving such a purpose just as it is capable
     of serving as the basis for the giving of financial advice to others, for

arriving at a market price, for determining whether to extend credit to   A
the company, or for the writing of financial articles in the press. Indeed,
it is readily foreseeable by anyone who gives the matter any thought that
it might well be relied on to a greater or less extent for all or any of
such purposes. It is, of course, equally foreseeable that potential
investors having no proprietary interest in the company might well avail
themselves of the information contained in a company's accounts
published in the newspapers or culled from an inspection of the   B
documents to be filed annually with the Registrar of Companies (which
includes the audited accounts) in determining whether or not to acquire
shares in the company. I find it difficult to believe, however, that the
legislature, in enacting provisions clearly aimed primarily at the protection
of the company and its informed control by the body of its proprietors,
can have been inspired also by consideration for the public at large and   C
investors in the market in particular.

The question is, I think, one of some importance when one comes to
consider the existence of that essential relationship between the appellants
and the respondent to which, in any discussion of the ingredients of the
tort of negligence, there is accorded the description "proximity," for it is
now clear from a series of decisions in this House that, at least so far as
concerns the law of the United Kingdom, the duty of care in tort   D
depends not solely upon the existence of the essential ingredient of the
foreseeability of damage to the plaintiff but upon its coincidence with a
further ingredient to which has been attached the label "proximity" and
which was described by Lord Atkin in the course of his speech in
*Donoghue v. Stevenson* [1932] A.C. 562, 581 as:

    "such close and direct relations that the act complained of   E
    directly affects a person whom the person alleged to be bound to
    take care would know would be directly affected by his careless
    act."

It must be remembered, however, that Lord Atkin was using these
words in the context of loss caused by physical damage where the
existence of the nexus between the careless defendant and the injured   F
plaintiff can rarely give rise to any difficulty. To adopt the words of
Bingham L.J. in the instant case [1989] Q.B. 653, 686:

    "It is enough that the plaintiff chances to be (out of the whole
    world) the person with whom the defendant collided or who
    purchased the offending ginger beer."

                                                                        G

The extension of the concept of negligence since the decision of this
House in *Hedley Byrne & Co. Ltd. v. Heller & Partners Ltd.* [1964]
A.C. 465 to cover cases of pure economic loss not resulting from
physical damage has given rise to a considerable and as yet unsolved
difficulty of definition. The opportunities for the infliction of pecuniary
loss from the imperfect performance of everyday tasks upon the proper
performance of which people rely for regulating their affairs are   H
illimitable and the effects are far reaching. A defective bottle of ginger
beer may injure a single consumer but the damage stops there. A single
statement may be repeated endlessly with or without the permission of

A    its author and may be relied upon in a different way by many different
     people. Thus the postulate of a simple duty to avoid any harm that is,
     with hindsight, reasonably capable of being foreseen becomes untenable
     without the imposition of some intelligible limits to keep the law of
     negligence within the bounds of common sense and practicality. Those
     limits have been found by the requirement of what has been called a
     "relationship of proximity" between plaintiff and defendant and by the
B    imposition of a further requirement that the attachment of liability for
     harm which has occurred be "just and reasonable." But although the
     cases in which the courts have imposed or withheld liability are capable
     of an approximate categorisation, one looks in vain for some common
     denominator by which the existence of the essential relationship can be
     tested. Indeed it is difficult to resist a conclusion that what have been
C    treated as three separate requirements are, at least in most cases, in fact
     merely facets of the same thing, for in some cases the degree of
     foreseeability is such that it is from that alone that the requisite
     proximity can be deduced, whilst in others the absence of that essential
     relationship can most rationally be attributed simply to the court's view
     that it would not be fair and reasonable to hold the defendant
     responsible. "Proximity" is, no doubt, a convenient expression so long
D    as it is realised that it is no more than a label which embraces not a
     definable concept but merely a description of circumstances from which,
     pragmatically, the courts conclude that a duty of care exists.

         There are, of course, cases where, in any ordinary meaning of the
     words, a relationship of proximity (in the literal sense of "closeness")
     exists but where the law, whilst recognising the fact of the relationship,
E    nevertheless denies a remedy to the injured party on the ground of
     public policy. *Rondel v. Worsley* [1969] 1 A.C. 191 was such a case, as
     was *Hill v. Chief Constable of West Yorkshire* [1989] A.C. 53, so far as
     concerns the alternative ground of that decision. But such cases do
     nothing to assist in the identification of those features from which the
     law will deduce the essential relationship on which liability depends and,
     for my part, I think that it has to be recognised that to search for any
F    single formula which will serve as a general test of liability is to pursue a
     will-o'-the wisp. The fact is that once one discards, as it is now clear
     that one must, the concept of foreseeability of harm as the single
     exclusive test—even a prima facie test—of the existence of the duty of
     care, the attempt to state some general principle which will determine
     liability in an infinite variety of circumstances serves not to clarify the
     law but merely to bedevil its development in a way which corresponds
G    with practicality and common sense. In *Sutherland Shire Council v.
     Heyman*, 60 A.L.R. 1, 43–44, Brennan J. in the course of a penetrating
     analysis, observed:

             "Of course, if foreseeability of injury to another were the
         exhaustive criterion of a prima facie duty to act to prevent the
         occurrence of that injury, it would be essential to introduce some
H        kind of restrictive qualification—perhaps a qualification of the kind
         stated in the second stage of the general proposition in *Anns* [1978]
         A.C. 728. I am unable to accept that approach. It is preferable, in
         my view, that the law should develop novel categories of negligence

incrementally and by analogy with established categories, rather   A
than by a massive extension of a prima facie duty of care restrained
only by indefinable 'considerations which ought to negative, or to
reduce or limit the scope of the duty or the class of person to whom
it is owed.' "

The same approach is, I think, reflected in that passage in the speech of
Lord Devlin in the *Hedley Byrne* case [1964] A.C. 465, 524–525 in which   B
he considered the impact of *Donoghue v. Stevenson* on the facts of that
case and in which he analysed and described the method by which the
law develops:

> "In his celebrated speech in that case Lord Atkin did two things.
> He stated what he described as a 'general conception' and from that
> conception he formulated a specific proposition of law. In between   C
> he gave a warning 'against the danger of stating propositions of law
> in wider terms than is necessary, lest essential factors be omitted in
> the wider survey and the inherent adaptability of English law be
> unduly restricted.'

> "What Lord Atkin called a 'general conception of relations
> giving rise to a duty of care' is now often referred to as the
> principle of proximity. You must take reasonable care to avoid acts   D
> or omissions which you can reasonably foresee would be likely to
> injure your neighbour. In the eyes of the law your neighbour is a
> person who is so closely and directly affected by your act that you
> ought reasonably to have him in contemplation as being so affected
> when you are directing your mind to the acts or omissions which are
> called in question. . . .   E

> "Now, it is not, in my opinion, a sensible application of what
> Lord Atkin was saying for a judge to be invited on the facts of any
> particular case to say whether or not there was 'proximity' between
> the plaintiff and the defendant. That would be a misuse of a
> general conception and it is not the way in which English law
> develops. What Lord Atkin did was to use his general conception
> to open up a category of cases giving rise to a special duty. It was   F
> already clear that the law recognised the existence of such a duty in
> the category of articles that were dangerous in themselves. What
> *Donoghue v. Stevenson* did may be described either as the widening
> of an old category or as the creation of a new and similar one. The
> general conception can be used to produce other categories in the
> same way. An existing category grows as instances of its application   G
> multiply until the time comes when the cell divides. . . .

> "In my opinion, the appellants in their argument tried to press
> *Donoghue v. Stevenson* too hard. They asked whether the principle
> of proximity should not apply as well to words as to deeds. I think
> it should, but as it is only a general conception it does not get them
> very far. Then they take the specific proposition laid down by
> *Donoghue v. Stevenson* and try to apply it literally to a certificate or   H
> a banker's reference. That will not do, for a general conception
> cannot be applied to pieces of paper in the same way as to articles
> of commerce or to writers in the same way as to manufacturers.

A    An inquiry into the possibilities of intermediate examination of a
     certificate will not be fruitful. The real value of *Donoghue v.
     Stevenson* to the argument in this case is that it shows how the law
     can be developed to solve particular problems. Is the relationship
     between the parties in this case such that it can be brought within a
     category giving rise to a special duty? As always in English law, the
     first step in such an inquiry is to see how far the authorities have
B    gone, for new categories in the law do not spring into existence
     overnight."

         Perhaps, therefore, the most that can be attempted is a broad
     categorisation of the decided cases according to the type of situation in
     which liability has been established in the past in order to found an
C    argument by analogy. Thus, for instance, cases can be classified
     according to whether what is complained of is the failure to prevent the
     infliction of damage by the act of the third party (such as *Dorset Yacht
     Co. Ltd. v. Home Office* [1970] A.C. 1004, *P. Perl (Exporters) Ltd. v.
     Camden London Borough Council* [1984] Q.B. 342, *Smith v. Littlewoods
     Organisation Ltd.* [1987] A.C. 241 and, indeed, *Anns v. Merton London
     Borough Council* [1978] A.C. 728 itself), in failure to perform properly a
D    statutory duty claimed to have been imposed for the protection of the
     plaintiff either as a member of a class or as a member of the public
     (such as the *Anns* case, *Ministry of Housing and Local Government v.
     Sharp* [1970] 2 Q.B. 223, *Yuen Kun Yeu v. Attorney-General of Hong
     Kong* [1988] A.C. 175) or in the making by the defendant of some
     statement or advice which has been communicated, directly or indirectly,
E    to the plaintiff and upon which he has relied. Such categories are not,
     of course, exhaustive. Sometimes they overlap as in the *Anns* case, and
     there are cases which do not readily fit into easily definable categories
     (such as *Ross v. Caunters* [1980] Ch. 297). Nevertheless, it is, I think,
     permissible to regard negligent statements or advice as a separate
     category displaying common features from which it is possible to find at
     least guidelines by which a test for the existence of the relationship
F    which is essential to ground liability can be deduced.

