# Exhibit 11

- 12 -

## THE SUPREME COURT

### Record No. 2002/177

*Denham J.*
*Geoghegan J.*
*Kearns J.*

BETWEEN:

## HAROLD WILDGUST AND CARRICKOWEN LIMITED

**Appellants/Plaintiffs**

and

## THE GOVERNOR AND COMPANY OF THE BANK OF IRELAND

**First-named Defendant**

and

## NORWICH UNION LIFE INSURANCE SOCIETY

**Respondent/Second-named Defendant**

## JUDGMENT of Mr. Justice Geoghegan delivered the 22nd day of March 2006

This is an appeal by the above-named appellants/plaintiffs from an order of the High Court (Morris P.) dated 15th October, 2001 dismissing an action for damages for negligence against the above-named respondent/second-named defendant. There is also a cross-appeal by the said respondents against the particular costs order made in the High Court and I will return to that in due course.

I gratefully adopt the full account of the relevant facts in the case as well as its complex procedural history set out in the judgment about to be delivered herein by Kearns J. I will content myself by giving a shorthand account of the salient facts as

found by the trial judge. The first-named appellant (hereinafter referred to as *"Mr. Wildgust"*) and his late wife had effected a life policy of insurance on each of their lives with the respondent insurance company. Mr. Wildgust carried on business through a company controlled by him namely, the second above-named appellant, Carrickowen Limited. In the late nineteen eighties Carrickowen Limited purchased certain properties and for that purpose obtained loan facilities from Hill Samuel Bank Limited (*"Hill Samuel"*). In accordance with normal practice, Hill Samuel required collateral security for the loan. As a consequence, personal guarantees were entered into by Mr. Wildgust and his late wife, Margaret Wildgust. The properties acquired were to be mortgaged to Hill Samuel and two life policies including the policy already referred to were to be assigned by way of mortgage to Hill Samuel. Carrickowen Limited held an account with the first-named defendant, Bank of Ireland, and the arrangement was that the premiums on the relevant life policy were to be paid for by way of direct debit from that account. The mortgage assignment of the life policy to Hill Samuel contained a covenant by Mr. Wildgust and his wife to pay and keep up the premiums on the policy. A monthly premium became due on the 23rd March, 1992 but the direct debit for that month was not paid.

I should explain that Mr. Wildgust took the view that the Bank of Ireland had wrongly neglected to pay the direct debit and in that connection the Bank of Ireland was originally a defendant in these proceedings. In the course of the hearing, the claim against the Bank of Ireland became settled and that bank is no longer involved.

Returning to the action against the respondent on the appeal, i.e. the Norwich Union, that company notified Hill Samuel but not the Wildgusts or their insurance broker that there had been default in the direct debit. Mr. Declan O'Hanlon was the relevant manager of Hill Samuel at the time and when he received the notification of the default, he contacted Mr. Wildgust. It was of considerable concern to Mr. O'Hanlon that the policy should not be allowed to lapse and he was aware at the time that Mrs. Wildgust was seriously ill. Indeed around that time, she was diagnosed as terminally ill. Mr. Wildgust assured Mr. O'Hanlon that he, Mr. Wildgust, had sent a cheque or more accurately a bank draft that would cover the premium. In giving this assurance, Mr. Wildgust appears to have acted *bona fide* but as is explained in the judgment of Kearns J. that particular payment had been treated as an excess payment and was refunded not to Mr. Wildgust but to his company, Carrickowen Limited, a fact of which Mr. Wildgust only became aware after the policy lapsed in May, 1992.

On the 22nd April, 1992, Mr. O'Hanlon, working off his diary, telephoned the respondent to make absolutely sure that the March payment had been made notwithstanding the assurance given to him by Mr. Wildgust. He did not personally remember making the call but he had a clear file note which showed that it had

been made and detailing the contents of the call. The learned trial judge accepted that the file note was accurate.

The file note read as follows:

> *"File note*
> *Carrickowen Limited*
>
> *With regard to the above account I have been advised by Mr. Harry Wildgust that Mrs Margaret Wildgust has been diagnosed with cancer. We hold as security a policy assigned to ourselves with Norwich Union Life Insurance Society.*
>
> *On the 6th April 1992 we received an advice from Norwich Union Life Insurance Society that the direct debit on the policy had been returned unpaid. I contacted the clients and was informed that they had forwarded a cheque to Norwich Union to keep the policy in order.*
>
> *I rang Norwich Union today, 22nd April, to confirm that the policy was correct and in order. Norwich Union confirmed that the cheque had been received and everything was correct and in order."*

Although the respondent, at the trial, disputed the facts contained in that file note, the learned President, as I have already mentioned, accepted them as true. In fact the policy was not *"correct and in order"* and it became a lapsed policy.

Mr. O'Hanlon had not informed Mr. Wildgust that he had sought confirmation from the respondent that the premiums were paid up. Mr. Wildgust, therefore, cannot be said to have personally relied on the information given to Mr. O'Hanlon by the respondent. By reason of that fact, the learned President held that Mr. Wildgust was not entitled to recover damages in negligence against the respondent for loss resulting from the lapse of the policy. As is clear from the summary of facts which I have given and indeed the more detailed account of the facts set out by Kearns J. in his judgment, Mr. Wildgust was successful in the High Court on every relevant issue of fact. On some crucial facts there was no real controversy, such as for instance that it would generally have been known that where a life policy is mortgaged to a bank, the bank in its own self-interest would pay up any default premiums so as to prevent the policy lapsing. Mr. Wildgust failed, however, on the single legal ground of non-reliance. As it is quite crucial, it is worthwhile in my view quoting in full the final paragraph in the second reserved judgment of the President as it contains the basis on which the action was dismissed.

> *"In my view the one major insurmountable difficulty for the plaintiff is that at no stage did he, Mr. Wildgust become aware of the fact that the misstatement had been made by the Norwich Union nor did he place any reliance upon it. He was not misled by the misstatement because he was not aware of it. He was not prejudiced by it. It was not until two months later that he became aware of the fact that the premium had not been paid. In my view the misstatement in no way influenced or contributed towards the conduct of the plaintiff. It did not influence him or cause him to act to his detriment. I do not believe that it would be reasonable that the law should impose a duty on the defendant for the benefit of the plaintiff in these circumstances. In my view to do so would, as Brennan J., said in **Caparo Industries Limited Plc v. Dickman BA** 'massive extension of a prima facie duty of care' which is not my understanding of the law in this jurisdiction."*

The quote from Brennan J. comes of course from **Sutherland Shire Council v. Heyman** 60 A.L.R. 1, 43-44 an Australian case but it is cited in the speech of Lord Oliver of Aylmerton in **Caparo Industries Plc v. Dickman** [1990] 2 AC 605. Even if the learned President is right in his apparent view that reliance on the statement by the actual plaintiff is essential to recovery, a proposition which I will be examining, I find it surprising that a win for Mr. Wildgust in this case could conceivably be thought of as a *"massive extension of a prima facie duty of care"*.

**The law**

If the former President is correct in his view that reliance by the actual plaintiff on the truth of an incorrect statement negligently made is an essential ingredient of liability in all cases of negligent misstatement then this appeal must obviously be dismissed. Having read all the relevant authorities, I am not satisfied that such personal reliance is always essential. The facts of this particular case are most unusual and I have not come across any reported case sufficiently analogous to this case as to be of definitive assistance. The wide interpretation of **Donoghue v. Stevenson** [1932] AC 562 in relation to liability for negligence prevalent until recently made it important to make a sharp distinction between negligence in act on the one hand and negligence in a statement on the other hand. Pragmatically, some kind of control mechanism was necessary in relation to liability for negligent misstatement as otherwise an action might lie at the suit of large numbers of people influenced and reasonably foreseen to be influenced by the erroneous statement. By contrast a negligent act will for the most part foreseeably damage only a small category of people. The more recent English case law coming from the House of Lords with particular reference to **Caparo Industries v. Dickman** [1990] 2 AC

605 has introduced a third element into liability for negligence in addition to reasonable foreseeability and proximity and that is reasonableness in the imposition of a duty of care. That principle has been endorsed albeit *obiter* by Keane C.J. in his judgment in this court in **Glencar Exploration Plc v. Mayo County Council** (No. 2) [2002] 1 IR 84. The different route ultimately traversed by the courts in England in relation to negligent statements was partly based on the necessity for a control mechanism for the reason which I indicated and partly because of pre **Donoghue v. Stevenson** authorities which were not mentioned and still less expressly overruled by that case. Those earlier authorities would not be binding in this jurisdiction and now that the concept of reasonableness in imposing a duty of care appears to be accepted, concepts which run through the English case law relating to negligent misstatements and negligent misrepresentations such as reliance by the plaintiff on the truth of the statement, *"assumption of risk"* by the maker of the statement, *"special relationship"*, *"relationship analogous to contract"*, or even for that matter the will-o'-the-wisp concept of *"proximity"* may not be all that necessary. For the purposes of this case however, I am prepared to assume that the law of negligent misstatements is a separate code from the law of negligent acts. This has the advantage that I do not have to consider the law relating to the recoverability of damages for economic loss arising from negligence in general as it has always been accepted that such loss is recoverable if it derives from an actionable negligent misstatement.