         The damage which may be occasioned by the spoken or written word
     is not inherent. It lies always in the reliance by somebody upon the
     accuracy of that which the word communicates and the loss or damage
     consequential upon that person having adopted a course of action upon
     the faith of it. In general, it may be said that when any serious
G    statement, whether it takes the form of a statement of fact or of advice,
     is published or communicated, it is foreseeable that the person who
     reads or receives it is likely to accept it as accurate and to act
     accordingly. It is equally foreseeable that if it is inaccurate in a material
     particular the recipient who acts upon it may suffer a detriment which, if
     the statement had been accurate, he would not have undergone. But it
     is now clear that mere foreseeability is not of itself sufficient to ground
H    liability unless by reason of the circumstances it itself constitutes also the
     element of proximity (as in the case of direct physical damage) or unless
     it is accompanied by other circumstances from which that element may
     be deduced. One must, however, be careful about seeking to find any

general principle which will serve as a touchstone for all cases, for even   A
within the limited category of what, for the sake of convenience, I may
refer to as "the negligent statement cases," circumstances may differ
infinitely and, in a swiftly developing field of law, there can be no
necessary assumption that those features which have served in one case
to create the relationship between the plaintiff and the defendant on
which liability depends will necessarily be determinative of liability in    B
the different circumstances of another case. There are, for instance, at
least four and possibly more situations in which damage or loss may
arise from reliance upon the spoken or written word and it must not be
assumed that because they display common features of reliance and
foreseeability they are necessarily in all respects analogous. To begin
with, reliance upon a careless statement may give rise to direct physical
injury which may be caused either to the person who acts on the faith of    C
the statement or to a third person. One has only to consider, for
instance, the chemist's assistant who mis-labels a dangerous medicine, a
medical man who gives negligent telephonic advice to a parent with
regard the treatment of a sick child, or an architect who negligently
instructs a bricklayer to remove the keystone of an archway (as in
*Clayton v. Woodman & Sons (Builders) Ltd.* [1962] 2 Q.B. 533). In    D
such cases it is not easy to divorce foreseeability simpliciter and the
proximity which flows from the virtual inevitability of damage if the
advice is followed. Again, economic loss may be inflicted upon a third
party as a result of the act of the recipient of the advice or information
carried out in reliance upon it (as, for instance, the testator in *Ross v.
Caunters* [1980] Ch. 297 or the purchaser in *Ministry of Housing and
Local Government v. Sharp* [1970] 2 Q.B. 223, both cases which give    E
rise to certain difficulties of analysis). For present purposes, however, it
is necessary to consider only those cases of economic damage suffered
directly by a recipient of the statement or advice as a result of his
personally having acted in reliance upon it.

   In his dissenting judgment in *Candler v. Crane, Christmas & Co.*
[1951] 2 K.B. 164, Denning L.J. suggested three conditions for the    F
creation of a duty of care in tort in such cases. First, the advice must be
given by one whose profession it is to give advice upon which others rely
in the ordinary course of business, such as accountants, surveyors,
valuers and the like: p. 179. Secondly, it must be known to the adviser
that the advice would be communicated to the plaintiff in order to
induce him to adopt a particular course of action: p. 180. Thirdly, the
advice must be relied upon for the purpose of the particular transaction    G
for which it was known to the advisers that the advice was required:
p. 182. It is plain, however, from other passages in his judgment, that
Denning L.J. did not consider these conditions as necessarily exhaustive
criteria of the existence of a duty and the speeches in this House in the
*Hedley Byrne* case [1964] A.C. 465, where his judgment was approved,
indicate a number of directions in which such criteria are to be extended.    H
To begin with, Lord Reid, at p. 486, would not have confined liability to
statements made or advice given in the exercise of a profession involving
the giving of such advice but would have extended it to:

A      "all those relationships where it is plain that the party seeking
       information or advice was trusting the other to exercise such a
       degree of care as the circumstances required, where it was reasonable
       for him to do that, and where the other gave the information or
       advice when he knew or ought to have known that the inquirer was
       relying on him."

B   Lord Morris of Borth-y-Gest, with whom Lord Hodson agreed, whilst
    initially, at p. 502, referring to persons "possessed of a special skill"
    nevertheless went on to state the conditions in which a duty of care
    might arise in very much wider terms, at p. 503:

       "Furthermore, if in a sphere in which a person is so placed that
       others could reasonably rely upon his judgment or his skill or upon
C      his ability to make careful inquiry, a person takes it upon himself to
       give information or advice to, or allows his information or advice to
       be passed on to, another person who, as he knows or should know,
       will place reliance upon it, then a duty of care will arise."

    Nonetheless, the subsequent decision of the Privy Council in *Mutual
    Life and Citizens' Assurance Co. Ltd. v. Evatt* [1971] A.C. 793, from
D   which Lord Reid and Lord Morris dissented, would have confined the
    duty of care to cases where the advice relied upon was given in the
    course of a business or profession involving the giving of advice of the
    kind in question. For present purposes, it is unnecessary to attempt a
    resolution of the difference of opinion arising from the *Mutual Life* case,
    since there is no question here but that the certifying of the accounts
    was something done in the course of the ordinary business of the
E   appellants.
       Leaving this on one side, however, it is not easy to cull from the
    speeches in the *Hedley Byrne* case [1964] A.C. 465 any clear attempt to
    define or classify the circumstances which give rise to the relationship of
    proximity on which the action depends and indeed Lord Hodson, at
    p. 514, expressly stated (and I respectfully agree) that he did not think it
    possible to catalogue the special features which must be found to exist
F   before the duty of care will arise in the given case. Lord Devlin, at
    p. 530, is to the same effect. The nearest that one gets to the
    establishment of a criterion for the creation of a duty in the case of a
    negligent statement is the emphasis to be found in all the speeches upon
    "the voluntary assumption of responsibility" by the defendant. This is a
    convenient phrase but it is clear that it was not intended to be a test for
G   the existence of the duty for, on analysis, it means no more than that
    the act of the defendant in making the statement or tendering the advice
    was voluntary and that the law attributes to it an assumption of
    responsibility if the statement or advice is inaccurate and is acted upon.
    It tells us nothing about the circumstances from which such attribution
    arises.
       The point that is, as it seems to me, significant in the present
H   context, is the unanimous approval in this House of the judgment of
    Denning L.J. in *Candler's* case [1951] 2 K.B. 164, 181 in which he
    expressed the test of proximity in these words: "did the accountants
    know that the accounts were required for submission to the plaintiff and

use by him?" In so far as this might be said to imply that the plaintiff    A
must be specifically identified as the ultimate recipient and that the
precise purpose for which the accounts were required must be known to
the defendant before the necessary relationship can be created, Denning
L.J.'s formulation was expanded in the *Hedley Byrne* case, where it is
clear that, but for an effective disclaimer, liability would have attached.
The respondents there were not aware of the actual identity of the
advertising firm for which the credit reference was required nor of its    B
precise purpose, save that it was required in anticipation of the placing
of advertising contracts. Furthermore, it is clear that "knowledge" on
the part of the respondents embraced not only actual knowledge but
such knowledge as would be attributed to a reasonable person placed as
the respondents were placed. What can be deduced from the *Hedley
Byrne* case, therefore, is that the necessary relationship between the    C
maker of a statement or giver of advice ("the adviser") and the recipient
who acts in reliance upon it ("the advisee") may typically be held to
exist where (1) the advice is required for a purpose, whether particularly
specified or generally described, which is made known, either actually or
inferentially, to the adviser at the time when the advice is given; (2) the
adviser knows, either actually or inferentially, that his advice will be
communicated to the advisee, either specifically or as a member of an    D
ascertainable class, in order that it should be used by the advisee for
that purpose; (3) it is known either actually or inferentially, that the
advice so communicated is likely to be acted upon by the advisee for
that purpose without independent inquiry, and (4) it is so acted upon by
the advisee to his detriment. That is not, of course, to suggest that
these conditions are either conclusive or exclusive, but merely that the    E
actual decision in the case does not warrant any broader propositions.

Those propositions are, I think, in accord with the two United States
authorities which were referred to in the course of the speeches in the
*Hedley Byrne* decision. In *Glanzer v. Shepard* (1922) 135 N.E. 275,
where a public weigher negligently certified an overweight so that the
purchaser of the goods paid too much for them, the identity of the
recipient of the certificate was known, the purpose of the certificate was    F
known, and the certificate was issued for the very purpose of enabling
the price of the goods to be ascertained and with the knowledge that it
would be acted upon by the recipient for that purpose. In *Ultramares
Corporation v. Touche*, 174 N.E. 441, on the other hand—a case much
nearer to the present—the action failed. There auditors, although aware
generally that the certified accounts of the company would be shown to    G
others by the company as the basis of financial dealings generally
"according to the needs of the occasion," were unaware of the company's
specific purpose of obtaining financial help from the plaintiff.

The most recent authority on negligent misstatement in this House—
the two appeals in *Smith v. Eric S. Bush* and *Harris v. Wyre Forest
District Council* [1990] 1 A.C. 831 which were heard together—does
not, I think, justify any broader proposition than that already set out,    H
save that they make it clear that the absence of a positive intention that
the advice shall be acted upon by anyone other than the immediate
recipient—indeed an expressed intention that it shall not be acted upon

A   by anyone else—cannot prevail against actual or presumed knowledge that it is in fact likely to be relied upon in a particular transaction without independent verification. Both appeals were concerned with surveyors' certificates issued to mortgagees in connection with the proposed purchases for which the mortgagees were contemplating making advances. In each case there was an express disclaimer of responsibility, but in each case it was known to the surveyor that the substance of the

B   report (in the sense of what was important to a purchaser)—that is to say whether or not any repairs to the property were considered essential—would be made known by the mortgagee to the purchaser, the plaintiff in the action, and would be likely to be acted upon by him in entering into a contract to purchase the property. In so far as the case was concerned with the effects of the disclaimer, it does not require

C   consideration in the present context, but there are important passages in the speeches in this House bearing upon the questions which arise on this appeal and indicative of the features which, in that case, led their Lordships to conclude that the necessary relationship of proximity existed between the surveyors and the purchasers of the respective properties. Lord Templeman deduced the relationship from a combination of factors. He said, at pp. 847–848:

D        "I agree that by obtaining and disclosing a valuation, a mortgagee does not assume responsibility to the purchaser for that valuation. But in my opinion the valuer assumes responsibility to both mortgagee and purchaser by agreeing to carry out a valuation for mortgage purposes knowing that the valuation fee has been paid by the purchaser and knowing that the valuation will probably be

E        relied upon by the purchaser in order to decide whether or not to enter into a contract to purchase the house. . . . In general I am of the opinion that in the absence of a disclaimer of liability the valuer who values a house for the purpose of a mortgage, knowing that the mortgagee will rely and the mortgagor will probably rely on the valuation, knowing that the purchaser mortgagor has in effect paid for the valuation, is under a duty to exercise reasonable skill and

F        care and that duty is owed to both parties to the mortgage for which the valuation is made."