The tort of negligent misstatement has its origins in England in **Hedley Byrne and Co. Limited v. Heller and Partners Limited** [1964] AC 465. It has an even earlier link with the famous minority Court of Appeal judgment of Denning L.J. (as he then was) in **Candler v. Crane, Christmas and Co.** [1951] 2 K.B. 164. As Kearns J. has pointed out, at an early stage **Hedley Byrne** was accepted by the Irish High Court as representing the law in this jurisdiction also (see **Securities Trust Limited v. Hugh Moore and Alexander Limited** [1964] I.R. 417 (Davitt P.) and **Bank of Ireland v. Smyth** [1966] I.R. 646 (Kenny J.). There has not been much discussion or analysis of the problems however in this court. The most relevant case law is essentially a succession of judgments from the House of Lords. In his speech in **Hedley Byrne** Lord Reid cited with approval a passage from the speech of Viscount Haldane LC in **Naughton v. Lord Ashburton** [1914] A.C. 932. He clearly indicated that quite apart from contractual or fiduciary relationships a duty of care in the making of a statement may arise *"from other special relationships which the courts may find to exist in particular cases."* Lord Reid attached considerable importance to the expression *"other special relationships"* and he went on to observe as follows at p. 486:

> *"I can see no logical stopping place short of all those relationships where it is plain that the party seeking information or advice was trusting the other to exercise such a degree of care as the circumstances required,*

> *where it was reasonable for him to do that, and where the other gave the information or advice when he knew or ought to have known that the inquirer was relying on him."*

In **Hedley Byrne** the only relationship alleged was the relationship between the enquirer and the person giving the information. Hence the emphasis on reliance by the enquirer. It is, however, a small extension of this and justified in my view by later case law, that where a person who is not the enquirer is damaged as a consequence of the wrong answer and where the existence of such a person and the reasonable foreseeability of such damage ought to have been present in the mind of the person giving the information, there was a special relationship with that person also which gave rise to a duty of care.

There were nuanced differences of emphasis in the speeches of the Law Lords in **Hedley Byrne** but overall, the concept of *"special relationship"* was accepted even though different characterisations were given. Lord Devlin, for instance, made a distinction between social and professional relationships and between those which are of a contractual character or equivalent to contract. He pointed out that

> *"it may often be material to consider whether the adviser is acting purely out of good nature or whether he is getting his reward in some indirect form. The service that a bank performs in giving a reference is not done simply out of a desire to assist commerce. It would discourage the customers of the bank if their deals fell through because the bank had refused to testify to their credit when it was good."*

Before I further travel into the case law, I would pause here to consider the facts of this case. The person in the Norwich Union giving the information had reason to believe that Mr. Wildgust may have been under the impression that his account was in order and he would also be aware or ought to have been aware that the respondent would have paid the premium if a negative answer had been given. It should have been clear, therefore, that an incorrect answer would potentially damage Mr. Wildgust. That was enough, in my view, to create the *"special relationship"*, if such is needed but quite apart from that, given that the assignment of the policy to the respondent was by way of mortgage, Mr. Wildgust had an equity of redemption in the policy. Even though Hill Samuel was making the request in its own business interest, nevertheless in providing the information the Norwich Union would reasonably be expected to treat the respondent and their customer the mortgagor as identified with each other. Even if one might quibble with the word *"identified"* there was sufficient linkage to create a special relationship but as I have already indicated, I think that such relationship existed at any rate. I do not think that Hill Samuel or Mr. O'Hanlon can be said to have been

an agent of Mr. Wildgust in making the enquiry or in relying on the answer but proof of such agency is not necessary in my view to establish liability.

In **Smith v. Bush** [1990] 1 AC 831 at 846 Lord Templeman cited with apparent approval dicta of Lord Denning M.R. in **Ministry of Housing and Local Government v. Sharp** [1970] 2 Q.B. 223 at 268 where Lord Denning rejected the argument

> *"that a duty to use due care (where there was no contract) only arose when there was a voluntary assumption of responsibility ... Lord Reid in **Hedley Byrne's** case ... and Lord Devlin at p. 529 ... used those words because of the special circumstances of that case (where the bank disclaimed responsibility). But they did not in any way mean to limit the general principle. In my opinion the duty to use due care in a statement arises, not from any voluntary assumption of responsibility, but from the fact that the person making it knows, or ought to know, that others, being his neighbours in this regard, would act on the faith of the statement being accurate."*

Lord Templeman also cited from the judgment of Salmon L.J. in that case where he indicated that he did not accept that in all cases the obligation to take reasonable care necessarily depends on the voluntary assumption of responsibility. Of course, the citation from Lord Denning must itself be related to the case with which he was dealing. It is in that context, in my view, that he speaks of *"neighbours"* who *"would act on the faith of the statement being accurate"*. It is quite true and it is not in dispute that Mr. Wildgust did not himself personally rely on the information given. But on any reasonable view of the case he was nevertheless vis-à-vis the person giving the information a proximate *"neighbour"* who could foreseeably be damaged. As I have already pointed out, the facts of this case simply do not fit into the facts of any other relevant case. But I take the view that all the qualifications and controlled mechanisms referred to in the different cases are just that. They are to prevent a potential liability to large numbers of people. That is simply not a problem here.

The case from which I found the greatest assistance is **White v. Jones** [1995] 2 AC 207 and in particular the speech of Lord Browne-Wilkinson. This is the famous case in which the House of Lords held by a majority that the assumption of responsibility by a solicitor to his client who had given instructions for the drawing up of a will for execution extended to an intended beneficiary under the proposed will in circumstances where the solicitor could foreseeably foresee that a consequence of his negligence might be a resultant loss of the intended legacy without either the testator or his estate having a remedy against him; and that

accordingly in the circumstances the plaintiffs were entitled to the relief sought. Interestingly, though perhaps irrelevantly, the Irish High Court (Barrington J.) had long before that made a similar decision in **Wall v. Hegarty** [1980] ILRM 124. I say *"irrelevantly"* because the importance of **White v. Jones** lies more in the further analysis by the Law Lords of the principles underlying **Hedley Byrne**. With reference to that case, Lord Browne-Wilkinson at p. 272 made the following observation:

> *"... since this House was concerned with cases of negligent misstatement or advice, it was inevitable that any test laid down required both that the plaintiff should rely on the statement or advice and that the defendant could reasonably foresee that he would do so. In the case of claims based on negligent statements (as opposed to negligent actions) the plaintiff will have no cause of action at all unless he can show damage and he can only have suffered damage if he has relied on the negligent statement. Nor will a defendant be shown to have satisfied the requirement that he should foresee damage to the plaintiff unless he foresees such reliance by the plaintiff as to give rise to the damage. Therefore, although reliance by the plaintiff is an essential ingredient in a case based on negligent misstatement or advice, it does not follow that in all cases based on negligent action or inaction by the defendant it is necessary in order to demonstrate a special relationship that the plaintiff has in fact relied on the defendant or the defendant has foreseen such reliance. If in such a case careless conduct can be foreseen as likely to cause and does in fact cause damage to the plaintiff that should be sufficient to found liability."*

That quotation does not fully avail the appellant in this case. However, he does place some of the apparent principles enunciated in **Hedley Byrne** in the context of the particular facts of that case. At p. 274 Lord Browne-Wilkinson says the following:

> *"The law of England does not impose any general duty of care to avoid negligent misstatements or to avoid causing pure economic loss even if economic damage to the plaintiff was foreseeable. However, such a duty of care will arise if there is a special relationship between the parties. Although the categories of cases in which such special relationship can be held to exist are not closed, as yet only two categories have been identified*

> *namely (1) where there is a fiduciary relationship and (2) where the defendant has voluntarily answered a question or tendered skilled advice or services in circumstances where he knows or ought to know that an identified plaintiff will rely on his answers or advice. In both these categories the special relationship is created by the defendant voluntarily assuming to act in the matter by involving himself in the plaintiff's affairs or by choosing to speak. If he does so assume to act or speak he is said to have assumed responsibility for carrying through the matter he has entered upon. In the words of Lord Reid in **Hedley Byrne** [1964] AC 465, 486 he has 'accepted a relationship ... which requires him to exercise such care as the circumstances require' i.e. although the extent of the duty will vary from category to category, some duty of care arises from the special relationship."*

If interpreted literally those words again do not establish a case for the plaintiff but if the underlying principles are adopted I think that they do. The essence of this case was that the person in the Norwich Union giving the information in response to the request ought to have known that it would be relied on at least by the respondent and that if the statement was incorrect, the policy could lapse to the detriment not just of Hill Samuel but to their customer who was paying the premiums and who had a beneficial interest in the form of the equity of redemption in the policy. I fail to see how that did not amount to a special relationship. Put shortly, Mr. Wildgust was a *"neighbour"* for the purposes of the law of negligence and a specially close one at that. There is no question here of the respondent being liable to large numbers of perhaps unknown persons. In my view, the respondent is liable to the appellants and I would, therefore, allow the appeal. The terms of the order can be discussed with counsel.

On the amended pleadings there are issues of contributory negligence both directly and vicariously by reason of the involvement of the Bank of Ireland. I express no views on these matters as they were not raised in argument.

As regards the cross-appeal that is essentially a costs matter which can be dealt with when the costs of the appeal as a whole are being considered by the court.

Wildgust & anor. v. Govr. of BOI

JUDGMENT of Mr. Justice Kearns delivered the 22nd day of March,
2006 JUDGMENT of Mr. Justice Kearns delivered the 22nd day of March, 2006

This case raises an important point of law concerning the scope of liability for
negligent misstatement. In particular, it gives rise to an important question as to
whether a claimant, under the principles of law established in *Hedley Byrne & Co.
Ltd. v. Heller & Partners Ltd.* [1964] AC 465, may recover damages in
circumstances where he is not the person to whom a negligent misstatement is
addressed, has not relied upon it, but nonetheless has suffered loss and damage
because an intermediary to whom the negligent misstatement was addressed was in
consequence prevented from acting, as he most assuredly would have done, to
protect both the claimant and the intermediary from the loss which in fact
occurred.