Lord Griffiths at p. 862, rejected the voluntary "assumption of responsibility" as a helpful formula for testing the existence of a duty of care observing that the phrase:

G        "can only have any real meaning if it is understood as referring to the circumstances in which the law will deem the maker of the statement to have assumed responsibility to the person who acts upon the advice."

He continued, at pp. 862, 864–865:

H        "The essential distinction between the present case and the situation being considered in *Hedley Byrne* [1964] A.C. 465 and in the two earlier cases, is that in those cases the advice was being given with the intention of persuading the recipient to act upon it. In the present case, the purpose of providing the report is to advise

A the mortgagee but it is given in circumstances in which it is highly probable that the purchaser will in fact act on its contents, although that was not the primary purpose of the report. I have had considerable doubts whether it is wise to increase the scope of the duty for negligent advice beyond the person directly intended by the giver of the advice to act upon it to those whom he knows may do so."

B "I therefore return to the question in what circumstances should the law deem those who give advice to have assumed responsibility to the person who acts upon the advice or, in other words, in what circumstances should a duty of care be owed by the adviser to those who act upon his advice? I would answer—only if it is foreseeable that if the advice is negligent the recipient is likely to suffer damage, that there is a sufficiently proximate relationship between the parties and that it is just and reasonable to impose the liability. In the case of a surveyor valuing a small house for a building society or local authority, the application of these three criteria leads to the conclusion that he owes a duty of care to the purchaser. If the valuation is negligent and is relied upon damage in the form of economic loss to the purchaser is obviously foreseeable. The necessary proximity arises from the surveyor's knowledge that the overwhelming probability is that the purchaser will rely upon his valuation, the evidence was that surveyors knew that approximately 90 per cent. of purchasers did so, and the fact that the surveyor only obtains the work because the purchaser is willing to pay his fee. It is just and reasonable that the duty should be imposed for the advice is given in a professional as opposed to a social context and liability for breach of the duty will be limited both as to its extent and amount. The extent of the liability is limited to the purchaser of the house—I would not extend it to subsequent purchasers. The amount of the liability cannot be very great because it relates to a modest house. There is no question here of creating a liability of indeterminate amount to an indeterminate class. I would certainly wish to stress that in cases where the advice has not been given for the specific purpose of the recipient acting upon it, it should only be in cases when the adviser knows that there is a high degree of probability that some other identifiable person will act upon the advice that a duty of care should be imposed. It would impose an intolerable burden upon those who give advice in a professional or commercial context if they were to owe a duty not only to those to whom they give the advice but to any other person who might choose to act upon it."

C

D

E

F

G

Finally, in relation to the *Smith* appeal, Lord Jauncey of Tullichettle observed, at p. 871–872:

"The four critical facts are that the appellants knew from the outset: (1) that the report would be shown to Mrs. Smith; (2) that Mrs. Smith would probably rely on the valuation contained therein in deciding whether to buy the house without obtaining an independent valuation; (3) that if, in these circumstances, the

H

A    valuation was, having regard to the actual condition of the house,
     excessive, Mrs. Smith would be likely to suffer loss; and (4) that she
     had paid the building society a sum to defray the appellants' fee. In
     the light of this knowledge the appellants could have declined to act
     for the building society, but they chose to proceed. In these
     circumstances they must be taken not only to have assumed
B    contractual obligations towards the building society but delictual
     obligations towards Mrs. Smith, whereby they became under a duty
     towards her to carry out their work with reasonable care and skill.
     It is critical to this conclusion that the appellants knew that Mrs.
     Smith would be likely to rely on the valuation without obtaining
     independent advice. In both *Candler v. Crane, Christmas & Co.*
     [1951] 2 K.B. 164 and *Hedley Byrne & Co. Ltd. v. Heller &*
C    *Partners Ltd.* [1964] A.C. 465, the provider of the information was
     the obvious and most easily available, if not the only available,
     source of that information. It would not be difficult therefore to
     conclude that the person who sought such information was likely to
     rely upon it. In the case of an intending mortgagor the position is
     very different since, financial considerations apart, there is likely to
D    be available to him a wide choice of sources of information, to wit,
     independent valuers to whom he can resort, in addition to the
     valuer acting for the mortgagee. I would not therefore conclude
     that the mere fact that a mortgagee's valuer knows that his valuation
     will be shown to an intending mortgagor of itself imposes upon him
     a duty of care to the mortgagor. Knowledge, actual or implied, of
     the mortgagor's likely reliance upon the valuation must be brought
E    home to him. Such knowledge may be fairly readily implied in
     relation to a potential mortgagor seeking to enter the lower end of
     the housing market but non constat that such ready implication
     would arise in the case of a purchase of an expensive property
     whether residential or commercial."

F    Thus *Smith v. Eric S. Bush* [1990] 1 A.C. 831, although establishing
     beyond doubt that the law may attribute an assumption of responsibility
     quite regardless of the expressed intentions of the adviser, provides no
     support for the proposition that the relationship of proximity is to be
     extended beyond circumstances in which advice is tendered for the
     purpose of the particular transaction or type of transaction and the
     adviser knows or ought to know that it will be relied upon by a
G    particular person or class of persons in connection with that transaction.
     The judgment of Millett J. in the recent case of *Al Saudi Banque v.*
     *Clarke Pixley* [1990] Ch. 313 (decided after the decision of the Court of
     Appeal in the instant case) contains an analysis of the decision of this
     House in *Smith v. Eric S. Bush* and concludes—and I agree—that it
     established a more stringent test of the requirements for proximity than
H    that which had been applied by the Court of Appeal in the instant case.
     At p. 335–336 of his judgment, Millett J. gives what I find a helpful
     analysis of that case and of the features which distinguished it from the
     *Hedley Byrne* case and from the instant case:

"In each of the cases considered by the House of Lords, A
therefore, there was a tripartite transaction in which the valuation
could realistically be regarded as provided by the valuer to the
purchaser. In each of the cases the valuation was given to the
mortgagee with the intention of being acted on by him in a specific
transaction known to the valuer, viz: the making of a mortgage
offer in connection with a specific transaction of house purchase,
and in the knowledge that the valuation or the gist of the valuation B
would be communicated to the purchaser and would in all probability
be relied upon by him in deciding whether to go ahead with the
very transaction for which the mortgage offer was sought. This was
a much more restricted context in which to found a duty of care
than was present in the *Caparo* case, for there was in contemplation
not only a particular and identified recipient of the information to C
whom the defendant knew that it would be communicated, but a
particular and known purpose for which he could foresee that it
would be relied on.

"In *Hedley Byrne* [1964] A.C. 465 and the cases which followed
it, the statement was made directly to the plaintiff with the intention
that the plaintiff should act upon it. The *JEB Fasteners* case [1983]
1 All E.R. 583 can be supported only on the basis that the D
statement was impliedly confirmed directly to the plaintiff without
any such intention, but with a particular transaction in contemplation,
and it was foreseeable that the plaintiff would rely upon it in that
transaction. In *Caparo's* case [1989] Q.B. 653 it was made to the
plaintiff without any such intention and without any particular
transaction in contemplation, but it was foreseeable that the plaintiff E
might rely upon it in some unknown future transaction. In *Smith v.
Eric S. Bush* [1990] 1 A.C. 831 it was made to a third party with
the intention that he should act upon it in a known and contemplated
transaction, but in the knowledge that it would be communicated to
the plaintiff and would almost certainly be relied upon by him in
connection with a transaction without which the transaction of the
third party could not proceed." F

My Lords, no decision of this House has gone further than *Smith v.
Eric S. Bush*, but your Lordships are asked by the respondents to widen
the area of responsibility even beyond the limits to which it was
extended by the Court of Appeal in this case and to find a relationship
of proximity between the adviser and third parties to whose attention G
the advice may come in circumstances in which the reliance said to have
given rise to the loss is strictly unrelated either to the intended recipient
or to the purpose for which the advice was required. My Lords, I
discern no pressing reason of policy which would require such an
extension and there seems to me to be powerful reasons against it. As
Lord Reid observed in the course of his speech in *Hedley Byrne* [1964]
A.C. 465, 483, words can be broadcast with or without the consent or H
foresight of the speaker or writer; and in his speech in the same case,
Lord Pearce drew attention to the necessity for the imposition of some
discernible limits to liability in such cases. He said, at p. 534:

A        "The reason for some divergence between the law of negligence
     in word and that of negligence in act is clear. Negligence in word
     creates problems different from those of negligence in act. Words
     are more volatile than deeds. They travel fast and far afield. They
     are used without being expended and take effect in combination
     with innumerable facts and other words. Yet they are dangerous
     and can cause vast financial damage. How far they are relied on
B    unchecked . . . must in many cases be a matter of doubt and
     difficulty. If the mere hearing or reading of words were held to
     create proximity, there might be no limit to the persons to whom
     the speaker or writer could be liable."