In a judgment *Wildgust v. Bank of Ireland,* delivered on the 28th July, 1998,
Morris P. summarised the background facts of this case in the following manner:-

> *"The first named plaintiff is a businessman and is the principal if not
> the sole shareholder in the second named plaintiff company. That
> company, Carrickowen Ltd., was incorporated for the purpose of
> holding two commercial units in the Coolock Industrial Estate. The
> first named plaintiff and his late wife wished to create an
> arrangement whereby they would sublet smaller units within these
> commercial units at a rent sufficient to pay the mortgage on the
> property and thereby create a pension fund for themselves. With this
> intention they applied for and obtained from Hill Samuel merchant
> bankers a loan of £215,000 (which sum was subsequently increased
> by an additional £50,000) which loan was secured by the primary
> security of a mortgage over the property in favour of Hill Samuel and
> was backed by a personal guarantee from Mr. Wildgust and the late
> Mrs. Wildgust. As an additional secondary security, Mr. & Mrs.
> Wildgust were required to obtain and assign to Hill Samuel a policy
> of insurance on their joint and several lives. All of these transactions
> were satisfactorily carried through. Mr. Wildgust put in place an
> arrangement whereby the rents of the tenants occupying the sub-units
> were paid direct, in the first instance, into a company account with
> Allied Irish Banks, but this arrangement was subsequently changed to
> one whereby the rents were paid into a company account in the Bank
> of Ireland at their Ballsbridge branch and arrangements were made
> with the bank that the premiums on the life policy were to be
> discharged to Norwich Union by direct debit. The premiums were due
> monthly on the 23rd of each month.*
>
> *A breakdown in the system occurred as a result of which the direct
> debit payment due on the 23rd of March, 1992, was not paid. Mr.*

*Wildgust held the Bank of Ireland responsible for this fact. They were accordingly joined as defendants in the present claim. However, after the hearing had progressed for some days a settlement was reached between Mr. Wildgust and the Bank of Ireland as a result of which they were struck out of the case.*

*Because of the failure to discharge the premium due on the 23rd of March, 1992, the life policy lapsed. The late Mrs. Wildgust died on the 1st of January, 1993. The amount payable under the terms of the policy on her death was not paid as the Norwich Union claimed that the policy had lapsed. Mr. Wildgust brings this action to enforce payment of that amount and claims that as a result of withholding payment consequential loss has been suffered by him and by his company."*

The initial hearing of this case before Morris P. was interrupted at the close of the plaintiff's case when the defendants raised a pleading point, namely, that a case in negligent misstatement had not been properly pleaded. The learned President acceded to that application and directed that the plaintiffs be at liberty to amend their statement of claim to plead a claim for negligent misstatement of fact or a claim based on the *Hedley Byrne v. Heller* principle. The plaintiffs appealed this ruling to the Supreme Court where, on the 13th April, 2000, the Supreme Court (McGuinness J.) upheld the ruling of the President and directed that the matter be re-listed before him with a view to continuing and concluding the trial. (See *Wildgust v. Bank of Ireland* [2001] 1 ILRM 24)

Accordingly, the hearing of the matter before the President recommenced on the 19th July, 2001.

Because the facts of this case are of such vital importance, I propose to quote at some length from the summary of the issues of fact which appear in the judgment of Morris P. delivered on the 17th August, 2001. It is necessary to do so to understand how the claim for negligent misstatement arises in this case.

Morris P. first identified the issues of fact giving rise to that claim in the following manner at p.6:-

*"It is alleged that a Mr. Declan O'Hanlon who was the manager of Hill Samuel became aware of the fact that there had been a breakdown in the payment of the direct debit to the Norwich Union Insurance Company by the Bank of Ireland because Hill Samuel were among the persons to whom default notice was sent. He says that he telephoned Mr. Wildgust to enquire about payment of the premium and was told by him that the premium had been paid. Subsequently he says that he telephoned the Norwich Union on the 22nd April, 1992,*

*to enquire about the payment of this direct debit and he was told that
the cheque for the premium had been received and that everything
was 'correct and in order'. He says that in reliance upon this he took
no action. In fact the premium had not been paid. He said that if he
had known that the premium remained unpaid then it would have
been paid by Hill Samuel in order to keep the policy alive. He said
that he was sure that this would have occurred particularly in view of
Mrs Wildgust's ill health. It is alleged on behalf of the Plaintiff that
the information given to Mr. O'Hanlon constituted a negligent
misstatement of fact as a result of which the policy was allowed to
lapse and the Plaintiff has suffered loss and damage.*

*It is denied on behalf of the Norwich Union Insurance Company that
the telephone call described by Mr. O'Hanlon or any such call was
ever made."*

Having identified that issue of fact, the learned President proceeded to summarise
the relevant evidence in the following manner at p.7:-

*"Mr. Declan O'Hanlon was in the employment of Hill Samuel
between 1982 and 1993. At the relevant time he was Manager of the
Merchant Bank and became familiar with the commercial mortgage
granted to the Second Named plaintiff while he was in the bank. He
was aware that an advance of £215,000 was originally made and this
was secured by Mr. & Mrs Wildgust's personal guarantees and an
assignment of a life insurance policy on the lives of Mr. & Mrs
Wildgust with the Norwich Union Insurance Company. Subsequently
the mortgage facility was increased to £275,000. He was aware of an
arrangement put in place by Mr. Wildgust for the payment of
premiums on the life policy through the Bank of Ireland by way of
direct debit. He informed the Court that it is common practice for a
Banker in the position of Hill Samuel if they became aware of a
default on the payment of a premium which might result in a policy
lapsing that the bank would themselves pay the premium.*

*On the 3rd April 1992 Hill Samuel received a direct debit breakdown
advice indicating that a premium of £227.25 due on the 23rd March
1992 was unpaid. Upon becoming aware of this fact Mr. O'Hanlon
says that as Account Manager he referred the matter to Senior
Management and after discussing it with his superiors he contacted
Mr. Wildgust informing him of the breakdown in payment. He says
that when he contacted Mr. Wildgust and was informed by him that
he, Mr. Wildgust had forwarded a cheque to the Norwich Union to
keep the policy in order and he said that on the 22nd April 1992 he
telephoned the Norwich Union to confirm that the cheque had been
received and that everything was in order. He says that the Norwich*

> *Union confirmed that this was so. He says that he has no doubt that if*
> *he had known that the premium was not paid arrangements would*
> *have been made for Hill Samuel to pay the premium to prevent the*
> *policy lapsing. This was of particular importance as Mrs Wildgust*
> *had been diagnosed with cancer."*

The President then noted that Mr. O'Hanlon had given this evidence entirely from a contemporaneous note which he made on the 22nd April, 1992. Evidence of the system operating within the Norwich Union at the relevant time was then given by two officials of the company, including Ms. Betty Tuite, who was manager of the premium collection and agency department. She confirmed that there were four people in the direct debit section who were skilled and experienced operatives who were fully trained. She gave further evidence of a detailed nature concerning the electronic recording system within the office and informed the Court that no record of Mr. O'Hanlon's inquiry existed on the computer records.

In resolving this issue of fact, the President found that, even though there existed a thorough and business-like procedure for noting inquiries in the Norwich Union office, it was not incapable of error and it would have been possible for Mr. O'Hanlon's inquiry not to have been entered in the system. He also noted that Mr. O'Hanlon had no financial or other interest in the transaction to provide him with any motive to do otherwise than to tell the full truth about the memorandum or file note which he signed on the 22nd April, 1992.

The President thus concluded that Mr. O'Hanlon was given the assurance in the terms which he described to the Court. Having made that crucial finding, the President then proceeded to address the evidence which had been given by Mr. Wildgust, stating at p.13:-

> *"Mr. Wildgust gave detailed evidence of difficulties which he had*
> *with the loan facilities which were made available to him and his*
> *company by the Bank of Ireland which are not of any relevance to the*
> *present issues save that it emerges from the lack of attention to his*
> *dealings with the Bank of Ireland that in late 1991 and early 1992*
> *Mr. Wildgust was apparently preoccupied by his wife's ill health and*
> *allowed his business affairs to lapse.*
>
> *A premium was due to the Norwich Union on the 23rd March 1992*
> *and default notices were sent by the Norwich Union to Hill Samuel*
> *and Mr. Wildgust in respect of that default. Mr. Wildgust says he*
> *never received this default notice. He claims there should not have*
> *been a failure on the part of the Bank of Ireland to pay the direct*
> *debit because he had at that time renegotiated overdraft*
> *arrangements with the Bank of Ireland which he believed provided*
> *him with the facility for meeting such payments. The first notice that*

> *he had that the premium due on the direct debit of the 23rd March*
> *1992 was not paid was in the latter half of the month of June. This*
> *delay was due to the bank strike and the postal strike which finished*
> *at that time. He said 'If I had found out before, I would have paid the*
> *money straight up.' He said that between the 23rd March and the end*
> *of June he received no communication from the Bank of Ireland in*
> *relation to the direct debit nor did he receive any communication*
> *whatever from the Norwich Union in relation to the return of the*
> *direct debit. It was after June and probably around August that he*
> *had communication with the Norwich Union about the direct debit.*
> *He says that around the 8th, 9th or 10th April he had a telephone*
> *conversation with Mr. O'Hanlon of Hill Samuel. He said that Mr.*
> *O'Hanlon told him that the direct debit had not been paid and that he*
> *told Mr. O'Hanlon that he had sent a cheque to cover it. This was a*
> *reference to a cheque for £681.75 which he believed was to be held*
> *by the Bank of Ireland in reserve to meet a contingency such as this.*
> *In fact he did not know then but now knows that this reserve was not*
> *available because that cheque was returned."*