     As I have already mentioned, it is almost always foreseeable that
C  someone, somewhere and in some circumstances, may choose to alter
   his position upon the faith of the accuracy of a statement or report
   which comes to his attention and it is always foreseeable that a report—
   even a confidential report—may come to be communicated to persons
   other than the original or intended recipient. To apply as a test of
   liability only the foreseeability of possible damage without some further
   control would be to create a liability wholly indefinite in area, duration
D  and amount and would open up a limitless vista of uninsurable risk for
   the professional man.
     On the basis of the pleaded case, as amended, it has to be assumed
   that the appellants, as experienced accountants, were aware or should
   have been aware that Fidelity's results made it vulnerable to take-over
   bids and that they knew or ought to have known that a potential bidder
E  might well rely upon the published accounts in determining whether to
   acquire shares in the market and to make a bid. It is not, however,
   suggested that the appellants, in certifying the accounts, or Parliament,
   in providing for such certification, did so for the purpose of assisting
   those who might be minded to profit from dealings in the company's
   shares. The respondents, whilst accepting that it is no part of the
   purpose of the preparation, certification and publication of the accounts
F  of a public company to provide information for the guidance of predators
   in the market, nevertheless argue that the appellants' knowledge that
   predators might well rely upon the accounts for this purpose sufficiently
   establishes between them and potential bidders that relationship of
   "proximity" which founds liability. On the face of it, this submission
   appears to equate "proximity" with mere foreseeability and to rely upon
G  the very misinterpretation of the effect of the decision of this House in
   the *Anns* case [1978] A.C. 728 which was decisively rejected in the
   *Governors of Peabody Donation Fund v. Sir Lindsay Parkinson & Co.
   Ltd.* [1985] A.C. 210 and in *Yuen Kun Yeu v. Attorney-General of Hong
   Kong* [1988] A.C. 175. Your Lordships have been referred, however, to
   three authorities, one from New Zealand and two from the United
   Kingdom, which do undoubtedly support the respondents' contention.
H     In *Scott Group Ltd. v. McFarlane* [1978] N.Z.L.R. 553, the
   defendants were the auditors of a company which had been successfully
   taken over in reliance upon certified consolidated accounts in which, as
   a result of double-counting, the assets were overstated. It was admitted

that the failure of the defendants to discover the discrepancy was due to  A
negligence. In the Supreme Court of New Zealand, Quilliam J.
dismissed the plaintiffs' claim on the ground that the appellants, though
careless, owed them no duty of care. An appeal to the Court of Appeal
failed but the court was divided as to the reasons. Richmond P. held
that the appeal failed for the same reason as that stated by the trial
judge. Woodhouse J. would have allowed the appeal. Cooke J., on the
other hand, whilst concurring with Woodhouse J. that the respondents  B
did in fact owe a duty of care to the appellants, held that the appeal
failed because they had failed to show any recoverable loss.

The more restrictive view was expressed by Richmond P. in the
following terms, at pp. 566–567:

"The question in any given case is whether the nature of the
relationship is such that one party can fairly be held to have  C
assumed a responsibility to the other as regards the reliability of the
advice or information. I do not think that such a relationship
should be found to exist unless, at least, the maker of the statement
was, or ought to have been, aware that his advice or information
would in fact be made available to and be relied on by a particular
person or class of persons for the purposes of a particular transaction  D
or type of transaction. I would especially emphasise that to my
mind it does not seem reasonable to attribute an assumption of
responsibility unless the maker of the statement ought in all the
circumstances, both in preparing himself for what he said and in
saying it, to have directed his mind, and to have been able to direct
his mind, to some particular and specific purpose for which he was
aware that his advice or information would be relied on. In many  E
situations that purpose will be obvious. But the annual accounts of
a company can be relied on in all sorts of ways and for many
purposes. It would be going too far to treat accountants as
assuming a responsibility towards all persons dealing with the
company or its members, in reliance to some greater or lesser
degree on the accuracy of the accounts, merely because it was  F
reasonably foreseeable, in a general way, that a transaction of the
kind in which the plaintiff happened to become involved might
indeed take place. The relationship between the parties would, I
think, be too general and not sufficiently 'special' to come within
the principles underlying the decision in *Hedley Byrne*. As I have
said, I believe it to be essential to the existence of a 'special
relationship' that the maker of the statement was or should have  G
been aware that his advice was required for use in a specific type of
contemplated transaction. This requirement has not always required
emphasis in the course of judicial discussion as to the nature of a
special relationship. Probably this is because in most cases the
purpose for which the information was required was, on the facts,
quite obvious. But certainly this particular point was made very
clear indeed in Denning L.J.'s judgment in *Candler v. Crane,  H
Christmas & Co.* I would think that it must almost inevitably
follow, once the maker of the statement is aware of a specific
purpose for which his information will be used, that he will also

2 A.C.                    Caparo Plc. v. Dickman (H.L.(E.))

A          have in direct contemplation a specific person or class of persons,
           even though unidentified by name."

           The New Zealand Companies Act 1955 contained provisions relating
    to the auditors' report which is similar in substance to those contained in
    the United Kingdom legislation but with this variation, that the "true
    and fair view" which group accounts are certified to give are qualified by
B   the words "so far as concerns members of the company." In relation to
    these provisions, Richmond P. observed, at p. 568:

           "The provisions of the Act to which I have just referred are
        aimed essentially at the protection of the members of the company
        and of course the auditors, whose contract of employment is with
        the company itself, are under a contractual duty of care to the
C       company. These provisions do not encourage me to take the view
        that there is any reason why the auditors of a public company
        should thereby come under a common law duty of care to third
        persons dealing with the company or its members on the faith of
        their audit certificate, such liability being in some way based on a
        much wider principle than would apply, for example, in the case of
        auditors certifying the accounts of a private company. Like Quilliam
D       J., I can also see no reason to differentiate between auditors as such
        and a firm of chartered accountants employed to prepare the
        accounts of the company. The only point which has given me some
        concern, so far as the statutory provisions are concerned, is the
        requirement of section 133(1) whereby a copy of the balance sheet
        and auditors' report is required to be annexed to the annual return
        and thus becomes available to the public under section 9(1) of the
E       Act. But on reflection, this only means that the auditor of the
        accounts of a public company knows that the accounts and his
        report will become available to the public generally and,
        consequently, may be relied on by one or more members of the
        public, to some greater or lesser degree, as the basis of some
        business transaction. It is not suggested, however, that the
F       Companies Act imposes any statutory duty of care as between
        auditors and members of the public who rely on the accounts. In
        the case of a company whose shares are listed on the Stock
        Exchange the auditor will also know that under the Stock Exchange
        rules a copy of the accounts must be made available. He knows,
        too, that shareholders will receive copies of the accounts and that
        the company itself may well make copies available to business
G       institutions and individuals for various purposes. In the end all
        these matters merely add up to the fact that the auditor of a public
        company will necessarily have in his contemplation the possibility
        that the accounts may be relied on in all sorts of ways by persons
        other than the company and its members. This, as I have said, is
        not sufficient to bring about a 'special relationship.'"

H   Both Woodhouse and Cooke JJ., who favoured a wider view of
    responsibility, based themselves upon an interpretation of the speech of
    Lord Wilberforce in the *Anns* case [1978] A.C. 728 which required, as
    the first stage of the two-stage inquiry to which he there referred, no

more than a consideration of whether harm was foreseeable, thus A
equating the "proximate relationship" as comprehending foresight and
nothing more. This is made quite clear from the following passage in
the judgment of Woodhouse J., at p. 574:

> "In this regard it will be noticed that although the first part of
> the inquiry outlined by Lord Wilberforce is to ask whether 'there is
> a sufficient relationship of proximity' in order to decide whether B
> there is a prima facie duty of care, he would test the sufficiency of
> proximity simply by the reasonable contemplation of likely harm.
> And, with respect, I do not think that there is any need for or any
> sound reason in favour of a more restrictive approach. The issue
> has been made increasingly complex by the successive and varying
> formulas that have been used in an effort to confine the general
> area of responsibility, in particular for negligent words or in respect C
> of purely economic losses. At this initial stage at least it should be
> possible to remove some degree of uncertainty—in my opinion it
> is done by the comprehensible and straightforward test of
> foreseeability."

Woodhouse J., again emphasised foreseeability as the relevant test for
the creation of the relationship of proximity in his judgment where he D
said, at p. 575:

> "Although an audit is undertaken on behalf of the members of a
> public company it must be within the reasonable contemplation of
> any auditor that confidence in its ability to handle its commercial
> arrangements would depend upon the authenticity of its accounts—
> a confidence that would disappear if reliance could not be put upon E
> the audit report. So I think that when auditors deliberately
> undertake to provide their formal report upon the accounts of a
> public company they must be taken to have accepted not merely a
> direct responsbility to the shareholders but a further duty to those
> persons whom they can reasonably foresee will need to use and rely
> upon them when dealing with the company or its members in F
> significant matters affecting the company assets and business. An
> example, no doubt, would be the banker asked to make substantial
> advances on the security of the company undertaking. On the other
> hand, there would seem to be formidable difficulties for a plaintiff
> who attempted to prove that an auditor should have foreseen the
> plaintiff's likely reliance upon some newspaper or a Stock Exchange
> reference to a company's accounts. However, it is sufficient for G
> present purposes to restrict consideration to a take over offer
> related, as so frequently is the position, to the value of shareholders'
> funds. In such a situation the need to rely upon audited accounts
> is, I think, quite obvious. As a matter of commercial reality I think
> the auditor and offeror are in a relationship of close proximity."

Cooke J. was to the same effect. At p. 583 he adopted, as the first step H
of Lord Wilberforce's two-stage approach, the formulation which equates
the relationship of proximity with foreseeability, although at an earlier
stage of his judgment he seemed to be disposed to regard the essential

A  relationship as arising not simply from the foreseeability that a member
of the public might rely on the accounts as a basis of some transaction
but, for a reason which I confess I do not fully understand, from the
foreseeability that some member of the public might rely on the accounts
for the making of a take-over bid. He said, at p. 581:

B       "The learned judge in the Supreme Court was disposed to
        regard the requirement of filing audited accounts, which are available
        for public inspection, as not imposed by Parliament for the purpose
        of enabling people to deal confidently in reliance on the accuracy of
        the accounts. He thought it much more likely that the purpose was
        to enable a proper supervision to be exercised over the activities of
        companies, and to enable those concerned to ensure that the
        companies were not trading illegally or dishonestly. With respect, I
C       am unable to agree with him on that point. The statutory
        requirements regarding the filing of financial information stem, I
        think, from the view that those *dealing with* or *investing in* a limited
        liability company have a legitimate interest in being afforded
        reasonable access to relevant information; and that this interest has
        to be balanced against the wish for confidentiality naturally
        entertained by family companies and the like which do not appeal
D       to the public for funds. . . . I would agree, though, that the
        provisions are probably not aimed, or at least not primarily, at
        protecting purchasers of shares in the market."

Thus the majority of the Court of Appeal favoured a more extensive
view of the circumstances from which the essential relationship between
E  plaintiff and defendant may be inferred in a negligent statement case
than had yet emerged from any decision in the United Kingdom.

Now, of course, any decision of the Court of Appeal of New
Zealand is entitled to the very greatest respect, but it has to be observed
that the majority view was based upon an interpretation of Lord
Wilberforce's observations in the *Anns* case [1978] A.C. 728, 751–752
which has since been severely qualified by subsequent decisions of this
F  House.