I pause at this point to make a slight correction which both sides agree should be made to the last two sentences quoted above which are of some relevance in relation to Mr. Wildgust's state of mind in 1992. On the 9th January, 1990, against a background of some difficulty with the then existing direct debit in favour of Norwich Union made with Allied Irish Banks, Mr. Wildgust caused a bank draft for £681.75, representing 3 months instalments on the life policy, to be sent to Norwich Union. As events transpired, the Allied Irish Bank direct debit had functioned properly and this payment represented a double payment for three months of the policy. The sum in question was received by Norwich Union, but despite a Norwich Union file note dated the 11th January, 1990, noting that the refund should go *"immediately to Mr. Wildgust's a/c"*, the repayment was in fact made to the account of Carrickowen Ltd., a fact of which Mr. Wildgust in evidence claimed he only became aware after the policy lapsed in May, 1992. He thus asserted in evidence his belief that he had a "cushion" or "buffer zone" of three overpayments to protect him in the event of any breakdown in the direct debit arrangements. Norwich Union claimed in turn that Mr Wildgust knew, or should have known, about the repayment to Carrickowen's account and that he had conspicuously failed to raise the issue with Norwich Union either when the policy lapsed or in his solicitor's preliminary letter in December, 1992.

It is also common case that the assignment of the life policy to Hill Samuel permitted (though did not oblige) Hill Samuel to discharge premiums in respect thereof. For the sake of completeness the court of trial also heard submissions in relation to a mortgage made between Carrickowen and Hill Samuel in connection with the advance of monies by Hill Samuel whereby, under clause 12 thereof, Carrickowen appointed Hill Samuel as its attorney for certain purposes related to

Carrickowen's covenants under the mortgage. However, these purposes appear unrelated to the life policy and the payment of premiums thereunder.

The learned President continued at p.14 of the judgment:-

> *"I am of the view from the totality of Mr. Wildgust's evidence that he became aware that the policy had lapsed at the end of June, 1992, when he got his statements.*
>
> *What emerges from Mr. Wildgust's evidence is:*

*(a) At no stage up to the time when the policy lapsed was Mr. Wildgust aware of the telephone conversation between Mr. O'Hanlon and the Norwich Union or of any information given to Mr. O'Hanlon by the Norwich Union.*
*(b) Mr. Wildgust believed at all times that the Bank of Ireland were in sufficient funds or otherwise obligated to him to discharge the direct debits due to the Norwich Union as premiums on the policy.*
*(c) At no stage did or could Mr. Wildgust have placed any reliance upon any statements made by the Norwich Union to Mr. O'Hanlon."*

Again, because this portion of the judgment of the learned President so neatly encapsulates the ultimate issue in this case, I propose to set it out in full:-

> *"Since I delivered judgment on the application for a non-suit on the 28th July 1998, the Supreme Court has considered the law in this jurisdiction having regard to the decision of the Supreme Court in Ward v. McMaster [1988] I.R. 337 and Glencar Explorations Plc & anor v. Mayo County Council [2002] 1 IR 84.*
>
> *In his judgment, delivered the 19th July 2001, Keane C.J. considered the approach of McCarthy J. in Ward v. McMaster and contrasted it to what he described as the more cautious approach favoured in Caparo Industries Plc. v. Dickman [1990] 2 AC 605 and Sutherland Shire Council v. Heyman [1985] 157 C.L.R. 424, and, having done so, summarising the law had this to say: 'There is in my view, no reason why courts determining whether a duty of care arises, should consider themselves obliged to hold that it does in every case where injury or damage to property was reasonably foreseeable and the notorious difficulty and elusive test of 'proximity' or 'neighbourhood' can be said to have been met, unless very powerful public policy considerations dictate otherwise. It seems to me that no injustice will be done if they are required to take the further step of considering whether, in all the circumstances, it would be reasonable that the law should impose a duty of a given scope on the defendant for the benefit of the plaintiff, as held by Costello J., at first instance in Ward v.*

> *McMaster, by Brennan J. in Sutherland Shire Council v. Heyman and*
> *by the House of Lords in Caparo Industries Plc. v. Dickman. As*
> *Brennan J. pointed out, there is a significant risk that any other*
> *approach will result in what he called a 'massive extension to a*
> *prima facie duty of care restrained only by indefinable*
> *considerations…'"*

The President continued:-

> *"Accordingly, when McCarthy J. said in Ward v. McMaster 'whilst*
> *Costello J. essentially rested his conclusion on the 'fair and*
> *reasonable' test, I prefer to express the duty as arising from the*
> *proximity of the parties, the foreseeability of the damage and the*
> *absence of any compelling exemption based upon public policy.' This*
> *is no longer the full test. I must add the further factor of asking myself*
> *'is it just or reasonable that the law should impose a duty of a given*
> *scope on the defendant for the benefit of the plaintiff?' I am satisfied*
> *that this is the appropriate test in cases where negligent misstatement*
> *is alleged."*

Having summarised the relevant legal principles in this way, the President then
continued at p.17:-

> *"It is submitted on behalf of the plaintiff by Mr. Bradley S.C., that it*
> *is unrealistic to attempt to separate the coinciding interest of Hill*
> *Samuel and the plaintiff since each had an identical and*
> *corresponding interest in ensuring that the policy remained in place*
> *and accordingly a misrepresentation made to Hill Samuel must, he*
> *submits, prejudice Mr. Wildgust since without this misrepresentation*
> *the policy would have been renewed by Hill Samuel.*
>
> *In my view the one major insurmountable difficulty for the plaintiff is*
> *that at no stage did he, Mr. Wildgust, become aware of the fact that*
> *the misstatement had been made by the Norwich Union nor did he*
> *place any reliance upon it. He was not misled by the misstatement*
> *because he was not aware of it. He was not prejudiced by it. It was*
> *not until two months later that he became aware of the fact that the*
> *premium had not been paid. In my view the misstatement in no way*
> *influenced or contributed towards the conduct of the plaintiff. It did*
> *not influence him or cause him to act to his detriment. I do not believe*
> *that it would be reasonable that the law should impose a duty on the*
> *defendant for the benefit of the plaintiff in these circumstances. In my*
> *view to do so would, as Brennan J. said in Sutherland Shire Council v*
> *Heyman be a 'massive extension of a prima facie duty of care' which*
> *is not my understanding of the law in this jurisdiction."*

**Submissions of the parties**

On behalf of the plaintiff, Mr. Bradley submitted that the learned President had found a number of crucial facts proven to his satisfaction, including the following:-
(a) The inquiry by Mr. O'Hanlon on behalf of Hill Samuel to the respondent was made by telephone calls specifically to ascertain whether the premium due for the previous month had been paid.
(b) The respondent answered positively and erroneously that the said direct debit payment had been made and that consequently premium payments were in order.
(c) As a result of the aforesaid information and in reliance upon the same Mr. O'Hanlon, as manager of Hill Samuel, took no further steps to ensure that the policy did not lapse. If he had known that the premium in fact remained unpaid, then Hill Samuel would have paid the premium as was its right as assignee of the policy in order to keep the policy alive.
(d) The respondent maintained a thorough and business-like procedure for noting such enquiries concerning the status of insurance policies held with it, but this procedure was not incapable of error and in this instance an error had occurred.
(e) The first appellant did not become aware of the fact that the misstatement had been made by the respondent until two months later when he learned that the premium had not been paid, by which time the policy had lapsed and could not in the particular circumstances be reinstated due to the patent ill health of his wife.

Counsel for the plaintiff contended that these primary facts as so found by the trial judge were based on credible evidence and cannot now be denied by the respondent. It was also implicit from the aforesaid findings of fact that the respondent had not notified Mr. Wildgust of the non-payment of the premium for the month of March at all. In this regard, Mr. Bradley relied upon decisions of this court in relation to primary findings of fact in *Hay v. O'Grady* [1992] 1 I.R. 210 and *Best v. Wellcome Foundation Ltd.*[1993] 3 I.R. 421. Counsel for the plaintiff further argued that the trial judge was entitled to infer from the foregoing established facts that the respondent had been guilty of negligent misstatement. It necessarily followed that Hill Samuel had made the inquiry in the capacity of a person who held the benefit of the policy as security and, depending on the answer to the inquiry, would have taken appropriate steps to ensure that the policy did not lapse.

Counsel for the plaintiff further submitted therefore that the only issue in dispute was whether the respondent had been guilty of a breach of duty of care towards the appellants, giving rise to an entitlement to damages in the particular circumstances where they had not in fact been aware of the relevant communication and consequently did not act upon it. While the learned trial judge had held that to include the plaintiff as either a person, or being in a category of persons, to whom a duty was owed would represent *"a massive extension of a prima facie duty of care"*, counsel for the plaintiff submitted that this conclusion was erroneous. He submitted that for all practical purposes the plaintiff and Hill Samuel could be regarded as having an identical interest, the latter as assignees of the policy, and the plaintiff as a person who had contracted with the respondent and who was

entitled to an equity of redemption in the policy in question. He submitted that the trial judge was clearly in error in finding, as he did, that the appellants were not prejudiced in the events which occurred and in further finding that it was necessary for Mr. Wildgust to have actually been misled by the statement and to have actually relied upon it before it would be reasonable to impose a duty of care.