The *Scott Group* case [1978] N.Z.L.R. 553 has, however, since been
referred to and accepted in two cases decided in the United Kingdom.
In *JEB Fasteners Ltd. v. Marks Bloom & Co.* [1981] 3 All E.R. 289, the
plaintiffs who had acquired the shares of the company as a result of a
take-over, claimed damages against the company's auditors who, it was
G  claimed, had been negligent in certifying the accounts. Woolf J.
dismissed the claim on the ground that the plaintiffs failed to show the
causative connection between reliance on the erroneous accounts and
the take-over and his decision was subsequently affirmed by the Court of
Appeal [1983] 1 All E.R. 583. In the course of his judgment, however,
Woolf J. made the following observation with regard to the auditors'
liability [1981] 3 All E.R. 289, 296–297:

H       "Without laying down any principle which is intended to be of
        general application, on the basis of the authorities which I have
        cited, the appropriate test for establishing whether a duty of care
        exists appears in this case to be whether the defendants knew or

reasonably should have foreseen at the time the accounts were    A
audited that a person might rely on those accounts for the purpose
of deciding whether or not to take over the company and therefore
could suffer loss if the accounts were inaccurate. Such an approach
does place a limitation on those entitled to contend that there has
been a breach of duty owed to them. First of all, they must have
relied on the accounts and, second, they must have done so in
circumstances where the auditors either knew that they would or    B
ought to have known that they might. If the situation is one where
it would not be reasonable for the accounts to be relied on, then, in
the absence of express knowledge, the auditor would be under no
duty. This places a limit on the circumstances in which the audited
accounts can be relied on and the period for which they can be
relied on. The longer the period which elapses prior to the    C
accounts being relied on, from the date on which the auditor gave
his certificate, the more difficult it will be to establish that the
auditor ought to have foreseen that his certificate would, in those
circumstances, be relied on."

Now although he disclaimed any intention of laying down a general
principle, it is clear that Woolf J., like Woodhouse and Cooke JJ., was    D
interpreting Lord Wilberforce's two-stage approach in the *Anns* case as
establishing a test of proximity which depended on the foreseeability of
harm alone and that he regarded the limits of liability as being set not
by the need for any relationship other than such as might be inferred
from such foreseeability but by the factual difficulties likely to be
encountered in establishing foreseeability in cases in which the reliance
essential to the cause of action was separated in time from the statement    E
or advice relied upon. In the light, therefore, of the observations of
Lord Keith of Kinkel in the *Peabody* case [1985] A.C. 210 and in the
*Yuen Kun Yeu* case [1988] A.C. 175, this case provides no very
convincing authority for the respondents' proposition, although, as
Bingham L.J. observed in the instant case, the facts were such as to
justify a finding of a relationship of proximity without any extension of    F
the criteria suggested by Denning L.J. in his judgment in *Candler's* case
[1951] 2 K.B. 164.

The third case upon which the respondents rely is the decision of the
Outer House of the Court of Session in *Twomax Ltd. v. Dickson,
McFarlane & Robinson*, 1982 S.C. 113, the facts in which have a broad
similarity to those in the *JEB Fasteners* case and in the instant case.    G
The court was concerned with three separate claims from investors (one
of whom was a company and two of whom were individuals) who had
acquired shares in a private company which, shortly after the investments
were made, went into receivership and was subsequently wound up. All
three investors claimed that their respective investments were made on
the faith of the company's audited accounts which had been negligently
prepared and certified by the defenders, the company's auditors, in the    H
course of their statutory audit. The Lord Ordinary (Lord Stewart), at
pp. 122–124, having contrasted the limitations appearing from the
speeches of Lord Morris and Lord Hodson in the *Hedley Byrne* case

A    with the broader formulation of general principle in the speech of Lord
Wilberforce in the *Anns* case, accepted the latter as governing the
proper approach to the question of whether or not the essential
relationship between pursuers and defenders was established in a
negligent statement case and followed the guidance of the majority
judgments of the New Zealand Court of Appeal in the *Scott Group*
case, save that he could not draw any sensible distinction between the

B   case of the corporate pursuer, which had acquired the controlling
interest, and that of the individual minority investors. He thus, by
implication, rejected the suggestion that a potential bidder in the market
is in some special position as compared with other investors such as to
create between him and the auditors carrying out their statutory duties,
a special relationship which does not arise in the case of an investor

C   concerned to acquire only a minority interest. And this, with respect,
must be correct, for there can be no logical distinction according to
whether an investor is likely to acquire many shares or only a few. Such
distinction as there is lies only in the scale of the potential loss which
may be little or great according to the magnitude of the investment.
Indeed, as he pointed out, it could legitimately be said that the smaller
the investment the greater the likelihood of the investor accepting the

D   audited accounts as the basis for his action without making any
independent investigation. In the result, Lord Stewart held that the
knowledge to be imputed to the defenders that there would or might
well be potential investors in the market who would be interested in
purchasing existing shares or subscribing for new shares and who might
be influenced by the accounts was sufficient to create between them and

E   such investors the relationship of proximity which gave rise to an
enforceable duty of care.

    This case, therefore, falls into the same category as the other two
cases. All three were based upon the view of Lord Wilberforce's
exposition in the *Anns* case [1978] A.C. 728 which would result in
foreseeability and proximity being treated as synonymous—a view which
this House (and, indeed, Lord Wilberforce himself in *McLoughlin v.*

F   *O'Brian* [1983] 1 A.C. 410) has now decisively rejected. That, of
course, does not conclude the question for it would still be open to your
Lordships to find in the circumstances of this case that a special
relationship existed between the auditor conducting an annual audit in
pursuance of his statutory duty and every potential investor in the
market or, indeed, any other person who might do business with the

G   company without relying solely upon the foreseeability of potential
damage to such person. Just as, for instance, in *Smith v. Eric S. Bush*
[1990] 1 A.C. 831, one of the factors giving rise to the relationship in
that case was the circumstance that the plaintiff was the person who paid
for the report upon which the reliance was placed, so here it might be
said that a special relationship was to be found in the nature and extent
of the statutory duties which the auditor is called upon to fulfil.

H     For my part, however, I can see nothing in the statutory duties of a
company's auditor to suggest that they were intended by Parliament to
protect the interests of investors in the market and I see no reason in
policy or in principle why it should be either desirable or appropriate

that the ambit of the special relationship required to give rise to liability       A
in cases such as the present should be extended beyond those limits
which are deducible from the cases of *Hedley Byrne* and *Smith v. Eric S.
Bush*. Those limits appear to me to be correctly and admirably stated in
the passages from the judgment of Richmond P. in the *Scott Group* case
to which I have already referred. In particular, I see no reason why any
special relationship should be held to arise simply from the circumstance
that the affairs of the company are such as to render it susceptible to the        B
attention of predators in the market who may be interested in acquiring
all or the majority of the shares rather than merely a parcel of shares by
way of addition to a portfolio. It follows that I would dismiss the
respondents' cross-appeal.

I turn, therefore, to the question raised by the appellants' appeal.
The Court of Appeal, whilst rejecting unanimously the respondents'             C
contention that the appellants owed them a duty of care simply as
potential investors in the market, nevertheless by a majority allowed
their claim that a similar duty was owed to them in their capacity as
shareholders from the date when they first became registered in respect
of shares which they had purchased. Now it cannot be nor is it claimed
that this event created for the appellants any new or greater risk of
harm in relation to a certification which had already taken place; nor        D
can it be claimed that it brought about some change in the quality or
extent of the respondents' reliance upon the (ex hypothesi) inaccurate
information which they had previously received and digested. The only
difference in their position before registration and their position
afterwards was that, as registered shareholders, they now had the
statutory right to receive the accounts on which they had already relied       E
in acquiring their original shares and to receive notice of and attend the
annual general meeting of Fidelity at which the accounts were to be read
and, if thought fit, approved and passed. This change of position seems,
on the face of it, less than momentous and in fact they did not trouble
to appoint a representative to attend the meeting on their behalf. If a
distinction is to be found at all, therefore, it can only be that the nature
and purpose of the statutory provisions governing the appointment and         F
duties of auditors and the certification and publication to shareholders
and others of the accounts have the effect of creating, between the
auditors and individual shareholders, as potential investors in that
capacity, that special relationship of proximity which is required to give
rise to the duty of care and which does not exist between the auditors
and the investing public generally.                                            G

Now if it be right, as, for my part, I believe that it is and as the
Court of Appeal has held, that no relationship of proximity and thus no
duty of care exists between auditors and the investing public generally in
relation to the statutory audit—I say nothing, of course, about a case
where accounts are audited specifically for the purpose of submission to
a potential investor—the attribution of such a duty arising from the
receipt of exactly the same information by a person who happens to be          H
the registered holder of a share in the company whose accounts are in
question produces entirely capricious results. O'Connor L.J. [1989]
Q.B. 653, 715, in his dissenting judgment, instanced the case of a

A   shareholder who, having purchased further shares at an overvalue on
    the basis of the accounts, shows the accounts to a friend who has no
    existing shareholding but proceeds to make a similar purchase. Each
    receives exactly the same information; each relies upon it in exactly the
    same way and for the same purpose; and the loss sustained in both cases
    is identical and is equally foreseeable. Yet liability is said to exist in the
    one case but not in the other. One has indeed only to consider the
B   circumstances of the instant case which must ultimately result in drawing
    a distinction between the loss sustained as a result of the initial purchase
    of shares (irrecoverable) and that sustained as a result of purchases
    made after the first registration (recoverable) although all purchases
    were made in reliance upon exactly the same information.