He further contended that it could not be seriously disputed that if the first appellant had made the inquiry on his own behalf and had received the same information as Mr. O'Hanlon with the same consequent effects, then the appellant's claim for damages for negligence would be unanswerable. Equally, if Hill Samuel itself had suffered the loss and damage which in fact was suffered by the appellants, the respondent could hardly be heard to say that it was not liable to Hill Samuel in negligence in the like circumstances. In the present case, the respondent had a distinct duty of care both to Hill Samuel and to their own policy holder, and counsel for the plaintiff submitted it was unreal and artificial to suggest that the appellants had no case simply because the inquiry was made by another interested party. He submitted that in all the circumstances it was just, fair and reasonable in the present case that a duty of care be imposed.

In response, Mr. Sreenan S.C., on behalf of the respondent insurance company, argued that the plaintiff was now seeking to maintain a cause of action in respect of a statement made, not to him, but to Hill Samuel, about which he did not know and upon which he did not rely. He submitted that the cause of action was not just unsustainable as a matter of law, but was an entirely circular contention since the respondent could not be held liable for loss caused by the plaintiff's own breach of contract with the respondent and/or by a breach of contract and/or negligence by the plaintiff's own bank in failing to pay the premium on its behalf, for which as a matter of law the plaintiff was now liable. In essence, counsel for the respondent argued that the plaintiff's claim was that the respondents owed to him some type of legal obligation to prevent him suffering loss as a result of his own wrongdoing and that of his agent, namely, the Bank of Ireland.

He further submitted there was no evidence to support the suggestion by the plaintiffs that Hill Samuel Bank were acting as the agent of the plaintiffs in making the inquiry of the Norwich Union. Mr. O'Hanlon had specifically indicated that in telephoning the Norwich Union, he was concerned to ensure that things were in order from Hill Samuel's point of view as the assignee of the policy. When asked whether his concern was to look after the interests of Hill Samuel in this matter, he had answered that that was so. He went on to confirm that he was making the call on behalf of Hill Samuel and that he was contacting the insurance company *"independently"*. He did not go back to Mr. Wildgust after receiving information from Norwich Union. Further, Mr. Wildgust said that he did not rely on Hill Samuel to contact the Norwich Union.

In order to make a case in negligent misstatement in the instant circumstances, counsel for the respondent contended that the plaintiffs would have to establish:-
(a) That a statement was made by Norwich Union to Hill Samuel, who then communicated same to the plaintiff;
(b) That Norwich Union owed Hill Samuel a duty of care;
(c) That Norwich Union held itself out as holding a special skill;
(d) That Norwich Union intended or knew that Hill Samuel would inform the plaintiffs, who would rely and act upon this statement;

and

(e) That the plaintiffs did so rely and act upon the statement to their detriment.

Counsel for the respondent argued that these requirements had not been met in the instant case. Further, the plaintiffs were attempting to subsume the tort of negligent misstatement into ordinary principles of negligence because the facts of the case could not sustain a claim in negligent misstatement. While the plaintiffs had attempted to rely upon the decision of the Supreme Court in *Glencar Exploration plc. v. Mayo County Council (No.2)* [2002] 1 IR 84, the Chief Justice had stated in that case that a claim for damages in negligent misstatement was a major qualification to the principle that no action for negligence lay in respect of purely economic loss. The plaintiffs were in effect seeking to extend the law of negligence in respect of purely economic loss in circumstances where they cannot bring themselves within the parameters of the tort of negligent misstatement, nor could they bring themselves within the category of cases represented by *Siney v. Dublin Corporation* [1980] I.R. 400 and *Ward v. McMaster*[1988] I.R. 29. Counsel further submitted that there was no basis for an extension of the law of negligence to embrace a claim where the statement of the defendant was unknown to and not relied on by the plaintiff.

Furthermore, counsel for the respondent submitted that before addressing the question of whether the plaintiffs had made out a case in negligent misstatement, this Court should find that no duty of care can or should arise at all by virtue of the fact that the parties were in a contractual relationship and the losses suffered by the plaintiffs were caused by their own breach of contract in failing to pay the premiums due under the policy. Hamilton C.J. quoted from Halsbury (4th ed. Vol.3(1) para. 149) in *Kennedy v. Allied Irish Banks* [1998] 2 IR 48 as follows:-

> *"where the parties are in a contractual relationship, it is not to the advantage of the law's development to search for liability in tort, particularly in a commercial relationship."*

Moreover, counsel for the respondent submitted, in the same case Hamilton C.J. went on to quote from an earlier decision of the English Court of Appeal in *National Bank of Greece S.A. v. Pinios Shipping Co. (No. 3)* [1988] 2 Lloyds Rep 126 where Lloyd L.J. stated at p.139:- *"So far as I know it has never been the*

*law that a plaintiff who has the choice of suing in contract or tort can fail in
contract yet nevertheless succeed in tort".*

Having adverted to this passage in *Kennedy v. Allied Irish Banks*, Hamilton C.J.
also observed at p.56:-

> *"when parties are in a contractual relationship their mutual
> obligations arise from their contract and are to be found expressly or
> by necessary implication in the terms thereof and that obligations in
> tort which may arise from such contractual relationship can not be
> greater than those found expressly or by necessary implication in
> their contract."*

Counsel further submitted that the same issue had been revisited by this court
in *Pat O'Donnell & Co. Ltd. v. Truck & Machinery Sales Ltd.* [1998] 4 I.R. 191 at
p. 199 where O'Flaherty J. invoked the passage from Hamilton C.J.'s judgment
in *Kennedy* that:-

> *"the general duty of care in tort cannot be manipulated so as to
> override the contractual allocation of responsibility between the
> parties. Thus if, for instance, a contract provides, whether expressly
> or by necessary implication, that the defendant is not liable for a
> particular risk, then the law of tort should not be allowed to
> contradict that."*

Counsel contended that the plaintiff's policy lapsed as a result of breach of
contract, namely the non-payment of the premiums by the plaintiffs and that no
issue of duty of care to maintain such contract can be implied after the fact which
would have the effect of varying or amending the contract or in imposing a higher
contractual duty than that expressly provided for in the contract.

I should also state that counsel made extensive reference to case law on negligent
misstatement in their respective submissions and these cases are referred to in the
main part of the judgment which follows.

### Decision

As was noted by Keane C.J. in *Glencar Exploration plc. v. Mayo County Council
(No.2)* [2002] 1 IR 84 at 136:-

> *"The decisions in both Donoghue v. Stevenson [1932] AC 562 and
> Hedley Byrne & Co. Ltd. v. Heller & Partners Ltd. [1964] AC
> 465 have been considered and adopted by our courts in a number of
> cases and unquestionably represent the law in this jurisdiction."*

An appropriate starting point therefore is to remind oneself of precisely what was
decided by these two cases, firstly, in relation to the tort of negligence generally
and secondly, in relation to the more narrowly defined tort of negligent
misstatement.

The key passage about the duty of care in the speech of Lord Atkin in *Donoghue v. Stevenson* at p. 580 is in the following terms:-

> *"At present I content myself at pointing out that in English law there must be, and is, some general conception of relations giving rise to a duty of care, of which the particular cases found in the books are but instances. The liability for negligence, whether you style it such or treat it as in other systems as a species of 'culpa', is no doubt based upon a general public sentiment of moral wrongdoing for which the offender must pay. But acts or omissions which any moral code would censure cannot in a practical world be treated so as to give a right to every person injured by them to demand relief. In this way rules of law arise which limit the range of complainants and the extent of their remedy. The rule that you are to love your neighbour becomes in law, you must not injure your neighbour; and the lawyer's question, Who is my neighbour? receives a restricted reply. You must take reasonable care to avoid acts or omissions which you can reasonably foresee would be likely to injure your neighbour. Who, then, in law is my neighbour? The answer seems to be - persons who are so closely and directly affected by my act that I ought reasonably to have them in contemplation as being so affected when I am directing my mind to the acts or omissions which are called in question."*

This concept was further elaborated by Lord Atkin when he pointed out at p.581 that *"proximity"* in this context should not be confined to *"mere physical proximity"*, but should extend:-

> *"to such close and direct relations that the act complained of directly affects a person whom the person alleged to be bound to take care would know would be directly affected by his careless act."*

The injury for which a claimant might be compensated, however, under the general law of negligence was confined to personal injury to, or damage to the property of, a plaintiff. The *Hedley Byrne* case was a major milestone in the evolution of the law of negligence, because it extended liability to include pecuniary loss caused by a negligent misstatement. It is important therefore to have regard to the considerations which prompted the House of Lords in *Hedley Byrne* when it held that a negligent, though honest, misrepresentation, spoken or written, could give rise to an action for damages for financial loss caused thereby, apart from any contract or fiduciary relationship. It did so on a very specific basis, namely, that the law would imply a duty of care when a party seeking information from a party possessed of a special skill trusts him to exercise due care, and that party knew or ought to have known that reliance was being placed on his skill and judgment.