        So unreasonable a distinction must call in question the analysis which
C   leads to it. The majority in the Court of Appeal deduced the
    relationship from what Bingham L.J. described, at p. 684D, as "the
    degree of closeness between the parties." It was pointed out that
    although the auditors are appointed and paid by the company that is the
    result of the vote of the shareholders in general meeting and their
    remuneration is paid out of funds which might otherwise be available for
    distribution to shareholders by way of dividend. Their duty is to report
D   to the shareholders whether the accounts give a true and fair view of the
    company's financial position and their report is sent to each shareholder
    as an identifiable individual. Thus, it was said, the relationship, although
    not a contractual one, was very close to being contractual and was
    moreover one in which a lack of care would be likely directly to affect
    the very person whose interest the auditor is engaged to protect, should
E   that person choose to rely upon the accounts for the purpose of making
    or disposing of an investment. My Lords, of course I see the force of
    this, but, as I have already suggested, "proximity" in cases such as this is
    an expression used not necessarily as indicating literally "closeness" in a
    physical or metaphorical sense but merely as a convenient label to
    describe circumstances from which the law will attribute a duty of care.
    It has to be borne in mind that the duty of care is inseparable from the
F   damage which the plaintiff claims to have suffered from its breach. It is
    not a duty to take care in the abstract but a duty to avoid causing to the
    particular plaintiff damage of the particular kind which he has in fact
    sustained. I cannot improve on the analysis which is to be found in the
    judgment of Brennan J. in the High Court of Australia in the *Shire of
    Sutherland* case, 60 A.L.R. 1 to which I have already referred. After
G   citing the speech of Viscount Simonds in *The Wagon Mound* [1961]
    A.C. 388, 425, where he observed that it was vain to isolate the liability
    from its context and to say that B is or is not liable and then to ask for
    what damage he is liable, Brennan J. continued, at p. 48:

            "The corollary is that a postulated duty of care must be stated in
        reference to the kind of damage that a plaintiff has suffered and in
        reference to the plaintiff or a class of which the plaintiff is a
H       member. I venture to repeat what I said in *John Pfeiffer Pty. Ltd.
        v. Canny* (1981) 148 C.L.R. 218, 241–242: 'His duty of care is a
        thing written on the wind unless damage is caused by the breach of
        that duty; there is no actionable negligence unless duty, breach and

consequential damage coincide . . . for the purposes of determining liability in a given case, each element can be defined only in terms of the others.' It is impermissible to postulate a duty of care to avoid one kind of damage—say, personal injury—and, finding the defendant guilty of failing to discharge that duty, to hold him liable for the damage actually suffered that is of another independent kind—say, economic loss. Not only may the respective duties differ in what is required to discharge them; the duties may be owed to different persons or classes of persons. That is not to say that a plaintiff who suffers damage of some kind will succeed or fail in an action to recover damages according to his classification of the damage he suffered. The question is always whether the defendant was under a duty to avoid or prevent that damage, but the actual nature of the damage suffered is relevant to the existence and extent of any duty to avoid or prevent it."

In seeking to ascertain whether there should be imposed on the adviser a duty to avoid the occurrence of the kind of damage which the advisee claims to have suffered it is not, I think, sufficient to ask simply whether there existed a "closeness" between them in the sense that the advisee had a legal entitlement to receive the information upon the basis of which he has acted or in the sense that the information was intended to serve his interest or to protect him. One must, I think, go further and ask, in what capacity was his interest to be served and from what was he intended to be protected? A company's annual accounts are capable of being utilised for a number of purposes and if one thinks about it it is entirely foreseeable that they may be so employed. But many of such purposes have absolutely no connection with the recipient's status or capacity, whether as a shareholder, voting or non-voting, or as a debenture-holder. Before it can be concluded that the duty is imposed to protect the recipient against harm which he suffers by reason of the particular use that he chooses to make of the information which he receives, one must, I think, first ascertain the purpose for which the information is required to be given. Indeed the paradigmatic *Donoghue v. Stevenson* case of a manufactured article requires, as an essential ingredient of liability, that the article has been used by the consumer in the manner in which it was intended to be used: see *Grant v. Australian Knitting Mills Ltd.* [1936] A.C. 85, 104 and *Junior Books Ltd. v. Veitchi Co. Ltd.* [1983] 1 A.C. 520, 549, 552. I entirely follow that if the conclusion is reached that the very purpose of providing the information is to serve as the basis for making investment decisions or giving investment advice, it is not difficult then to conclude also that the duty imposed upon the adviser extends to protecting the recipient against loss occasioned by an unfortunate investment decision which is based on carelessly inaccurate information. Bingham L.J. did, indeed, conclude that the provision of guidance for the making of investment decisions was one of the purposes to be discerned in the statutory provisions. He observed [1989] Q.B. 653, 681–682:

" . . . I think these provisions also reflect a wider and more commercial intention. The growth and development of limited

A   liability companies over a relatively very short period have been
    phenomenal. Their proliferation and expansion have depended on
    their acceptance by the investing public as an advantageous and (on
    the whole) reliable medium of investment. The statutory
    requirements that companies account to their members and that
    auditors express an independent opinion to shareholders on the
    truth and accuracy of company accounts are in my view designed (in
B   part at least) to fortify confidence in the holding of shares as a
    medium of investment by enabling shareholders to make informed
    investment decisions. There are obvious reasons, both economic
    and social, why this end should be regarded as desirable."

    How far he regarded this as an essential feature of the relationship of
C   proximity which he held to exist between the appellants and the
    respondents as shareholders is not, however, entirely clear, for he
    attributed the same intention to the legislature in relation to investors
    generally. He said, at p. 682:

        "The publication of accounts must limit, if it cannot eliminate,
        the scope for rumour-inspired speculation and thus promote an
        informed and orderly market. It enables prospective investors, like
D       shareholders, to make informed decisions. For such prospective
        investors the independent opinion of the auditor has the same
        significance as for existing shareholders."

    As I have already indicated, I am not, for my part, able to share this
    view of the intention of the legislature. I do not believe and I see no
E   grounds for believing that, in enacting the statutory provisions, Parliament
    had in mind the provision of information for the assistance of purchasers
    of shares or debentures in the market, whether they be already the
    holders of shares or other securities or persons having no previous
    proprietary interest in the company. It is unnecessary to decide the
    point on this appeal, but I can see more force in the contention that one
    purpose of providing the statutory information might be to enable the
F   recipient to exercise whatever rights he has in relation to his proprietary
    interest by virtue of which he receives it, by way, for instance, of
    disposing of that interest. I can, however, see no ground for supposing
    that the legislature was intending to foster a market for the existing
    holders of shares or debentures by providing information for the purpose
    of enabling them to acquire such securities from other holders who
    might be minded to sell.
G
        For my part, I think that the position as regards the auditor's
    statutory duty was correctly summarised by O'Connor L.J. in his
    dissenting judgment when he said, at p. 714:

        "The statutory duty owed by auditors to shareholders is, I think,
        a duty owed to them as a body. I appreciate that it is difficult to
        see how the over-statement of the accounts can cause damage to the
H       shareholders as a body; it will be the underlying reasons for the
        over-statement which cause damage, for example fraudulent
        abstraction of assets by directors or servants, but such loss is
        recoverable by the company. I am anxious to limit the present case

654

to deciding whether the statutory duty operates to protect the    A
individual shareholder as a potential buyer of further shares. If I
am wrong in thinking that under the statute no duty is owed to
shareholders as individuals, then I think the duty must be confined
to transactions in which the shareholder can only participate because
he is a shareholder. The Companies Act 1985 imposes a duty to
shareholders as a class and the duty should not extend to an
individual save as a member of the class in respect of some class    B
activity. Buying shares in a company is not such an activity."

In my judgment, accordingly, the purpose for which the auditors'
certificate is made and published is that of providing those entitled to
receive the report with information to enable them to exercise in
conjunction those powers which their respective proprietary interests
confer upon them and not for the purposes of individual speculation    C
with a view to profit. The same considerations as limit the existence of
a duty of care also, in my judgment, limit the scope of the duty and I
agree with O'Connor L.J. that the duty of care is one owed to the
shareholders as a body and not to individual shareholders.

To widen the scope of the duty to include loss caused to an
individual by reliance upon the accounts for a purpose for which they    D
were not supplied and were not intended would be to extend it beyond
the limits which are so far deducible from the decisions of this House.
It is not, as I think, an extension which either logic requires or policy
dictates and I, for my part, am not prepared to follow the majority of
the Court of Appeal in making it. In relation to the purchase of shares
of other shareholders in a company, whether in the open market or as a
result of an offer made to all or a majority of the existing shareholders,    E
I can see no sensible distinction, so far as a duty of care is concerned,
between a potential purchaser who is, vis-à-vis the company, a total
outsider and one who is already the holder of one or more shares. I
accordingly agree with what has already fallen from my noble and
learned friend, Lord Bridge of Harwich, and with the speech to be
delivered by my noble and learned friend, Lord Jauncey of Tullichettle,    F
which I have had the advantage of reading, and I, too, would allow the
appeal and dismiss the cross-appeal.

LORD JAUNCEY OF TULLICHETTLE.  My Lords, it no longer requires a
detailed citation of authority to vouch the well-established proposition
that a negligent statement may, in certain circumstances, render the
maker thereof liable for economic loss occasioned thereby to another.    G
It is sufficient to mention *Cann v. Willson* (1888) 39 Ch.D. 39, the
dissenting judgment of Denning L.J. in *Candler v. Crane, Christmas &
Co.* [1951] 2 K.B. 164, and two cases in this House, *Hedley Byrne &
Co. Ltd v. Heller & Partners Ltd.* [1964] A.C. 465 and *Smith v. Eric S.
Bush* [1990] 1 A.C. 831. Whether liability exists in any particular case
will depend upon whether the maker of the statement owes a duty of
care to the person who has suffered loss. In this connection I cannot do    H
better than quote the words of Lord Keith of Kinkel in *Governors of
Peabody Donation Fund v. Sir Lindsay Parkinson & Co. Ltd.* [1985]
A.C. 210, 240–241:

A
"The true question in each case is whether the particular defendant owed to the particular plaintiff a duty of care having the scope which is contended for, and whether he was in breach of that duty with consequent loss to the plaintiff. A relationship of proximity in Lord Atkin's sense must exist before any duty of care can arise, but the scope of the duty must depend on all the circumstances of the case. . . . So in determining whether or not a
B
duty of care of particular scope was incumbent upon a defendant it is material to take into consideration whether it is just and reasonable that it should be so."

The relationship of proximity to which Lord Keith referred is not one which is created solely by the foreseeability of harm resulting from carelessness in the statement, but is one in which some further ingredient
C
importing proximity is present. Thus in *Hill v. Chief Constable of West Yorkshire* [1989] A.C. 53, 60 Lord Keith said:

"It has been said almost too frequently to require repetition that foreseeability of likely harm is not in itself a sufficient test of liability in negligence. Some further ingredient is invariably needed to establish the requisite proximity of relationship between plaintiff
D
and defendant, and all the circumstances of the case must be carefully considered and analysed in order to ascertain whether such ingredient is present."