The Court was careful to draw a distinction between negligent words and negligent acts. In the course of his speech, Lord Reid stated at p.482:-

> *"The most obvious difference between negligent words and negligent acts is this. Quite careful people often express definite opinions on social or informal occasions even when they see that others are likely to be influenced by them; and they often do that without taking that care which they would take if asked for their opinion professionally or in a business connection. The appellant agrees there can be no duty of care on such occasions, and we were referred to American and South African authorities where that is recognised, although their law appears to have gone much further than ours has yet done. But it is at least unusual casually to put into circulation negligently made articles which are dangerous. A man might give a friend a negligently-prepared bottle of homemade wine and his friend's guests might drink it with dire results. It is by no means clear that those guests would have no action against the negligent manufacturer.*
>
> *Another obvious difference is that a negligently made article would only cause one accident, and so it is not very difficult to find the necessary degree of proximity or neighbourhood between the negligent manufacturer and the person injured. But words can be broadcast with or without the consent or the foresight of the speaker or writer. It would be one thing to say that the speaker owes a duty to a limited class, but it would be going very far to say that he owes a duty to every ultimate 'consumer' who acts on those words to his detriment. It would be no use to say that a speaker or writer owes a duty but can disclaim responsibility if he wants to. He, like the manufacturer, could make it part of a contract that he is not to be liable for his negligence: but that contract would not protect him in a question with a third party, at least if the third party was unaware of it."*

Lord Reid thus concluded that there was good sense behind the existing law that *"in general an innocent but negligent misrepresentation gives no cause of action".*

He concluded that before any duty could arise the most *"natural requirement would be that expressly or by implication from the circumstances the speaker or writer has undertaken some responsibility."*

The principles laid down in *Hedley Byrne & Co v Heller* were followed almost immediately in this jurisdiction by the High Court in *Securities Trust Ltd. v Hugh Moore & Alexander Ltd.* [1964] I.R. 417 wherein Davitt P. defined the context in which liability may arise as follows at p.421:-

> *"circumstances may create a relationship between two parties in which, if one seeks information from the other and is given it, that*

> *other is under a duty to take reasonable care to ensure that the*
> *information given is correct."*

Various cases in Britain in the following years attempted to define a single general principle which might be applied in all circumstances to determine the existence, parameters and scope of the duty of care. One such case was *Dorset Yacht Co. Ltd. v. Home Office* [1970] AC 1004, in which Lord Reid stated at pp. 1026 - 1027:-

> *"In later years there has been a steady trend towards regarding the*
> *law of negligence as depending on principles so that, when a new*
> *point emerges, one should ask not whether it is covered by authority*
> *but whether recognised principles apply to it. Donoghue v.*
> *Stevenson* [1932] AC 562 *may be regarded as a milestone, and the*
> *well known passage in Lord Atkin's speech should I think be*
> *regarded as a statement of principle. It is not to be treated as if it*
> *were a statutory definition. It will require qualification in new*
> *circumstances. But I think that the time has come when we can and*
> *should say that it ought to apply unless there is some justification or*
> *valid explanation for its exclusion."*

That case was followed by *Anns v. Merton London Borough Council* [1978] AC 728 in which a more comprehensive attempt was made to articulate a single general principle when Lord Wilberforce stated at pp.751 - 752:-

> *"Through the trilogy of cases in this House - Donoghue v.*
> *Stevenson* [1932] AC 562, *Hedley Byrne & Co. Ltd. v. Heller &*
> *Partners Ltd.* [1964] AC 465, *and Dorset Yacht Co. Ltd. v. Home*
> *Office* [1970] AC 1004, *the position has now been reached that in*
> *order to establish that a duty of care arises in a particular situation,*
> *it is not necessary to bring the facts of that situation within those of*
> *previous situations in which a duty of care has been held to exist.*
> *Rather the question has to be approached in two stages. First one has*
> *to ask whether, as between the alleged wrongdoer and the person*
> *who has suffered damage there is a sufficient relationship of*
> *proximity or neighbourhood such that, in the reasonable*
> *contemplation of the former, carelessness on his part may be likely to*
> *cause damage to the latter - in which case a prima facie duty of care*
> *arises. Secondly, if the first question is answered affirmatively, it is*
> *necessary to consider whether there are any considerations which*
> *ought to negative, or to reduce or limit the scope of the duty or the*
> *class of person to whom it is owed or the damages to which a breach*
> *of it may give rise."*

There then followed the further decision of the House of Lords in *Caparo Industries plc. v. Dickman & ors* [1990] 2 AC 605. This is a case of particular relevance to the instant case because it involves negligent misstatement in a specific way. The plaintiffs were a limited company who had taken over F. Plc. and then sued its directors alleging fraudulent misrepresentation. They also sued its auditors claiming that they were negligent in carrying out the audit and making

their report, which they were required to do within the terms of the Companies Act, 1985. The plaintiffs claimed that they relied on the accounts as certified and contended that the auditors owed both shareholders and potential investors a duty of care in respect of the accuracy of the accounts and should have known that the company's profits were not as high as projected. The House of Lords held, however, that liability for economic loss due to negligent misstatement was confined to cases where the statement or advice had been given to a known recipient for a specific purpose of which the maker was aware and upon which the recipient had relied and acted to his detriment; the Court further held that since the purpose of the statutory requirement for an audit of public companies under the Act of 1985 was the making of a report to enable shareholders to exercise their class rights in general meeting, it did not extend to the provision of information to assist shareholders in the making of decisions as to future investment in the company, and since, additionally, there was no reason in policy or principle why auditors should be deemed to have a special relationship with non-shareholders contemplating investment in the company in reliance in the public accounts, even when the affairs of the company were known to be such as to render it susceptible to an attempted takeover, the auditors had not owed any duty of care to the plaintiffs in respect of their purchase of F. Plc's shares.

In the course of his speech, Lord Bridge noted at p. 617, *"the inability of any single general principle to provide a practical test which can be applied to every situation to determine whether a duty of care is owed and, if so, what is its scope."* Lord Bridge went on to say at pp. 617-618:-

> *"What emerges is that, in addition to the foreseeability of damage, necessary ingredients in any situation giving rise to a duty of care are that there should exist between the party owing the duty and the party to whom it is owed a relationship characterised by the law as one of 'proximity' or 'neighbourhood' and that the situation should be one in which the court considers it fair, just and reasonable that the law should impose a duty of a given scope upon the one party for the benefit of the other. But it is implicit in the passages referred to that the concepts of proximity and fairness embodied in this additional ingredients are not susceptible of any such precise definition as would be necessary to give them utility as practical tests, but amount in effect to little more than convenient labels to attach to the features of different specific situations which, on a detailed examination of all the circumstances, the law recognises pragmatically as giving rise to a duty of care of a given scope. Whilst recognising, of course, the importance of the underlying general principles common to the whole field of negligence, I think the law has now moved in the direction of attaching greater significance to the more traditional categorisation of distinct and recognisable situations as guides to the existence, the scope and the limits of the varied duties of care which the law*

imposes. We must now, I think, recognise the wisdom of the words of
Brennan J. in the High Court of Australia in Sutherland Shire
Council v. Heyman (1985) 60 A.L.R. 1, 43-44, where he said:-

> "It is preferable, in my view, that the law should
> develop novel categories of negligence incrementally
> and by analogy with established categories, rather than
> by a massive extension of a prima facie duty of care
> restrained only by indefinable 'considerations which
> ought to negative, or to reduce or limit the scope of the
> duty or the class of person to whom it is owed.'"

To the forefront of the considerations referred to by Lord Bridge was the
recognition that distinctions were always to be observed in the law's essentially
different approach to the different kinds of damage which one party might suffer in
consequence of the acts or omissions of another. He noted that it was one thing to
owe a duty of care to avoid causing injury to the person or property of others, it
was quite another to avoid causing others to suffer purely economic loss. He
stressed that the damage which may be caused by the negligently spoken or written
word will normally be confined to economic loss sustained by those who rely on
the accuracy of the information or advice they receive as a basis for action. This of
course is eminently sensible as otherwise there could be an endless number of third
parties who might be affected. Having reviewed a number of cases,
including *Hedley Byrne & Co. Ltd. v. Heller & Partners* [1964] AC 465, *Smith v.
Bush* [1990] 1 AC 831 and *Harris v. Wyre Forest District Council* [1990] 1 AC
831 Lord Bridge concluded at p.620:-

> "The salient feature of all these cases is that the defendant giving
> advice or information was fully aware of the nature of the transaction
> which the plaintiff had in contemplation, knew that the advice or
> information would be communicated to him directly or indirectly and
> knew that it was very likely that the plaintiff would rely on that advice
> or information in deciding whether or not to engage in the
> transaction in contemplation. In these circumstances the defendant
> could clearly be expected, subject always to the effect of any
> disclaimer of responsibility, specifically to anticipate that the plaintiff
> would rely on the advice or information given by the defendant for
> the very purpose for which he did in the event rely on it. So also the
> plaintiff, subject again to the effect of any disclaimer, would in that
> situation reasonably suppose that he was entitled to rely on the
> advice or information communicated to him for the very purpose for
> which he required it. The situation is entirely different where a
> statement is put into more or less general circulation and may
> foreseeably be relied on by strangers to the maker of the statement
> for any one of a variety of different purposes which the maker of the
> statement has no specific reason to anticipate. To hold the maker of
> the statement to be under a duty of care in respect of the accuracy of

> *the statement to all and sundry for any purpose for which they may choose to rely on it is not only to subject him, in the classic words of Cardozo C.J. to 'liability in an indeterminate amount for an indeterminate time to an indeterminate class:' see Ultramares Corporation v. Touche (1931) 174 N.E. 441, 444; it is also to confer on the world at large a quite unwarranted entitlement to appropriate for their own purposes the benefit of the expert knowledge or professional expertise attributed to the maker of the statement. Hence, looking only at the circumstances of these decided cases where a duty of care in respect of negligent statements has been held to exist, I should expect to find that the 'limit or control mechanism . . . imposed upon the liability of a wrongdoer towards those who have suffered economic damage in consequence of his negligence', Candlewood Navigation Corporation Ltd. v. Mitsui O.S.K. Lines Ltd [1986] AC 1, 25 rested in the necessity to prove, in this category of the tort of negligence, <u>as an essential ingredient of the 'proximity' between the plaintiff and the defendant, that the defendant knew that his statement would be communicated to the plaintiff, either as an individual or as a member of an identifiable class, specifically in connection with a particular transaction or transactions of a particular kind (e.g. in a prospectus inviting investment) and that the plaintiff would be very likely to rely on it for the purpose of deciding whether or not to enter upon that transaction or upon a transaction of that kind."</u>*(emphasis added).