Once foreseeability of likely harm from a careless statement has been established, it becomes necessary to examine the circumstances in and the purposes for which the statement was made in order to determine
E
whether there are also present the further ingredients necessary to establish the requisite proximity of relationship between the maker of the statement and the person who has acted upon it. As Bingham L.J. observed in the present case, the concept of proximity is somewhat elusive, extending as it does beyond mere physical proximity. It might be described as the circumstances in which the law considers it proper
F
that a duty of care should be imposed on one person towards another. If in any given circumstances a relation of proximity is found to exist, consideration must still be given to the scope of the duty which arises therefrom. In the case of physical proximity, few problems will arise, but where there exists a duty of care in relation to the making of statements, written or oral, problems may arise if those statements are capable of being used for more than one purpose. It is not disputed in
G
the present case that economic loss to the plaintiff as a shareholder was foreseeable by the auditors as a result of any failure on their part to exercise reasonable care in the conduct of the audit. What is disputed is whether the auditors owed any duty to individual shareholders, and if so, what was the scope of that duty.

Before examining the circumstances in this case which may be relevant to the existence of a relationship of proximity, it is helpful to
H
look in a little more detail at the four cases dealing with negligent statements to which I have already referred. In *Cann v. Willson*, 39 Ch.D. 39, valuers instructed by an intending mortgagor sent the valuation to solicitors acting for an intending mortgagee knowing that it

was hoped thereby to induce the mortgagee to make a loan. Chitty J.   A
held that in the circumstances the valuers owed a duty of care to the
mortgagee. In *Candler v. Crane, Christmas & Co.* [1951] 2 K.B. 164,
the accountants were aware that the accounts were to be shown by their
employer to the plaintiff who was a potential investor, and indeed their
clerk discussed those accounts with him. Denning L.J., in suggesting
the circumstances in which a duty to use care in a statement by
professional persons would exist apart from contract, posed three   B
questions: first, what persons are under such duty? Secondly, to whom
do those professional people owe this duty? And thirdly, to what
transactions does the duty of care extend? In relation to the second
question, he said, at pp. 180–181:

     "I will take accountants, but the same reasoning applies to the
     others. They owe the duty, of course, to their employer or client;   C
     and also I think to any third person to whom they themselves show
     the accounts, or to whom they know their employer is going to
     show the accounts, so as to induce him to invest money or take
     some other action on them. But I do not think the duty can be
     extended still further so as to include strangers of whom they have
     heard nothing and to whom their employer without their knowledge   D
     may choose to show their accounts. Once the accountants have
     handed their accounts to their employer they are not, as a rule,
     responsible for what he does with them without their knowledge or
     consent. . . . But excluding such cases as those, there are some
     cases—of which the present is one—where the accountants know all
     the time, even before they present their accounts, that their
     employer requires the accounts to show to a third person so as to   E
     induce him to act on them: and then they themselves, or their
     employers, present the accounts to him for the purpose. In such
     cases I am of opinion that the accountants owe a duty of care to the
     third person. The test of proximity in these cases is: did the
     accountants know that the accounts were required for submission to
     the plaintiff and use by him?"
                                                                          F

In relation to the third question, he said, at pp. 182–183, 183–184:

     "[The duty of care] extends, I think, only to those transactions
     for which the accountants knew their accounts were required. For
     instance, in the present case it extends to the original investment of
     £2,000 which the plaintiff made in reliance on the accounts, because
     the accountants knew that the accounts were required for his   G
     guidance in making that investment; but it does not extend to the
     subsequent £200 which he made after he had been two months with
     the company. This distinction, that the duty only extends to the
     very transaction in mind at the time, is implicit in the decided
     cases"

     "It will be noticed that I have confined the duty to cases where
     the accountant prepares his accounts and makes his report for the   H
     guidance of the very person in the very transaction in question.
     That is sufficient for the decision of this case. I can well understand
     that it would be going too far to make an accountant liable to any

A    person in the land who chooses to rely on the accounts in matters of
     business, for that would expose him to 'liability in an indeterminate
     amount for an indeterminate time to an indeterminate class': see
     *Ultramares Corporation v. Touche, per* Cardozo C.J. Whether he
     would be liable if he prepared his accounts for the guidance of a
     specific class of persons in a specific class of transactions, I do not
     say."

B

     Denning L.J. clearly considered that the scope of any duty of care
was limited to the precise transaction for which the accountants knew
that the accounts were to be used. In *Hedley Byrne* [1964] A.C. 465, a
company's bankers were asked by the plaintiffs' bankers whether the
company "would be good for an advertising contract of £8,000 to
C    £9,000." The company's bankers answered the question in the affirmative
but, "without responsibility on the part of the bank." When the
company failed, the plaintiffs sought to recover damages from the
bankers for negligence in making the statement. The action failed
because of the express disclaimer of responsibility, but this House, after
detailed review of authority, held that a negligent statement, oral or
D    written, could give rise to an action of damages for economic loss apart
from any contractual or fiduciary relationship subsisting between the
parties. In the context of this case, *Hedley Byrne* is perhaps most
important for its approval of the dissenting judgment of Denning L.J. in
*Candler v. Crane, Christmas & Co.* After setting out the facts in
*Candler*, Lord Reid said [1964] A.C. 465, 487:

E        "This seems to me to be a typical case of agreeing to assume a
         responsibility: [the accountants] knew why the plaintiff wanted to
         see the accounts and why their employers, the company, wanted
         them to be shown to him, and agreed to show them to him without
         even a suggestion that he should not rely on them."

     Lord Reid is again there emphasising the fact that the maker of the
     statement was aware of the purpose for which the accounts were
F    required to be seen. Finally, in *Smith v. Eric S. Bush* [1990] 1 A.C.
     831, the plaintiff applied for a mortgage to a building society which in
     pursuance of its statutory duty under the Building Societies Act 1962
     instructed independent surveyors to prepare a written report as to the
     value of the house in question. The plaintiff paid to the building society
     a fee in respect of this report, and subsequently a copy thereof was
G    provided to her. Without obtaining an independent valuation, the
     plaintiff bought the house which later turned out to be structurally
     defective. The surveyor was found to have been negligent in failing to
     discover the defect. This House held that, notwithstanding the presence
     of an exclusion clause in his report, he was thereby in breach of a duty
     of care owed to the plaintiff. It is clear from the speeches which were
     delivered that the facts which created the proximate relationship between
H    the surveyor and the plaintiff were that the former knew that the
     valuation had been paid for by the plaintiff and would be shown to and
     probably relied upon by her in deciding whether or not to buy the
     house. Thus, Lord Templeman said, at p. 847:

Lord Jauncey
of Tullichettle                    Caparo Plc. v. Dickman (H.L.(E.))                    [1990]

"I agree that by obtaining and disclosing a valuation, a mortgagee   A
does not assume responsibility to the purchaser for that valuation.
But in my opinion the valuer assumes responsibility to both
mortgagee and purchaser by agreeing to carry out a valuation for
mortgage purposes knowing that the valuation fee has been paid by
the purchaser and knowing that the valuation will probably be
relied upon by the purchaser in order to decide whether or not to
enter into a contract to purchase the house."                        B

Lord Templeman undoubtedly considered that one of the necessary
ingredients of the relationship of proximity was the fact that the valuer
knew of the particular transaction for the purposes of which reliance
would probably be placed on his report.

Lord Griffiths, after setting out three criteria for the imposition of a
duty of care on an adviser, namely, foreseeability of damage, proximity   C
of relationship and reasonableness continued, at p. 865:

"The necessary proximity arises from the surveyor's knowledge
that the overwhelming probability is that the purchaser will rely
upon his valuation, the evidence was that surveyors knew that
approximately 90 per cent. of purchasers did so, and the fact that
the surveyor only obtains the work because the purchaser is willing   D
to pay his fee. It is just and reasonable that the duty should be
imposed for the advice is given in a professional as opposed to a
social context and liability for breach of the duty will be limited
both as to its extent and amount. The extent of the liability is
limited to the purchaser of the house—I would not extend it to
subsequent purchasers."                                              E

Here Lord Griffiths is limiting the existence and scope of the duty of
care to the very person and the very transaction which were in the
contemplation of the surveyor at the material time.

My Lords, in each of these cases where a duty of care has been
held to exist, the statement in question has, to the knowledge of its
maker, been made available to the plaintiff for a particular purpose   F
upon which he has relied. In the present case, the auditors, by
accepting office, came under a statutory duty to make their report to
the members of the company. The crucial issue is the purpose for
which the report was made. To quote the words of Denning L.J. in
the *Candler* case [1951] 2 K.B. 164, 183, what was the "very
transaction" for which it was provided? To answer this question, it is
necessary to look at the relevant provisions of Part VII of the   G
Companies Act 1985.

Section 221 requires every company to cause accounting records to
be kept which should be sufficient to show and explain the company's
transactions, and should be such as (a) to disclose with reasonable
accuracy the financial position of the company at the time, and (b) to
enable the directors to ensure that any profit and loss account
complies with the requirements of the Act. If a company's business   H
involves dealing in goods, the accounting records require to contain
statements of stock at the end of each financial year and all statements
of stocktaking from which such statements of stock derive. Section

A   227 requires that the directors, by subsection (1) prepare a profit and
loss account for the financial year in respect of each accounting
reference period of the company and, by subsection (3), prepare a
balance sheet as at the last day of the financial year. Section 228(2) is
in the following terms:

B       "The balance sheet shall give a true and fair view of the state
of affairs of the company as at the end of the financial year; and
the profit and loss account shall give a true and fair view of the
profit or loss of the company for the financial year."

In terms of section 235 the directors are required to prepare a
report "containing a fair review of the development of the business of
the company and its subsidiaries during the financial year and of their
C   position at the end of it," and giving particulars of, inter alia, changes
in asset values, directors' shareholdings and other interests and
contributions for political and charitable purposes. Section 236 makes
provision for an auditors' report in the following, inter alia, terms:

        "(1) A company's auditors shall make a report to its members
on the accounts examined by them, and on every balance sheet
and profit and loss account, and on all group accounts, copies of
D   which are to be laid before the company in general meeting
during the auditors' tenure of office. (2) The auditors' report
shall state—(a) whether in the auditors' opinion the balance sheet
and profit and loss account and (if it is a holding company
submitting group accounts) the group accounts have been properly
prepared in accordance with this Act; and (b) without prejudice
E   to the foregoing, whether in their opinion a true and fair view is
given—(i) in the balance sheet, of the state of the company's
affairs at the end of the financial year; (ii) in the profit and loss
account (if not framed as a consolidated account), of the
company's profit or loss for the financial year. . . ."