It is interesting to observe that Lord Bridge in arriving at this conclusion attached considerable importance to the dissenting judgment in the Court of Appeal of Denning L.J. in *Candler v. Crane Christmas & Co.* [1951] 2 K.B. 164. That case is of some significance, because he specifically addressed the issue *"to whom do these professional people owe the duty"*. Denning L.J. stated at pp.180-181:-

> *"Secondly, to whom do these professional people owe this duty? I will take accountants, but the same reasoning applies to the others. They owe the duty, of course, to their employer or client; and also I think to any third person to whom they themselves show the accounts, or to whom they know their employer is going to show the accounts, so as to induce him to invest money or take some other action on them. But I do not think the duty can be extended still further so as to include strangers of whom they have heard nothing and to whom their employer without their knowledge may choose to show their accounts. Once the accountants have handed their accounts to their employer they are not, as a rule, responsible for what he does with them without their knowledge or consent... The test of proximity in these cases is: did the accountants know that the accounts were required for submission to the plaintiff and use by him?"*

The very last sentence from this citation seems particularly apposite in determining whether a duty of care to Mr Widgust should be ascribed to Norwich Union with regard to the information given to Mr O'Hanlon of Hill Samuel.

In considering firstly the general duty of care in this jurisdiction it might be argued that the parameters of the duty were extended somewhat significantly by the judgment of McCarthy J. in this Court in *Ward v. McMaster* [1988] I.R. 337.

This was a case in which a married couple purchased a house which contained structural defects which had not been picked up on examination on behalf of the local authority by an auctioneer. The plaintiffs sued both the builders and the local authority, their claim against the latter being based on the contention that the local authority should have known that the plaintiffs would rely on an appropriate inspection having been carried out on behalf of the authority. In fact it was carried out by an auctioneer who was not a qualified surveyor and whose report did not reveal the defects in the house. In the High Court, Costello J. held it was within the reasonable contemplation of the second defendant that carelessness on its part in carrying out the valuation of the house might be likely to cause damage to the purchaser. He further held it was consistent with the local authority's public law powers that they should be accompanied by a common law duty of care in favour of the plaintiffs and he further held that, for similar reasons, it was *"just and reasonable"* that the Court should hold that a duty of care arose in the case.

Upholding the judgment of Costello J. on appeal, Henchy J. was satisfied that the facts of the case were such that it could be decided in accordance with *"well established principles"* in that the relationship between the plaintiff and the local authority was such that the latter owed to him a duty of care to carry out an appropriate valuation. McCarthy J., however, went a little further, adopting the two stage test adopted by Lord Wilberforce in *Anns v. Merton London Borough Council* [1978] AC 728, to state at p. 349:-

> *"Whilst Costello J. essentially rested his conclusion on the 'fair and reasonable' test, I prefer to express the duty as arising from the proximity of the parties, the foreseeability of the damage, and the absence of any compelling exemption based upon public policy. I do not, in any fashion, seek to exclude the latter consideration, although I confess that such a consideration must be a very powerful one if it is to be used to deny an injured party his right to redress at the expense of the person or body that injured him."*

However, in *Glencar Exploration plc. v. Mayo Co. Co. (No 2)* [2002] 1 IR 112, Keane C.J. having considered both the judgments of Henchy J. and McCarthy J. in *Ward v. McMaster*, expressed the view at p. 138 that:-

> *"it is not clear that the observations of the latter in relation to the two stage test in Anns necessarily formed part of the ratio of the decision. Given the far reaching implications of adopting in this jurisdiction a*

> *principle of liability in negligence from which there has been such*
> *powerful dissent in other common law jurisdictions, I would not be*
> *prepared to hold that further consideration of the underlying*
> *principles is foreclosed by the dicta of McCarthy J. in Ward v.*
> *McMaster."*

He thus concluded at p. 139:-

> *"There is, in my view, no reason why courts determining whether a*
> *duty of care arises should consider themselves obliged to hold that it*
> *does in every case where injury or damage to property was*
> *reasonably foreseeable and the notoriously difficult and elusive test*
> *of 'proximity' or 'neighbourhood' can be said to have been met,*
> *unless very powerful public policy considerations dictate otherwise. It*
> *seems to me that no injustice will be done if they are required to take*
> *the further step of considering whether, in all the circumstances, it is*
> *just and reasonable that the law should impose a duty of a given*
> *scope on the defendant for the benefit of the plaintiff, as held by*
> *Costello J. at first instance in Ward v. McMaster [1985] I.R. 29, by*
> *Brennan J. in Sutherland Shire Council v. Heyman (1985) 157 C.L.R.*
> *424 and by the House of Lords in Caparo plc. v. Dickman [1990] 2*
> *AC 605."*

This most authoritative recent statement of the law in relation to the general duty
of care in negligence is in itself a powerful reason for holding that the test
in *Caparo*, if applicable, must apply with even greater force to cases of negligent
misstatement and that Lord Bridge's caveat at p. 621 that an essential ingredient of
the 'proximity' between the plaintiff and the defendant in such circumstances must
at the very least involve proof "*that the defendant knew that his statement would be*
*communicated to the plaintiff, either as an individual or as a member of an*
*identifiable class, specifically in connection with a particular transaction or*
*transactions of a particular kind and that the plaintiff would be very likely to rely*
*on it for the purposes of deciding whether or not to enter upon that transaction or*
*upon a transaction of that kind*".

This strikes me as a particularly appropriate restriction to apply to any duty of care
arising in respect of negligent misstatement for all the reasons identified in the
cases already considered and bearing in mind always the crucial distinction
between words and statements on the one hand and deeds and conduct on the other.
It seems obvious that this distinction is one which should not be elided. The
question however is whether the principles in *Caparo*, itself a case in negligent
misstatement, should apply to cases of negligent misstatement in this jurisdiction,
as distinct from cases of the general duty of care in negligence where application
of those principles has been established by the decision of this Court in *Glencar*
*plc. v. Mayo Co. Co. (No.2)*.

There are findings of fact in the present case which place the defendants in an
invidious position. This Court, following its own decisions in *Hay v.*

*O'Grady* [1992] 1 I.R. 210 and *Best v. Wellcome Foundation* [1993] 3 I.R.
421, must accept as correct the primary findings of fact made by the learned trial
judge, which include findings that Mr. O'Hanlon did make the disputed telephone
call, was given inaccurate information by specialised and trained staff in relation to
the position of premium payments payable under the policy, that the information
given was therefore a negligent misstatement and that Hill Samuel did rely upon
this negligent misstatement not to intervene on the plaintiff's behalf, as on the
evidence most certainly would have occurred, to pay the premiums in question
having regard to the parlous state of health of Mrs. Wildgust and Mr. Wildgust's
then preoccupation with her care and welfare. It is also a further finding of fact by
the learned trial judge that Mr. Wildgust only knew about the problem with the
premium payments in June, 1992, from which it follows that the trial judge was
satisfied that Mr. Wildgust had not received any breakdown notice.

Mr. Sreenan has repeatedly stated that in the absence of the negligent misstatement
being addressed directly to the plaintiff, and in the further absence of any
communication by Mr. O'Hanlon with Mr. Wildgust to inform him of his
conversation with the official in Norwich Union, essential links in the chain of
causation are broken because *Hedley Byrne & Co. v. Heller & Partners* [1964] AC
465 indicates that these are appropriate limbs of the test. Of course it is argued on
behalf of the plaintiff that essentially Mr. Wildgust and Hill Samuel were *"under
the same roof"* insofar as any proximity test is concerned, that they both had an
equal interest in getting accurate information to prevent the happening of the loss
which did in fact occur, and thus may be identified for all practical purposes as
being the same person in law in the context of the particular misstatement.

It seems to me that the 'agency' argument relied on by the plaintiffs in this respect,
whereby it is contended that Hill Samuel were 'agents' of the plaintiffs for the
purpose of making the particular inquiry is a red herring. Hill Samuel were acting
on their own behalf. This does not dispose of the proximity point however because
it must have been within the contemplation of the official giving out the
information that it would either be relayed to Mr. Wildgust as the person liable for
the payments under the policy or acted upon by the bank to prevent the lapse of the
policy. It would be absurd to treat Hill Samuel as though it had in some way itself
become the sole insured under the policy so as to exclude Mr. Wildgust from the
very limited category of persons with an interest in the transaction. It would
equally have been well within the understanding of the respondents that Hill
Samuel, as a merchant bank in the business of lending money, was holding the
policy by way of security subject always to Mr. Wildgust's equity of redemption.
They were thus, in my view, both 'neighbours' in the legal sense to whom a duty
was owed. Is Mr. Wildgust in these circumstances to be deprived of a remedy
because the communication was made to only one of two neighbours where one or
other could and would have acted to prevent the loss?

In *Spring v. Guardian Insurance plc.* [1995] 2 AC 296, the plaintiff was dismissed as an insurance salesman by the respondent company who then supplied a reference for the plaintiff which contained a negligent misstatement. The House of Lords held that an employer who gave a reference in respect of a former employee owed that employee a duty to take reasonable care in its preparation and would be liable to him in negligence if he failed to do so and the employee thereby suffered economic damage. Further, it was held that the plaintiff was entitled to succeed on the principle in *Hedley Byrne & Co. Ltd. v. Heller & Partners Ltd.* [1964] AC 465.