Section 237(1) defines auditors' duties as follows:

F       "It is the duty of the company's auditors, in preparing their
report, to carry out such investigations as will enable them to
form an opinion as to the following matters—(a) whether proper
accounting records have been kept by the company and proper
returns adequate for their audit have been received from branches
not visited by them, (b) whether the company's balance sheet and
(if not consolidated) its profit and loss account are in agreement
G   with the accounting records and returns."

Section 241 provides, inter alia:

        "(1) In respect of each financial year of a company the
directors shall lay before the company in general meeting copies
of the accounts of the company for that year. (2) The auditors'
report shall be read before the company in general meeting, and
H   be open to the inspection of any member of the company. (3)
In respect of each financial year the directors—(a) shall deliver
to the registrar of companies a copy of the accounts for the
year. . . ."

A   The accounts of a company are defined by section 239 to include, inter alia, the company's profit and loss account and balance sheet, and the directors' and auditors' reports. In terms of section 240, a copy of the company's accounts must be sent to every member not less than 21 days before the date of the meeting referred to in section 241(1). Finally, section 245 imposes penalties on directors whose defective accounts are laid before the company or delivered to the
B   Registrar of Companies.

Three matters emerge from the statutory provisions, namely: (1) that the responsibility for the preparation of accounts giving a true and fair view of the company's financial state is placed fairly and squarely on the shoulders of the directors; (2) that the role of the auditors is to provide an independent report to the members on the
C   proper preparation of the balance sheet and profit and loss account, and as to whether those documents give a true and fair view respectively of the state of the company's affairs at the end of the financial year and of the company's profit and loss for that year. Their role is thus purely investigative rather than creative; (3) that the company's accounts, including the auditors' report, will be furnished to all members of the company as well as to debenture holders and
D   any other persons entitled to receive notice of general meeting. The accounts will, of course, also be available to any member of the public who chooses to examine the company file in the office of the Registrar of Companies.

So much for the circumstances in which company accounts reach the members. Circumstances which render it inevitable that auditors
E   will be aware that their reports will be seen and relied upon by the members. However, that does not answer the fundamental question of the purpose, and hence the very transactions, for which the annual accounts of a company are prepared and distributed to its members. Mr. Goldsmith, for the auditors, submitted that the principal purpose was to provide an account of the stewardship of the directors to the shareholders as a body, and not to provide individual investors,
F   whether shareholders or members of the public, with comparative information. Mr. Bathurst, for Caparo, on the other hand, argued that the purpose was to enable shareholders to make such individual decisions as they wished in relation to the company, including decisions as to investment, they already being investors, and decisions as to voting in general meetings.

G   In the Court of Appeal [1989] Q.B. 653, 685D–690F Bingham L.J. concluded that the auditors had voluntarily assumed direct responsibility to individual shareholders to whom they owed a duty to exercise reasonable care in carrying out their audit. He further concluded that such duty was owed to a shareholder in respect of any loss sustained by him in selling, retaining, or buying shares in the company. Bingham L.J. referred to the approval by Cardozo C.J. in
H   *Ultramares Corporation v. Touche,* 174 N.E. 441, 447 of an earlier statement that:

"'negligent words are not actionable unless they are uttered directly, with knowledge or notice that they will be acted on, to

A    one to whom the speaker is bound by some relation of duty,
     arising out of public calling, contract or otherwise, to act with
     care if he acts at all.'"

He then said, at p. 686:

     "This formulation would not exclude the finding of a sufficiently
     proximate relationship in the present case if the words 'will be
B    acted upon' are replaced, as in English law I think they should
     be, by 'may be acted upon.'"

Taylor L.J. said, at p. 703G:

     "once proximity to the shareholder is established, the auditor
     ought prima facie to be liable for any loss suffered in foreseeable
C    reliance upon the report; . . ."

In my view these observations go too far. Possibility of reliance on a
statement for an unspecified purpose will not impose a duty of care
on the maker to the addressee. More is required. In *Smith v. Eric S.
Bush* [1990] 1 A.C. 831 it was probable, if not highly probable, that
the potential purchaser would rely on the valuer's report. This
D    probable reliance was an essential ingredient in establishing proximity.
Had it merely been a possibility that the purchaser would rely on the
report I very much doubt whether this House would have decided that
the valuer owed a duty of care to the purchaser. Furthermore,
reliance, even if probable, thereby establishing proximity, does not
establish a duty of care of unlimited scope. Regard must be had to
the transaction or transactions for the purpose of which the statement
E    was made. It is loss arising from such transaction or transactions
rather than "any loss" to which the duty of care extends.
     I do not understand that either Bingham L.J. or Taylor L.J., in
reaching their conclusions, relied to any material extent upon the
purpose for which accounts of a company, including the auditors'
report, are provided to members or consequentially upon the
transactions for which the members were expected to use them.
F    O'Connor L.J., in a dissenting judgment, considered that the statutory
duty owed by auditors to shareholders was owed to them as a body
and not as individuals.
     My Lords, Part VII of the Companies Act 1985 provides that the
accounts of a company for each financial year shall be laid before the
company's general meeting, that is to say before the members in
G    general meeting. Copies of the accounts must be sent to the members
at least 21 days in advance, and it is obvious that the reason for this is
to enable the members to prepare themselves for attendance at and
participation in the meeting. The annual general meeting provides
the opportunity for members to question the stewardship of the
company during the preceding year, to vote for or against election or
re-election of directors, to approve or disapprove the appointment or
H    re-appointment of auditors and to take other decisions affecting the
company as a whole or themselves as members of a particular class of
shareholders. There is nothing in Part VII which suggests that the
accounts are prepared and sent to members for any purpose other

662

Lord Jauncey
of Tullichettle                    Caparo Plc. v. Dickman (H.L.(E.))                    [1990]

than to enable them to exercise class rights in general meeting. I A
therefore conclude that the purpose of annual accounts, so far as
members are concerned, is to enable them to question the past
management of the company, to exercise their voting rights, if so
advised, and to influence future policy and management. Advice to
individual shareholders in relation to present or future investment in
the company is no part of the statutory purpose of the preparation
and distribution of the accounts. It follows that I am in agreement B
with the views of O'Connor L.J. as to the nature of the statutory duty
owed by auditors to shareholders.

     If the statutory accounts are prepared and distributed for certain
limited purposes, can there nevertheless be imposed upon auditors an
additional common law duty to individual shareholders who choose to
use them for another purpose without the prior knowledge of the C
auditors? The answer must be no. Use for that other purpose would
no longer be use for the "very transaction" which Denning L.J. in the
*Candler* case [1951] 2 K.B. 164, 183 regarded as determinative of the
scope of any duty of care. Only where the auditor was aware that
the individual shareholder was likely to rely on the accounts for a
particular purpose such as his present or future investment in or
lending to the company would a duty of care arise. Such a situation D
does not obtain in the present case.

     The Court of Appeal unanimously rejected a submission by Caparo
that an auditor owed a duty to a potential investor who held no
shares. In this House it was argued that the relationship of the
unwelcome bidder in a potential takeover situation was nearly as
proximate to the auditor as was the relationship of a shareholder to E
whom the report was directed. Since I have concluded that the
auditor owed no duty to an individual shareholder, it follows that this
argument must also fail. The fact that a company may at a time when
the auditor is preparing his report be vulnerable to a take-over bid
cannot per se create a relationship of proximity between the auditor
and the ultimate successful bidder. Not only is the auditor under no
statutory duty to such a bidder but he will have reason at the material F
time to know neither of his identity nor of the terms of his bid. In
this context the recent case of *Al Saudi Banque v. Clarke Pixley*
[1990] Ch. 313 is in point. There Millett J. held that the auditors of a
company owed no duty of care to a bank which lent money to the
company, regardless of whether the bank was an existing creditor or a
potential one, because no sufficient proximity of relationship existed G
in either case between the auditor and the bank. I have no doubt
that this case was correctly decided and I would only add that I am in
entire agreement with the careful process of reasoning whereby the
judge reached his decision.

     It only remains to mention *Twomax Ltd. v. Dickson, McFarlane &
Robinson*, 1982 S.C. 113 to which your Lordships were referred. The
Lord Ordinary (Lord Stewart) held that auditors owed a duty of care H
to potential investors who were not shareholders by applying the test
of whether the defenders knew or reasonably should have foreseen at
the time the accounts were audited that a person might rely on those

**2 A.C.**            **Caparo Plc. v. Dickman (H.L.(E.))**        <span style="font-size:small">Lord Jauncey<br>of Tullichettle</span>

A   accounts for the purpose of deciding whether or not to take over the company, and therefore would suffer loss if the accounts were inaccurate. There were in that case no such findings in fact as would support the existence of a relationship of proximity between the auditor and the unknown potential investor. I therefore consider that the reasoning of the Lord Ordinary was unsound and that the decision cannot be supported.

B     For the foregoing reasons, I would allow the appeal.

*Appeal allowed with costs.*
*Cross-appeal dismissed with costs.*

*Solicitors: Freshfields; Berwin Leighton.*

C

C. T. B.

D

[HOUSE OF LORDS]

GUINNESS PLC.   .     .     .     .     .     .     .     **RESPONDENTS**

E                                       AND

SAUNDERS   .     .     .     .     .     .     .     .     **APPELLANT**

1989   Oct. 30, 31;        Lord Keith of Kinkel, Lord Brandon of Oakbrook,
       Nov. 1, 2, 6, 7;              Lord Templeman, Lord Griffiths and
F   1990   Feb. 8                                   Lord Goff of Chieveley

*Company—Director—Fiduciary duty—Accounting for profits to company—Committee of board of directors agreeing to pay director sum in connection with company's take-over bid—Whether power in committee to grant special remuneration—Whether director entitled to retain sum paid or part on quantum*
G   *meruit basis or as equitable allowance—Conflict of personal interest and duty—Whether company entitled to repayment of sum paid—Companies Act 1985 (c. 6), ss. 317(1), 727(1)*

    The two defendants and another director of the plaintiff company, as a committee of the board of directors, agreed to pay the second defendant £5.2m. for his services in connection with a take-over bid being made by the plaintiffs. Following
H   the successful completion of the bid, the plaintiffs paid the money. They claimed recovery of the money on the ground that the second defendant had received the payment in breach of his fiduciary duty as a director in that he had not disclosed his interest in the agreement to the plaintiffs' directors as required