At p. 319 Lord Goff of Chieveley stated:-

> *"The fact that the inquiry in Hedley Byrne itself was directed, in a case concerned with liability in respect of a negligent misstatement (in fact a reference), to whether the maker of the statement was liable to a recipient of it who had acted in reliance upon it, may have given the impression that this is the only way in which liability can arise under the principle in respect of a misstatement. But, having regard to the breadth of the principle as stated in Hedley Byrne itself, I cannot see why this should be so. Take the case of the relationship between a solicitor and his client, treated implicitly by Lord Morris and expressly by Lord Devlin as an example of a relationship to which the principle may apply. I can see no reason why a solicitor should not be under a duty to his client to exercise due care and skill when making statements to third parties, so that if he fails in that duty and his client suffers damage in consequence, he may be liable to his client in damages. The question whether a person who gives a reference to a third party may, if the reference is negligently prepared, be liable in damages not to the recipient but to the subject of the reference, did not arise in Hedley Byrne and so is not addressed in that case. That is the central question with which we are concerned in the present case; and I propose first to consider it in the context of an ordinary relationship between employer and employee and then to turn to apply the relevant principles to the more complex relationships which existed in the present case.*
>
> *Prima facie (i.e. subject to the point on defamation, which I will have to consider later), it is my opinion that an employer who provides a reference in respect of one of his employees to a prospective future employer will ordinarily owe a duty of care to his employee in respect of the preparation of the reference. The employer is possessed of special knowledge, derived from his experience of the employee's character, skill and diligence in the performance of his duties while working for the employer.... Furthermore, when such a reference is provided by an employer, it is plain that the employee relies upon him to exercise due skill and care in the preparation of the reference*

> *before making it available to the third party. In these circumstances,*
> *it seems to me that all the elements requisite for the application of the*
> *Hedley Byrne [1964] AC 465 principle are present."*

I cannot see how any different considerations arise in the present case or how any
requirement exists to reach a different outcome. Those providing the information
within Norwich Union to Mr. O'Hanlon must have been well aware that it might
be relied upon as much by Mr. Wildgust as by Hill Samuel. They were both within
a limited and determinate class of persons with a direct interest in the transaction,
Hill Samuel having the legal assignment of the life policy and Mr. Wildgust the
equity of redemption. Either of the parties, had they received accurate information,
would, on the evidence, have acted to ensure that premiums were immediately
paid, particularly having regard to the poor state of health of the plaintiff's wife. I
therefore have no hesitation in concluding that the respondents did assume a duty
towards both the plaintiff and Hill Samuel in making the representation in
question. The fact that the representation reached only Hill Samuel makes no
difference in my view once it is established that Hill Samuel, as part of the class or
category of persons intended to be affected by the representation, would have acted
upon it to prevent the loss to the plaintiff which in fact occurred.

From the foregoing it is apparent that I favour an interpretation, or adaptation if
needs be, of the *Hedley Byrne* principles which would include more than just the
person to whom the negligent misstatement is addressed. The 'proximity' test in
respect of a negligent misstatement in my view must go further than that and
include persons in a limited and identifiable class when the maker of the statement
can reasonably expect, in the context of a particular inquiry, that reliance will be
placed thereon by such person or persons to act or not act in a particular manner in
relation to that transaction. As I accept the submission of plaintiff's counsel that
Mr Wildgust and Hill Samuel had virtually an identical interest in preserving the
policy and that both formed such an identifiable class, either of whom could have
acted to prevent Mr. Wildgust's loss, I believe it is just and reasonable to ascribe to
the respondents a duty of care with regard to Mr Wildgust in such circumstances.
In a nutshell, I would interpret *Hedley Byrne* in the light of what was stated
in *Caparo* on the facts of this case.

I am far from convinced that to so hold represents any major extension of the
principles in *Hedley Byrne v Heller* as the facts of that case may indicate.

The appellants in *Hedley Byrne* were advertising agents who had placed substantial
forward advertising orders for a company on terms by which they, the appellants,
were personally liable for the cost of orders. They asked their bankers to inquire
into the company's financial stability and their bankers made inquiries of the
respondents, who were the company's bankers. The respondent gave favourable
references, and in reliance on these references the appellants placed orders which

resulted in financial loss. Without having to specifically decide the particular point of identification, Lord Reid had the following to say at p.482:-

> *"Before coming to the main question of law, it may be well to dispose of an argument that there was no sufficiently close relationship between these parties to give rise to any duty. It is said that the respondents did not know the precise purpose of the inquiries and did not even know whether the National Provincial Bank wanted the information for its own use or for the use of a customer: they knew nothing of the appellants. I would reject that argument. They knew that the inquiry was in connection with an advertising contract, and it was at least probable that the information was wanted by the advertising contractors. It seems to me quite immaterial that they did not know who these contractors were: there is no suggestion of any speciality which could have influenced them in deciding whether to give information or in what form to give it. I shall therefore treat this as if it were a case where a negligent misrepresentation is made directly to the person seeking information, opinion or advice, and I shall not attempt to decide what kind or degree of proximity is necessary before there can be a duty owed by the defendant to the plaintiff."*

In the same case Lord Morris of Borth-y-Gest, with whom Lord Hodson concurred on this particular point, stated at p 503:-

> *"if in a sphere in which a person is so placed that others could reasonably rely on his judgment or his skill or upon his ability to make careful inquiry, a person takes it upon himself to give information or advice to, or allows his information or advice to be passed on to another person who, as he knows or should know, will place reliance upon it, then a duty of care will arise."*

Lord Pearce, also in point in the same case at p. 539, added:-

> *"Was there such a special relationship in the present case so as to impose on the defendants a duty of care to the plaintiffs as the undisclosed principals for whom the National Provincial Bank was making the inquiry? The answer to that question depends on the circumstances of the transaction. If, for instance, they disclosed a casual social approach to the inquiry, no such special relationship or duty of care would be assumed (see Fish v. Kelly 17 C.B.N.S. 194). To import such a duty the representation must normally, I think, concern a business or professional transaction whose nature makes clear the gravity of the inquiry and the importance and influence attached to the answer,"*

These dicta, and notably those of Lord Reid, provide a very persuasive basis for concluding that the principles in *Caparo* may more properly be seen as a clarification of the principles of *Hedley Byrne*, rather than any major extension thereof. It must also be borne in mind that the plaintiffs lost in *Hedley Byrne* largely because there was an express disclaimer of responsibility for the accuracy of the information provided by the bank, a feature entirely absent from the present case.

That leaves only the argument that the plaintiff cannot profit from his own breach of contract by invoking a claim in tort. As already indicated, reliance was placed by the respondents on the decision of this Court in *Kennedy v. Allied Irish Banks plc* [1998] 2 IR 48 in making this submission and on certain dicta of Hamilton C.J. cited above. However the case in question is an authority for the proposition that, irrespective of the existence of a contract, a duty of care may still arise where a party undertakes to exercise a special skill to perform a particular task knowing that the party on whose behalf the task was being performed relied on that skill. In so holding, Hamilton C.J., having invoked *Hedley Byrne*, stated at p 56:-

> "The existence of such a duty was recognised by the High Court in the cases of Tulsk Co-operative Livestock Mart Ltd. v. Ulster Bank Ltd (Unreported, High Court, Gannon J., 13th May, 1983), Towey v. Ulster Bank [1987] ILRM 142 and T.E. Potterton Ltd. v. Northern Bank Ltd. [1993] 1 I.R. 413.
>
> In these cases it is found as a fact that the customer, to the knowledge of the bank, relied on the bank to perform a particular task, that the bank assumed the responsibility of performing that task and failed to exercise the requisite degree of care in the performance of such task."

This is not a case where it is sought to read into Mr Wildgust's contract some implied term at variance with those expressly stated with regard to the requirement to pay the premiums in the manner stipulated. On the contrary, the negligent misstatement may be seen as a collateral representation, altogether outside the terms of the contract, which suggested that a particular contractual obligation had in fact been discharged.

Nor does the decision of this Court in *Pat O'Donnell & Co. Ltd. v. Truck and Machinery Sales Ltd.* [1998] 4 I.R. 191 materially assist the respondent. Having referred to a multitude of cases wherein it was held that there can be concurrent liability in tort and contract, O'Flaherty J. stated at p 199:-

> "Thus, where under the general law a person owes a duty to another to exercise reasonable care and skill in some activity, a breach of that duty can give rise to a claim in tort notwithstanding the fact that the

> *activity is the subject matter of a contract between them. There is no*
> *general duty of non-cumul des obligations such as is found in civil*
> *law systems."*

It was only by way of postscript to those observations that O'Flaherty J. added the rider cited by counsel for the respondent to the effect *"that the general duty of care in tort cannot be manipulated so as to override the contractual allocation of responsibility between the parties."*

However, in turning to address the facts of the particular case, O'Flaherty J. then went on to say at p. 200:-

> *"In the present case, the terms of the contract were duly complied*
> *with. To succeed, therefore, the counterclaimant had to establish that*
> *duties otherwise owed to it by the plaintiff had been*
> *breached."* (emphasis added)

It could not be clearer but that O'Flaherty J. was simply saying that if a contract provides, whether expressly or by necessary implication, that the defendant is not liable for a particular risk, then the law of tort should not, within the four corners of the contract, be allowed to contradict that. That is a completely different situation from that which arises in the present case where no want of care in contravention of the terms of the contract is being contended for.

I would allow the appeal herein.