# Exhibit 4

A.C.                    Reg. v. Kamara (H.L.(E.))          Lord Cross
                                                          of Chelsea

A a criminal offence. It follows that, in my opinion, the course adopted by
Stable J. in *Rex* v. *Bramley* was wrong.

*Appeal dismissed.*

Solicitors: *Scott, Clarke & Co.; Director of Public Prosecutions.*

B                                                      F. C.

_____

[HOUSE OF LORDS]

C NORWICH PHARMACAL CO. AND OTHERS        .     .    APPELLANTS

AND

CUSTOMS AND EXCISE COMMISSIONERS     .     .  RESPONDENTS

1972  May 11, 12, 15;      Lord Denning M.R., Buckley and Roskill L.JJ.
       June 13, 14, 15, 16; July 25
D 1973  Feb. 26, 27, 28;      Lord Reid, Lord Morris of Borth-y-Gest,
       March 1, 5, 6, 7, 12, 13,      Viscount Dilhorne, Lord Cross of Chelsea
       14, 15, 19, 20, 21;                         and Lord Kilbrandon
       June 26

   *Practice—Discovery—Action for—Action for discovery against*
E     *Customs and Excise Commissioners—Confidential information*
      *concerning third parties obtained under statutory powers—*
      *Discovery of information sought—Whether any action for*
      *discovery per se*
   *Crown—Privilege—Objection to produce documents—Infringement*
      *of patent by unknown importers—Disclosure of names of*
      *importers sought from Customs and Excise Commissioners—*
      *Whether in public interest to order discovery*

F      The appellants were the owners and licensees of a patent for
   a chemical compound known as furazolidone. It appeared
   that the patent was being infringed by illicit importations
   of furazolidone manufactured abroad. In order to obtain
   the names and addresses of the importers the appellants brought
   actions against the Commissioners of Customs and Excise
   alleging infringement of the patent and seeking orders for the
   disclosure of the relevant information. On a summons for
   inspection of documents, the commissioners claiming privilege
G  against production of the relevant documents, Graham J.
   ordered discovery of the names and addresses of the importers.
      On appeal, the Court of Appeal reversed that decision.
   The appellants appealed. At the hearing of the appeal the
   appellants abandoned the contention that they had a cause of
   action for infringement by the commissioners themselves and
   the appeal proceeded on the basis that the case was and always
   had been an action solely for discovery:—
H      *Held*, allowing the appeal, (1) that where a person, albeit
   innocently and without incurring any personal liability, became
   involved in the tortious acts of others he came under a duty to
   assist one injured by those acts by giving him full information

134

Norwich Pharmacal v. Customs & Excise (C.A.)                    [1974]

by way of discovery and disclosing the identity of the wrong-   A
doers, and for that purpose it mattered not that such involve-
ment was the result of voluntary action or the consequence of
the performance of a duty statutory or otherwise; and that,
accordingly, prima facie the respondents were under a duty to
disclose the information sought (post, pp. 175B–E, 187F—188E,
195B–G, 197B–G, 203F—204D).

    *Upmann* v. *Elkan* (1871) L.R. 12 Eq. 140; 7 Ch.App. 130;
*Orr* v. *Diaper* (1876) 4 Ch.D. 92; 25 W.R. 23 and *Post* v. *Toledo,
Cincinnati and St. Louis Railroad Co.* (1887) 11 N.E.Rep. 540   B
applied.

    *Queen of Portugal* v. *Glyn* (1840) 7 Cl. & F. 466, H.L.(E.)
considered.

    (2) That in the circumstances there was no head of public
policy nor statutory provision which precluded the making of
an order for discovery.

    Decision of the Court of Appeal, post, p. 137c; [1972] 3   C
W.L.R. 870; [1972] 3 All E.R. 813 reversed.


The following cases are referred to in their Lordships' opinions:

*Angel* v. *Angel* (1822) 1 L.J.O.S.Ch. 6.
*Butterworth* v. *Bailey* (1808) 15 Ves.Jun. 358.
*Colonial Government* v. *Tatham* (1902) 23 Natal L.R. 153.
*Dixon* v. *Enoch* (1872) L.R. 13 Eq. 394.                     D
*Fenton* v. *Hughes* (1802) 7 Ves.Jun. 287.
*Hart* v. *Stone* (1883) 1 Buch.App.Cas. 309.
*Hunt* v. *Maniere* (1864) 34 Beav. 157.
*London (Mayor and Commonalty and Citizens of)* v. *Levy* (1803) 8
    Ves.Jun. 398.
*Moodalay* v. *Morton* (1785) 1 Bro.C.C. 469; 2 Dick. 652.
*Orr* v. *Diaper* (1876) 4 Ch.D. 92; 25 W.R. 23; 46 L.J.Ch. 41; 35 L.T. 468.   E
*Plummer* v. *May* (1750) 1 Ves.Sen. 426.
*Portugal (Queen of)* v. *Glyn* (1840) 7 Cl. & F. 466, H.L.(E.).
*Post* v. *Toledo, Cincinnati and St. Louis Railroad Co.* (1887) 11 N.E.Rep.
    540.
*Rowell* v. *Pratt* [1938] A.C. 101; [1937] 3 All E.R. 660, H.L.(E.).
*Upmann* v. *Elkan* (1871) L.R. 12 Eq. 140; 7 Ch.App. 130.
*Upmann* v. *Forester* (1883) 24 Ch.D. 231.                    F


The following additional cases were cited in argument in the House of
    Lords:

*Barnard* v. *National Dock Labour Board* [1953] 2 Q.B. 18; [1953] 2
    W.L.R. 995; [1953] 1 All E.R. 1113, C.A.
*Bass* v. *Board of Customs*, February 20, 1818, F.C.
*Bovill* v. *Cowan* (1867) 15 W.R. 608.                        G
*Brown* v. *McDonald* (1905) 133 F. 897.
*Burchard* v. *MacFarlane* [1891] 2 Q.B. 241, C.A.
*Carver* v. *Pinto Leite* (1871) 7 Ch.App. 90.
*Coca-Cola Co.* v. *City of Atlanta* (1922) 110 S.E. 730.
*Conway* v. *Rimmer* [1968] A.C. 910; [1968] 2 W.L.R. 998; [1968] 1
    All E.R. 874, H.L.(E.).
*Cowan* v. *Stanhill Estates Pty. Ltd.* [1966] V.R 604.        H
*Dummer* v. *Chippenham Corporation* (1807) 14 Ves.Jun. 245.
*Hancocks & Co.* v. *Lablache* (1878) 3 C.P.D. 197.
*Heathcote* v. *Fleete* (1702) 2 Vern. 442.

135

**A.C.**         Norwich Pharmacal v. Customs & Excise (C.A.)

A   Hillman's Airways Ltd. v. Société Anonyme d'Éditions Aéronautiques
      Internationales [1934] 2 K.B. 356.
   Leven v. Board of Excise, March 3, 1814, F.C.
   McDade v. Glasgow Corporation, 1966 S.L.T.(Notes) 4.
   March v. Keith (1860) 30 L.J.Ch. 127.
   Metropolitan Asylum District v. Hill (1881) 6 App.Cas. 193, H.L.(E.).
   Morse v. Buckworth (1703) 2 Vern. 443.
   Murillo, The (1873) 28 L.T. 374.

B   Nobel's Explosives Co. v. Jones, Scott & Co. (1881) 17 Ch.D. 721, C.A.;
      (1882) 8 App.Cas. 5, H.L.(E.).
   Plymouth Mutual Co-operative and Industrial Society Ltd. v. Traders'
      Publishing Association Ltd. [1906] 1 K.B. 403, C.A.
   Pressed Steel Car Co. v. Union Pacific Railway Co. (1917) 240 F. 135.
   Reg. v. Lewes Justices, Ex parte Secretary of State for Home Department
      [1973] A.C. 388; [1972] 3 W.L.R. 279; [1972] 2 All E.R. 1057,
      H.L.(E.).

C   Reg. v. Lord Leigh [1897] 1 Q.B. 132, C.A.
   Reg. v. Snider [1953] 2 D.L.R. 9.
   Saltman Engineering Co. Ltd. v. Campbell Engineering Co. Ltd. (1948)
      65 R.P.C. 203, C.A.
   Sinclair Refining Co. v. Jenkins Petroleum Process Co. (1933) 53 S.Ct. 736.
   Spokes v. Grosvenor and West End Railway Terminus Hotel Co. Ltd.
      [1897] 2 Q.B. 124, C.A.

D   Stuart v. Ismail, 1942 A.D. 327.
   Tetley v. Easton (1856) 18 C.B. 643.
   Utterson v. Mair (1793) 4 Bro.C.C. 270.
   Uzielli, In re, Ponsardin v. Peto (1863) 33 L.J.Ch. 371.
   Vass v. Board of Customs, Feb. 20, 1818, F.C.
   Walker v. Pennsylvanian Railway Co. (1944) 36 A. 2d 597.
   Washburn and Moen Manufacturing Co. v. Cunard Steamship Co. (1889)
      6 R.P.C. 398.

E   Weld-Blundell v. Stephens [1920] A.C. 956, H.L.(E.).
   Zachariassen v. The Commonwealth (1917) 24 C.L.R. 166.

   The following cases are referred to in the judgments of the Court of
      Appeal:

F   Attorney-General v. Mulholland; Attorney-General v. Foster [1963] 2
      Q.B. 477; [1963] 2 W.L.R. 658; [1963] 1 All E.R. 767, C.A.
   Conway v. Rimmer [1968] A.C. 910; [1968] 2 W.L.R. 998; [1968] 1
      All E.R. 874, H.L.(E.).
   Fraser v. Evans [1969] 1 Q.B. 349; [1968] 3 W.L.R. 1172; [1969] 1
      All E.R. 8, C.A.
   Gartside v. Outram (1856) 26 L.J.Ch. 113.

G   Hubbard v. Vosper [1972] 2 Q.B. 84; [1972] 2 W.L.R. 389; [1972] 1
      All E.R. 1023, C.A.
   Hunt v. Maniere (1864) 34 Beav. 157.
   Initial Services Ltd. v. Putterill [1968] 1 Q.B. 396; [1967] 3 W.L.R.
      1032; [1967] 3 All E.R. 145, C.A.
   Murray v. Clayton (1872) L.R. 15 Eq. 115.
   Nobel's Explosives Co. v. Jones, Scott & Co. (1881) 17 Ch.D. 721, C.A.;
      (1882) 8 App.Cas. 5, H.L.(E.).

H   Orr v. Diaper (1876) 4 Ch.D. 92; 25 W.R. 23; 46 L.J.Ch. 41; 35 L.T. 468.
   Reg. v. Lewes Justices, Ex parte Secretary of State for Home Department
      [1973] A.C. 388; [1972] 3 W.L.R. 279; [1972] 2 All E.R. 1057,
      H.L.(E.).

Norwich Pharmacal v. Customs & Excise (C.A.) [1974]

Saccharin Corporation v. Chemicals and Drugs Co. [1900] 2 Ch. 556; 17 R.P.C. 612, C.A.

Tournier v. National Provincial and Union Bank of England [1924] 1 K.B. 461, C.A.

Upmann v. Elkan (1871) L.R. 12 Eq. 140; 7 Ch.App. 130.

Upmann v. Forester (1883) 24 Ch.D. 231.

Weld-Blundell v. Stephens [1920] A.C. 956, H.L.(E.).

The following additional cases were cited in argument in the Court of Appeal:

British United Shoe Machinery Co. Ltd. v. Simon Collier Ltd. (1910) 27 R.P.C. 567, H.L.(E.).

Clayton v. Earl of Glengall (1837) Cr. & Dix Ab.Ca. 70.

Crompton (Alfred) Amusement Machines Ltd. v. Customs and Excise Commissioners (No. 2) [1972] 2 Q.B. 102; [1972] 2 W.L.R. 835; [1972] 2 All E.R. 353, C.A.

Dixon v. Enoch (1871) L.R. 13 Eq. 394.

Grosvenor Hotel, London, In re [1964] Ch. 464; [1964] 2 W.L.R. 184; [1964] 1 All E.R. 92, C.A.

Hargreaves (Joseph) Ltd., In re [1900] 1 Ch. 347, C.A.

Heathcote v. Fleete (1702) 2 Vern. 442.

Henderson v. M'Gown, 1916 S.C. 821.

Hillman's Airways Ltd. v. Société Anonyme d'Éditions Aéronautiques Internationales [1934] 2 K.B. 356.

International General Electric Co. of New York Ltd. v. Customs and Excise Commissioners [1962] Ch. 784; [1962] 3 W.L.R. 20; [1962] 2 All E.R. 398; [1962] R.P.C. 235, C.A.

McDade v. Glasgow Corporation, 1966 S.L.T.(Notes) 4.

Morse v. Buckworth (1703) 2 Vern. 443.

Panthalu v. Ramnord Research Laboratories Ltd. [1966] 2 Q.B. 173; [1965] 3 W.L.R. 682; [1965] 2 All E.R. 921, C.A.

Pfizer Corporation v. Ministry of Health [1965] A.C. 512; [1965] 2 W.L.R. 387; [1965] 1 All E.R. 450, H.L.(E.).

Pinder v. Spurr (unreported), February 14, 1972, Lawton L.J.

Reg. v. Lewes Justices, Ex parte Secretary of State for Home Department [1972] 1 Q.B. 232; [1971] 2 W.L.R. 1466; [1971] 2 All E.R. 1126, D.C.

Shaw v. Kay (1904) 5 T.C. 74.

Upmann v. Currey (1885) 29 S.J. 735.

Washburn and Moen Manufacturing Co. v. Cunard Steamship Co. (1889) 6 R.P.C. 398.

APPEAL from the Court of Appeal, post, p. 137C.

This was an appeal, brought by leave of the House of Lords, by the appellants, Norwich Pharmacal Co. (now known as Morton-Norwich Products Inc.), Smith Kline and French Laboratories Ltd. and Norwich Pharmacal Co., the plaintiffs in consolidated actions, from an order of the Court of Appeal (Lord Denning M.R., Buckley and Roskill L.JJ.) dated July 25, 1972, allowing an appeal of the respondents, the Commissioners of Customs and Excise, defendants to the actions, from the order of Graham J. [1972] Ch. 566 dated March 14, 1972, requiring them to disclose

**A.C.**          Norwich Pharmacal v. Customs & Excise (C.A.)

A   to the appellants the names and addresses of the persons who were infringing the appellants' patent.

The facts are stated in their Lordships' opinions, post, p. 173A.

*Sydney Templeman Q.C., J. P. Warner* and *W. Bruce Spalding* for the appellant commissioners in the Court of Appeal.

B   *Anthony Walton Q.C.* and *Robin Jacob* for the respondent plaintiffs in the Court of Appeal.

The main submissions of counsel in the Court of Appeal were similar to those made later before the House of Lords, post, pp. 152F—172H, where the plaintiffs abandoned the contention that they had a cause of action for infringement.

*Cur. adv. vult.*

C   July 25, 1972. The following judgments were read.

LORD DENNING M.R. The Norwich Pharmacal Co. is an American corporation which owns a patent. Smith Kline and French Laboratories Ltd. are an English subsidiary and licensee of the patent. I will call them "the plaintiffs." They have letters patent for a chemical compound.

D   In the specification it is designated by a very long name. I will not write it or repeat it. It is claim 2. It has 36 letters and five figures. The plaintiffs have given it a shortened name which I can both write and repeat. It is "furazolidone." This substance is useful for putting into poultry food because it gives the birds some protection against infection by microbes. Very little of it goes a very long way. The plaintiffs mix it with chalk in the proportion of about one-quarter of furazolidone to

E   three-quarters of chalk. This I will call the furazolidone mixture. This goes even further. Only half a pound of the mixture goes into one ton of feeding stuff. Some large poultry farms buy pure furazolidone themselves, or the mixture of chalk and furazolidone, and put it themselves into the feeding stuff. But smaller farms buy the final feeding stuff from merchants who have previously injected the furazolidone mixture into it.

F   The plaintiffs make the furazolidone in this country, and mix it with chalk here, and sell the mixture here. They have a strong belief, however, that a lot of "pirate" furazolidone is being imported into this country from abroad. Sometimes it is brought in by big farmers. At other times it is brought in by merchants who put it into poultry food which they sell. The plaintiffs want to put a stop to these "pirate" importations. But they do not know who are the people who are importing it. They

G   have no means, they say, of finding out: because the final foodstuff contains only a small amount of furazolidone. "It is," says the manager of their legal department, "for practical purposes impossible to show that this furazolidone is not lawful material originating with my company or its associates."

In these circumstances the plaintiffs seek to discover from the customs

H   authorities the names of the importers. It appears that in the United States there is a law which enables patentees to get such names from the customs authorities. The plaintiffs seek to do the same here by means of this action. It appears that the customs authorities here publish statistics

A.C. 1974—6

138
Lord Denning M.R.   Norwich Pharmacal v. Customs & Excise (C.A.)          [1974]

showing the total amount of goods imported under the name of furazolidone,
but none of the details.   The plaintiffs seek to get the customs to disclose     A
the names of the people who imported these quantities of furazolidone.
If they can get the names, they intend to sue them for infringement of
their patent.   This will, they say, enable them to stop the "pirate"
importations to a large extent. .But it will not be "fool-proof."   The
goods are sometimes imported as "medicament" without a name: so it
will not appear in the statistics as furazolidone.                                B

    The customs authorities have in their possession the names of the
importers; because, whenever goods are imported, the importer has to
fill in the form of entry giving the name of the importers, the description
of the goods, and so forth: see section 28 of the Customs and Excise
Act 1952.   The customs authorities regard this information as confidential.
They do not publish it at all.   They only publish the statistics showing     C
total quantities imported in the year, but no names or addresses.

    This confidence is strongly confirmed in the Finance Act 1967.   Section
3 authorises the commissioners to disclose some of the information to
others if it is in the national interest, or rather, if the Secretary of State
is satisfied that it is in the national interest.   But very significantly the
section says that the commissioners are not to disclose "the price of the
goods or the name of the importer of the goods."   Those matters are so     D
sacrosanct that not even the Secretary of State can require them to be
disclosed—not even when it is in the national interest.

    Yet the judge has held that the commissioners must disclose the names
of the importers to the plaintiffs.   The commissioners appeal to this court.
Let me get one point out of the way at the very first.   It was suggested
that the commissioners were themselves guilty of infringing the plaintiffs'
patents—not whilst they were ignorant, but as soon as they were told     E
that the goods infringed the plaintiffs' patent.   I cannot accept this
suggestion.   The commissioners do not have possession of the goods.
All they do is ask the importers to pay the customs duty.   They have
power, of course, to prevent importation until the duty has been paid.
The goods must stay in an approved warehouse till the duty is paid.   None
of this makes the commissioners guilty of infringement of patents: see     F
*Nobel's Explosives Co.* v. *Jones, Scott & Co.* (1881) 17 Ch.D. 721; (1882)
8 App.Cas. 5.   They do not infringe the monopoly.   All that the Royal
Grant gives to the patentee and his licensees is the right to "make use
exercise and vend the said invention within the United Kingdom."   The
commissioners do none of those things.   They do not make, use, exercise
or vend it.   They only collect duty on it.

    But the plaintiffs suggest that the commissioners infringe in another     G
way.   The plaintiffs rely on the provision in the Royal Grant which gives
them "the whole profit and advantage" accruing by reason of the said
invention; and they say that, by taking the duty, the commissioners take
some of that profit and advantage.   That is quite untenable.   The profit
is taken by the importer, not by the commissioners.   The commissioners
charge duty on it, just as the revenue authorities charge tax on profits.     H
But that does not make them participators in it.

    Finally, on this part of the case the plaintiffs suggest that, when goods
are imported which infringe their patent, they are prohibited goods and

A   are liable to forfeiture under section 44 (*b*) of the Customs and Excise Act
1952: and, therefore, the commissioners are in a position to make use of
them. But that prohibition of imports is only available when the prohibi-
tion is imposed " under or by virtue of an enactment ": as, for instance,
when injurious drugs are prohibited. It does not apply to goods which
infringe a patent. By no stretch of the imagination could the commis-
sioners be expected to " police " imports so as to see that patents are not
B   infringed. Not even if the monopolist asks them, can the commissioners
be expected to do it.

I find myself, therefore, in entire agreement with the judge on this
part of the case. There is no conceivable cause of action against the
commissioners for infringement of patent.

Now I turn to the question whether there can be discovery against
C   the commissioners—so as to compel them to give information as to the
names of the importers. The cases warrant two propositions. First,
discovery can be granted in aid of any reasonable action which the
plaintiff has brought or is intending to bring, or is capable of bringing,
against the defendant. Thus, where the defendant has been found guilty
of infringing a patent, he can be ordered to give the names and addresses
of persons to whom he has sold the goods, both in aid of damages: see
D   *Murray* v. *Clayton* (1872) L.R. 15 Eq. 115; or of an account of profits:
see *Saccharin Corporation* v. *Chemicals and Drugs Co.* [1900] 2 Ch. 556.
But that is only in aid of an existing or future action against the defendant.

Secondly, in general, " no independent action for discovery lies against
a party against whom no reasonable cause of action can be alleged, or
who is in the position of a mere witness." It was so held by the judge,
who gives many cases to support this proposition: [1972] Ch. 566,
E   582–584. This proposition is founded on good reason. It would be
intolerable if an innocent person—without any interest in a case—were
to be subjected to an action in Chancery simply to get papers or information
out of him. The only permissible course is to issue a subpoena for him
to come as a witness or to produce the documents to the court.

But Mr. Walton urges—and the judge has so held—that there is an
F   exception to this second proposition—an exception, it is said, in aid of
the administration of justice. Mr. Walton says that, when it is clear that
there has been wrongdoing, and the plaintiff is unable to find out the
wrongdoers but a third party knows the names, then the court can order
discovery from the third party to find out the names, even though there
is no reasonable cause of action against him. In support of this pro-
position Mr. Walton quotes cases of trade marks or passing off, and in
G   particular *Hunt* v. *Maniere* (1864) 34 Beav. 157; *Upmann* v. *Elkan*
(1871) L.R. 12 Eq. 140; *Orr* v. *Diaper* (1876) 4 Ch.D. 92, but much
more fully and better reported in 25 W.R. 23. Those were cases of
wharfingers, forwarding agents or shippers who were importing or exporting
spurious goods. They handled champagne, cigars and sewing cotton which
were dressed up so as to deceive purchasers. They did not know of
H   the fraud at first, but later on were given notice of it. The courts held
that, on getting to know of the fraud, the wharfingers, forwarding agents
or shippers ought not to part with the spurious champagne, cigars or
sewing cotton. They ought to give to the aggrieved party such information

as he might reasonably require so as to track down the fraud and sue the culprits.  They ought to give the names of the consignors who shipped the goods with the counterfeit marks upon them; or the consignees who were importing them.

In each of those cases the wharfinger, forwarding agent or shipper had possession or control of the goods.  As soon as the injured party complained, it was pretty clear that the goods were spurious and deceptively marked.  If the wharfinger, forwarding agent or shipper had parted with the goods after notice, he would be aiding and abetting a fraud.  As soon as notice was given, the injured party could have obtained an injunction to restrain the wharfinger, forwarding agent or shipper from parting with them.  Even without giving him notice, the injured party could have moved for an injunction; for otherwise the notice might merely serve to put the defendant on his guard and he might get rid of the goods: see *Upmann* v. *Forester* (1883) 24 Ch.D. 231, 236.  Seeing that that cause of action existed, the cases come within the first proposition that the court can order discovery in aid of a reasonable action which the plaintiff is intending to bring or is capable of bringing.

But this case is very different.  It falls within the second proposition.  The plaintiffs have no reasonable cause of action which they can conceivably bring against the commissioners.  They cannot, therefore, bring an action against them merely for the purpose of discovering from them the names of importers.

Even if the plaintiffs could overcome that hurdle, they are faced with another.  It is that the names of the importers were given to the commissioners in confidence—for a limited and restricted purpose—and the courts ought not to compel them to break that confidence.  That principle was stated by Lord Reid in *Conway* v. *Rimmer* [1968] A.C. 910, 946: " If the state insists on a man disclosing his private affairs for a particular purpose it requires a very strong case to justify that disclosure being used for other purposes."

The law about confidential information has developed much of recent years.  The cases show that the public interest has two sides to it.  On the one hand it is usually in the public interest that when information is received in confidence—for a limited and restricted purpose, as it always is—it should not be used for other purposes.  In such cases confidences will be held sacrosanct.  Thus the courts have held in these cases that confidences should be kept and not broken: where the disclosure would involve the writer in a libel action, *Weld-Blundell* v. *Stephens* [1920] A.C. 956; where a banker was asked to disclose the state of a customer's account, *Tournier* v. *National Provincial and Union Bank of England* [1924] 1 K.B. 461; and where the Gaming Board were asked to disclose information obtained about an applicant, *Reg.* v. *Lewes Justices, Ex parte Secretary of State for Home Department* [1973] A.C. 388.  On the other hand, confidences will sometimes be overcome by a higher public interest, such as the interest of justice itself, the prevention of wrongdoing, or the security of the state.  Thus the courts have held that confidences cannot be used so as to cover up wrongdoing: see *Gartside* v. *Outram* (1856) 26 L.J.Ch. 113; *Initial Services Ltd.* v. *Putterill* [1968] 1 Q.B. 396, nor to prevent disclosure of practices, which might be dangerous

141

A.C.      Norwich Pharmacal v. Customs & Excise (C.A.)   Lord Denning M.R.

A   to mental health, see *Hubbard* v. *Vosper* [1972] 2 Q.B. 84; nor to hamper an investigation into breaches of security, see *Attorney-General* v. *Mulholland*; *Attorney-General* v. *Foster* [1963] 2 Q.B. 477, 488, 489; nor in affairs of general concern where the public interest requires disclosure, see *Fraser* v. *Evans* [1969] 1 Q.B. 349, 367. So in every case it is a question of weighing the public interest. The courts must consider the relationship, and rule upon it as and when it comes before them.

B   In the present case I am quite clear that the public interest demands that the commissioners should keep secret the names of importers. Parliament emphasised it in section 3 of the Finance Act 1967. It would, no doubt, be a great convenience to the plaintiffs to get the names of importers. It would enable them to assert their monopoly and get an injunction and damages against infringers. This financial gain would, no doubt, be of private benefit to them. And it would help to stop wrong-

C   doing. But it is as nothing compared to the importance of keeping the information secret.

Another aspect of the public interest (often referred to in the cases on Crown privilege) is the interest in ensuring candour. If there was ever a case in which it was in the public interest to ensure candour, it is this very case. If importers thought that the commissioners would

D   disclose their names and addresses, they would soon find ways to circumvent this disclosure. They would use the names of nominees. They would conceal the description of the goods, by giving them a false or invented description, or by making it so general as to be untraceable— such as " medicament." They might resort to forgery. All these things have happened we are told, in the United States where the customs do disclose information. Rather than give scope to those evils, it is better

E   to insist on keeping their names and addresses secret.

I would like to say that I have benefited much from the judgment of Graham J. But, whilst agreeing with much that he says, I am afraid that I cannot agree with his decision. I would allow the appeal and dismiss the application.

F   BUCKLEY L.J. I would like to associate myself with what Lord Denning M.R. has said of the very clear and careful judgment of Graham J.

I will deal first with the plaintiffs' cross-appeal. This asserts that the Commissioners of Customs and Excise have infringed the plaintiffs' patent. This is put on two grounds: (1) that the commissioners by allowing imported furazolidone to be brought into this country with knowledge of the plaintiffs' claim that this commodity infringes their patent aid and

G   abet the infringement, and (2) that by exacting payment of customs duty on the imported furazolidone the commissioners obtain a profit in breach of the grant to the first plaintiff in the letters patent of the full profit of the invention.

It is true that the commissioners were informed by the plaintiffs in 1967 of the claim that the material imported under the name furazolidone

H   infringed the patent, but it is not, in my opinion, a duty or a function of the commissioners to verify the truth of such an assertion. The importation might not be an infringement for a number of reasons. The patent might be invalid, although in the present case its validity is as a matter

142
Buckley L.J.     Norwich Pharmacal v. Customs & Excise (C.A.)          [1974]

of pleading admitted. The importation or the manufacture of the goods
might have been licensed. The goods, though described as furazolidone,     A
might not in fact infringe the patent. The plaintiffs would, of course, deny
any such suggestions, but it would I think be strange if the commissioners
were bound either to accept the plaintiffs' claim without question on the
one hand, or to satisfy themselves by inquiry as to its validity on the other.
The importation of infringing goods will give rise to a cause of action
for damages for infringement against the importers, but it is not illegal.     B
Such goods are not, in my opinion, prohibited goods for the purposes of
section 44 (b) of the Customs and Excise Act 1952. Their importation is
not prohibited or restricted under or by virtue of any enactment. The
Patents Act 1949 cannot, I think, be said to contain any such prohibition.
It is true that the grant of the patent in the form prescribed under section
21 (3) of that Act contains a command that no one shall " make use or
put in practice the said invention nor in anywise imitate the same without     C
the consent of the patentee," but this prohibition, in my opinion, derives
its force from the act of the Crown in making the grant and not under
or by virtue of the Act of Parliament. In any case, I do not consider
that it is a prohibition of importation. Importation of infringing goods is
an infringement of the private rights of a patentee; it is not an infraction
of any general law of the land forbidding such importation. The com-     D
missioners are, I think, under no obligation to police the plaintiffs'
immunity from infringement of the patent and would not, it seems to me,
have any justification on that ground for forfeiting the goods or otherwise
preventing their importation. The goods are not in the possession or under
the control of the commissioners. The commissioners cannot, in my
judgment, be accurately said to aid or abet any infringement.

Nor do I think that, by demanding and receiving payment of customs     E
duty in pursuance of their statutory duty, the commissioners participate in
any profit of the invention. The liability for duty is a debt due to the
Crown by the importer arising out of the act of importation. It is a per-
sonal obligation, a debt, just as income tax is a debt. It is, in my judgment,
no more a part of the profit of the invention than income tax is a part of
the profits in respect of which it is assessed. The whole of the profit on     F
the imported goods is the importer's, notwithstanding that by reason of the
importation he has incurred a liability to pay the duty.

In my judgment the cross-appeal fails. So the question whether the
plaintiffs can maintain the action against the commissioners for discovery of
the names of the importers must be considered upon the basis that the
plaintiffs have no cause of action against the commissioners for infringement.

Mr. Walton referred us to certain cases in which defendants, in whose     G
possession or custody infringing goods were, were restrained from parting
with them or held to be under a duty to retain them and give information
relating to them pending determination of the question of infringement.
These are not, I think, relevant to the present case in which, as I have
already said, the imported goods are not, and indeed have never been, in
the possession of the commissioners, nor have they been in their custody     H
or under their control save in so far as their statutory powers, conferred for
purposes exclusively connected with levying customs duties, confer control.

Mr. Walton has contended that a plaintiff can bring an action

143

**A.C.**          Norwich Pharmacal v. Customs & Excise (C.A.)          **Buckley L.J.**

A against a defendant for the sole purpose of extracting information from that defendant which will enable the plaintiff to sue a third party in other proceedings for an admitted wrong. The necessary conditions, he says, are (1) that a wrong has been done to the plaintiff, (2) that he does not know whom to sue, (3) that the defendant knows the identity of the wrongdoer, (4) that the plaintiff knows this, (5) that he has no other way of discovering that information, (6) that the plaintiff can get relief against B no one other than that wrongdoer in respect of the wrong, and (possibly) (7) that the defendant is more than a mere witness, in the sense that he has an interest in the outcome of the prospective action by the plaintiff against the wrongdoer.

Mr. Templeman says that no authority can be found supporting this proposition and that no one against whom the plaintiff has no reasonable cause of action can be sued merely for discovery.

C On this part of the case Mr. Walton relied mainly on two cases: *Orr* v. *Diaper*, 4 Ch.D. 92; 25 W.R. 23 and *Upmann* v. *Elkan*, L.R. 12 Eq. 140; 7 Ch.App. 130. Graham J., after discussing these and other cases, stated his conclusion thus [1972] Ch. 566, 584:

D " Having given these cases careful consideration, they seem to me to show that in general it is correct that no independent action for discovery lies against a party against whom no reasonable cause of action can be alleged or who is in the position of a mere witness in the strict sense. This is the normal rule but there is nothing in them which shows that the rule is invariable and is to be understood as excluding cases such as *Orr* v. *Diaper* or *Upmann* v. *Elkan* or indeed *Panthalu* v. *Ramnord Research Laboratories Ltd.* [1966] 2 Q.B. 173 where it E can properly be said that the evidence may be relevant to an issue in the main action."

I will refer first to *Upmann* v. *Elkan* L.R. 12 Eq. 140, which is the earlier of these cases in date. A case containing boxes of cigars, some of which were alleged to bear a spurious imitation of the plaintiff's trade mark, had been shipped to St. Katharine's Dock, for importation to this F country, to the order of Messrs. Elkan, a firm of forwarding agents carrying on business in London. Messrs. Elkan were in possession of forwarding instructions from the consignors directing distribution of the contents of the case to various persons resident in England, whose names and addresses were stated in those instructions. The plaintiff filed a bill against Messrs. Elkan and the dock company for an injunction to restrain Messrs. Elkan from removing the boxes of cigars bearing the spurious mark from St. G Katharine's Dock and from infringing the plaintiff's mark, for an account and for damages. The plaintiff obtained an interim injunction, first ex parte and subsequently inter partes. Before the bill was filed Messrs. Elkan offered to tell the plaintiff the names of the consignors and of the persons to whom the cigars were to be delivered and gave the plaintiff this information seven days after the filing of the bill. No relief H was asked against the dock company. It was not established that Messrs. Elkan had been privy to the infringement. In the course of his judgment Lord Romilly M.R. (who was later affirmed on appeal by Lord Hatherley L.C., 7 Ch.App. 130, 132) said, L.R. 12 Eq. 140, 146:

144
**Buckley L.J.**       Norwich Pharmacal v. Customs & Excise (C.A.)       **[1974]**

"It does not, in my opinion, make any difference whether the goods are sent to a person who does not deal in the article consigned, and whose duty is simply to distribute the goods to other persons, or whether the goods are sent to him as consignee for his own purposes. In either case they are sent to the dock to be at his disposal, and without his signature the goods cannot be disposed of. It will not do for him to say, as he does in this case, 'I know nothing about the goods sent. I do not know whether they have any, or, if any, what brand on them, or whose it is.' It is his duty to know this, and if he receives notice that they bear a fraudulent imitation of another man's brand, he ought to ascertain this as speedily as possible after such notice, and to take the proper and necessary steps to prevent their being disposed of in that state."

And he said of the dock company, at p. 147:

"In fact, in many respects the position of the dock company does not differ from his. For all acts done in ignorance they are excusable, but as soon as they receive notice of the fraud, and either by bill filed or by plaintiff's indemnity the dock company is protected, they must retain the goods until the question is determined, . . ."

It is plain that that case is not authority for the proposition that a suit may be brought for discovery only against a party against whom no other relief can properly be sought. Not only was an injunction sought against Messrs. Elkan, but in an interim form it was obtained. In the event no final order was made against Messrs. Elkan for costs or otherwise, but they recovered no costs and were required to give an undertaking. The cigars, which seem to have been in the possession of the dock company, were at the disposal of Messrs. Elkan. Lord Romilly M.R. held that, upon being informed of the fraud, they were in duty bound to give the information required and to undertake that the goods should not be removed or dealt with until the offending mark had been removed. It was doubtless on this basis that the injunction was granted.

In *Orr v. Diaper*, 4 Ch.D. 92; 25 W.R. 23 the plaintiffs were manufacturers of sewing cotton and thread, and their product was packed and ticketed in a distinctive way. They discovered that inferior sewing cotton and thread, similarly packed and ticketed, was being shipped to Valparaiso by Messrs. Diaper, a firm of shippers at Liverpool. The plaintiffs asked Messrs. Diaper from whom they had received these goods and on whose behalf they were shipped. They received no answer and commenced proceedings in which they alleged, inter alia, that Messrs. Diaper were still shipping the goods. The relief claimed was discovery of the names and addresses of the consignors of the goods to the defendants and particulars of the shipments in aid of proceedings contemplated by the plaintiffs. These proceedings, it is evident, were to be against the consignors. The defendants demurred.

The only report of the case to which the judge's attention was drawn seems to have been that at 4 Ch. 92; but it is more fully and better reported at 25 W.R. 23. From that report it appears that counsel for the defendants cited the following passage from *Mitford on Pleading*, 4th ed. (1827), p. 191:

A
" If therefore the plaintiff does not show by his bill such a case as renders the discovery which he seeks material to the relief, if he prays relief, or does not show a title to sue the defendant in some other court, or that he is actually involved in litigation with the defendant, or liable to be so, and does not also show that the discovery which he prays is material to enable him to support or defend a suit, he shows no title to the discovery, and consequently a demurrer will hold."

B
It will be noted that the effect of this statement is that a bill would not lie for discovery unless the plaintiff was seeking other relief in the Court of Chancery, or was suing or entitled to sue the defendant in some other court. Hall V.-C. felt strongly that the plaintiff ought to have the information he sought. " Nothing," he said, 25 W.R. 23, 24, " but ' absolute necessity ' will compel me to allow this demurrer." Having expressed the opinion that

C
the position of the defendants in shipping the goods was one which might subject them to proceedings by way of injunction to restrain them from continuing to ship the goods, Hall V.-C. said, at p. 25:

" But it is said that the defendants are in the position of witnesses, and you cannot have a bill of discovery brought against a witness. But I think that the position of the defendants is different from that of a

D
mere witness and the rule that a mere witness cannot be made a party to obtain discovery has no application to this case. That view of the case seems to me to bring it within the rule as stated in *Mitford*. The plaintiffs do show a right to sue the defendants in some other court, which expression, since the change made by the Judicature Acts, must mean this court, in some other proceeding."

E
That part of this passage which starts with the words " That view of the case " is represented in the report in 4 Ch.D. 92, 96, only by the sentence: " I think that the plaintiffs do show a title to sue." I am inclined to think that the judge may have read this equivocal statement as meaning that in the view of Hall V.-C. the plaintiffs were entitled to sue Messrs. Diaper merely for discovery. The fuller report shows that Hall V.-C. was carefully bringing himself within the rule in *Mitford*—that is,

F
he was basing himself on the circumstance that the plaintiffs were in a position to seek not merely discovery but substantive relief against Messrs. Diaper. The case is not, as the judge thought, an exception to the general rule (see *Bray on Discovery* (1885), p. 40) that no person without an interest (such that a decree could be made against him or that he might be affected by the decree) could be made a defendant to a bill in Chancery

G
for the purpose of discovery. Messrs. Diaper had an interest, for in consequence of the prospective proceedings by the plaintiffs against the consignor of the goods, Messrs. Diaper were exposed to the risk of being restrained by injunction from continuing to ship the goods. Properly understood the decision in *Orr* v. *Diaper*, 25 W.R. 23 is, in my judgment, not in Mr. Walton's favour, but against him.

H
The reason why Messrs. Diaper were exposed to the risk of an injunction was, I think, similar to the reason why Messrs. Elkan were in fact restrained by injunction from parting with control of the cigars. If a man has in his possession or control goods the dissemination of which, whether in the way

of trade or, possibly, merely by way of gifts (see *Upmann* v. *Forester*, 24 Ch.D. 231) will infringe another's patent or trade mark, he becomes, as soon as he is aware of this fact, subject to a duty, an equitable duty, not to allow those goods to pass out of his possession or control at any rate in circumstances in which the proprietor of the patent or mark might be injured by infringement ensuing. The man having the goods in his possession or control must not aid the infringement by letting the goods get into the hands of those who may use them or deal with them in a way which will invade the proprietor's rights. Even though by doing so he might not himself infringe the patent or trade mark, he would be in dereliction of his duty to the proprietor. This duty is one which will, if necessary, be enforced in equity by way of injunction: see *Upmann* v. *Elkan*, L.R. 12 Eq. 140; 7 Ch.App 130. The man having possession or control may also be under a duty to give information in relation to the goods to the proprietor of the patent or mark: *Upmann* v. *Elkan*.

The commissioners are not, in my opinion, and never have been, in this position in respect of the imported furazolidone. It has never been in their possession, and the only powers of control which they have ever had in respect of it have been statutory powers conferred upon them for a particular purpose, viz. the collection of customs duty, and only for that purpose. In my judgment, they have never come under any such duty to the plaintiffs as was held to have arisen in *Upmann* v. *Elkan*. The plaintiffs could, in my opinion, never have obtained substantive relief of any kind against the commissioners.

I think that it remains the law that no action for discovery can be brought against a party against whom no other relief is or could be sought, that is to say, against whom the plaintiff has no reasonable cause of action. In this case the plaintiffs disclose no reasonable cause of action against the commissioners, who are on this ground, in my judgment, entitled to have the action dismissed.

This, if right, disposes of this appeal, but I will add that I agree with Lord Denning M.R. in thinking that in this case the balance of public interest is in favour of preserving confidentiality in respect of the information disclosed by the importers to the commissioners, and of avoiding inhibiting candour on the part of importers in respect of the information they are required to give to the commissioners. I also would allow the appeal.

ROSKILL L.J. The issue for decision in this appeal arises out of a summons for inspection of documents dated March 3, 1971, and issued by the plaintiffs in actions, now consolidated, brought by them against the commissioners. The commissioners delivered lists of documents in each action. They properly included all relevant documents in those lists, but claimed privilege against the production of those documents named in part 3 of schedule 1 to each list on the grounds both that they were precluded by law from producing them and that their production would be injurious to the public interest because they contained confidential information about the affairs of persons other than the plaintiffs furnished to the commissioners by such persons pursuant to sections 26, 28 and 29 of the Customs and Excise Act 1952. That objection to production was overruled by Graham J. in circumstances which I will later relate. But both before him and on

147

**A.C.**          Norwich Pharmacal v. Customs & Excise (C.A.)          **Roskill L.J.**

A  appeal to this court the objection was maintained not only on these two grounds but on the wider ground that in truth these actions were but actions for discovery and that the pleaded allegations against the defendants of infringement of the plaintiffs' patents were no more than unsupported and unsupportable allegations made by the plaintiffs against the commissioners in an effort to circumvent the well-established rule that the court will not in general permit actions for discovery when no other relief is or can properly be sought.

B      It is a remarkable fact that when one looks at the writs and statements of claim in these actions one finds that the first two paragraphs of each writ allege infringement, as do the first seven paragraphs of each statement of claim, whereas only the third paragraph of each writ and the last three paragraphs of each statement of claim relate to the issue of discovery.

C      Thus the essential question this court has to decide has been heavily though skilfully disguised under allegations of infringement which, like my Lords and the trial judge, I regard as unfounded in fact and unsupportable in law for reasons I will give later. When therefore this disguise is stripped off, as stripped off it must be, one is left with a prayer in each writ for discovery of the documents to the production of which exception is taken, supported by allegations of fact in the last three paragraphs of each state-

D  ment of claim. The plaintiffs wish to sue those by whom the goods allegedly infringing their patents have been and are being imported into this country. They do not know the names of these alleged infringers. The commissioners know the names. The plaintiffs cannot sue without the information which they say they cannot otherwise obtain. The commissioners have that information but refuse to supply it. Therefore the plaintiffs seek to extract this information from them by legal process. The question is whether the law

E  allows them to do so. The plaintiffs say that the interests of justice require the disclosure of this information by the defendants. Otherwise rights accorded them under patents given under the Royal Prerogative and by statute are denied them. No other consideration can be allowed to prevail against the interests of justice which in this case they say coincides with their own interests, least of all those considerations which have led the

F  commissioners to refuse production. Forensic cries for relief claimed to be in the interests of justice against the restrictive doctrines of what was until the very recent decision of the House of Lords in *Reg.* v. *Lewes Justices, Ex parte Secretary of State for Home Department* [1973] A.C. 388 still called Crown privilege, of confidentiality and of the remnants of the now extinct Chancery bill of discovery should find a sympathetic hearing from any court. But the crucial question remains whether those interests

G  shall prevail against other and perhaps wider interests, also public or national in character, which are relied upon by the commissioners as outweighing the interests on which the plaintiffs rely and as tipping the scale against the plaintiffs.

      I have had the advantage of reading in advance the judgments which have been delivered. I would not add to them were it not that we are

H  differing from the careful and helpful judgment of the judge from which like my Lords I have derived much benefit.

      Mr. Walton frankly admitted that the claim for alleged infringement was but a peg upon which to hang his clients' claim for discovery. Wisely he

argued this point last preferring to rest his main submission upon what he
contended were stronger points. He boldly sought to argue that goods   A
imported into this country which he claimed infringed the plaintiffs' patents
were " prohibited goods " for the purposes of the Customs and Excise Act
1952, and should be forfeited, and that the commissioners by levying duty
upon such goods, even in pursuance of a statutory power and duty so to do,
were infringing those patents because they were taking a profit from those
goods whereas the plaintiffs were entitled to the entire profit upon them   B
by virtue of those patents. Mr. Walton even went so far—under some
pressure from the court—to submit that the Commissioners of Inland
Revenue would be in like position were they to levy taxes upon the profits
earned from such importation. Alternatively, he contended that the com-
missioners and their officers were aiding and abetting infringement because
by collecting duty and permitting the import of these goods they were
sufficiently connected with the principal offenders as to be equal parties   C
to the infringement with those principal offenders.

With respect I find these propositions almost unarguable. The phrase
" prohibited goods " is nowhere defined in the Act of 1952. But it
plainly means, when one looks at the various sections which deal, inter
alia, with prohibited goods, goods the import or export of which is pro-
hibited or restricted by reason of some statutory enactment currently in   D
force: see, for example, sections 44, 45, 56 and 304. The fact that goods
may be imported which infringe a patent does not make them " pro-
hibited goods " or liable to forfeiture. One may ask the questions:
" How are the commissioners to know if particular goods do infringe
a patent? " " Are they to investigate every consignment? " " Are they to
investigate every patent and consider possible challenges to its validity? "
I can find nothing in the Act of 1952 which makes such goods prohibited   E
goods or which would justify the commissioners in refusing clearance once
the duty upon them was paid. Moreover the suggestion that the com-
missioners and their officers by permitting the import of these allegedly
infringing goods are permitting the import of prohibited goods seemingly
involves that each and all are guilty of offences against section 304 of
the Act of 1952. It is indeed a curious argument which involves that   F
the commissioners and their officers performing their statutory duty of
collecting duty, which in the circumstances of these cases rarely if ever
involves them acquiring actual or constructive possession of the goods,
should simultaneously when performing that duty be guilty of a serious
criminal offence.

As to the allegation of aiding and abetting, it is of the essence of
aiding and abetting that the offender in some way should knowingly further   G
the principal offender in his criminal activities. A person cannot be con-
victed of aiding and abetting if he does not know of the essential matters
which constitute the offence by the principal offender. I again ask: are
the commissioners to investigate every consignment and each patent?
Though I agree with Mr. Walton that in the present case it is unlikely
to be so, any patent may be open to challenge as invalid. The particular   H
goods imported may in fact have been licensed. They may in fact not
infringe the patent for they may be of different chemical composition even
though wrongly described as furazolidone.

149
A.C.                    Norwich Pharmacal v. Customs & Excise (C.A.)                    Roskill L.J.

A    Nor can I accept the argument that by levying duty upon imported goods in pursuance of their statutory duty so to do, the commissioners are infringing or are aiding and abetting any infringement of the patents. They are not thereby participating in the profits of the invention. The importer by importing incurs by statute a liability to pay duty to the Crown. As Buckley L.J. has said, he incurs a personal obligation and a debt to the Crown, independent of all questions of patents.

B    I would only add on this branch of the case that the decision of this court in *Nobel's Explosives Co.* v. *Jones, Scott & Co.*, 17 Ch.D. 721, approved by the House of Lords, 8 App.Cas. 5, is inconsistent with Mr. Walton's submissions: see especially the judgment of James L.J., 17 Ch.D. 721, 741–743 and the speeches of Lord Selborne L.C. and of Lord Blackburn, 8 App.Cas. 5, 10–12. I therefore unhesitatingly reject the plaintiffs' alternative claim in their cross-notice to support the judge's

C    judgment on the ground, rejected by the judge, that the commissioners have infringed their patents. If the claim for discovery is to succeed it must succeed in its own right and independently of any question of infringement.

     Mr. Walton claimed that even in 1972 there was a cause of action for what has sometimes been called "mere discovery." He accepted

D    that the circumstances when such an action could be brought were very rare because, as he put it, the necessary facts rarely combine together to justify the bringing of such an action. Here he claimed all the necessary facts to be present and thus that the plaintiffs' present action could properly be maintained. The first prerequisite was that a plain and manifest wrong had been done to the plaintiffs; the second, that the plaintiffs did not know who were the authors of their misfortune or whom to sue; third,

E    that the defendants in the action for discovery must be more than what has been called in some of the cases "a mere witness"—he must have an interest in the proceedings; the fourth, that it must be in everyone's interest that justice should be done; the fifth, that the defendants in the intended action for discovery must know the name of the person or persons whom the plaintiffs wished to sue; and the sixth, that the plaintiffs

F    had no alternative means of obtaining that name or those names.

     The judge [1972] Ch. 566, 583 clearly accepted the existence of what might be called the basic rule, that there is no independent action for discovery against a party against whom no reasonable cause of action existed or who was in the position of a mere witness. But he also accepted from Mr. Walton a submission based on cases such as *Orr* v. *Diaper*, 4 Ch.D. 92; 25 W.R. 23 and *Upmann* v. *Elkan*, L.R. 12 Eq. 140 that the

G    rule was not invariable and that those cases supported the existence of an exception (seemingly at least in cases of alleged infringement of patents, copyrights and trade marks, if in no others) where the facts of which discovery was sought could be said to be relevant to an issue in the action which it was desired to bring once the essential facts had been elicited by the process of discovery. I can readily see the attraction of this view

H    where a plaintiff has been granted a monopoly and yet is deprived by lack of essential knowledge possessed by another of the full benefits of that monopoly. But it is not easy to see the logical reason why if the general rule exists, as the judge accepted that it did exist, the suggested

150
**Roskill L.J.**   Norwich Pharmacal v. Customs & Excise (C.A.)        [1974]

exception should be a limited exception operating only in favour of
monopolists such as the plaintiffs. It is true that proof of the existence   A
of such a limited exception will suffice the present plaintiffs. But if such
an exception should be made for them, others, in fields far removed from
patent, copyright or trade mark law, may equally seek to claim that the
interests of justice in their cases too demand the right to obtain information
in the possession of third parties who are unwilling to disclose it. If this
be correct it is surprising that no case exists in the books where a litigant   B
or indeed an authority charged with law enforcement has sought this
means of supplying deficiencies of proof in civil or indeed in criminal
proceedings.

I therefore turn to consider whether authority compels acceptance of
Mr. Walton's main submission, for if it be right I see no logic in con-
fining the exception for which he contends to cases of alleged infringement
of patents, copyright or trade marks, though for obvious reasons he did   C
not seek to suggest that the exception was of any wider application.

Buckley L.J. has related the facts in *Upmann* v. *Elkan*, L.R. 12 Eq.
140 and I need not repeat them. There are two important facts to be
observed. First, the defendants Elkan were forwarding agents to whom
were entrusted by goods owners the business of receiving, forwarding and
delivering goods. Secondly, the defendants St. Katharine's Dock Co. had   D
physical possession of the infringing cigars, holding them to Elkan's order.
Thus the dock company as bailees could not lawfully dispose of the goods
without the instructions and authority of their bailors, Elkan. Together
these two defendants could put these infringing cigars into circulation
and thus damage the plaintiffs' rights deriving from their trade marks.
The common law courts could not at that date assist for there was no
injury to the plaintiffs' title to or right to possession of the goods for   E
they had none. But equity would and did intervene to prevent injury
to the plaintiffs' trade marks by stopping persons such as the defendants,
who were in a position to injure those trade marks by using their ability
as bailors and bailees of the infringing goods to put them into circulation
to the detriment of the plaintiffs' rights of which the defendants had been
put upon notice, from so doing. The defendants in that case were willing   F
to give the necessary discovery in the action showing how the infringing
cigars had come into their respective possession and control. The plain-
tiffs' action was not an action for discovery only. It was also initially an
action for an injunction which was obtained in the first instance. I find
nothing in the judgments of Lord Romilly M.R. at first instance and of
Lord Hatherley L.C. on appeal supporting the view that the action was
one for discovery only. It quite plainly was not.   G

The earlier decision of Lord Romilly M.R. in *Hunt* v. *Maniere*, 34
Beav. 157 was concerned with spurious Veuve Cliquot champagne and
is similarly explicable. The plaintiffs were the warehousemen. The
defendant was the indorsee of the dock warrants issued by the plaintiffs.
The plaintiffs had been given notice by Veuve Cliquot of the alleged
infringement of their rights. They were also sued at common law by   H
the defendant who as the bailor of the champagne had claimed delivery
of the champagne from the plaintiffs as his bailees. The common law
courts at that date would have been bound to give effect to the defendant's

A.C.        Norwich Pharmacal v. Customs & Excise (C.A.)        Roskill L.J.

A claim. So the plaintiffs successfully sought to restrain the defendant's action at common law and succeeded in so doing since they were in peril of proceedings in equity by Veuve Cliquot if once the plaintiffs knowingly put infringing goods into circulation.

If regard be had only to the report of *Orr* v. *Diaper* in 4 Ch.D. 92, some support can be found for Mr. Walton's basic proposition. The judge was referred only to that single report, from which it might be
B deduced that the contention of the defendants that their demurrer should be upheld on the ground that the action was one for discovery only, had been overruled. But the industry of counsel during the argument of this appeal brought to light no less than three other reports of this case, one in 25 W.R. 23, a second in 35 L.T. 468, and a third (1877) 46 L.J.Ch. 41. It is clear from the perusal of the report in 25 W.R. that the report in the Law Reports is regrettably defective, quite apart from the fact that
C the headnote is inaccurate in describing the defendants as shipowners which on the facts stated they manifestly were not. They were either shippers or forwarding agents or both.

Buckley L.J. has quoted the relevant passages from the report in 25 W.R. and in particular the citation by counsel for the defence from *Mitford on Pleading*, 4th ed. (1827), p. 191. Hall V.-C. clearly accepted that a
D plaintiff was not entitled to sue a defendant merely for discovery. But he regarded the case as one in which the plaintiffs were entitled to seek substantive relief from the defendants. The reason for this conclusion is not far to seek when one looks at the facts stated in the fuller reports. The defendants had shipped in the past and were still shipping goods which infringed the plaintiffs' trade marks. The defendants were on notice of that fact. They as such shippers or forwarding agents were in a position to con-
E trol the disposal of these infringing goods, disposal of which would damage the plaintiffs' rights. This the court was not prepared to allow. As I read the decision in *Orr* v. *Diaper*, 25 W.R. 23 it is an illustration of the general rule, not of any exception to it. It is entirely consistent with *Upmann* v. *Elkan*, L.R. 12 Eq. 140. The case being after the passing of the Judicature Acts, the procedural complications which arose in *Hunt* v. *Maniere*, 3
F Beav. 157 were happily no more—hence the statement of Hall V.-C., 25 W.R. 23, 25: "The plaintiffs do show a right to sue the defendants in some other court, which expression, since the change made by the Judicature Acts, must mean this court, in some other proceeding."

I therefore agree that *Orr* v. *Diaper* is no support for Mr. Walton's main submission. On the contrary, properly understood it is against that submission.
G The principle to be derived from these cases and others referred to during the argument is not that there is any exception in favour of the proprietors of patents, trade marks and copyrights to the general rule that the courts will not permit an action for discovery unlinked with any sustainable claim for substantive relief, even where the avowed object of such an action is to obtain discovery of the names of alleged infringers. The true
H principle is that stated by Buckley L.J. towards the end of his judgment. I respectfully agree with and adopt that statement of principle. Since the commissioners are not and never have been in possession of this imported furazolidone and their only powers of control are those accorded to them

152
**Roskill L.J.**        Norwich Pharmacal v. Customs & Excise (C.A.)        [1974]

by statute for the purpose of fulfilling the statutory obligation laid upon them by Parliament to levy duty upon these goods when imported, the commissioners do not come within this principle. At no time could the plaintiffs ever obtain substantive relief against the commissioners. Accordingly, in my judgment, this is an action for " mere discovery " within the meaning given to that phrase in the authorities. On the authorities such an action clearly cannot be permitted. Accordingly, I find myself unable to agree with the judge. I would allow the appeal and dismiss the summons for inspection. It was agreed that the effect of dismissing the summons was to dismiss the action as if the application had been an application to strike out the action as disclosing no cause of action, though as a matter of convenience no summons to this effect was ever issued.

This conclusion makes it unnecessary to deal with the other issues, namely, whether the balance of public interest is in favour of withholding inspection on grounds of confidentiality attaching to information disclosed to the defendants by the importers and also of avoiding want of candour in respect of information supplied by them to the defendants. But since both these matters were fully argued during the appeal, I think it right to say that I, like Buckley L.J., entirely agree with what has fallen from Lord Denning M.R. on these issues and I have nothing to add to that part of my Lord's judgment. I would allow the appeal accordingly and dismiss the summons.

> *Appeal allowed with costs.*
> *Action dismissed with costs.*
> *Certificate for three counsel refused.*
> *Leave to appeal refused.*

Solicitors: *Solicitor, Commissioners of Customs and Excise; Allen & Overy.*

C. N.

November 7. The Appeal Committee of the House of Lords (Lord Morris of Borth-y-Gest, Lord Simon of Glaisdale and Lord Cross of Chelsea) allowed a petition by the plaintiffs for leave to appeal.

*Anthony Walton Q.C., Robin Jacob* and *Peter Prescott* for the appellants.

[LORD REID said that their Lordships desired first to hear argument on whether the appellants could establish a prima facie right to the discovery sought.]

The appellants seek from the commissioners and seek only the names of the importers into this country of the chemical compound furazolidone, of which the appellants are the owners and licensees of the patent relating thereto. They seek discovery of no documents. This is the distinction between the present case and numerous cases on discovery. The reported decisions on discovery merely afford guidance. It is conceded that as a general rule one cannot obtain discovery from a witness. The question arises: are there exceptions to that rule? There is a duty in certain circumstances on any member of the public who has knowledge of the commission of a tort to communicate such information that he may possess to

A.C.          Norwich Pharmacal v. Customs & Excise (H.L.(E.))

A  any person who has suffered damage in consequence of its commission.
If asked, he has a duty to disclose. The rules of discovery were invented
by equity for the purpose of furthering the due administration of justice:
see *Holdsworth's History of English Law*, 3rd ed., vol. 5 (1947), pp. 281,
282, 332, n. 8.

The respondents are liable to give the limited discovery sought in the
present circumstances, namely, the identity of the parties proper to be
B  sued, because they would before the Judicature Acts have been liable to
give discovery thereof in a suit by bill for discovery. The Court of Appeal
wrongly dealt with this issue by applying the mere witness rule.

The respondents contended that there were only " two animals," mere
witnesses and infringers, and that there was no " third animal." This is
plainly incorrect and entirely overlooks the protective jurisdiction of equity.
The appellants rely on the statement of principle by Buckley L.J., ante,
C  pp. 145H—146B, citing *Upmann* v. *Forester*, 24 Ch.D. 231.

The first and principal case on which the appellants rely to characterise
the defendant as someone other than an infringer is *Orr* v. *Diaper* (1876)
4 Ch.D. 92; 25 W.R. 23. That case has been reported in several reports,
and the Court of Appeal had before them the report in the Weekly
Reporter which they preferred as being fuller than the authorised Law
D  Report which was the only report before Graham J. Their Lordships
held that this fuller report threw a further light on the decision to that
thrown by the Law Report, but they insufficiently analysed that further
light.

The facts in that case were that the defendants were shippers, that is,
carriers who were acting on behalf of unknown exporters. The plaintiffs
discovered that spuriously marked goods were being exported from the
E  United Kingdom to their foreign markets, and that they had been shipped
by the defendants. They accordingly sought the names of the exporters
on whose behalf they were shipped. That is why in that case the names
sought were those of the exporters rather than the importers. It is of
importance in understanding the nature of the decision, however reported,
that all the shipments in respect of which discovery was sought were ship-
F  ments which were past (some of them by as much as two years) at the
date of the proceedings. It follows that the defendants had parted (or at the
lowest could freely part, since no injunction was sought) with all the goods
in respect of which discovery was sought. No doubt an injunction could
have been obtained in respect of any future shipments, and then the true
owners would have had to come forward and reveal themselves if they
G  wanted their goods. But the discovery sought of past shipments could not
have been relevant to an injunction to restrain future ones.

Against the background of the whole case it is plain that Hall V.-C.
can have held only one of two things, either sufficient for the appellants'
purpose, namely, either (i) it is possible to have discovery against persons
against whom no suit for any relief (other than discovery) could be brought
H  (this is the ratio that appears from the Law Report which is the revised
report and the one most likely to reflect the true views of the judge), or
(ii) that it is possible to have discovery against persons in the position of
the defendants, because against them some relief other than relief in respect

154          Norwich Pharmacal v. Customs & Excise (H.L.(E.) )          [1974]

of infringement could be obtained, even in the case where no such other    A
relief was prayed.

The Court of Appeal rejected the first of the two possible views of
Hall V.-C.  In so doing, they misunderstood the effect of *Mitford on Plead-
ings*, 4th ed. (1827), p. 191, of which they considered only an extract devoid
of its context.  All *Mitford* is stating in the part of his treatise relied on
against the appellants (Part V) is that no action for discovery can be    B
brought where the information to be gained is irrelevant for the purposes
of an actual or intended litigation.  Even where he deals with the " mere
witness " rule (Part III) he is only stating that no discovery can be sought
of evidence which would be inadmissible.  The Court of Appeal moreover
failed to realise that the appellant should also succeed on the alternative
view of Hall V.-C.'s decision, since they failed to appreciate the implica-
tions with respect to the respondents of the cause of action they found    C
to exist against Diaper.  In effect, the Court of Appeal held that there was
a " third animal " who, not being himself an infringer was nevertheless
liable to equitable relief, explaining *Orr* v. *Diaper* on this basis but failing
to appreciate that this cause of action also existed against the respondents.
In this action the appellants rely on the observations of Buckley L.J.
quoted above.  In the present case the Court of Appeal did not follow this
principle.    D

Where a person is not a party to proceedings and discovery is required
against him, he is made a respondent to the bill of discovery and entitled
to his costs: see *Beames on Costs*, 2nd ed. (1840), section IV, p. 17,
and *Bray on Discovery* (1885), p. 618.  The importance of this is
to answer the query " why should a person be put to expense in answering
proceedings of this kind? "  The answer is that he is not.  It is akin to
the position of witnesses who are called on subpoena who also obtain their    E
costs.

The reasons given in the old cases for holding that one cannot obtain
discovery against a mere witness because for example, if evidence were
obtained before the trial a counter-story might be concocted, and because
a bill of discovery put a stay to proceedings at law, do not apply to where
all that is required are the names of tortfeasors.    F

It is conceded that *Orr* v. *Diaper*, 4 Ch.D. 92 has not been commented
upon in any subsequent reported case, but it is pertinent to observe that
the standard textbooks support the appellant's proposition: see *Story's
Equity Jurisprudence*, 2nd Engl. ed. (1892), p. 1011, para. 1483 and paras.
1486, 1499, 1500, 1501; *Bray on Discovery*, pp. 609, 612; *Halsbury's Laws
of England*, 3rd ed., vol. 12 (1955), p. 10, para. 11; *Ross on Discovery*
(1912), pp. 10, 11; *Sichel & Chance, Interrogatories and Discovery* (1883),    G
p. 180; *Snell's Equity*, 1st ed. (1874), p. 516.

As to the authorities, in *Upmann* v. *Elkan* (1871) L.R. 12 Eq. 140
there were two defendants, Messrs. Elkan who were forwarding agents,
and the London & St. Katharine's Dock Company who were warehouse-
men in possession of the spuriously marked imported goods.  Neither of
these parties was guilty of infringement and neither was held guilty of    H
infringement.  Yet Lord Romilly M.R. said, at p. 145, that after such an
innocent person was given notice of the fact that the goods bore spurious
marks and was requested to give all information respecting them: " It is

A
his duty at once to give all the information required," and on appeal, 7 Ch.App. 130, 133, Lord Hatherley L.C. said in relation to Messrs. Elkan: " I hold them to be innocent of any part of this contrivance on the part of the consignor; but still it was their duty, from the first moment, to give all the information they possibly could." Lord Hatherley L.C.'s observation is entirely consistent with *Orr* v. *Diaper*, 4 Ch.D. 92. Further, Lord Romilly M.R.'s statement shows that the innocence or guilt of the "third

B
animal" is not a relevant factor. Moreover, *Hunt* v. *Maniere* (1864) 34 Beav. 157 shows that when a person has physical possession of goods whose dissemination would infringe another's patent or trade mark, the proprietor of the patent or mark has a right to proceed in equity to prevent the person in whose custody the goods in question are from parting with them, and that the custodian of the goods is protected from actions at law by the rightful owners, whose rights are thus overridden. See also

C
the observations of Stirling J. in *Washburn and Moen Manufacturing Co.* v. *Cunard Steamship Co.* (1889) 6 R.P.C. 398 on the practice of the old Court of Chancery in the exercise of its protective jurisdiction.

There is a line of English cases which illustrates the proposition that the obtaining of the name of a prospective party to proceedings is an exception to the rule that discovery cannot be obtained against a witness:

D
*Heathcote* v. *Fleete* (1702) 2 Vern. 442; *Morse* v. *Buckworth* (1703) 2 Vern. 443; *Moodalay* v. *Morton* (1785) 1 Bro.C.C. 469; *Angel* v. *Angel* (1822) 1 L.J.O.S.Ch. 6; *The Murillo* (1873) 28 L.T. 374; *Tetley* v. *Easton* (1856) 18 C.B. 643; *Bovill* v. *Cowan* (1867) 15 W.R. 608; *Hancocks & Co.* v. *Lablache* (1878) 3 C.P.D. 197; *Spokes* v. *Grosvenor and West End Railway Terminus Hotel Co. Ltd.* [1897] 2 Q.B. 124; *Hillman's Airways Ltd.* v. *Société Anonyme d'Éditions Aéronautiques Internationales* [1934] 2 K.B.

E
356.

*The Law of Scotland.* By means of the accessory action of exhibitio ad probandum it has long been possible to enforce production of documents in the hands of third parties where they are required in evidence in a principal action which it is desired to bring: see *Maclaren, Court of Session Practice* (1861) 644. But it has been largely superseded by the

F
modern procedure of motion for diligence against havers, now available under the Rules of the Court of Session, II, 95–97. The haver need not himself be liable in any way. Examples of such third party havers include: *Leven* v. *Board of Excise*, March 3, 1814, F.C.; *Vass* v. *Board of Customs*, Feb. 20, 1818, F.C.; *McDade* v. *Glasgow Corporation*, 1966 S.L.T. (Notes) 4.

Under Scots law, therefore, a plaintiff is entitled to discovery of names against persons participating in infringement of trade marks, patents, pass-

G
ing off and copyright. This proposition covers innocent participation.

*South African law.* This is based on the English law of discovery, although as pointed out by Bale C.J. in *Colonial Government* v. *Tatham* (1902) 23 Natal L.R. 153 the latter was itself probably adapted from the Roman law. The applicants must have " a bona fide claim against some person or persons whose names he seeks to discover, and whose name can

H
be supplied by the respondent, and that he has no other appropriate remedy" (p. 157). See also *Stuart* v. *Ismail*, 1942 A.D. 327. The South African cases are put on the basis that it would be a denial of justice not to grant the relief sought.

156

*American Law.* A number of cases have held that " the jurisdiction
of this court to entertain a bill in equity for discovery . . . will still be exer-
cised even in aid of an action at law, if the plaintiff cannot without it find
out whom he should sue ": *per* Judge Learned Hand in *Pressed Steel Car
Co.* v. *Union Pacific Railway Co.* (1917) 240 F. 135, 136. See also the
observations of Cardozo J. in *Sinclair Refining Co.* v. *Jenkins Petroleum
Process Co.* (1933) 53 S.Ct. 736. For examples of an application of the
principle, see *Brown* v. *McDonald* (1905) 133 F. 897 and *Coca-Cola Co.*
v. *City of Atlanta* (1922) 110 S.E. 730.

*Position of the Customs.* It is common ground that the Customs never
had possession of the infringing goods in this case. The fact that even if
they had had possession, an injunction could not have been granted against
them, they being the Crown, ought not to make any difference to the exer-
cise of the jurisdiction to grant discovery, if they had sufficient control to
bring them within the scope of the protective equitable jurisdiction. They
plainly did have such control.

The powers of the Customs derive in the first instance from the Customs
and Excise Act 1952 and Regulations made thereunder. When goods
are imported, they are automatically by operation of law placed into what
the Act describes as " Customs charge." This term is not defined, but
under section 294 (5) " If any imported goods . . . are without the authority
of the proper officer removed from customs charge before they have been
examined, those goods shall be liable to forfeiture." It is also an offence
to remove any imported goods from Customs charge before they have been
examined. In the case of goods imported by sea, they may not be " un-
loaded, landed or removed from the place of landing or from a transit
shed . . . without the authority of the proper officer ": see the Ship's Report,
Importation and Exportation by Sea Regulations 1965, S.I. No. 1993,
regulation 6. Other relevant provisions are sections 22, 26, 33, 34, 38, 44
and 70.

In the light of the above, it is plain that the charge that the Customs
have over goods entering into this country amounts to that control which
brings the principle in *Upmann* v. *Elkan*, L.R. 12 Eq. 140 into operation.

There is no statutory right of an importer to receive a clearance through
the Customs. Any duty on the part of the Customs, if satisfied that the
law has been complied with, to grant a clearance comes from the common
law. An arbitrary refusal, or one based on unjustifiable grounds would
be a denial of that right: see *Zachariassen* v. *The Commonwealth* (1917)
24 C.L.R. 166. In the case of importation of infringing goods, however,
their refusal to allow the goods to enter would not be arbitrary, nor could
the importers obtain any relief in court in respect of such refusal in order
to further their wrongdoing.

The Court of Appeal erred in viewing the matter in the light of the
assumption that the Customs were being asked to assume to themselves
a positive power to stop the importation, rather than being asked negatively
to refuse unreasonably to exercise their powers to allow the importation.
The Court of Appeal also erred in holding that the Customs' powers were
conferred only for the purpose of collecting revenue and did not exist for
any other purpose.

In fine, the cases on discovery do not support the decision of the Court

**A.C.**     **Norwich Pharmacal v. Customs & Excise (H.L.(E.))**

A   of Appeal. It is sufficient if the plaintiff can show that the Customs are in some way mixed up with the goods and it is not necessary for the plaintiff to show that he must be able to sue the Customs before he can establish any right to ask the court to exercise its discretion in his favour for relief.

    If it be said that the Customs are using their powers for the purpose not contemplated by the statute, then reliance is placed on the observations

B   of Lord Watson in *Metropolitan Asylum District* v. *Hill* (1881) 6 App.Cas. 193, 213.

    *Robin Jacob* followed.

    *Peter Oliver Q.C., Peter Gibson* and *W. Bruce Spalding* for the respondent commissioners. (1) This is an action solely for discovery and must be approached in the same way as, before 1873, the Court of Chancery would have approached a bill for discovery. (2) Discovery is an example of the

C   equitable auxiliary jurisdiction and consists of the extraction on oath, whether by answering interrogatories or identifying and producing documents, of information material to a pending (or, in rare cases, an anticipated) proceeding. (3) In general, it is not and never has been available against anyone except a party to the pending or anticipated proceedings and it has always been held to be improper to join as a party a person against whom nothing

D   can be alleged except that he is in possession of the relevant documents or information simply for the purpose of obtaining discovery against him, even in cases where that person may have an indirect financial or other interest in the proceedings. (4) Exceptions to this rule have been made in the case of: (i) officers or members of corporations and similar bodies in actions contemplated or pending against the body; (ii) attorneys alleged to be implicated in fraudulent transactions for improperly detaining docu-

E   ments; (iii) auctioneers, agents for sale and possibly other agents, in actions against their principals; (iv) arbitrators in cases where it is sought to satisfy an award on the ground of fraud. In these cases, discovery has been ordered although the officer, attorney, agent or arbitrator is not himself and (in some cases) cannot properly be a party to the proceedings. (5) A further exception arises where the person against whom the discovery is

F   sought has a direct interest in the pending or contemplated action, and for this purpose a "direct interest" means either (i) that a decree can be made against him in respect of some part which he is playing or has played in the matters in issue in the pending or contemplated proceedings or (ii) that any decree made is going directly to affect him so that he could properly be joined as a party: *e.g.*, an administration order will affect directly beneficiaries under a trust; an order in respect of a first mortgage

G   may affect a second mortgagee. (6) There is no further relevant exception. In particular it is not and never has been sufficient, in order for A to obtain discovery from B, for him to allege nothing more than that he needs certain information to enable him to commence or proceed with an action, that B has that information, and that he cannot get that information from any other source.

H    The respondents in this case do not fall within any relevant exception. In particular, nothing that they do, have done, or can lawfully do, renders them, in relation to any matter with which the appellants' proposed proceedings are concerned, liable to a decree, nor would anything that they do

**Norwich Pharmacal v. Customs & Excise (H.L.(E.) )**   [1974]

have done, or can lawfully do, render them liable to a decree independently of the provisions of the Crown Proceedings Act 1947.

In so far as any duty to give information arises as a matter of law from the possession or control of goods and in so far as such duty is enforceable by an action for discovery simpliciter, the respondents do not have and never have had any such control as is capable of giving rise to such duty.

Discovery, like all equitable remedies, is a discretionary remedy, but that does not mean that it is an arbitrary remedy: and over the past 300 years the courts have resolved distinct and clear rules as to the circumstances in which orders for interrogatories or production and inspection of documents can be made, including what has been referred to as the " mere witness " rule. There were two ways in which it could be obtained before the Judicature Act. One was by a bill in equity praying for relief; in which event one would get as part of the process that discovery which was relevant to the relief which was claimed. The other was by a bill, referred to as a bill of discovery, not claiming any relief but asking for the defendant to the bill to answer certain interrogatories, disclose documents or both.

By the mid-18th century, the courts had evolved the rule that the procedure could not be used to interrogate before trial (either by making an additional defendant to a bill for relief or by launching a bill for discovery against him) one who had no interest in the suit, but who was a mere witness.

The rule was applied as early as 1749 in *Plummer* v. *May* (1750) 1 Ves.Sen. 426 where there is found a clear differentiation drawn between a mere witness and a party interested. A number of exceptions were made —perhaps not wholly logically. One was the officer or book-keeper of a corporation—an exception subsequently extended to a member. Others were attorneys, arbitrators and agents. The agency exception seems to have been confined at first to auctioneers holding deposits, but later became extended to other agents: see *Fenton* v. *Hughes* (1802) 7 Ves.Jun. 287 where there is a rationalisation of *Plummer* v. *May*.

The rule was accepted by the appellants, but it is claimed (in their case) that it only applies where the plaintiff has his action and not when he has not got his action, but desires the information to enable him to start it. That this clearly is not or was not the law appears from Lord Eldon L.C.'s decision in *Mayor and Commonalty and Citizens of London* v. *Levy* (1803) 8 Ves.Jun. 398.

In paragraph 95 of the appellants' printed case, it is said that the rule was excluded whenever the defendant had an interest in the proposed action sufficient to be recognised by equity as excluding the rule. This is true so far as it goes, but it tells us nothing at all about the type of interest recognised. It is evident from *Fenton* v. *Hughes*, 7 Ves.Jun. 287 that a mere interest in the outcome, even though the action be brought by the plaintiff at law as agent for the defendant in equity, is not sufficient. This was recognised and adopted by this House in *Queen of Portugal* v. *Glyn* (1840) 7 Cl. & F. 466 where Lord Cottenham L.C. reviews the authorities and emphasises the rule. This case is of particular importance, not only because it is a decision of this House, but because it decisively rejected once and for all the very principle for which the appellants contend—namely, that there is some general equity to obtain discovery whenever the needs of

159

A.C.          Norwich Pharmacal v. Customs & Excise (H.L.(E.) )

A justice require it. The House rejected the observations of Lord Abinger C.B. in the court below. There was a clear recognition by this House of the mere witness rule. The rule was stated by Wickens V.-C., in *Dixon* v. *Enoch*, L.R. 13 Eq. 394, 399 in 1872 as being that a bill " can only be maintained against a person who is, or is to be, a party to the record at law, and not against a witness whose evidence may go to charge some third person." See also *Burchard* v. *MacFarlane* [1891] 2 Q.B. 241 where it

B is restated, thus showing that it survived the Judicature Act.

The appellants, however, contend that there is a further exception to the rule beyond those recognised exceptions in *Fenton* v. *Hughes*, 7 Ves.Jun. 287. But the submission rests in the ultimate analysis on *Orr* v. *Diaper*, 4 Ch.D. 92 and nothing but *Orr* v. *Diaper*.

The principles are conveniently summarised in *Bray on Discovery*. It is conceded that *Orr* v. *Diaper* is treated by *Bray* as an additional excep-

C tion, but this is wrong. It was not an additional exception at all. It was a case where an agent, who was himself actively engaged in infringing the plaintiff's rights by participating with knowledge in passing off goods as those of the plaintiffs, was properly stopped by injunction and made to disclose, as part of the relevant discovery in aid of that cause of action, the details of his wrongdoing. For the comparable position of one who

D has in his hands goods bearing a false trade mark: see *Upmann* v. *Forester*, 24 Ch.D. 231.

In effect, three propositions are based on *Orr* v. *Diaper*, 4 Ch.D. 92. First, it is said that Diaper was not a person who had any " interest " in the proposed action in the sense that a decree could be made against him. An alternative way of putting it is that, even if there was an interest (in the sense of a liability to a decree arising out of the matter for which the

E proposed action was concerned), this was not treated by Hall V.-C. as of any materiality. Therefore, it is said, this is a case where the ratio of the decision was that Diaper was not a mere witness because (i) Orr did not know who the consignors were; (ii) Diaper did know; (iii) Orr could not obtain the information he needed from anywhere else. The proposition is sought to be supported thus: it is true, it is said, that Diaper might

F (consistently with the authorities) have been enjoined under what has been referred to as " the protective jurisdiction of equity " from parting with the goods: and, in that context, the discovery of the names of the consignors of those goods which had been shipped after notice might be material. But it is said the discovery actually ordered was discovery of the particulars of the consignments right back to 1874 when the defendants were wholly innocent. No cause of action could be established in relation

G to that period. Therefore, what was in the Vice-Chancellor's mind was not cause of action at all. This, it is said, is demonstrated by the reference to *Mitford on Pleading*. What counsel and the judge were discussing was materiality, not cause of action.

There is an unproven assumption underlying this, namely, that the discovery ordered did go back to 1874. The whole of the proposition, however, even on that assumption, is based upon two complete fallacies. The

H first is that the case was one in which the only relief claimable against the defendants was an injunction under the " protective jurisdiction of equity " (whatever that may mean—if it means anything beyond the right of equity

to injunct a wrongdoer or a threatening or intending wrongdoer). This
was a case of actual infringement by the defendants for two reasons: (a)
This was a demurrer and it therefore admitted every allegation in the
statement of claim. By admitting this the defendants admitted that they
themselves had been deliberately assisting in the passing off of spurious
goods, that is, that they were actual wrongdoers. Whether they were acting
as principals or agents is wholly immaterial. (b) Secondly, quite apart
from knowledge, the fraudulent goods had been exported by the defen-
dants. The decision in *Upmann* v. *Forester*, 24 Ch.D. 231 shows that
guilt or innocence is immaterial. A person may be perfectly innocent, but
he can still be sued for an injunction to restrain passing off. The defendant
in *Orr* v. *Diaper*, 4 Ch.D. 92 had not only rendered himself liable to an
injunction, but, by admission, to an account of profits or damages, the
usual relief in a passing off action where knowledge is established. The
discovery back to 1874 was clearly material to this claim if the plaintiff
had sought to pursue it. Here is a man who says: " I admit for the past
two years I have been acting as agent in helping another person to pass
off his goods as yours and have caused you damage." It is self-evident
that the identity of his principal or principals is material: but in any event
the courts are not too tender of the susceptibilities of wrongdoers, nor
when discovery is a matter of indifference to the defendant will the court
weigh in golden scales the question of materiality or immateriality: see
*Carver* v. *Pinto Leite* (1871) 7 Ch.App. 90.

    The second fallacy is that the Vice-Chancellor was considering only the
question of materiality. Whatever the passage in *Mitford* was directed to
by its author, both counsel and judge were quite clearly considering it in
the context of whether there was any claim for relief which could be made
against the defendant, and the interjection of the Vice-Chancellor in the
report in the Law Reports shows that he was not prepared to allow the
case to go off on the point that the plaintiffs did not say in their statement
of claim that they were going to join the defendant as parties to the pro-
posed action. The Court of Appeal's analysis of this case was entirely
correct, once it is appreciated that it was a case of a wrongdoer caught
red-handed and knowingly in the act of wrongdoing (which was what was
admitted for the purposes of the demurrer); it then becomes apparent that
it is an example of, and not an exception from, the rule. True, *Bray* treats
*Orr* v. *Diaper*, 4 Ch.D. 92 as if it were an exception, but in so doing he
was wrong. In the hundred-odd years which have passed since *Orr* v.
*Diaper* there does not appear to be any recorded case in England of a
claim like the present one having been made.

    As to the reconciliation of *Orr* v. *Diaper* with *Queen of Portugal* v.
*Glyn*, 7 Cl. & F. 466, *Queen of Portugal* v. *Glyn* was concerned with the
bill of discovery, not a bill of relief. In the case of a bill of relief, one
could obtain discovery from a defendant against whom one claimed relief
and also against a person who though not joined for relief, was " inter-
ested " in the sense that a decree could be made against him. In dealing
with the pure bill of discovery, one must either have a pending proceeding
in which the defendant to the bill is a party or one must aver that one
intends to bring an action against him. But in a bill of relief, one can
join as defendant for discovery a person who is " interested in the suit "

**A.C.**      **Norwich Pharmacal v. Customs & Excise (H.L.(E.))**

A   in the sense that a decree can be made against him. Now all this is swept away by the Judicature Acts, and in *Orr* v. *Diaper*, Hall V.-C. is applying not the rule applicable to a bill of discovery, but the rule applicable to a bill of relief, where the test is: can the court make a decree?

It is accepted that *Orr* v. *Diaper*, 4 Ch.D. 92 went further than was warranted by previous cases in the sense that it was the first and only case in which discovery was accorded to a person against whom the plain-

B   tiff disclaimed the intention of seeking any relief either at law or in equity. The interesting question is why it went further. There are three possible explanations: (1) Hall V.-C. was simply wrong; (2) the rule had developed and changed since 1840 when *Queen of Portugal* v. *Glyn*, 7 Cl. & F. 466 was decided; (3) the Vice-Chancellor was applying a totally different principle. The difficulty in relation to both situations (2) and (3) is that there is no warrant from the reports for saying that the rule had changed or

C   developed and that Hall V.-C.'s judgment is based on the predicate that he was in fact applying the rule. The inference is therefore that he was, if not wrong, at least a pioneer and the reason why he became a pioneer was that he fell into the self-same error as did Lord Wynford in *Queen of Portugal* v. *Glyn*, 7 Cl. & F. 466 in failing to make the distinction between a bill of relief and a bill of discovery. The distinction was clearly drawn

D   in the cases which have been referred to. The distinction is clearly drawn in *Bray on Discovery*: see pp. 19, 20, 40. A litigant or prospective litigant might want discovery in aid of an action at law or of relief in equity. If the former, he had to bring a bill of discovery simpliciter; and to support it, he had to show not that the defendant was " mixed up " in the thing, but that the defendant actually was a party or intended to be a party to the record at law. Otherwise, he was met with the answer that he could

E   obtain his evidence in the ordinary way. If what he desired was relief in equity, he brought a bill of relief and joined the person from whom he sought discovery as a defendant to the bill. The question was, then, was he properly joined: had he a sufficient interest in the suit to keep him there: and " interest " came to be defined in terms of the possibility of a decree being made (apart from a decree for discovery merely). What

F   he could not do was to join a defendant for the purpose of discovery for some suit at law to which he did not intend to make him a party. With this in mind, it is interesting to peruse the report of the argument in *Orr* v. *Diaper*, to be found in 25 W.R. 23, 24. The logic of Hall V.-C.'s position is that where one has detected one malefactor who knows the name of his confederate or associate, one does not let him resort to the rather technical rule relating to discovery before the Judicature Act in order to

G   escape giving the name of his confederate. But that is no ground for extending the notion beyond the rule which equity applied even in the case for a bill of relief.

The two further propositions based on *Orr* v. *Diaper*, 4 Ch.D. 92 are these: (1) if the appellants say, they are wrong about the necessity to show a claim for relief against the person from whom information is sought,

H   then they contend that there is such a claim in the instant case against the respondents because wherever a civil wrong is being committed and a third person has a power to prevent it being committed or perfected, equity will interfere in the course of its " protective jurisdiction," at any

**Norwich Pharmacal v. Customs & Excise (H.L.(E.))**                    [1974]

rate where the wrong is concerned with goods and the goods are capable    A
of being held back by the third person concerned exercising a control
which he has in this situation. (2) either cumulatively or alternatively, it is
contended there is a general duty on one who has controlling powers over
goods or who is, as it is put, " mixed up " with them to give all information
about the goods to one who claims that their release or delivery or further
transmission would constitute an infringement of his private rights. The
authority for these two propositions comes from three cases: first, *Hunt*    B
v. *Maniere,* 34 Beav. 157, the case of the wharfinger. There is nothing
very special about this case. All that it decides is that a person who is in
possession of goods as an agent for another and who may subject himself
to action if he delivers them up to his principal for purposes which he
knows to be tortious has a defence in equity to an action in detinue by the
principal if he declines to deliver them. Secondly, *Upmann* v. *Elkan,*    C
L.R. 12 Eq. 140 on which a great deal has been made to turn, but which
is in essence a very simple case. It has nothing whatever to do with dis-
covery and the only questions were: (i) should the court grant an injunc-
tion in the circumstances; (ii) the defendants not having opposed the claim,
but submitted to act as the court directed, whether they ought properly
be made to pay the costs. It is in this context of this that Lord Romilly's
judgment has to be read. The case went to appeal (7 Ch.App. 130) where    D
one finds the Lord Chancellor emphasising in terms that the defendants,
albeit perhaps unwittingly, were wrongdoers against whom the plaintiffs
had a right to an injunction. Accordingly, all that can be deduced from
this decision is that if one finds a man actively and voluntarily engaged
in importing spurious goods, one can obtain an injunction against him as
a wrongdoer and if he wants to avoid that result and avoid paying the costs,    E
he must give the plaintiff information which will enable him to put a stop
to the matters complained of before the bill is filed. It does not establish
any right of action or duty arising simply from the fact of the defendant
having a power to stop the goods from proceeding further, and certainly
it establishes no such duty in the case of the person who has not voluntarily
engaged in the transaction. Thirdly, *Washburn and Moen Manufacturing*
*Co.* v. *Cunard Steamship Co.,* 6 R.P.C. 398, a clear case of infringement    F
by an agent who had control of the goods in question, which does not
assist the appellants, for the respondents are in the same position as were
the defendants in *Nobel's Explosives Co.* v. *Jones, Scott & Co.* (1882) 8
App.Cas. 5, where it was held that the mere facilitating of the passage
of infringing material by lodging documents was not an involvement in the
importation which would subject a Customs House agent to an injunction.    G

If (contrary to the respondents' submissions) there is a duty arising
from possession or control of goods, and if equity will interfere to stop
the goods against anyone who has possession or control, do the respondents
have, in any relevant sense " control " of goods unloaded at a port or
airport? What has to be postulated in the context of this particular pro-
position advanced by the appellants is: (a) that the commissioners have    H
a power which they can lawfully use for the purpose solely of preventing
goods from getting into the hands of a consignee; (b) that the respondents
have a duty to exercise that power for that purpose; (c) that a court of

A  equity can and will issue a decree that will (for effective purposes) result
in the exercise of that power.

If the powers conferred by the Customs and Excise Act 1952 be exam-
ined, two things become apparent. The first is that the powers conferred
at no stage enable the respondents themselves either to take possession
of the goods (except in the case of goods liable to forfeiture) or to influence
their final destination: and the second is that the powers—all the powers
B  —are conferred solely for the purpose of the statutory functions of col-
lecting the proper duty or such other functions as may, by statute, be vested
in the respondents. [Reference was made to sections 28 and 34 of the
Act.] In Reg. v. Lord Leigh [1897] 1 Q.B. 132 it was held that the police
authorities could not use a statutory power conferred upon them for a
collateral purpose.

It was said that Buckley L.J. put the appellants' argument in its widest
C  form. The way it is put in the appellants' printed case is that the mere
witness rule applies only where the plaintiff is seeking to obtain evidence.
When what is required is simply a sworn statement from the defendant
of a name of another person, the rule does not apply. If this be right, it
must be because the mere possession of knowledge in circumstances in
which the prospective plaintiff does not have it and cannot obtain it from
D  anywhere else (which is not accepted in the present case) gives rise to a
duty in the person having the knowledge to give the information and a
right in the injured person not having the knowledge to receive it. This
must be so, because courts of law or equity do not interfere merely for
convenience. It is a necessary prerequisite to obtaining relief that the
plaintiff seeking it should establish a duty in the defendant to accord that
relief. The concept of such a duty is not an easy one to envisage in the present
E  circumstances. Although there is no authority for the proposition in
English law, which may be deemed fortunate because the implications are
far reaching, the duty, if it exists, must be one which arises regardless
of the circumstances in which the information was obtained.

As to the older cases which it is said support the appellants' first pro-
position and Bray's treatment of Orr v. Diaper, 4 Ch.D. 92 as an additional
F  exception to the "mere witness" rule, Moodalay v. Morton, 1 Bro.C.C.
469 is of no assistance. There the plaintiff was seeking to sue the com-
pany and was seeking discovery in relation to that suit, that is, it
was a bill for discovery against a wrongdoer. The plaintiff knew who
had done him wrong: he was merely endeavouring to find out the status
of the actual wrongdoers: it is interesting to observe that in both reports
of the case it appears that the bill was supported by a distinct allegation
G  that the company had done wrong—presumably because the pleader
thought this a necessary allegation. Accordingly, it is merely an example
of the auxiliary jurisdiction of equity at work in aid of an action at law.

Angel v. Angel, 1 L.J.O.S.Ch. 6 is of no importance except for its
reference to Moodalay v. Morton. Heathcote v. Fleete, 2 Vern. 442 and
Morse v. Buckworth, 2 Vern. 443 seem to be merely examples of a well-
H  known exception to the mere witness rule—(a) the defendants were them-
selves persons against whom relief was to be sought and (b) they were
agents for a wrongdoing principal. The Murillo, 28 L.T. 374 depended
upon the special rule relating to discovery in the Admiralty Court. Tetley

164

Norwich Pharmacal v. Customs & Excise (H.L.(E.) )     **[1974]**

v. *Easton*, 18 C.B. 643 was an example of an action against a wrongdoer. *Bovill* v. *Cowan*, 15 W.R. 608 is of no assistance for there the plaintiff required names from a defendant who was already before the court. *Hancocks & Co.* v. *Lablache*, 3 C.P.D. 197 is even more remote. There is no doubt whatsoever that the defendant was liable. There was a demurrer on the ground of misjoinder. Leave was given to amend by joining the husband, and interrogatories were ordered to enable this to be done. *March* v. *Keith* (1860) 30 L.J.Ch. 127 is simply a decision where the inquiry is as to whether there are other persons, in addition to those already joined, whose interest may be affected by the decree.

*The Scottish Cases. Leven* v. *Board of Excise*, March 3, 1814, and *Vass* v. *Board of Customs*, Feb. 20, 1818, F.C. were both cases of diligence in an existing action where the question was one of Crown privilege. *McDade* v. *Glasgow Corporation*, 1966 S.L.T. (Notes) 4 was also a case of diligence in an existing action for the production of documents which would, it was hoped, prove that the defendants were (as they were allegedly) the persons responsible for the accident.

*The South African Cases. Colonial Government* v. *Tatham*, 23 Natal L.R. 153 was the case of an agent for a syndicate, and the court assumed that at the material time he himself was a member and therefore liable on the contract. It is interesting to observe that the Chief Justice thought that there was no difference in principle between discovery of names of parties and any other discovery. *Stuart* v. *Ismail*, 1942 A.D. 327 is an even clearer case. There the person from whom the names were required was himself a defendant in the action.

*The United States Cases. Sinclair Refining Co.* v. *Jenkins Petroleum Process Co.*, 53 S.Ct. 736 and *Pressed Steel Car Co.* v. *Union Pacific Railway Co.*, 240 F. 135 are relevant simply for their statements of general principle. The respondents concede that *Walker* v. *Pennsylvanian Railway Co.* (1944) 36 A. 2d 597, goes further than any English case and it does so in reliance, at any rate in part, on the older English cases. But the statement at p. 601 shows that the approach of the courts of New Jersey had by 1944 become that a man is not a " mere witness " unless the evidence which he has to give is evidence which can be useful at the trial. That is a gloss for which the English cases give no support at all. In *Brown* v. *McDonald*, 133 F. 897 it is true, there is a reference to *Orr* v. *Diaper*, 4 Ch.D. 92 but merely in the context of there being no pending action; there was a specific finding that the defendants were not mere witnesses. *Coca-Cola Co.* v. *City of Atlanta*, 110 S.E. 730 is plainly distinguishable, for it proceeded on the view that the civil code showed a policy to reveal the property of debtors. In the *Walker* case, 36 A. 2d 597 reliance was placed on *Post* v. *Toledo, Cincinnati and St. Louis Railroad Co.*, 11 N.E.Rep. 540. There there was an action to compel a corporation to disclose the names of its stockholders in order that the plaintiff could institute a suit against the corporation and its stockholders. There is really nothing peculiar about the decision which is in fact in accordance with principle. It is strongly in favour of the respondents. It distinguishes the respondents' position from that of the wharfinger. Further, the court had a full citation of the relevant authorities in that case.

It is plain that there is no general principle that merely because a per-

A  son has information that discovery can be obtained against him. Such a principle cannot stand in view of the libel cases: see, for example, *Plymouth Mutual Co-operative and Industrial Society Ltd.* v. *Traders' Publishing Association Ltd.* [1906] 1 K.B. 403.

The respondents' case may be summarised as follows: (1) The appellants' case rests on *Orr* v. *Diaper*, 4 Ch.D. 92 alone. (2) That case was wrongly decided at the time. But assuming that it is a sound proposition,
B  and it has become the law by being adopted and cited by textbook writers here and in common law jurisdictions outside England, it is authority only for this: where one finds a wrongdoer one can obtain discovery from him of the names of his associates in the wrongdoing without the necessity either of suing him personally for other relief, or by averring that one means to do so. (3) The respondents are not wrongdoers and are therefore in any event outside the proposition for which *Orr* v. *Diaper* is authority. (4)
C  If it is to be said that *Orr* v. *Diaper* is authority for a wider proposition, namely, that one can apply to a bill of discovery the rule previously applicable to a bill of relief, namely, that one can obtain discovery against a person " interested " in the action (in the sense that a decree can be made against him) then the respondents are not such persons. (5) They are not such persons because although equity will interfere by injunction to restrain
D  a wrongdoer or, quia timet, one who is going to be a wrongdoer if an injunction is not granted, it will not interfere against one who has no voluntary connection at all with the wrong, but who simply has the ability, by activity or inactivity, to prevent or delay other persons from doing wrong. No authority whatever has been cited for the proposition that one can obtain an order against such a person. All the cases cited are cases of persons who: (a) are agents of, or, bailees for, wrongdoers; (b) have
E  voluntarily assumed that position; and (c) have either possession or the power to say finally what shall be done with the goods; and (d) are actively assisting, or (unless restrained) will actively assist, in the wrongdoing. There is no third animal. One is either an infringer or a threatened infringer or one is nothing: *Nobel's* case, 8 App.Cas. 5. (6) If it is said that there is some duty to give information arising from the mere existence of the
F  statutory powers conferred on the respondents for the fulfilment of their functions (because this is " control " of the goods), these powers do not constitute " control " in any relevant sense. " Control " must mean possession either actual or constructive in the sense of having someone else possessing on one's behalf to whom one can give directions at to the final disposition of the goods. (7) The appellant's own formulation involved, as a necessary ingredient of discovery in the postulated circumstances, the
G  inability of the plaintiff to get the action on foot without the information he seeks. The respondents do not accept that he is so able. Their evidence is that obtaining the information from the respondents would be the most direct method and (b) that it is difficult to obtain it in any other way. (8) The innovation which the appellants seek would cause manifest inconvenience to the citizens of this country whose only fault is that they happen
H  to have some information that the plaintiff wants—no doubt a popular conception in these egalitarian days, but not an innovation to which this House should lend its assistance.

*Walton Q.C.* in reply. This House is only concerned with rights and

Norwich Pharmacal v. Customs & Excise (H.L.(E.))          [1974]

A

duties. It is not a court of morals. There is a general duty on persons to give evidence: see *Wigmore on Evidence*, 1st ed. vol. IV (1905), sect. 2192; " . . . there is a general duty to give what testimony one is capable of giving, and . . . any exemptions which may exist are distinctly exceptional . . ." That statement represents the truth. What difference is there in the present proceedings, provided the court has full control and the witness obtains his expenses? If the appellants have a right, then there must be a method of enforcing that right. The appellants only need names, and this is all that they will obtain for the court will only give minimum relief. This is an application of what is called " judicial parsimony ": see *per* Judge Learned Hand in the *Pressed Steel* case, 240 F. 135.

B

*The Plymouth Mutual Co-operative* case [1906] 1 K.B. 403 is also an example of application of judicial parsimony for there the plaintiff had a defendant and why should the plaintiff have his damages twice? There is an historical explanation for the attitude taken by the courts in libel cases. Defamation was originally a crime. Equity refused to aid the obtaining of evidence in relation to criminal proceedings or evidence which would result in self-incrimination.

C

The reasons for the mere witness rule must be one or more of the following: (1) because one does not want litigants " fishing " into the other side's evidence in advance, since they would be tempted to concoct contrary evidence; (ii) because any evidence thus obtained would be hearsay evidence; (iii) because otherwise before the Judicature Act it would have enabled defendants to bring actions for discovery against persons who were unwilling to comply, with the object of delaying their own substantive proceedings indefinitely, which is the real explanation of *Queen of Portugal* v. *Glyn*, 7 Cl. & F. 466; (iv) because it would subject innocent persons having nothing to do with the litigation to trouble and expense. The first three reasons cannot apply here.

D

E

In *Dummer* v. *Chippenham Corporation* (1807) 14 Ves.Jun. 245 Lord Eldon L.C. gives failure of justice as the reason for the exception to the mere witness rule in relation to corporations.

In *Queen of Portugal* v. *Glyn*, 7 Cl. & F. 466 it is important to observe that discovery was sought by the defendant and not the plaintiff. It is suggested that the reason for the delay in delivering judgment in that case was that a conflict arose between giving a hard decision in that case and making a bad law. Because if discovery were given to the defendant in that case, discovery would be sought by a defendant in every case of a bill of exchange and this would hold up proceedings on the bill. Nevertheless the House of Lords recognised at p. 486 that there are exceptions to the mere witness rule.

F

G

There are three reasons for granting discovery here: (1) the case forms an exception to the mere witness rule; (2) the respondents are so mixed up in the relevant transaction, to use the words of Lord Romilly, as to entitle the appellants to discovery; (3) the appellants could bring an action against the respondents. A person is mixed up in the transaction if innocently or not he facilitates the commission of the wrong complained of. A test of whether a person is mixed up in a transaction is to see whether if that person had not acted as he did the tort would not have been committed.

H

167

A   It was said that the respondents were not volunteers, but neither are dock companies. In *In re Uzielli* (1863) 33 L.J.Ch. 371 an injunction was granted against persons who were acting involuntarily under statutory duties. Dock companies are no more volunteers than are the Customs. *Orr* v. *Diaper*, 4 Ch.D. 92 was a case of the defendant being mixed up in the transaction in question, which also applies to *Brown* v. *McDonald*, 133 F. 897. The Customs are mixed up in these transactions. They play

B   a vital role. The court could order the respondents to stop these goods leaving the docks, which shows that the Customs have sufficient control both for enabling the mixed-up principle to be invoked and also for the purpose of the appellants obtaining a declaration under the equitable protective jurisdiction of the court. [Reference was made to sections 44 and 261 of the Customs and Excise Act 1952.]

*The protective jurisdiction of equity.* It was said: (1) that this juris-

C   diction never existed; (2) that the protective jurisdiction was abolished by *Nobel's Explosives Co.* v. *Jones, Scott & Co.*, 8 App.Cas. 5; (3) if the jurisdiction still exists, it extends only to agents and bailees. As to (1), for this to succeed, it would be necessary to show that all the defendants in the relevant cases were infringers. In other words, for example, that Diaper was an infringer and that the Cunard Company were infringers. But a

D   carrier, like a shipper, is never an infringer unless he is particeps criminis. In *Orr* v. *Diaper*, 4 Ch.D. 92, the defendant could be enjoined against, but damages could not be obtained against him. Even if Diaper knew all about the transactions, damages could not be obtained against him, but merely an injunction. He was not a tortfeasor at law but a wrongdoer in equity and an injunction could be granted against him under the equitable protective jurisdiction: see also the observations of Stirling J. in *Wash-*

E   *burn and Moen Manufacturing Co.* v. *Cunard S.S. Co.*, 6 R.P.C. 398. As to (2), it is almost impossible to differentiate between the defendants in *Upmann* v. *Elkan*, L.R. 12 Eq. 140 and *Nobel's Explosives Co.* v. *Jones, Scott & Co.*, 8 App.Cas. 5 where there was no attempt by a side wind to abolish the equitable protective jurisdiction. The question of innocence is irrelevant in relation to the equitable protective jurisdiction. All that

F   matters is whether the defendant has the goods under his possession or control.

In *Washburn's* case, 6 R.P.C. 398, Stirling J. put the basis of jurisdiction on power or control. There is no case where it has been put on the basis of the defendant being an agent or carrier. Accordingly, there is no foundation for proposition (3) above.

It is relevant to ascertain whether a declaration could be obtained against

G   the respondents because if an injunction could be obtained under the equitable protective jurisdiction, then a declaration could be obtained and a declaration is sufficient to enable a party to obtain discovery: see *Barnard* v. *National Dock Labour Board* [1953] 2 Q.B. 18.

*Moodalay* v. *Morton*, 1 Bro.C.C. 469 is similar to *Orr* v. *Diaper*, 4 Ch.D. 92. The report of *Moodalay* in 2 Dick. 652 makes plainer than

H   does the report in Brown that it was the case of obtaining names in order to know whom to sue and it was so understood by *Story* in the edition that came out before *Orr* v. *Diaper* and was so understood also in the first edition of *Snell*. *Mayor of London* v. *Levy*, 8 Ves.Jun. 398 unlike *Moodalay*

Norwich Pharmacal v. Customs & Excise (H.L.(E.))          [1974]

v. *Morton* was a pure " fishing " case. In *Fenton* v. *Hughes*, 7 Ves.Jun. A
287 the facts were not sufficient to warrant making an exception to the
rule. *Burchard* v. *MacFarlane* [1891] 2 Q.B. 241 states the general rule.
There was no full citation of authority. *Post* v. *Toledo, Cincinnati and
St. Louis Railroad Co.*, 11 N.E.Rep. 540 assists the appellants, for there
discovery was obtainable against someone who had some relation to the
property. Similarly the respondents have some relation to the goods in
question here. *Bovill* v. *Cowan*, 15 W.R. 608 involved a defence associa-    B
tion and the persons in question were net co-infringers. There was no
conspiracy to infringe. There were merely persons who had a common
interest.

[Their Lordships conferred. Lord Reid intimated that their Lord-
ships desired to hear argument on the other issues raised in the appeal.]

The appellants have made out a prima facie case for the information    C
they seek. This information involves a contempt of the Crown and is a
serious tort. The information required is contained in documents which
are mundane. Ship owners and ships masters and dock and harbour autho-
rities and even stevedores handle them. Thus it can be seen that a wide
class of persons are in possession of the required information. Without
there being an express or implied obligation not to divulge, there is no
question of general confidentiality in this case.    D

As to the respondents' contention on candour, the consignors are
required by law to disclose the identity of the product under threat of a
penalty. This is factual information that is sought and not what is a mere
matter of opinion: contrast *Reg.* v. *Lewes Justices, Ex parte Secretary of
State for Home Department* [1973] A.C. 388.

The reliance placed by the Court of Appeal upon the fact that docu-    E
ments might be forged or that the importations might be in the names of
nominees does not stand up to examination. Forgery merely at the moment
of entry could not be effective and, further, in so far as the importers might
give the names of nominees, it is not understood how this could constitute
an evil of any kind or lead to evasion of Customs dues. Importers may
well be nominees at present. It is conceded that there may be an importa-
tion which is licensed. The respondents should give all the names because    F
the possibility that importation of this substance being lawful is a remote
possibility.

The respondents rely on this branch of the case on section 3 of the
Finance Act 1967. This statutory prohibition is over-ridden by the prin-
ciple that it is not to be so construed as to hinder the due administra-
tion of justice. It is an enabling section, directed to promiscuous publication.
That is why it contains safeguards of honest men's secrets.    G

The Court of Appeal took a wrong approach in that it failed altogether
to appreciate that the appellants came before them clothed in a very high
public interest. Lord Denning M.R. weighed the matter as primarily
one between the appellants' private benefit by way of financial gain, and
the public benefit of keeping the information secret. But that fails to
appreciate that behind the private rights of any individual litigant there    H
always stands the extremely important public interest that justice must be
done. That is an over-riding interest: see *Conway* v. *Rimmer* [1968]
A.C. 910. The cases show that not all functions of public departments

**A.C.**          Norwich Pharmacal v. Customs & Excise (H.L.(E.))

A are to be treated in the same way, that is, they do not all have the same weight. There is a very strong public interest that the affairs of taxpayers should not be disclosed and, therefore, it would need a very strong case indeed before a court would order the disclosure of a taxpayer's income tax return. In the present case, the public interest against disclosure of these names to the court is minimal. The principle on which the appellants rely is, namely, that the disclosure of wrongdoing is more essential

B to public justice than the fact that the Crown Revenue might suffer from the future failure of the wrongdoers to share the proceeds of their wrongdoing with the Government: see *Reg.* v. *Snider* [1953] 2 D.L.R. 9, 36.

As to the over-riding power of the court, the authority in this House is *Rowell* v. *Pratt* [1938] A.C. 101 which shows that there is no presumption either way, but that the court considers the individual statutory provision in each case. In *Cowan* v. *Stanhill Estates Pty. Ltd.* [1966] V.R.

C 604 there is a review of the English authorities.

In conclusion, the House should decide that " court " is not a person in these circumstances, particularly in a section like section 3 which is not a prohibiting section at all, but an enabling section. Strong reliance on this part of the case is placed on *Conway* v. *Rimmer* [1968] A.C. 910.

*Oliver Q.C.* Confidence in the present context is a head of public

D policy. Where information is furnished to a government department (i) for a particular purpose or (ii) under the compulsion (or possible compulsion) of a statute, then in the absence of express statutory power is there a bar upon the use of that information for other than the statutory purpose and, in particular, upon its disclosure either (a) to other government departments or (b) to other persons? To express the issue thus is to put it much more widely than it was put by the respondents below and much more

E widely than is necessary for the purposes of the present case. For present purposes, it is sufficient to rely on specific statutory provision. But on the wide issue, there are three classes of statutes: (1) An Act requiring the furnishing of information, but not containing any prohibition, express or by necessary implication, on disclosure by the recipient, e.g. the Customs and Excise Act 1952, s. 65; (2) an Act containing power to require information and a specific prohibition on disclosure either absolute or with

F specific exception, e.g. the Agricultural Marketing Act 1931, s. 17; (3) an Act containing power to require information but with an express provision authorising disclosure in limited cases or to a limited extent and thereby by implication prohibiting disclosure in other cases, e.g. the Finance Act 1967, s. 3.

To the question " is there an absolute bar on the disclosure of infor-

G mation collected pursuant to statutory powers? " the answer is " No." The respondents do not claim this as a general principle. The appellants accept that there is a general obligation of confidence, but it is said that this is subject to the general principle, that it will yield to a strong case of public interest (*Conway* v. *Rimmer* [1968] A.C. 910). This is not disputed subject to this qualification that if there is a statutory prohibition, either express or implied, on the disclosure of information or on the dis-

H closure of information except in particular circumstances, then the statutory prohibition prevails.

*Rowell* v. *Pratt* [1938] A.C. 101 is a case of an express prohibition

A.C. 1974—7 (1)

and the following principles are deducible from it: (i) there is no rule of construction which imposes a limitation on a statutory prohibition to the effect that it is only to apply unless a court in legal proceedings otherwise orders; (ii) prohibition may be implied, for example, by imposing a criminal penalty on disclosure; (iii) where there is a statutory prohibition, the court will not over-ride it on the footing that it is transcended by the requirements of the administration of justice.  Examples of express prohibitions are:  section 11 of the Parliamentary Commissioner Act 1967; section 111 of the Companies Act 1967; and section 21 of the Agriculture Act 1970.

It is conceded that the Customs and Excise Act 1952 contains no express prohibition regarding the disclosure of information gathered under the Act.  Prima facie, therefore, the position would be that applicable to any other statutorily gathered information, that is, it is non-disclosable except in the event of the court finding a balance of public interest in favour of disclosure.  The difficulties about accepting this, however, arise principally from the provisions of section 3 of the Finance Act 1967.  As to this section, it is to be noted: (a) it is permissive, so that it recognises by implication the general confidential nature of the information to which it relates; (b) the disclosure authorised is " to persons other than the Commissioners " so that the implication is that apart from this power there is no power to disclose to any other person (and prima facie) that would include a party to litigation before the court; and (c) the information which can be disclosed is strictly limited in nature, and even the power to increase the ambit of disclosable information cannot be extended to name and price.  As to (c), the fact that there is an express prohibition in relation to the factors of name and price shows a very strong public policy against disclosure.  If it be said that the information required here is disclosed to many persons, it is information to persons concerned with the transmission of the goods in question.  They cannot use it for any other purpose.  In relation to the question of confidentiality, it is important to consider section 127 of the Finance Act 1972 which shows that there is nothing very strange in imposing an increasingly strict policy in relation to confidentiality.  Further, section 16 (9) of the Agriculture Act 1970 underlines the practice of confidentiality.  It indicates the confidentiality of statutory information.  A perusal of the relevant statutory provisions shows a thread running through them, that information required to be disclosed to a statutory body is to be deemed confidential.  The respondents concede, however, that despite the language of section 3 of the Finance Act 1967, the public interest may over-ride the provisions of the section in certain circumstances, for example, where the information is required in prosecuting a charge of serious crime or in preparing a defence of a charge to serious crime.

For there to be disclosure the factor in favour of disclosure must be very weighty.  In the respondents' submission the disclosure of names for the prosecution of private rights is not a sufficient factor.  Public policy has two aspects: there is the moral aspect in that a person is entitled to believe that his private affairs will not be disclosed.  Secondly, there is the expediency aspect, for it is a relevant consideration what would be the effect of disclosure on the interests of the State.

If it be said that sections 111 and 112 of the National Insurance Act

A  1965 show a relaxation in the relation of the disclosure of names, the answer is albeit there has been a shift in public policy against the general prohibition of the disclosure of names it is a shift away from that position only in relation to matrimonial proceedings.

The contest in the present case, assuming that it is proper in proceedings where no other relief can be claimed to seek disclosure at all, really comes down to a balancing of interests. One starts from the position that there is a strong public interest in maintaining the confidentiality of infor-
B  mation extracted from citizens under statutory compulsion. This is no more than the recognition by the legislature and by the courts that if the individual is to be asked to disclose his private affairs to the organs of the State, it is only right that the information so divulged should be used only for the purpose for which, under the statutory power, it has been called. This is something quite separate and apart from the candour
C  argument. It is in the public interest—it is part of public policy and the policy of the law that private confidences should not be abused—this is a moral policy, not an expediency one. There is always this dual aspect of public policy both facets of which were present in *Rowell* v. *Pratt* [1938] A.C. 101.

The countervailing public interest which it is said over-balances this,
D  is the interest of the private litigant in establishing his individual private rights in a civil action in a court of law. So stated the proposition subjects the obligation of confidence to an exception which would reduce it to a mere shell. " This information should be kept confidential except where its disclosure would assist another person to assert a private right."

If it be said that the appellants' right is more than a private right, it can be equally said that it is in the public interest generally that the rights
E  of individuals should be protected.

To the suggestion that the information required by the appellants is purely mundane information, the answer to this is that this is a meaning-less concept. It carries the appellants nowhere. The public interest in confidentiality cannot depend solely or even principally on the content of the information sought divorced from the context in which it was imparted
F  or the consequences of its disclosure. On this test, a great deal of highly secret information is " mundane," for example, the name and telephone number of a police informer.

In summary: (1) Information provided under statutory compulsion is to be treated as confidential, although, in the absence of expressed statutory prohibition, the court may order disclosure if the public interest requires it. (2) Whether the court in any given case will order disclosure depends not
G  on any general rule, but on the individual circumstances. Among other things the following factors will be relevant for consideration: (a) The type of information sought; (b) the degree of confidentiality imposed by the legislature so far as deducible from the statutory provisions; (c) the pur-poses for which the information is sought—for instance, how far can the Department of Social Security disclose names and addresses for proceed-ings other than maintenance proceedings? (3) The confidentiality of
H  information statutorily obtained is not affected by the fact that that infor-mation may, and often is, imparted to other persons not under statutory compulsion, *e.g.,* the Inland Revenue may obtain details of invoices and

vouchers, etc. which could in fact be obtained from the traders who furnished them in the first instance; (4) Names and addresses of informants in an area to which the legislature has indicated a particular sensitivity. Thus section 3 does not allow the veil to be lifted even in the national interest. (5) It is not in the public interest to foster litigation: *Weld-Blundell* v. *Stephens* [1920] A.C. 956.

*Walton Q.C.* in reply. The appellants accept as a general proposition that information primarily given for statutory purposes should not be disclosed without a strong case being made out for such disclosure. Such a strong case must necessarily be furnished where disclosure is necessary to ensure justice. Specifically on Crown privilege the onus of showing that this exists is upon the respondents: see *Reg.* v. *Lewes Justices, Ex parte Secretary of State for Home Department* [1973] A.C. 388. Further, the law of confidence does not apply to guilty secrets. Equity will not protect the guilty secret by whomsoever disclosed.

The appellants concede that the present proceedings are ex parte in so far as the Customs cannot be expected to challenge the validity of the patent. But prima facie evidence of validity has been given amply sufficient to secure the grant of an interlocutory injunction. Interlocutory injunctions have been granted in patent matters only in the last decade, and there have only been about six granted. This answers any suggestion that the granting of the present appeal would open the floodgates for applications of the present character.

If the respondents in any case were to consider that it would be prejudicial to disclose names, they could always refuse and be brought before the court where their costs would have to be paid by the applicant. This procedure protects the Customs. Further, the public interest is served if the discovery is sufficiently discriminate, that is, that it is only granted on the making out of a prima facie case of wrongdoing. *Practice Note (Wardship: Summons)* [1973] 1 W.L.R. 60, 63 shows that a number of government departments are prepared to give names and addresses in certain circumstances.

If it be said that the giving of names is the thin end of the wedge and that applicants will require further evidence, the answer is that the principle of judicial parsimony is applicable: the *Pressed Steel* case, 240 F. 135, 137, *per* Judge Learned Hand. If names are sufficient for the purpose, the court will not grant the giving of any further information.

As to the respondent's summary of their argument on this issue: (1) this is not disputed save for a change of onus and emphasis; (2) there is no dispute here, save on the application of the principles; (3) this conflicts with proposition 2 (a). It must help to clarify the question whether information should be disclosed by ascertaining in whose hands the information is. The information here is mundane and is not of that character contemplated by Lord Salmon in *Reg.* v. *Lewes Justices* [1973] A.C. 388 as being immune from disclosure. This information is not like income tax returns; it is information already known to ships masters among others; (4) is not accepted; (5) is stated far too widely.

Their Lordships took time for consideration.

173

A
June 26, 1973.  LORD REID.  My Lords, the appellants own patent no. 735,136 which covers a chemical compound called furazolidone. The validity of the patent is not in dispute.  This substance is widely used and matter published by the respondents shows that some 30 consignments of it were imported into the United Kingdom between 1960 and 1970. None of these were licensed by the appellants.  Each of these consignments therefore involved a tortious infringement of their right.  The appel-

B
lants have tried, but with little success, to discover the identity of the importers.

When any goods are imported the master of the ship bringing them and the importer have to lodge documents with the Customs which disclose the identity of the importer.  It is not disputed that the respondents have in their possession documents showing who imported each of these consignments and the appellants now seek to get from the respondents by way of

C
discovery the names of those who are shown in their records to have imported furazolidone during the last six years in order that the appellants may be able to take proceedings against such importers.  The respondents for a number of reasons say that they are not entitled or are not willing to give this information and they assert that the appellants have no right to obtain discovery.

D
On June 29, 1967, the appellants wrote a long letter to the respondents setting out their contentions and seeking information in respect of the persons responsible for the importation of this substance.  On July 25, the respondents replied that they had no authority to give such information. The appellants then issued a writ.  They alleged infringement by the respondents and sought wider discovery than they now seek.  But they now admit that they have no cause of action against the respondents.

E
The question therefore now is whether the respondents are in law liable to make discovery of the names of the wrongdoers who imported the patented substance.  Graham J. held that they were but his decision was reversed by the Court of Appeal.

Discovery as a remedy in equity has a very long history.  The chief occasion for its being ordered was to assist a party in an existing litigation.

F
But this was extended at an early date to assist a person who contemplated litigation against the person from whom discovery was sought, if for various reasons it was just and necessary that he should have discovery at that stage. Such discovery might disclose the identity of others who might be joined as defendants with the person from whom discovery was sought.  Indeed in some cases it would seem that the main object in seeking discovery was to find the identity of possible other defendants.  It is not clear to me

G
whether in all these cases the plaintiff had to undertake in some way to proceed against the person from whom he sought discovery if he found on discovery being ordered that it would suit him better to drop his complaint against that person and concentrate on his cause of action against those whose identity was disclosed by the discovery.  But I would think that he was entitled to do this if he chose.

H
But it is argued for the respondents that it was an indispensable condition for the ordering of discovery that the person seeking discovery should have a cause of action against the person from whom it was sought.  Otherwise it was said the case would come within the " mere witness " rule.

A

I think that there has been a good deal of misunderstanding about this rule. It has been clear at least since the time of Lord Hardwicke that information cannot be obtained by discovery from a person who will in due course be compellable to give that information either by oral testimony as a witness or on a subpoena duces tecum. Whether the reasons justifying that rule are good or bad it is much too late to inquire: the rule is settled. But the foundation of the rule is the assumption that eventually the testimony will be available either in an action already in progress or in an action which will be brought later. It appears to me to have no application to a case like the present case. Here if the information in the possession of the respondents cannot be made available by discovery now, no action can ever be begun because the appellants do not know who are the wrongdoers who have infringed their patent. So the appellants can never get the information.

B

To apply the mere witness rule to a case like this would be to divorce it entirely from its proper sphere. Its purpose is not to prevent but to postpone the recovery of the information sought. It may sometimes have been misapplied in the past but I see no reason why we should continue to do so.

C

But that does not mean, as the appellants contend, that discovery will be ordered against anyone who can give information as to the identity of a wrongdoer. There is absolutely no authority for that. A person injured in a road accident might know that a bystander had taken the number of the car which ran him down and have no other means of tracing the driver. Or a person might know that a particular person is in possession of a libellous letter which he has good reason to believe defames him but the author of which he cannot discover. I am satisfied that it would not be proper in either case to order discovery in order that the person who has suffered damage might be able to find and sue the wrongdoer. Neither authority, principle nor public policy would justify that.

D

E

So discovery to find the identity of a wrongdoer is available against anyone against whom the plaintiff has a cause of action in relation to the same wrong. It is not available against a person who has no other connection with the wrong than that he was a spectator or has some document relating to it in his possession. But the respondents are in an intermediate position. Their conduct was entirely innocent; it was in execution of their statutory duty. But without certain action on their part the infringements could never have been committed. Does this involvement in the matter make a difference?

F

On the view which I take of the case I need not set out in detail the powers and duties of the respondents with regard to imported goods. From the moment when they enter the port until the time when the consignee obtains clearance and removes the goods, they are under the control of the Customs in the sense that the Customs authorities can prevent their movement or specify the places where they are to be put, and in the event of their having any suspicions they have full powers to examine or test the goods. When they are satisfied and the appropriate duty has been paid the consignee or his agent is authorised to remove the goods. No doubt the respondents are never in possession of the goods, but they do have considerable control of them during the period from entry into the port until removal by the consignee. And the goods cannot get into the

G

H

A.C.          Norwich Pharmacal v. Customs & Excise (H.L.(E.) )          Lord Reid

A   hands of the consignee until the respondents have taken a number of steps and have released them.

My noble and learned friends, Lord Cross of Chelsea and Lord Kilbrandon, have dealt with the authorities. They are not very satisfactory, not always easy to reconcile and in the end inconclusive. On the whole I think they favour the appellants, and I am particularly impressed by the views expressed by Lord Romilly M.R. and Lord Hatherley L.C. in

B   *Upmann* v. *Elkan* (1871) L.R. 12 Eq. 140; 7 Ch.App. 130. They seem to me to point to a very reasonable principle that if through no fault of his own a person gets mixed up in the tortious acts of others so as to facilitate their wrong-doing he may incur no personal liability but he comes under a duty to assist the person who has been wronged by giving him full information and disclosing the identity of the wrongdoers. I do not think that it matters whether he became so mixed up by voluntary

C   action on his part or because it was his duty to do what he did. It may be that if this causes him expense the person seeking the information ought to reimburse him. But justice requires that he should co-operate in righting the wrong if he unwittingly facilitated its perpetration.

I am the more inclined to reach this result because it is clear that if the person mixed up in the affair has to any extent incurred any liability to the person wronged, he must make full disclosure even though the person

D   wronged has no intention of proceeding against him. It would I think be quite illogical to make his obligation to disclose the identity of the real offenders depend on whether or not he has himself incurred some minor liability. I would therefore hold that the respondents must disclose the information now sought unless there is some consideration of public policy which prevents that.

E   Apart from public policy the respondents say that they are prevented by law from making this disclosure. I agree with your Lordships that that is not so. If it were they could not even disclose such information in a serious criminal case, but their counsel were, quite rightly, not prepared to press their argument so far as that.

So we have to weigh the requirements of justice to the appellants against

F   the considerations put forward by the respondents as justifying non-disclosure. They are twofold. First it is said that to make such disclosures would or might impair or hamper the efficient conduct of their important statutory duties. And secondly it is said that such disclosure would or might be prejudicial to those whose identity would be disclosed.

There is nothing secret or confidential in the information sought or in the documents which came into the hands of the respondents containing

G   that information. Those documents are ordinary commercial documents which pass through many different hands. But it is said that those who do not wish to have their names disclosed might concoct false documents and thereby hamper the work of the Customs. That would require at least a conspiracy between the foreign consignor and the importer and it seems to me to be in the highest degree improbable. It appears that there are

H   already arrangements in operation by the respondents restricting the disclosure of certain matters if the importers do not wish them to be disclosed. It may be that the knowledge that a court might order discovery in certain cases would cause somewhat greater use to be made of these arrangements.

A

But it was not suggested in argument that that is a matter of any vital importance. The only other point was that such disclosure might cause resentment and impair good relations with other traders: but I find it impossible to believe that honest traders would resent failure to protect wrongdoers.

Protection of traders from having their names disclosed is a more difficult matter. If we could be sure that those whose names are sought are all tortfeasors, they do not deserve any protection. In the present case the possibility that any are not is so remote that I think it can be neglected. The only possible way in which any of these imports could be legitimate and not an infringement would seem to be that someone might have exported some furazolidone from this country and then whoever owned it abroad might have sent it back here. Then there would be no infringement. But again that seems most unlikely.

B

C

But there may be other cases where there is much more doubt. The validity of the patent may be doubtful and there could well be other doubts. If the respondents have any doubts in any future case about the propriety of making disclosures they are well entitled to require the matter to be submitted to the court at the expense of the person seeking the disclosure. The court will then only order discovery if satisfied that there is no substantial chance of injustice being done.

D

I would therefore allow this appeal. The respondents were quite right in requiring the matter to be submitted to the court. So they are entitled to their costs down to the date of the judgment of Graham J. Thereafter the appellants caused much extra expense by putting their case much too high. In the circumstances I would award no costs in the Court of Appeal or in this House.

E

LORD MORRIS OF BORTH-Y-GEST. My Lords, the question which calls for consideration arises in proceedings which by now have shed many of their original features. Two actions were begun. They were later consolidated. The plaintiffs [the appellants] were respectively the registered proprietors of, and the exclusive licensees in the United Kingdom under, letters patent which covered a specific chemical compound called furazolidone. The claims made by the plaintiffs in each action were as follows. First, there was a claim for a declaration that the defendants (the commissioners) had infringed or had caused, enabled or assisted others to infringe the letters patents. Secondly, there was a claim for a declaration that it was the commissioners' statutory duty to forfeit all the imported furazolidone in their possession custody or control which was not licensed for importation by the plaintiffs. Thirdly, there was a claim for an order that the commissioners should :

F

G

" (a) Set forth and disclose to the plaintiffs in the case of each consignment of furazolidone imported without the licence of the plaintiffs or one or other of them the names and addresses of the consignors and consignees thereof, the quantity of furazolidone therein and the date thereof. (b) Give the plaintiffs full and complete discovery of all documents which are or have been in their possession custody or control relating to such imported consignments of furazolidone."

H

177

A.C.      Norwich Pharmacal v. Customs & Excise (H.L.(E.))    Lord Morris<br>of Borth-y-Gest

A    It was pleaded that third parties whose names were unknown to the plaintiffs had infringed the letters patent by importing furazolidone without the leave and licence of the plaintiffs. Particulars were given setting out dates, quantities, values and countries from which imported. The discovery claimed was sought in aid of proceedings which the plaintiffs wished to bring against others but which they could not initiate without at least knowing the names of the importers.

B    After delivery of defences both parties filed lists of documents. In one part of the commissioners' list there were included the following documents: Special Chemical Register: Customs Entries (comprising Forms XS107 and C.105 and supporting documents) delivered by persons other than the plaintiffs relating to the importation of furazolidone: and ships' reports, cargo manifests, correspondence and books of account relating to such importations. The commissioners objected to produce those documents. The objection was on the following grounds:

C    " (a) that the defendants are precluded by law from disclosing them and (b) that their disclosure would be injurious to the public interest, because they contain confidential information about the affairs of persons other than the plaintiffs furnished to the defendants by such persons pursuant to sections 26, 28 and 29 of the Customs and Excise

D    Act 1952."

The plaintiffs took out a summons by which they asked that the defendants be ordered to produce the documents for inspection. The summons was adjourned into court and was heard by Graham J.

Though the learned judge held that the plaintiffs had no reasonable cause of action against the commissioners he held in a most careful and

E    illuminating judgment that the court could make an order requiring them to disclose to the plaintiffs the names and addresses of the importers of furazolidone. The commissioners appealed to the Court of Appeal against this order. The plaintiffs persisted in their contention that they had causes of action against the commissioners and by a respondent's notice they contended (a) that the commissioners had infringed (or had caused or

F    enabled or assisted others to infringe) the letters patent and (b) that the commissioners were in breach of a statutory duty to forfeit all imported furazolidone in their possession custody or control which the plaintiffs had not licensed for importation.

Having lost in the Court of Appeal the plaintiffs by leave appealed to this House. Though by their printed case the plaintiffs set out that to a limited extent they desired to maintain the contention that they had a cause

G    of action for infringement by the commissioners themselves, that contention was abandoned when the appeal was opened. The case proceeded therefore on the basis (a) that it consisted solely of a claim for limited discovery against the commissioners and (b) that no other relief could be or could have been claimed against the commissioners. It must be approached on the footing that it was and always had been an action solely for discovery.

H    The claim is now expressly limited so as to relate only to the names and addresses of any persons appearing from the customs entry to be the importers (a) in the case of the last importation referred to in paragraph 2 of the amended particulars of breaches in the first action and (b) in the case

178
Lord Morris
of Borth-y-Gest          Norwich Pharmacal v. Customs & Excise (H.L.(E.))          [1974]

A

of each importation referred to in paragraph 2 of the particulars of
infringements in the second action.

It is important to mention certain matters. (1) The commissioners by
their pleadings admitted (for the purposes of this case) the validity of the
letters patent. But beyond this there was evidence showing that the validity
of the patent (the complete specification of which was published nearly 16
years ago) had never been challenged. Some infringements had been
detected and all infringers who had been detected had been sued: the     B
actions had been settled on the basis that there was infringement. (2) The
commissioners publish certain monthly statistics of goods imported into the
United Kingdom and the importation of furazolidone has been specifically
mentioned. The plaintiffs are in a position to assert that the persons who
have imported, whoever they are, must have been infringers and therefore
wrongdoers. The commissioners know the names and addresses of these      C
people. The plaintiffs wish to sue such people and intend to sue them if
they can find out who they are. The plaintiffs say that they are unable to
find out who the people are unless the commissioners tell them.

The plaintiffs wrote (in June and July 1967) to the commissioners and
asked for the information they sought. The commissioners stated that they
were advised that information furnished to them under a requirement of
the Customs and Excise Act 1952 should not be disclosed to third parties.   D

In my view, it would be reasonable, and in a broad sense of the term
just, if the desired information could be supplied. The facts are very special.
The plaintiffs are fully entitled to protect their interests. Subject always
to the emergence of some possible explanation of a nature not at present
known, the importers whose names are known to the commissioners are
wrongdoers. It will be unfortunate not only from the point of view of the   E
plaintiffs but also of that of the public if the wrongdoers cannot be
challenged. In this situation two questions arise: (1) Is it within the power
of the court to assist the plaintiffs or is the law powerless? (2) If the court
has power to make the desired order—would it be against the public interest
to make it?

In the review of very many authorities to which we were referred in     F
painstaking and learned arguments it seemed clear that as a broad and
general rule it is true to say that a court will not order discovery against a
mere witness. On behalf of the plaintiffs it is not sought to challenge this.
A witness is one who may be able to give testimony in either pending or
anticipated proceedings. Here there are no pending proceedings and unless
the plaintiffs secure the help of the court there are no anticipated proceed-   G
ings. If the names are given and if the plaintiffs take proceedings it is
unlikely that there would be any need to rely on any evidence from the
commissioners.

It is not suggested that in ordinary circumstances a court would require
someone to impart to another some information which he may happen to
have and which the latter would wish to have for the purpose of bringing
some proceedings. At the very least the person possessing the information   H
would have to have become actually involved (or actively concerned) in
some transactions or arrangements as a result of which he has acquired the
information. In all ordinary circumstances there would then be some

A.C.     Norwich Pharmacal v. Customs & Excise (H.L.(E.) )     Lord Morris
of Borth-y-Gest

A  proceedings in the course of which the machinery of the court would enable all relevant and admissible evidence to be obtained.

My Lords, the review of numerous authorities undertaken by learned counsel has left me with the impression that unless supplied by the case of *Orr* v. *Diaper* (1876) 4 Ch.D. 92 clear-cut authority is meagre in support of the very limited order now sought by the plaintiffs; equally I am left with the impression that it would be very unfortunate if the law could not come to

B  the aid of the plaintiffs. The commissioners have had public duties to discharge. They have acted with complete propriety. But in the course of their public duties they have come to know, and have been obliged to come to know, the names of those who can reasonably be assumed to be wrong-doers vis-à-vis the plaintiffs. Assuming that only the necessities of the public service (a matter to which I will later refer) have deterred the commissioners from disclosing the names to the plaintiffs, and always assuming that there

C  is no statutory prohibition against such disclosure, is there any reason why the court, in the interests of justice, and in the absence of any real doubt that certain wrongdoers are enjoying a quite fortuitous protection, should not authorise and require the commissioners to disclose the names?

So far as authority goes the sheet anchor of the appellants is the decision in 1876 in *Orr* v. *Diaper*, which is reported in 4 Ch.D. 92 and in other

D  reports. In the much earlier case of *Moodalay* v. *Morton* (1785) 1 Bro.C.C. 469 there was a bill for discovery against the East India Company and against Morton, their secretary. The plaintiffs had had a lease for a period of 10 years from the East India Company of the permission to supply the inhabitants of Madras with tobacco: the plaintiffs alleged that the company, by their servants in India, had dispossessed the plaintiffs and had granted

E  a lease to others: the plaintiffs intended to sue the East India Company but in order to do so they needed the evidence of persons resident in the East Indies: they therefore prayed for a commission for the examination of witnesses and they required the company and the secretary to discover by whom and under what authority the second lease was granted. The plaintiffs wanted to know whether those who had dispossessed them were or were not servants of the company: if they were not they would be liable in

·F  their own persons. A demurrer to the bill was overruled. The fact that no action had been brought was no answer.

*Moodalay* v. *Morton* was much discussed in *Angel* v. *Angel* (1822) 1 L.J.O.S.Ch. 6. It was considered whether it was not exceptional to grant a commission to examine witnesses before an action was begun. Sir John Leach V.-C. said, at p. 9, in reference to *Moodalay* v. *Morton*: " The

G  plaintiff there required a commission, in order to know against whom the action should be brought." While in the present case there is now no suggestion that the commissioners are to be sued the justice of the case would just as much warrant help being given to the plaintiffs as to *Moodalay*.

Numerous cases firmly recognised the rule that a bill of discovery would not lie against a mere witness. *Fenton* v. *Hughes* (1802) 7 Ves.Jun. 287 was

H  but one of many cases which illustrated the rule. Someone who was not being sued and could not be sued would be regarded as a mere witness. The rule was recognised in *Mayor and Commonalty and Citizens of London* v. *Levy* (1803) 8 Ves.Jun. 398, where the demurrer was allowed

180
Lord Morris
of Borth-y-Gest       Norwich Pharmacal v. Customs & Excise (H.L.(E.))        [1974]

because the bill did not allege with sufficient certainty by whom the duties   A
which were claimed were payable.  Lord Eldon L.C. said, at p. 404:

> " But it has never yet been, nor can it be, laid down, that you can
> file a bill, not venturing to state, who are the persons, against whom
> the action is to be brought; not stating such circumstances as may
> enable the court, which must be taken to know the law, and therefore
> the liabilities of the defendants, to judge; but stating circumstances;   B
> and averring, that you have a right to an action against the defendants
> or some of them.   That of necessity admits, that some of the
> defendants may be only witnesses; and against them there is no right
> to file such a bill."

In the present case the appellants are able to say that they have rights
which they intend to pursue and rights which as far as can be known must   C
succeed: they know everything except the names and addresses of those
whom they desire and intend to sue: they further know that those names
and addresses appear on Customs entries in the possession of the com-
missioners and of which the commissioners have become possessed in
pursuance of their duties.   Is there any reason why the court should not
sanction and direct discovery?

I do not propose to refer to the majority of the cases which were cited   D
for our consideration because I agree with the conclusion reached both by
the learned judge and by the Court of Appeal that in general the cases
support the view that no independent action for discovery lies against a party
against whom no reasonable cause of action can be alleged or who is in the
position of a mere witness in the strict sense.   If this is, in general, the con-
clusion which is reached after a study of numerous decisions how, then, is   E
the decision in *Orr* v. *Diaper*, 4 Ch.D. 92 to be viewed?   No less an authority
than Mr. Bray (see *Bray on Discovery* (1885), pp. 40–41) regarded it as a
special case.   From the broad general rule Graham J. considered that there
could be exceptional cases and that, of such, *Orr* v. *Diaper* was an example.
We have studied and re-studied that case and it was the subject of very
careful analysis in the Court of Appeal and in particular by Buckley L.J.,   F
who most helpfully examined the report of the case in 25 W.R. 23.
The conclusion which I for my part have reached, in agreement with the
Court of Appeal, is that *Orr* v. *Diaper* perhaps need not on its facts have
been regarded as an exception to the broad general rule.   Yet I think it
was so regarded.   Nor I think did Mr. Bray regard the decision as heretical
but rather as being an exception from a broad general rule which permitted
of certain exceptions being made, and an exception which, in the particular   G
case, a court in the interests of justice had been warranted in making.   To
prevent a denial of justice must at all times be the aim of a judge and the
concluding words of Hall V.-C., 4 Ch.D. 92, 96 would surely have been
regarded as wholly commendable in any court of equity:

> " In this case the plaintiffs do not know, and cannot discover, who
> the persons are who have invaded their rights, and who may be said   H
> to have abstracted their property.   Their proceedings have come to a
> deadlock, and it would be a denial of justice if means could not be
> found in this court to assist the plaintiffs."

181

**A.C.**   Norwich Pharmacal v. Customs & Excise (H.L.(E.) )   Lord Morris of Borth-y-Gest

A But whatever may be the true view of *Orr* v. *Diaper* I think that it is very significant that it has been quoted as an authority and has not been over-ruled, with the result that after this lapse of time it may be regarded as furnishing a precedent for a course that justice would seem to demand.

We were referred to *Hunt* v. *Maniere* (1864) 34 Beav. 157, *Upmann* v. *Elkan* (1871) L.R. 12 Eq. 140 and *Upmann* v. *Forester* (1883) 24 Ch.D. 231. But the position of the commissioners is not I think to be equated

B with that of wharfingers or forwarding agents or shippers. The position of the commissioners is rather special. They are not engaged in commercial activities: they differ from those who voluntarily engage in trade for their own profit. In no ordinary sense are the commissioners in possession of goods though they are endowed with certain wide powers which they need to enable them to discharge their statutory duties. But they are not mere outsiders or volunteers or, so to speak, mere bystanders. They

C become obliged to have active concern with, to acquire positive knowledge of, and to exercise certain powers in respect of, the affairs of traders and the movement of goods.

What, then, was the position of the commissioners when they were asked by the plaintiffs voluntarily to give the names? Were they entitled or obliged to do so? In this connection the words of Lord Romilly M.R. in

D *Upmann* v. *Elkan*, L.R. 12 Eq. 140 were referred to. (It may here be mentioned that neither in that case nor in *Upmann* v. *Forester*, 24 Ch.D. 231 did the proceedings take the form of a bill of discovery.) Lord Romilly M.R. said, at p. 145:

" I begin by assuming (which facts are proved here) that the correspondent of a London house sends goods to a London dock company to the order of that London house, and that the goods have on them the spurious trade-mark or brand of a person to whom the goods do not

E belong, and who has not been concerned in sending them thither. The person whose trade-mark is fraudulently imitated ascertains this fact before the goods leave the dock: he applies to the dock company not to allow them to leave the dock with the spurious trade-mark, and he applies to the persons at whose order they stand, and asks them

F to give him all information respecting them, and to undertake not to sell or distribute the goods until the spurious brand is removed. I assume, then, in addition, that the person so applied to is innocent and ignorant of the fraud. It is his duty at once to give all the information required, and to undertake that the goods shall not be removed or dealt with until the spurious brand has been removed, and to offer to give all facilities to the person injured for that purpose."

G In my view, the position of the commissioners differed from that of the forwarding agents in the case cited. I think that the commissioners were at the date of the request to them warranted in declining voluntarily to give the names. It is quite different if the court having considered all aspects of the public interest authorises and requires them to give the names. But

H the information possessed by the commissioners was information which others had been obliged to give them under statutory compulsion and for some particular purposes. I think that the commissioners were correct in taking the view that they ought to treat the information possessed by them

182
Lord Morris
of-Borth-y-Gest
        Norwich Pharmacal v. Customs & Excise (H.L.(E.))        [1974]

as confidential. In this respect the provisions of section 3 of the Finance   A
Act 1967 are of importance. The commissioners are given power to dis-
close some information to some others if the Secretary of State is satisfied
that it would be in the national interest, but no power is given to sanction
the disclosure of " the price of the goods or the name of the importer of
the goods." This shows that the names of importers come within an area
indicated by the legislature as being one of special sensitivity: see also
section 127 of the Finance Act 1972.                                           B

    The next step is to consider whether the court should make the desired
order and whether it would be in the public interest or against the public
interest to make the order. If there was some statutory prohibition (such
as that contained in section 17 (2) of the Agricultural Marketing Act 1931:
see *Rowell* v. *Pratt* [1938] A.C. 101) then that, of course, would be con-
clusive. In the absence of any such prohibition it seems to me that in the   C
special circumstances of this case, and with some support from authority,
the interests of justice warrant the court in making the desired order unless
there are some features of the public interest which are of such weight as
to out-balance the public interest of advancing the cause of justice. I can
well appreciate the importance of the considerations which were advanced
and which undoubtedly carry some weight, but having considered them
in relation to the very limited order now sought I am firmly of the view    D
that the balance of the public interest warrants the making of the order
as now requested. I consider that the fair order as to costs is that the
plaintiffs should pay to the commissioners their costs at first instance and
that there should be no order as to costs in the Court of Appeal and in
this House.

    I would allow the appeal accordingly.                                    E

    VISCOUNT DILHORNE. My Lords, the appellants hold the patent for
a chemical called furazolidone which is used in poultry food. The
respondents publish monthly statistics of the goods imported into the
United Kingdom. Those statistics revealed that in 32 months between
March 1960 and February 1970 furazolidone was imported into this
country, but they do not reveal who were the importers. Each importa-   F
tion, the appellants say, constituted an infringement of their patent,
though they say that it is conceivable that some of the chemical sold by
them was reimported into this country, in which case there would be no
infringement. The appellants say that although there must have been
infringement in, if not all, at least the majority of these importations, they
are unable to take any steps to protect their patent as they do not know   G
and cannot find out, unless successful in these proceedings, the names of
the importers, all of which are known to the respondents.

    On June 29, 1967, the appellants' solicitors wrote to the respondents
asking for the names, not only of the consignees, but also of the consignors
of the imported furazolidone and alternatively alleging that they were
under a duty to seize and forfeit the imported furazolidone. The
respondents in reply said that they were under no such duty and that in   H
the absence of statutory authority it was impossible for them to disclose
the names of the importers.

A.C.          Norwich Pharmacal v. Customs & Excise (H.L.(E.) )   Viscount Dilhorne

A  On February 4, 1969, the appellants issued a writ against the respondents in which they claimed a declaration that the respondents were infringing or enabling or assisting others to infringe their patent, an injunction to restrain them from doing so and an injunction to compel them to forfeit the imported furazolidone. The writ was later amended to include a claim for discovery by the respondents of the names and addresses of the consignors and consignees and of all documents which were or had been in their possession relating to the imported consignments.

B  On August 5, 1970, the appellants issued another writ claiming similar relief in respect of later importations in five months in 1968, 1969 and 1970. The two actions were consolidated and a summons for directions was taken out on March 3, 1971. It was adjourned into court and came before Graham J. After a five day hearing he gave judgment dealing with all the appellants' claims. He rejected the claim that the respondents were themselves infringers of the patent and also the claim that they were under

C  a duty to forfeit the furazolidone.

By their defence the respondents admitted the validity of the letters patent and at the hearing before Graham J. Mr. Walton for the appellants said that if the respondents gave the information asked for it was improbable that the question of infringement would be pressed against them. He

D  agreed that the proceedings could be treated as a pure action for discovery for the production of information as to the identity of the importers. And so although the claims in respect of infringement and forfeiture were not abandoned until the hearing in this House, the proceedings have continued to be treated as those for discovery of the names of the importers alone. Graham J. held that that discovery should be made and made an order in a form agreed between the parties.

E  In the Court of Appeal his decision was reversed, the court holding that the appellants had no conceivable cause of action against the respondents and that they could not bring an action merely for the purpose of discovering from them the names of the importers. They also held that the information required was received in confidence by the respondents and that the balance of public interest demanded that the respondents

F  should keep the names and addresses of the importers secret.

So there are three questions to be decided. First, on the facts of this case, can the respondents, who are not themselves wrongdoers, be ordered to disclose the names of the importers who, the validity of the patent being admitted, are wrongdoers. Secondly, in the exercise of the discretion vested in the court, should they be ordered to do so; and thirdly, are the respondents in any event prohibited from disclosing that information.

G  Numerous authorities were referred to on the first question. Few of them I found of much assistance. Many of them are very briefly reported and throw little, if any, light on the principles to be applied. The most recent and the most relevant case on which the appellants relied was decided nearly a hundred years ago, Orr v. Diaper (1876) 4 Ch.D. 92; 25 W.R. 23.

In that case the plaintiffs were sewing cotton and thread manufacturers.

H  The cottons and threads were made up for sale in different coloured papers and specially designed tickets were used to distinguish them from the cottons and threads of other manufacturers. The defendants were shippers and the plaintiffs discovered that they had for some time been shipping to

A   Valparaiso and elsewhere cotton thread packed in the same manner as their own and bearing the same tickets. The plaintiffs sought to find out the names and addresses of the parties from whom they had received the cotton for shipment and wrote saying they quite understood that the defendants were innocent of any intention to act prejudicially to them and that if they gave the names and addresses " the necessity for further pro- ceedings would cease." No reply was sent and proceedings were

B   commenced, the statement of claim alleging that the defendants " well knew the tickets and of the injury " and that they ought to give the information that was sought in aid of proceedings in contemplation by the plaintiffs to restrain the piracy of their tickets and that the proceedings contemplated could not be maintained without the discovery sought.

The defendants demurred. There are many differences in the report of the case in the Law Reports and in the Weekly Reporter, both in the

C   report of the arguments advanced on behalf of the defendants, counsel for the plaintiff not being called on, and in the report of the judgment of Hall V.-C.

It appears from the reports of the arguments that the main point taken on demurrer was that discovery was not obtainable from persons who will not be and who are not intended to be parties to an action and that to be

D   granted, " the discovery sought must be material, either to the relief prayed by the bill, or to some other suit actually instituted, or capable of being instituted ": 4 Ch.D. 92, 94 (*Mitford on Pleading*, 4th ed. (1827), p. 191, 3rd ed. (1814), p. 155) (4 Ch.D., at p. 94); and no relief was sought against the defendants and no other suit instituted or capable of being instituted against them. In the report in the Weekly Reporter, 25 W.R.

E   at p. 24, it is said that it was submitted that " These defendants are merely witnesses, and you cannot make a mere witness a party to obtain discovery " and then it was recognised that there may be circumstances under which discovery may be sought against persons who otherwise would not be parties to the action. Two examples were given: first, the case of a corporation where a person holding a representative position is made a party who other- wise would only be a witness,—that, it was said, was an exception to the rule,

F   —and, secondly, where there is statutory authority compelling discovery: *Dixon* v. *Enoch* (1872) L.R. 13 Eq. 394. In that case Wickens V.-C. said that the object of the Act was to enable the plaintiff to extract from the defendant the name or names of some other person or persons other than himself who might be sued at law. He then said, at p. 400:

G   " The supposition that if the plaintiff knows the name of one proprie- tor he can make him tell the names of all the others, but that, not knowing one name, he cannot get the information from the printer and publisher, who is the agent of the proprietors, and is put forth to stand between them and the public, is one that does not commend itself to one's common sense, and is not to be accepted without absolute necessity."

H   Hall V.-C. began his judgment with the citation of this passage from Wickens V.-C.'s judgment, saying, 25 W.R. at p. 24: " That is the view I take of this case. Nothing but ' absolute necessity ' will compel me to allow this demurrer." He clearly thought that Wickens V.-C.'s observa-

**A.C.**      Norwich Pharmacal v. Customs & Excise (H.L.(E.) )   Viscount Dilhorne

A   tions, in relation to a case where there was a defendant being sued for libel and a statute provided for the disclosure, were applicable to a case when the person from whom discovery was sought was not in fact a defendant from whom relief was sought.

In the report in the Weekly Reporter, at p. 24, it is said that he expressed the opinion that the position of the defendants in shipping the goods " might subject them to proceedings by way of injunction to restrain them
B   from continuing to ship these goods." He rejected the contention that they were mere witnesses, saying, according to the report of the Law Reports, 4 Ch.D., at p. 96: " their position, they being the actual shippers, is different from that of mere witnesses "; and according to the report in the Weekly Reporter, at p. 25:

C   " But I think that the position of the defendants is different from that of a mere witness, . . . That view of the case seems to me to bring it within the rule as stated in *Mitford*."

He ended his judgment by saying according to the Law Reports, 4 Ch.D., at p. 96: " . . . it would be a denial of justice if means could not be found in this court to assist the plaintiffs "; and overruled the demurrer.

As I read the reports of his judgment he based his conclusion on two
D   grounds: first, that the defendants were not mere witnesses and, secondly, on the fact that in his opinion they could themselves have been sued.

Whether he would have overruled the demurrer if he had been of the opinion that the defendants could not have had proceedings brought against them apart from the claim for discovery is not clear, though it would seem probable from Hall V.-C.'s other observations to which I have referred that he would have done all in his power to assist the plaintiffs.

E   In *Plummer* v. *May* (1750) 1 Ves.Sen. 426 Lord Hardwicke L.C. said that a person could not be made a defendant to a bill

" who is merely a witness, in order to have a discovery of what he can say to the matter, . . . But as against a party interested, the plaintiff is entitled to have a discovery from him, if he is charged to be con-
F   cerned in the fraud. . . ."

So the rule that discovery is not obtainable from a mere witness is of very considerable antiquity.

There are some more cases decided before *Orr* v. *Diaper* to which I must now refer. The first of these is *Moodalay* v. *Morton* (1785) 1 Bro.C.C. 469. There discovery was sought from the East India Company in order
G   to discover by what authority the plaintiffs were dispossessed of a lease for supplying the inhabitants of Madras with tobacco. The plaintiffs wanted to find out if the persons who had dispossessed them were acting as servants of the company. If they were, then the plaintiffs intended to sue the company. Lord Kenyon M.R. held that the plaintiffs were entitled to the discovery sought.

H   It was sought not to ascertain the identity of anyone but whether the company was responsible for the injury the plaintiffs had suffered. I regard the case as an authority for the proposition that discovery can be granted before an action is instituted, but it was information, not names,

that was sought, information to discover whether the company were responsible, not to identify the wrongdoer.

In *Mayor and Commonalty and Citizens of London* v. *Levy* (1803) 8 Ves.Jun. 398 in which *Moodalay* v. *Morton* was not cited, the defendants had refused to discover whose property were certain goods and without which discovery an action of law could not be proceeded with. Lord Eldon L.C., in the course of his judgment, said, at p. 404:

" That, where the bill avers, that an action is brought, or, where the necessary effect in law of the case stated by the bill appears to be, that the plaintiff has a right to bring an action, he has a right to a discovery, to aid that action, so alleged to be brought, or which he appears to have a right and an intention to bring, cannot be disputed. But it has never yet been, nor can it be, laid down, that you can file a bill, not venturing to state, who are the persons, against whom the action is to be brought; . . . but stating circumstances; and averring, that you have a right to an action against the defendants or some of them.  That of necessity admits, that some of the defendants may be only witnesses; and against them there is no right to file such a bill."

*Moodalay* v. *Morton*, 1 Bro.C.C. 469 was commented on in *Angel* v. *Angel* (1882) 1 L.J.O.S.Ch. 6, 9, where Sir John Leach V.-C. said it was an exception to the general rule

" for it would be absurd to demand that an action should be brought before the commission is granted, where the purpose of the commission is to ascertain against whom the action ought to be brought."

I do not see that it is possible to reconcile Lord Eldon L.C.'s observations with the decision in *Moodalay* v. *Morton* except upon the narrow ground that in *Moodalay* v. *Morton* the name of the proposed defendant was known and the company would be sued if discovery showed it to be responsible.  It would indeed be odd if you could get discovery if you named the party you intended to sue if you could discover his responsibility, but that you could not get discovery though you had suffered an injury if you were not able to name the person who might be responsible.

In *Story on Equity Jurisprudence*, 2nd Eng. ed. (1892), p. 1011, para. 1483, it is stated:

" . . . in general, it was necessary, in order to maintain a bill of discovery, that an action should be already commenced in another court, to which it should be auxiliary.  There were exceptions to this rule, as where the object of discovery was to ascertain who was the proper party against whom the suit should be brought.  But these were of rare occurrence."

A similar passage appears in the first edition and in a footnote to it *Moodalay* v. *Morton, Angel* v. *Angel* and *City of London* v. *Levy* are cited.  *Story* thus does not appear to have thought that the right to discovery of the proper party against whom the suit should be brought depended upon the ability of the plaintiff to give his name.

In *Queen of Portugal* v. *Glyn* (1840) 7 Cl. & F. 466, the majority in this House, Lord Cottenham L.C., Lord Lyndhurst and Lord Brougham,

187

**A.C.**        Norwich Pharmacal v. Customs & Excise (H.L.(E.) )   Viscount Dilhorne

A   Lord Wynford dissenting, held that a bill of discovery could not be granted against the Queen of Portugal who was not a party to an action brought against Glyns, the bankers, but who was clearly an interested party in that action as it was brought by her agent, Lord Cottenham L.C. holding that it was a long established rule that discovery on a bill would only be granted against a party to the action. *Moodalay* v. *Morton*, 1 Bro.C.C. 469 and *Angel* v. *Angel*, 1 L.J.O.S.Ch. 6 were not cited and I do

B   not consider that the decisions in those cases, *Moodalay* v. *Morton* being regarded as an exception to the general rule, are to be regarded as inferen-. tially overruled by this decision of this House.

*Hunt* v. *Maniere* (1864) 34 Beav. 157 and *Upmann* v. *Elkan* (1871) L.R. 12 Eq. 140 were neither of them cases on discovery. In *Hunt* v. *Maniere* the question was whether wharfingers had rightly refused to deliver up wine with a false label to the consignee. I do not think that this case

C   assists. In *Upmann* v. *Elkan*, L.R. 12 Eq. 140 though the dispute was about costs there were observations by Lord Romilly M.R. at first instance and, by Lord Hatherley L.C. on appeal (7 Ch.App. 130), which are of interest.

There a bill had been filed praying an injunction to restrain Elkans, who were forwarding agents and the consignees, from removing boxes of

D   cigars marked falsely with the plaintiffs' brand from St. Katharine's Docks. With regard to the St. Katharine Dock Company who were also joined as defendants, Lord Romilly M.R. said that there was not the least pretence for making them parties to the suit and, at p. 145, that it was the duty of the consignees, despite their innocence and ignorance of the fraud " at once to give all the information required," and to undertake that the goods should not be removed from their possession. Before the bill was filed the

E   defendants had disclosed the names of the consignors and ultimate con- signees. In the Court of Appeal (1871) 7 Ch.App. 130 it was held, affirming the decision of Lord Romilly M.R., that the fact that Elkans were agents and merely carriers was no defence to the suit, and Lord Hatherley L.C., at p. 133, said it was the business of Elkans, once the complaint was made, to give all proper information.

F   This case, while it states the duties of consignees of goods where complaint is made that they are spurious, does not decide that discovery could have been ordered against Elkans.

From these decisions it is apparent that little support is given to the decision in *Orr* v. *Diaper*, 4 Ch.D. 92. The most helpful case is *Moodalay* v. *Morton*, 1 Bro.C.C. 469. However, *Orr* v. *Diaper* has not so far as I am aware, ever been questioned or criticised in any subsequent case or in any

G   textbook and the principle it enunciates has been followed on several occasions in other countries. In the textbooks, in addition to the observa- tions of Story J. in his book on *Equity Jurisprudence* to which I have referred, there are statements to a similar effect in *Bray on Discovery* (1885), p. 40, in *Sichel & Chance, Interrogatories and Discovery* (1883), p. 180, and in *Ross on the Law of Discovery* (1912), p. 11, and it is not without

H   interest to note that in the third edition of *Snell's Equity* published in 1874 before the decision in *Orr* v. *Diaper*, it is said, at p. 516, that there are exceptions to the general rule that to maintain a bill of discovery an action should have been commenced in another court: " as where the object of

188
Viscount Dilhorne   Norwich Pharmacal v. Customs & Excise (H.L.(E.) )          [1974]

discovery is to ascertain who is the proper party against whom the suit
should be brought.   But these are of rare occurrence."

    In these circumstances it is, in my opinion, far too late to challenge that
decision.   What exactly did it decide?   In my view, that a discovery can be
granted against a person who is not a mere witness to discover, the fact of
some wrongdoing being established, who was responsible for it.   The " mere
witness " rule has lost a great deal of its importance since the Common
Law Procedure Act removed the bar to persons interested giving evidence,
but it still has significance.   Someone involved in the transaction is not a
mere witness.   If he could be sued, even though there be no intention of
suing him, he is not a mere witness.   In *Orr* v. *Diaper* Diapers were in-
volved, so were Elkans in *Upmann* v. *Elkan*, L.R. 12 Eq. 140, so was the
East India Company in *Moodalay* v. *Morton*, 1 Bro.C.C. 469 and it matters
not that the involvement or participation was innocent and in ignorance of
the wrongdoing.

    Are the respondents to be regarded as so involved in this case?   I think
the answer is yes.   They were not, it is true, involved of their own volition.
They were involved in the performance of their statutory duty.   The
furazolidone was in Customs charge until cleared and the commissioners
could control its movement until cleared (Customs and Excise Act 1952,
s. 22 (1) ).   I do not see how it can be said that they were not involved in
the importation of this chemical.

    So for these reasons in my opinion the answer to the first question I
formulated, can the respondents be ordered to disclose the names of the
importers? is in the affirmative.   As to the second question, should they be
ordered to do so?   I think that the answer is also yes, unless in consequence
of their special position the answer to the third question is in the negative.
Subject to the public interest in protecting the confidentiality of information
given to Customs, in my opinion it is clearly in the public interest and right
for the protection of patent holders, where the validity of the patent is
accepted and the infringement of it not disputed, that they should be able to
obtain by discovery the names and addresses of the wrongdoers from
someone involved but not a party to the wrongdoing.

    I now turn to the third question.   In their list of documents the
respondents asserted that they were precluded by law from disclosing the
names of the importers and that that disclosure would be injurious to the
public interest.   In their notice of appeal to the Court of Appeal they gave
notice that the grounds of appeal were:

      " Information about a taxpayer or his affairs furnished to a revenue
      collecting department of the Crown pursuant to the requirements of a
      statute is confidential and, in circumstances in which its disclosure is
      not authorised by statute, exceptionally strong reasons must exist to
      permit its disclosure to persons outside that department."

In their case they contend that discovery should not be ordered because
disclosure would be contrary to the public interest on two grounds (1) that
the information is given to the respondents and their officers in confidence
and under compulsion in order that the respondents may perform their
statutory duties.   " The informant " it is said " is entitled to assume that
information for this purpose will not be disclosed to others for a different

A

B

C

D

E

F

G

H

A.C.    Norwich Pharmacal v. Customs & Excise (H.L.(E.) )  Viscount Dilhorne

A  purpose ": and (2) that it is essential that the confidence of importers should be respected in order to ensure that full and candid information continues to be given by them. " The furnishing of the information " they submit " would inhibit importers from making full and frank disclosure." The affidavit of Sir Louis Petch, the Chairman of the Commissioners of Customs and Excise, sets out these contentions more fully.

B  The respondents were unable to point to any statutory provision prohibiting them from disclosing the names of the importers. I do not accept the proposition that all information given to a government department is to be treated as confidential and protected from disclosure, but I agree that information of a personal character obtained in the exercise of statutory powers, information of such a character that the giver of it would not expect it to be used for any purpose other than that for which it is given, or disclosed to any person not concerned with that purpose, is to be regarded as protected from disclosure, even though there is no statutory prohibition of its disclosure. But not all information given to a government department, whether voluntarily or under compulsion is of this confidential character and the question is whether the names of the importers of the furazolidone were given in confidence. I do not think that that is established. The names and addresses of the importers had to be given to the master of the ship and made known to all those taking part in securing the transit of the chemicals. Presumably the parcels of furazolidone had on them the names and addresses of the consignees for all to see, though they may, I do not know, have not disclosed that the contents of the parcels were furazolidone. The documents completed for the transit of the chemicals and for Customs which show the names of the consignees and the contents of the parcels do not seem to me more confidential than consignment notes completed for British Railways and British Road Services.

I do not doubt that a great deal of the information obtained by Customs is of a highly confidential character which it would be most improper for them to disclose but I do not consider that this information, even if it be of a confidential character, was of a highly confidential nature.

F  I do not forget that by section 127 of the Finance Act 1972, it is provided that no obligation as to secrecy or other restriction upon the disclosure of information imposed by statute or otherwise is to prevent the communication of information by the Commissioners of Inland Revenue to the Commissioners of Customs and Excise and vice versa, or that the disclosure of information obtained by one from the other is prohibited by section 127 (2), save for the purposes there specified, and I do not forget that by section 3 of the Finance Act 1967, power is given to the commissioners to disclose, on it being notified to them by the Secretary of State that it is in the national interest, that certain information about imported goods should be given, and that, though by order the Secretary of State can add to the description of information which can be disclosed, he is expressly debarred from authorising the disclosure of the price of the goods or the name of the importer.

H  I can well understand that Customs, taking the view that they are prohibited by law from disclosing information obtained by them, would require a provision expressly authorising disclosure to be included in these

Acts. The reasons for the prohibition in section 3 of the Act of 1967 of          A
the Secretary of State requiring information to be given as to the name of
an importer are not apparent from the section. It may have been, I do
not know, on account of the " candour " argument of Customs and Excise.

The inclusion of these provisions in these two recent Acts does not
appear to me to lead to the conclusion that the assumption that Customs
and Excise are prohibited by law from disclosing all information obtained
by them is well based. Much of the information they obtain is no doubt          B
of such a character that it is implicit that it is not to be used or disclosed
for any purpose other than that for which it is given. The question here is
whether the names of importers of furazolidone in infringement of the
patent are of that character.

For the reasons I have given I do not think they are. If any degree of
confidentiality is attached to them I think it must be a low degree. I must          C
confess that I am not in the least impressed by the " candour " argument.
I really cannot conceive it to be realistic to suggest that the vast majority
of importers who do not infringe patents or do other wrongs, will be in the
least deterred from giving proper information to Customs by the know-
ledge that pursuant to an order of the court the names of the wrongdoers
are disclosed by Customs.

Having said this, I want to make it clear that in my opinion Customs          D
and Excise have acted perfectly properly throughout these proceedings.
Applications for discovery by persons who are not sued and who have
done no wrong were a rare occurrence in the last century and are even
rarer in this. Customs are right to be solicitous for the interests of those
who give them information. They were right initially to refuse the
appellants' request. Indeed I think that it may well be that in cases which          E
are not absolutely on all fours with this, they would be right in future to
refuse disclosure except on the order of the court.

And the question is, should the court now order it? If a degree of
confidentiality does attach to the names and addresses of the importers, I
think that on the balance of national interest the interests of justice in this
case far outweigh any interest there may be in non-disclosure.

The appellants now only seek discovery of the names and addresses of          F
the consignees of the imported furazolidone in the last six years and,
in my opinion, that discovery should be ordered in the form which has
been agreed between the parties.

As to costs, I agree with the order proposed by my noble and learned
friend, Lord Reid.

For the reasons I have stated, in my opinion this appeal should be          G
allowed.

LORD CROSS OF CHELSEA. My Lords, on the appellants' summons for
inspection Graham J. held that the respondents had not infringed the
patent and that the goods were not liable to forfeiture under section 44 of
the Customs and Excise Act 1952, as " prohibited goods "; but that
nevertheless they were bound to disclose the names for which the appellants          H
were asking. His order dated December 8, 1971, which gave effect to
this decision was technically an interlocutory order but in reality it dis-
posed of all the issues raised in the consolidated actions. The respondents

A appealed to the Court of Appeal which by a judgment given on March 27, 1972, agreed with the judge on the question of infringement and on the construction of section 44; but held that, even apart from the question of privilege, the respondents, not being infringers, were under no obligation to disclose the names of the importers; and that in any case it would have been contrary to the public interest to have ordered them to disclose them. On their appeal to this House the appellants abandoned the con-

B tention that the respondents had infringed the patent. They did not, as I understood, abandon their contention that goods imported in infringement of a patent are goods " imported contrary to a prohibition in force with respect thereto under or by virtue of an enactment " within the meaning of section 44; but—in common I think with all your Lordships—I have no doubt that Graham J. and the Court of Appeal were right in rejecting this contention. The action falls, therefore, to be treated as a pure action

C for discovery and the questions to be decided are (A) whether in the circumstances the respondents, although not themselves infringers, would be bound—apart from any question of privilege—to make the discovery asked and (B) whether, if so, it would be contrary to the public interest to order them to make it. For the purpose of answering these questions one must make three assumptions in favour of the appellants, *first* that

D the patent is valid; *secondly*, that the patent has been infringed by importers whose names are known to the respondents; and *thirdly*, that the appellants cannot discover the identity of the infringers unless the respondents disclose it to them.

The most recent English authority to which the appellants could refer us in support of the proposition that the court can entertain an action by A against B in which the only relief asked is that B disclose to A the identity

E of someone who has to his knowledge infringed A's rights, in order to enable A to bring an action against him is the case of *Orr* v. *Diaper* decided by Hall V.-C. in 1876 and reported in 4 Ch.D. 92 and, more fully, in 25 W.R. 23. Unfortunately, however, in order to understand the argument and the judgment in that case it is necessary to plunge still further into the past and consider the practice of the Court of Chancery with regard to

F bills of discovery. I say " unfortunately " because the lawyer of today can at best have only a superficial understanding of a procedure developed when law and equity were administered in separate courts and the parties to common law actions were not permitted to give evidence. A further source of difficulty is that the Chancery reports before the time of Lord Eldon L.C. often take the form of brief notes, which may have been useful to those for whose benefit they were published but mean very little to the modern

G reader. I am, therefore, far from confident that what I am about to say is an accurate summary of the position. One starts with the distinction which came to be drawn by equity lawyers between a bill of relief and a bill of discovery. Since the ordinary Chancery bill asking for relief in equity always included a request that the defendant be ordered to answer on oath a number of interrogatories framed to elicit admissions which would help the petitioner to prove the case set out earlier in the bill it can be said

H that every Chancery bill was in a sense a bill of discovery. But a bill of discovery properly so called was a bill which simply asked for the disclosure of facts known to the defendant or of documents in his possession to aid the

petitioner in prosecuting or defending other proceedings and asked no other   A
equitable relief save, if the petitioner was the defendant to an action at law,
an injunction staying that action until the discovery was given.   A defendant
from whom discovery was sought either by a bill of relief or by a bill of
discovery might object to giving the discovery on the ground that he had no
" interest " in the proceedings but was " a mere witness " and ought not
to be compelled to give his evidence before the hearing.   To this rule   B
exceptions were allowed in the interests of justice but by the end of the 18th
century the list of exceptions was closed.   Further, what constituted an
" interest " for the purpose of the rule came to be defined.   In the case of a
bill of relief it was such an interest as that a decree could be made against
him or that he would be affected by the decree.   As to a bill of discovery it
was finally decided by this House in the *Queen of Portugal* v. *Glyn*, 7 Cl.   C
& F. 466 that such a bill could not be maintained against a person who
was not a party to the record in the action in aid of which the discovery
was sought even though he was deeply interested in its success.   It is,
incidentally, not without interest to observe that whereas in earlier days, in
particular at the time of the disputes between Lord Ellesmere L.C. and
Coke C.J., the common lawyers had bitterly resented the granting of injunc-
tions by the Chancellor staying proceedings at law where the defendant   D
could make out a prima facie case of fraud on the part of the plaintiff with
which the common law was unable to deal, in the case of the *Queen of
Portugal* v. *Glyn* it was common lawyers—Lord Abinger C.B. and Lord
Wynford—who thought that an injunction could and should be granted to
stay an action by an agent of the Queen on bills of exchange to which, if the
allegations in the bill were true, she was not " in conscience " entitled, whereas
it was the equity lawyer, Lord Cottenham L.C., who gave the leading speech   E
upholding the demurrer to the bill of discovery on the ground that the Queen
was not a party to the record at law and could in theory have been called
as a witness by the defendant.   But the " mere witness " rule has in principle
nothing to do with the question whether or not a defendant to a bill should
be obliged to disclose the identity of someone against whom the plaintiff
wishes to claim relief.   In such cases there can be no question of calling
the defendant to give the evidence at the hearing since without the dis-   F
closure of the name proceedings cannot be brought at all.   In this field it
was settled that if a party was properly made a defendant to a bill of relief
the petitioner was entitled to discovery from him of the existence or where-
abouts of other persons not parties in order that they might be made parties;
but whether one could bring a bill of discovery in order to find out whom
to sue in proceedings which you had not yet brought was not entirely clear.
On one side reliance could be placed on *Moodalay* v. *Morton*, 1 Bro.C.C.   G
469; 2 Dick. 652 decided in 1785 by Lord Kenyon M.R.   There the plaintiff
who said that the East India Company had granted him the right to supply
the inhabitants of Madras with tobacco for a term of years and that persons
who were servants of the company had dispossessed him and purported to
grant a lease of the right to someone else filed a bill of discovery against the
company and Morton their secretary asking them to disclose by whom and   H
under what authority the second lease had been made so that he might know
how to frame the action at law which he wished to bring in respect of the
injury done to him.   Obviously it was material for that purpose for him to

193

A.C.   Norwich Pharmacal v. Customs & Excise (H.L.(E.))   Lord Cross of Chelsea

A  discover whether those who had dispossessed him were acting by the authority of the company or not.  That case differs from the present case in that there the discovery might well have shown that the proper defendant to the proposed action was in fact the person—the East India Company—from whom discovery was sought; but that does not seem a very substantial distinction.  Further in *Angel* v. *Angel* (1822) 1 L.J.O.S.Ch. 6 Sir John Leach V.-C. appears to have regarded *Moodalay* v. *Morton*, 1 Bro.C.C.

B  469, as an authority showing that a " would be " plaintiff at law could bring a bill of discovery in equity to discover against whom the action should be brought.  On the other side reliance could be placed on some language used by Lord Eldon L.C. in his judgment in *Mayor and Commonalty and Citizens of London* v. *Levy*, 8 Ves.Jr. 398, 402, 404—though *Moodalay* v. *Morton* was not referred to in that case and the decision can be justified on the ground that the bill was a " fishing enquiry "

C  by plaintiffs who were trying to find out whether their rights had in fact been infringed.  It is noteworthy that Story in his *Equity Jurisprudence*, 2nd ed. (1839), para. 1483, states on the authority of *Moodalay* v. *Morton* and *Angel* v. *Angel* that a bill of discovery may be brought when the object of the discovery is to ascertain who is the proper party against whom a suit should be brought and that as his note also contains a reference to the *Mayor of London* v. *Levy* he presumably did not consider

D  that anything which Lord Eldon L.C. said in that case cast any doubt on the general principle.

With this by way of introduction one can now turn to *Orr* v. *Diaper*, 4 Ch.D. 92—though it is not irrelevant to bear in mind that since 1851 the parties to civil actions at law had been able to give evidence and that by the Judicature Act a single court had been established in place of the

E  separate courts of law and equity in which both law and equity could be administered concurrently with the proviso that in case of conflict the rules of equity should prevail.

*Orr* v. *Diaper* was argued on demurrer.  The facts alleged in the statement of claim which must be taken to have been true were that the plaintiffs were manufacturers of sewing cotton which they packed in a

F  distinctive way and which was sold abroad in—among other countries— Chile; that sewing cotton of an inferior quality packed according to their style and bearing counterfeit tickets had been sold in Chile for the past few years and that in April 1876 they discovered that the defendants who were shippers in Liverpool had been for some years and were still " shipping " these goods to Valparaiso.  On April 10, 1876, the plaintiffs' solicitors asked the defendants to give them the names of the consignors and, on their

G  refusal to do so, started an action on April 25 asking for discovery of the names and addresses of the consignors of the goods bearing the counterfeit tickets—" in aid of proceedings now in contemplation by the plaintiffs to restrain the piracy of the said tickets " which could not, as they said, be maintained without the discovery sought.  There is no doubt that if these allegations were established—and the demurrer of course proceeded on the

H  footing that they were established—the plaintiff could have obtained an injunction against Messrs. Diaper, in proceedings framed for that purpose, to restrain them from continuing to ship goods which were being " passed off " as the plaintiffs' goods.  This appears from *Upmann* v. *Elkan*, L.R.

194
Lord Cross
of Chelsea          Norwich Pharmacal v. Customs & Excise (H.L.(E.))          [1974]

12 Eq. 140; 7 Ch.App. 130. The relevant facts there were that on June 14, 1869, Messrs. Elkan who were continental forwarding agents carrying on business in London received a letter from a firm in Hamburg saying that they had shipped to them a case of cigars containing cigars of various brands, requesting them to pay the duty thereon and to forward the contents to various persons resident in England whose names and addresses were given. The case duly arrived and was warehoused with the St. Katharine's Dock Company. The plaintiffs who were cigar manufacturers discovered— somehow or other—that the cigars which were not of their manufacture were packed in boxes bearing an imitation of their brand and on June 19. their solicitors told Messrs. Elkan, who said that up to that time they had no reason to suspect that anything was wrong, that the cigars consigned to them bore a forged brand. After, as they said, verifying that this was indeed the fact, Messrs. Elkan offered to give the plaintiffs the names of the consignors and actually gave them the names on July 8. Meanwhile, on July 1, the plaintiffs filed a bill against Messrs. Elkan in the dock company asking for an injunction to restrain Messrs. Elkan from removing the cigars from the docks and from infringing their mark and asking for damages. They obtained an ex parte injunction on July 2. A motion for interim injunction was made on July 8 which stood over until July 15 on Messrs. Elkan giving an undertaking, and on July 15 the injunction was granted—Messrs. Elkan expressing their willingness to act as the court should direct but saying that they preferred to have an injunction granted against them to simply continuing their undertaking. When the suit came on the court held that Messrs. Elkan were not privy to the infringement of the mark and the dispute became a dispute as to costs—but to resolve it the court had to decide what were the rights and duties of the parties on the footing that Messrs. Elkan had no knowledge of the fraud before the plaintiffs' solicitors told them of it. Lord Romilly M.R., at p. 145, expressed the view that as soon as Messrs. Elkan were told of the fraud it was their duty to give the plaintiffs the information as to the identity of the consignors for which they were asking and to undertake that the goods should not be taken from the warehouse until the spurious brand had been removed. He added that persons in the position of Messrs. Elkan could not reasonably complain if proceedings were started against them before they gave the information. It was their misfortune that they had dishonest correspondents. In the result on Messrs. Elkan undertaking that if any fresh cigars should be sent to them bearing the plaintiffs' brand they would at once give the plaintiffs notice, he made no order as to costs as between the plaintiffs and Messrs. Elkan—leaving each side to pay its own. That decision was affirmed on appeal by Lord Hatherley L.C, who agreed with what Lord Romilly M.R. had said as to the duty of Messrs. Elkan on hearing of the fraud.

To return now to *Orr* v. *Diaper*, 4 Ch.D. 92—counsel for the defendant pointed out that the action was a pure action for discovery, that no relief was asked against his clients beyond the disclosure of names to enable the plaintiff to bring proceedings against the consignors, and he submitted that the "mere witness" rule applied. When Hall V.-C. asked whether the plaintiff could not add to his suit a claim for relief in equity against the defendant counsel referred to the rule (laid down by Lord Eldon L.C. in

A *Butterworth* v. *Bailey* (1808) 15 Ves.Jun. 358) that a bill of discovery could not be turned by amendment into a bill for relief. The Vice-Chancellor—perhaps unfortunately—did not call on counsel for the plaintiff. If he had done so it may be that counsel would have pointed out that the " mere witness " rule could have no application to a case where all that was being asked for was the identity of a wrongdoer whom the plaintiff would be unable to sue unless the defendant gave it to him. As it was the judge overruled

B the demurrer on the ground that the defendant was not a " mere witness " because on the facts taken to be admitted the plaintiff could have obtained an injunction against him if he had chosen to apply for one. To make the right of a plaintiff to obtain the sort of discovery which was being sought in the present case dependent on whether *Orr* v. *Diaper* and is being sought in the present case dependent on whether or not the plaintiff could have obtained some relief against the defendant if he had chosen to ask for it is to my mind utterly illogical. Suppose that

C *Diaper* after having innocently and unwittingly shipped infringing goods for some consignor for several years had gone out of business shortly before the plaintiff asked him for the consignor's name. In such a state of facts the plaintiff could not have obtained any relief against him since he was not continuing to ship infringing goods nor was there any danger that he would do so in the future. Yet if Lord Romilly M.R. and Lord Hatherley L.C. were right in saying that a man who has become innocently mixed up in

D fraudulent trading is under a duty to disclose the name of the wrongdoer to the injured party in order to enable him to bring his action that duty must be just the same in a case where because, for example, some infringing goods are still in his possession an injunction could be obtained against him and a case such as I have supposed where it could not. Bray, in his well-known work on *Discovery* published in 1885 treats *Orr* v. *Diaper*,

E 4 Ch.D. 92 as a modern example of what he regards as the old principle that a bill of discovery might be filed against a person in order to discover the names of other persons for the purpose of bringing an action against them although no proceedings were to be brought against the defendant to the bill—and makes no reference to the fact that in *Orr* v. *Diaper* it so happened that such proceedings could have been brought—see the note on p. 40. On p. 614 he suggests that the language used by Lord Eldon

F in *Mayor of London* v. *Levy*, 8 Ves.Jun. 398 " perhaps requires some little qualification." The same view of *Orr* v. *Diaper* was taken in 1887 by the Supreme Court of Massachusetts in *Post* v. *Toledo, Cincinnati and St. Louis Railroad Co.* (1887) 11 N.E.Rep. 540, There an Ohio corporation had recovered judgment in Ohio against another Ohio corporation under whose statutes its stockholders were personally responsible for its debts.. The

G business of the debtor corporation was conducted in Massachusetts and the creditor corporation brought a bill of discovery in the court of that state against the debtor corporation and its officers who were resident in Massachusetts for discovery of the names of its stockholders so that the creditor corporation could take proceedings against them in Ohio. Although the debtor corporation was made a defendant it was not served with the bill

H since there was no way in which effectual service could be made on it. So in substance the only defendants to the bill were the officers of the corporation against whom no relief was or could be claimed. They demurred to the bill. In support of the demurrer it was argued that Lord Eldon's

decision in *Mayor of London* v. *Levy,* 8 Ves.Jun. 398 was inconsistent with       **A**
the badly reported earlier cases such as *Moodalay* v. *Morton,* 1 Bro.C.C.
469 that Hall V.-C. could not have meant to overrule a decision of Lord
Eldon universally accepted for 75 years and that *Orr* v. *Diaper,* 4 Ch.D.
92 should be treated as a special case not to be followed unless the facts
were exactly the same.  On the other side it was said that if a plaintiff
could obtain from a person whom he had properly made defendant to a
bill for relief discovery of the names of other parties necessary to be made       **B**
defendants to the suit, why should he not be able to bring a bill of discovery
against persons against whom he could claim no relief in order to obtain
the names of defendants to a proposed action which he could not bring
unless he knew the names?—*Orr* v. *Diaper* was cited in support of that
argument.

In overruling the demurrer the court said, 11 N.E.Rep. 540, 547:       **C**

" The present case must be determined by the principles declared in
the few cases where the plaintiff does not know the names of the
persons against whom he intends to bring a suit, and brings a bill
against persons who stand in some relation to them, or to their
property, in order to discover who the persons are against whom he
may proceed for relief. . . .  It is settled that a bill of discovery may       **D**
be maintained to aid the plaintiff in a suit which he intends immediately
to bring, as well as in a suit already brought, if the bill discloses a cause
of action; and the difficult question is under what circumstances may
such a bill be maintained for the purpose of ascertaining the proper
parties against whom the suit should be brought."

The court then pointed out that the facts in *Mayor of London* v. *Levy,*       **E**
8 Ves.Jun. 398 were not such as required Lord Eldon to overrule *Moodalay*
v. *Morton,* 1 Bro.C.C. 469 and that in fact no reference is made to that
case in his judgment and they quote *Orr* v. *Diaper,* 4 Ch.D. 92 for the
proposition that under some circumstances discovery may be had for the
purpose of ascertaining the persons against whom the plaintiff may bring
a suit although he does not allege that he has a cause of action against       **F**
or intends to sue the persons who are the defendants in the proceedings
for discovery.  They then state their conclusion on the facts in the case
before them as follows, at p. 547:

" It is clear that courts do not compel discovery from persons who
sustain no other relation to the contemplated litigation, or to the
subject of the suit, than that of witnesses; and it is also clear that a
bill for discovery cannot be used to enable a plaintiff to fish for       **G**
information of any causes of action he may have against other persons
than the defendant. . . .  But when a plaintiff has a cause of action
against persons who are defined either by statute, or by their relations
to property or a business by the management of which the plaintiff
has suffered injury, and the names and residences of these persons are
unknown to him, it is not clear that there may not be such a state of
facts that a court ought to compel a discovery of the names and       **H**
residences of these persons from their agents in charge of the property
or business; and the decisions recognise that this may sometimes be
done.  In the present case it is the duty of the corporation to pay

**197**

A.C.    Norwich Pharmacal v. Customs & Excise (H.L.(E.) )

A
the plaintiff's judgment if it have sufficient assets. A part of its assets for that purpose is the liability of its stockholders. The corporation acts only through its directors and other principal officers; and it is necessary that the plaintiff, in order to enforce the liability of the stockholders, and thus obtain satisfaction of its judgment, should bring suit against the corporation and all its stockholders; and the plaintiff, except by discovery, cannot ascertain who these stockholders are."

B
I find that case of great assistance in the solution of the problem before us in this case. The court which decided it was of high standing; it was decided in the light of the old English Chancery authorities which as the case was decided as long ago as 1887 the judges were probably in a better position to understand than we are; and it lays down a reasonable principle by which to judge whether a plaintiff should have this sort of discovery.

C
To make his right depend on whether or not he could obtain some other relief against the defendant is to my mind quite irrational. The court in Post's case, 11 N.E.Rep. 540 makes it depend on the nature of the relation which subsists or subsisted between the defendant to the action for discovery and the persons the disclosure of whose names is sought. In that case the relation was that of agents in charge of the undertaking of which the persons whose names were sought were in effect the owners.

D
In cases such as Upmann v. Elkan, L.R. 12 Eq. 140 and Orr v. Diaper, 4 Ch.D. 92 the relation was that of persons engaged by the tortfeasor to deal with the goods in question and who in the course of doing so unwittingly facilitated the commission of the tort. In my judgment no sensible distinction can be drawn in applying the Post case principle between the position of the respondent commissioners and the position of Diaper or Messrs. Elkan or the St. Katharine's Dock Company. It is true that

E
Messrs. Elkan were under no obligation to enter into the business relations with the dishonest consignors which made them unwitting facilitators of a fraud whereas the commissioners were under a statutory duty to bring under their control for the purpose of exacting duty these infringing imports of furazolidone. But the fact remains that these goods passed through their hands and—assuming that they cannot claim privilege on the grounds

F
of public interest—I cannot see any reason why they should not be under the same duty to disclose the names as the dock company who owned the transit shed in which the imports were stored under the surveillance of customs officers. The dock company would certainly have been bound to give discovery of the names if the plaintiffs discovered the furazolidone was in a particular transit shed and that the dock company who were in possession of it knew the names of the importers. If so, why not the

G
commissioners who had effective control of the goods?
That being my conclusion on this part of the case I do not find it necessary to express any opinion on a point to which a good deal of argument was devoted—namely, whether the appellants could have obtained against the commissioners the equivalent of an injunction in the shape of a declaration that they ought not to give clearance to imports of fura-

H
zolidone without giving the appellants the name of the importers.
This brings me to the claim of privilege. In his affidavit sworn on April 28, 1971, Sir Louis Petch put the claim on two grounds; first, that the

commissioners were not entitled to disclose the information requested even **A**
if they wished to do so and, secondly, that assuming that they had the
power to give it the disclosure would be contrary to the public interest. Mr.
Oliver in his able and candid argument wisely did not seek to support the
first ground.  Of course a statute may provide that information of a certain
character shall not be disclosed even for purpose of legal proceedings. An
example of such a prohibition is section 17 (2) of the Agricultural Marketing **B**
Act 1931, which was considered in *Rowell* v. *Pratt* [1938] A.C. 101.  But
the commissioners are not prohibited by statute from disclosing the names
of importers.  No doubt the commissioners consider very properly that they
ought to treat as confidential and not voluntarily to disclose to another
government department information which comes to them as a result of the
exercise of the powers given to them by the Customs and Excise Act 1952,
for the purpose of enabling them to collect the revenues of customs and **C**
excise.  Section 3 of the Finance Act 1967, and section 16 (9) of the
Agriculture Act 1970, to which Sir Louis refers—and also section 127 of
the Finance Act 1972, passed after he had sworn his affidavit, were enacted
in order to make it clear that the obligation of secrecy which the com-
missioners very properly consider to be binding on them as a general rule is
not to apply in the cases there specified.  But this has nothing to do with
disclosure under an order of the court for the purpose of legal proceedings **D**
—whether criminal or civil, for outside the field of legal professional pri-
vilege the fact that information has been imparted confidentially is not—in
the absence of an express statutory prohibition—any bar to the court order-
ing its disclosure.  Then is it contrary to the public interest that this
information should be disclosed?  This problem falls to be considered
under two heads—first, from the point of view of the individuals who have **E**
supplied the information; secondly, from the point of view of the efficiency
of the Customs.  Now on the admitted facts in this case the great majority
of those whose names will be disclosed have infringed the appellants'
patent and it does not lie in their mouths to complain that their identity
is revealed.  It is no doubt conceivable—though most unlikely—that some
persons who bought furazolidone from the appellants and exported it for
sale abroad have re-imported it.  Such people, if they exist, might possibly **F**
dislike their identity being disclosed—but in this connection we should bear
in mind that the information in question is given to many others besides the
commissioners.  The shippers, the master of the ship and the employees of
the owners of the transit sheds or warehouses in which the goods are stored
will all know or have means of getting to know the names of the importers.
This information accordingly cannot fairly be regarded as highly con-
fidential information in the hands of the commissioners.  I turn now to **G**
the effect of the disclosure on the efficient working of the Customs service.
Sir Louis says that he is afraid that the good relations and mutual con-
fidence which usually exist between the officers of the Customs and traders
would be seriously impaired if it became known that any information of a
confidential character obtained from traders under statutory powers might
have to be disclosed by the commissioners otherwise than under the **H**
provisions of a statute enabling them to disclose it.  The traders whose
good relations with the Customs Sir Louis is anxious to maintain are,
presumably, honest traders.  Any honest trader who was disturbed at the

A.C.　　　　Norwich Pharmacal v. Customs & Excise (H.L.(E.) )

A　thought that a court could order the disclosure of importers' names in circumstances such as exist here would be a most unreasonable man and I cannot believe that there would be many such. No doubt dishonest traders might be disturbed by the knowledge that such disclosure could be ordered, and Sir Louis gives it as a further ground for the claim of privilege that dishonest traders who now tell the Customs the truth with regard to the character of the goods and the identity of the importers may be driven to giving false information. An argument that one should not try to stop one

B　form of wrongdoing out of fear that some of the wrongdoers may take to committing yet further offences in order to be able to maintain their original course of wrongdoing is not very attractive. But in any case I think that Sir Louis' fears on this head are exaggerated. On the question of public interest I agree with Graham J. and disagree with the Court of Appeal. I would therefore allow the appeal and I agree that the costs should

C　be dealt with in the manner proposed by my noble and learned friend, Lord Reid.

　　In the course of the argument fears were expressed that to order disclosure of names in circumstances such as exist in this case might be the " thin end of the wedge," that we might be opening the door to " fishing requests " by would-be plaintiffs who want to collect evidence or the requests

D　for names made to persons who had no relevant connection with the person to be sued or with the events giving rise to the alleged cause of action but just happened to know the name. I think that these fears are groundless. In the first place, there is a clear distinction between simply asking for the name of a person whom you wish to make a defendant and asking for evidence. This case has nothing to do with the collection of evidence. Secondly, although in any case which was on all fours with this case or any

E　subsequent case which may be decided the commissioners or any other person who was asked for a name would no doubt give it without putting the applicant to the expense of obtaining an order of the court; in any case in which there was the least doubt as to whether disclosure should be made the person to whom the request was made would be fully justified in saying that he would only make it under an order of the court. Then

F　the court would have to decide whether in all the circumstances it was right to make an order. In so deciding it would no doubt consider such matters as the strength of the applicant's case against the unknown alleged wrongdoer, the relation subsisting between the alleged wrongdoer and the respondent, whether the information could be obtained from another source, and whether the giving of the information would put the respondent to trouble which could not be compensated by the payment of all expenses

G　by the applicant. The full costs of the respondent of the application and any expense incurred in providing the information would have to be borne by the applicant.

　　LORD KILBRANDON. My Lords, the facts which are basic to the question of law arising in this appeal lie in very narrow compass. Between May

H　1967, and February 1970, there were in six individual months importations into the United Kingdom of furazolidone, a chemical substance of which the first appellants are patentees in U.S.A., and the second appellants (whom I shall refer to as " the appellants "), are exclusive licensees in the

200
Lord Kilbrandon      Norwich Pharmacal v. Customs & Excise (H.L.(E.))      [1974]

United Kingdom.   While it is possible, it is commercially very improbable,   A
that some of these importations may have included importations or re-
importations of the patented article manufactured by or under licence from
the appellants.   In spite of some unhappy ambiguities in the appellants'
pleadings, it is right that the appeal should be decided on the footing
that the importers of these parcels of furazolidone are by their use of the
substance infringers in the United Kingdom of the appellants' patent right,
could be restrained by law from future infringement, and are liable in law   B
for the pecuniary consequences of their past infringements.

The appellants have come to know of these infringements through the
publication by the respondents, the Commissioners of Customs and Excise,
of monthly Special Chemical Returns prepared by them and made available
by them to the chemical industry.   The name of the importer, otherwise
" infringer," does not appear in the return.   I do not think it is necessary to   C
go into the details of the compilation of, and the sources of information for,
the respondents' published statistics.   Nor do I need to refer, except in the
broadest way, to the procedures governing the passage of imported goods
through customs.   In the present context, that is the disclosure of names of
importers, it is enough to say that, on the arrival of a ship (or aircraft) at
a customs port, the master has to prepare, sign and deliver to customs a
" report " of his ship and her lading, which report contains a description of   D
each purchase of goods and the name of the consignee thereof, while the
importer or his agent must prepare, sign and deliver to customs a form of
" entry " specifying the description, quantity, tariff code number and value
of goods consigned to him.   No goods can be released out of customs'
charge until these forms have been presented, and the appropriate duty paid.

The case has been conducted on the footing that it is impossible for the   E
appellants to find out the names of the infringers of their patent unless
the respondents disclose them.   The respondents refuse to do so, and the
present action, as it is now maintained, is like the old bill of discovery in
as much as it prays for no relief, but seeks an order for discovery only.
This is not by any means the extent of the claim against the respondents
which was before the courts below.   Until the appeal was opened in your
Lordships' House, the appellants were claiming a declaration that the   F
respondents had infringed, or caused, enabled or assisted others to infringe
their patent, a declaration that it was the respondents' duty to forfeit the
imported furazolidone, and an order that they make a complete discovery
of documents relating to the importations.

It will be convenient to consider first whether such an application as
this would succeed against a person not in the position of a department of
State, that is, treating as a separate and subsequent question whether any   G
special considerations of public policy apply to such bodies as the Com-
missioners of Customs and Excise.   It is easy to envisage a dock authority,
probably operating under powers conferred in a local Act within the frame-
work of the Harbours Clauses Act 1847: the authority is empowered to
demand sight of a ship's manifest, or otherwise obtain a detailed account of
her cargo, broken down into quite narrow categories, in order that the   H
dock charges appropriate to each category of goods can be calculated and
imposed.   There will be some provision for the detention of goods in the
dock area until dues are paid, and the authority will necessarily be aware

201

A.C.     Norwich Pharmacal v. Customs & Excise (H.L.(E.))     Lord Kilbrandon

A  of the names of the consignees. The dock authority is apprised that the importation of certain goods which passed through the port infringed a patent conceded to be valid—as the respondents concede for the purposes of the present case—and the patentee can get no remedy unless the dock authority disclose the names of the patentee. To make the comparison completely valid, and with an eye to some of the precedents to which it will be necessary to refer, it must also be predicated not only that the patentee has no intention of bringing suit against the dock authority for

B  any relief other than discovery, but also that he has no ground in law or equity for doing so. That would, I apprehend, be the situation if the goods were no longer in the control of the authority, and if there were no grounds which would support an application for an injunction against them at the instance of the patentees in respect of future importations.

Among the large number of cases cited to us, I believe it is not possible

C  to find a precedent for the granting of an application for discovery in the precise circumstances I have figured. Indeed, I think I can greatly shorten what I have to say on this topic, which is of a technical character involving an expert knowledge of English legal history in the nature of things denied to me, by saying that I respectfully agree with the analysis made in the Court of Appeal by Buckley L.J. of the cases of *Upmann* v. *Elkan*, L.R. 12

D  Eq. 140 and *Orr* v. *Diaper*, 4 Ch.D. 92; 25 W.R. 23. These seem to be generally regarded as the root cases on the subject, especially perhaps the latter since it post-dates the Judicature Act 1873, and are widely cited as leading cases in the foreign jurisdictions to which we were copiously referred. In both cases the plaintiff claimed to have a right of action against the defendant arising out of the import or export of goods masquerading as his own; in *Upmann*, too, the defendant had refused, wrongly as Lord

E  Hatherley L.C. held, to disclose the names of the twenty consignees. In *Orr* v. *Diaper*, while the plaintiff had no intention of suing the defendant, he alleged in his statement of claim that the defendants " had been for some time and were still shipping " the offending goods; this statement was made after the defendants had acquired knowledge of the offences. This is no doubt the foundation for Hall V.C.'s observation that the plaintiffs showed a right to sue the defendants at law, " which expression,

F  since the change made by the Judicature Acts, must mean this court, in some other proceeding (25 W.R. 23, 25)."

In *Moodalay* v. *Morton*, 1 Bro.C.C. 469, as I read it, the plaintiff had an action not only against the person who had infringed his right of property by purporting to give it to another, but also against the East India Company if that person turned out to be their servant or agent. With

G  special reference to that case, I would heartily agree with some remarks made by the Vice-Chancellor in *Angel* v. *Angel* (1823) 1 L.J.O.S.Ch. 6, 8. (Presumably the reference in the quotation is to *Mitford's Chancery Pleadings*):

" In the several cases to be found in the reporters, the expressions are for the most part indistinct and confused; and Lord Redesdale, adher-

H  ing to the language of these authorities, has, with their words, adopted in some measure their inaccuracies and obscurities."

We were offered two reports of the judgment in *Moodalay*, one by Brown,

which was criticised by the Vice-Chancellor in *Angel*, 1 L.J.O.S.Ch. 6, 9, A
and the other by Dickens; they are entirely different from one another.
Both cannot be authentic, so I suppose it is possible that neither of them is.
We were shown at least three versions of the judgment in *Orr* v. *Diaper*;
the Court of Appeal made a point of preferring that in the Weekly Reporter
to that in the Law Reports. The former is certainly fuller and easier to
follow, but for all I know it was deliberately altered by the learned judge
on revision. These considerations made one reluctant to rely on the old B
cases except in so far as they deal with the actual subject matter arising
for decision in them. To erect on them a structure of principles which
should guide a modern court in the administration of justice seems to me
to be building on quicksands. If, without the positive assistance of the
ancient precedents, it seems possible to identify principles prima facie
acceptable, the only limitation to their adoption might be to see whether C
these principles had ever been authoritatively negatived,

   A case which gives rise to some difficulty is *Queen of Portugal* v.
*Glyn* (1840) 7 Cl. & F. 466. One Soares sued Glyns to recover the proceeds
of certain bills. Glyns filed a bill of discovery against Soares and the
Queen, alleging that Soares was a mere agent for the Queen. The Queen
demurred; in the demurrer Glyns' averments had to be accepted pro veritate. D
The House, reversing the decision of Lord Abinger C.B., Lord Wynford
dissenting, sustained the demurrer, on the ground that since the Queen was
not a party to the record in the action at law, she could not be made respon-
dent in the bill of discovery in equity. The case exhibits some curious
features. The appeal was heard in 1837; judgment was given more than
3 years later, after an unusually controversial debate. The case is ignored
by Bray (1885), by Story (1892) and by Snell in his first edition (1868), being E
the only one published before the Judicature Acts. The sole reference to
it in *Halsbury's Laws of England*, 3rd ed., vol. 1 (1952), para. 528, n. (i), is
under " Agency," not " Discovery." Two decisions (1892 and 1906) of the
Court of Appeal are there cited in support of the proposition,

       " In any action brought by an agent, the defendant is entitled to dis-
   covery from the principal as fully as if he were the plaintiff on the
   record, even though he is a foreign principal." F

The footnote concludes, " But see *Queen of Portugal* v. *Glyn*," which
certainly appears to decide the contrary.

   The case was not included in the extensive citation before the Court of
Appeal. Since much of the rather acrimonious discussion in this House
related to the technical requirements of bills in Chancery, the opinion may
be ventured that the case, at least since 1873, has not been regarded as G
authoritative; in any event it does not deal with the problem of discovery
for the purpose of finding the name of a proposed defendant. This point
is made in *Bray on Discovery* (1885), note to p. 40, contrasting *Queen of
Portugal* with *Orr* v. *Diaper*, 4 Ch.D. 92.

   Assuming that there are some characteristics attaching to a defendant in
such an issue, which will be decisive of the question whether he can be H
called on to make discovery in order to enable the plaintiff in that issue to
maintain a just cause of action against a third party, it seems to me
incredible that one of those characteristics should be the defendant's

203

A.C.        Norwich Pharmacal v. Customs & Excise (H.L.(E.))    Lord Kilbrandon

A   vulnerability in an action brought against him by the plaintiff. Why should A be bound to disclose to B the information which he must have before he can sue C if, and only if, B could, if he wished, also have sued A, although he has no intention of doing so? There is no rational distinction observable here.

B   This may be the place to dispose of the " mere witness " rule. It is settled, rightly or wrongly, that you cannot get discovery against someone who has no connection with the litigious matters other than that he might be called as a witness either to testify or to produce documents at the trial. We are not here in that territory. The defendant is not a mere witness, or any kind of witness, because the whole basis of the application is that, until the defendant has disclosed what he knows, there can be no litigation in which he could give evidence. Furthermore, if he were to disclose, either voluntarily or under compulsion, the names of the third parties whom the plaintiff desires to pursue, even then he might well not be a witness in the ensuing litigation. He might have no evidence to give; what he knew would not necessarily be required post litem motam.

C

The most attractive way to state an acceptable principle, intellectually at least, may be as follows. The dispute between the plaintiff and the defendants is of a peculiar character. The plaintiff is demanding what he conceives to be his right, but that right in so far as it is his patrimonial substance is not truly opposed to any interest of the defendants; he is demanding access to a court of law, in order that he may establish that third parties are unlawfully causing him damage. If he is successful, the defendants will not be the losers, except in so far as they may have been put to a little clerical trouble. If it be objected that their disclosures under pressure may discourage future customers, the answer is that they should be having no business with wrongdoers. Nor is their position easily distinguishable from that of the recipient of a subpoena, which, in total disregard of his probable loss of time and money, forces him to attend the court for the very same purpose as that for which discovery is ordered, namely, to assist a private citizen to justify a claim in law. The policy of the administration of justice demands this service from him.

D

E

F   But it is not necessary, in such a case as is being figured, to go as far as this. The defendants are not mere bystanders—although even if they be such they could in due time be called on to give oral evidence. The position in which they find themselves has been described in several ways; in a rather different context Lord Romilly M.R. in *Upmann* v. *Elkan*, L.R. 12 Eq. 140, 147 said of the importer that he was " mixed up with the transaction," and, of the dock company who were mere warehousemen, that " in many respects the position of the dock company does not differ from his [the importer's]." Again, the case of *Post* v. *Toledo, Cincinnati and St. Louis Railroad Co.* (1887) 11 N.E.Rep. 540, in which the Supreme Judicial Court of Massachusetts reviewed all the earlier English authorities, was concerned to state at p. 547

G

H   " . . . the principles declared in the few cases where the plaintiff does not know the names of the persons against whom he intends to bring a suit, and brings a bill against persons who stand in some relation to them, or to their property, in order to discover who the persons are against whom he may proceed for relief."

204
Lord Kilbrandon    Norwich Pharmacal v. Customs & Excise (H.L.(E.) )        [1974]

These words appear to me to provide an apt, and by no means too wide,    A
classification of those against whom discovery may in such circumstances
be obtained, though I think the court, perhaps misled by the fact that they
had available only the report at 4 Ch.D. 92, may have been wrong in saying
that in *Orr* v. *Diaper* the plaintiffs neither alleged that they had a cause
of action nor intended to sue the defendants. But the state of the reports
does not make this clear.

Turning, then, from the imaginary dock authority we have been con-    B
sidering to the Commissioners of Customs, do they stand in some relation
to the goods which makes the commissioners bound to disclose, on an
order of the court, the names of the persons who imported them in pre-
judice of the plaintiffs' rights, in order to enable them to sue? In my
opinion they do. The goods are at the order of the commissioners from
the time they enter the customs port until they go out of customs charge.    C
The goods are reported to them in detail, are directed by them to a parti-
cular transit shed, and are constructively in their possession and control
in the sense of being removable only on their authority; the commissioners
have the goods under their control so that they can exact in respect of them
the duties authorised by the legislature. The importation of these goods
infringes the plaintiffs' property right, and the functions which they perform
must I think place the commissioners in a relation with the importers which    D
entitles the plaintiffs to demand from them the names of the infringers.

As I have said, I do not know of any direct authority which will support
such an entitlement. But the proposition seems to be not inconsistent with
the ratio of the judgments in *Upmann*, L.R. 12 Eq. 140, *Post*, 11 N.E.Rep.
540, and *Hunt* v. *Maniere*, 34 Beav. 157. What is more important, if one
is searching for principles rather than collating decisions, is that there are    E
broad statements to be found in authoritative sources which are in harmony
with the spirit of the decisions, and do not seem to depend on any seemingly
extraneous fact, such as the liability of the defendant in discovery to be
sued, which, as I have said, has in my view no bearing on the liability to
discover in a suit proposed to be brought against a third party. *Bray on
Discovery* (1885), at p. 612 says (of the old Chancery practice, with which
the present action is said to be on all fours),    F

" A party might file a bill of discovery before he commenced his action,
where he required discovery in order to ascertain what form of action
to bring: or in order to ascertain the proper person against whom to
bring the action:"

he cites inter alia *Orr* v. *Diaper*, 4 Ch.D. 92, *Angel* v. *Angel*, 1 L.J.O.S.
Ch. 6, and *Moodalay* v. *Morton*, 1 Bro.C.C. 469. Story J., in his *Commen-*    G
*taries on Equity Jurisprudence*, 2nd Eng, ed. (1892), at p. 1011 says:

" in general, it was necessary, in order to maintain a bill of discovery,
that an action should be already commenced in another court, to which
it should be auxiliary. There were exceptions to this rule, as where
the object of discovery was to ascertain who was the proper party
against whom the suit should be brought."    H

After citing, among other cases, *Moodalay* v. *Morton*, the learned editor
of this edition (W. E. Grigsby) goes on to explain the effect on that excep-
tion of the Judicature Act 1873, as exemplified by *Orr* v. *Diaper*. The

A  first edition of this work was published in 1838, and Snell (whose 1st edition is dated 1868) appears to adopt Story freely: his account is very similar.

In another jurisdiction a similar principle has been applied. In *Colonial Government* v. *Tatham* (1902) 23 Natal L.R. 153, while the familiar relationship of agency could perhaps have been said to make the defendants liable in discovery, the basis is put much more broadly, first by Bale C.J. and Finnemore J. After quoting *Orr* v. *Diaper* they say at p. 157:

B       " Before granting such an application we must be satisfied that the applicant believes that he has a bona fide claim against some person or persons whose names he seeks to discover, and whose name can be supplied by the respondent, and that he has no other appropriate remedy. We are satisfied upon these points ":

C  agency does not seem to have been founded on. Beaumont A.J. refers to the passages in Story to which I have adverted, and says, at p. 158:

      " The principle which underlies the jurisdiction which the law gives to courts of equity in cases of this nature, is that where discovery is absolutely necessary in order to enable a party to proceed with a bona fide claim, it is the duty of the court to assist with the administration of justice by granting an order for discovery, unless some well-founded
D     objection exists against the exercise of such jurisdiction."

I observe that here the duty is said to lie rather on the court to make an order necessary to the administration of justice than on the respondent to satisfy some right existing in the plaintiff. In *Hart* v. *Stone* (1883) 1 Buch. App.Cas. 309, 314, de Villiers C.J. had cited *Voet* as authority for saying that " the judges had very large powers of ordering a disclosure
E  of facts where justice would be defeated without such a disclosure." And in another civil law system, though the example is rather on the margin of relevance, Erskine, in his *Institute of the Law of Scotland* (1838 ed.), at III, Tit. VIII, 54, 55, after pointing out that Scots law had borrowed from Rome the doctrine that the heir is entitled, on succeeding, to deliberate whether his *heriditas* is to be *damnosa* or *lucrosa* (for he will be liable,
F  unless he renounce the succession, for his ancestor's debts), says (56) that the heir has

      " a privilege to pursue for exhibition ad deliberandum, against all possessors, or havers, of writings, whether granted in favour of the ancestor, or by him in favour of others; "

There is no suggestion that in so doing he is pretending to exercise any
G  right of relief against the discoverers.

In my opinion, accordingly, the respondents, in consequence of the relationship in which they stand, arising out of their statutory functions, to the goods imported, can properly be ordered by the court to disclose to the appellants the names of persons whom the appellants bona fide believe to be infringing these rights, this being their only practicable
H  source of information as to whom they should sue, subject to any special right of exception which the respondents may qualify in respect of their position as a department of state. It has to be conceded that there is no direct precedent for the granting of such an application in the precise

A.C. 1974—8

206
Lord Kilbrandon    Norwich Pharmacal v. Customs & Excise (H.L.(E.))          [1974]

circumstances of this case, but such an exercise of the power of the      A
court seems to be well within broad principles authoritatively laid down.
That exercise will always be subject to judicial discretion, and it may
well be that the reason for the limitation in practice on what may be
a wider power to order discovery, to any case in which the defendant has
been "mixed up with the transaction," to use Lord Romilly's words, or
"stands in some relation" to the goods, within the meaning of the decision
in *Post*, 11 N.E.Rep. 540, is that that is the way in which judicial discretion      B
ought to be exercised.

I will now turn to an aspect of that public policy which, exceptionally,
protects from disclosure, either by discovery or testimony, communications
which public policy decrees shall be held confidential. The commonest
example arises from the relationship between attorney and client. The
aspect relied on by the respondents in the present appeal is that usually      C
but not very happily called "Crown privilege."

The defendants base their claim to refuse discovery on two broad
grounds. First, they say they are not permitted by law to disclose matters
which they have acquired in the course of the exercise of their statutory
functions and have no statutory authority to disclose. They found on
section 3 of the Finance Act 1967, as authorising limited disclosure, and
impliedly by therefore forbidding wider disclosure. But we are here con-      D
sidering the power of the court to make an order. *Rowell* v. *Pratt* [1938]
A.C. 101 provides an instance of a statute which authorises the gathering
of information, and also limits disclosure of it so as to prevent the court
from exercising such a power. This is not such a case. It was conceded
that, for example, the information here called for would in practice be
disclosed by the respondents on their own responsibility if that course were
shown to be necessary for the prosecution of, or the defence in, criminal      E
proceedings of a grave character, even other than customs prosecutions.
If that be so, the court must, in my opinion, be entitled to call for the same
sort of information in order to make possible the prevention of a civil wrong.

The other objections were, if I may say so, of a rather stereotyped and
unconvincing character. It was said that disclosure of names would, as it
were, drive future infringements underground, giving rise to falsehoods,      F
frauds, forgeries and circumventions, so that, as experience in the U.S.A.
has shown, the last state of matters would be worse than the first. Even
if this plea involved no element of exaggeration, I would not favour refusing
to stop one glaring fraud lest another be substituted for it. Lastly came
the "candour" point—that if the persons now under statutory obligation
to make disclosure to customs in the course of their business come to
appreciate that, in certain circumstances, the names of importers may have      G
to be disclosed to the court, the good relations which now exist between
them and the defendants would be endangered, and they might not give
the information required by statute with their customary candour. Some
such argument is generally accepted as convincing when the confidential
relationship between the tax-payer and the Inland Revenue is in question.
The information here sought is, however, to be found in documents very      H
different from income tax returns. It exists in bills of lading, ships'
manifests, masters' "reports," and the records of the keepers of transit
sheds, quite apart from "entries" made by importers. This is not a

207

A.C.    Norwich Pharmacal v. Customs & Excise (H.L.(E.))    Lord Kilbrandon

A   conclusive factor, but it is in my opinion an important factor which the court should take into account in exercising its judgment as to whether public policy demands that this information be treated, exceptionally, as confidential and immune from disclosure on an order of the court. In my opinion, public policy does not so demand.

I agree with the judgment of Graham J., and would accordingly allow this appeal. I also agree with the order as to costs proposed by my noble

B   and learned friend on the Woolsack.

*Appeal allowed.*

Solicitors: *Allen & Overy; Solicitor, Customs and Excise.*

J. A. G.

C

———

[HOUSE OF LORDS]

D   DAVIES (A.P.) (SUING AS WIDOW AND ADMINISTRATRIX
OF THE ESTATE OF KENNETH STANLEY DAVIES, DECD.) .    APPELLANT

AND

TAYLOR   .   .   .   .   .   .   .   .   .    RESPONDENT

1972 June 27, 28, 29;          Lord Reid, Lord Morris of Borth-y-Gest,
      Oct. 25                 Viscount Dilhorne, Lord Simon of Glaisdale,
E                                     Lord Cross of Chelsea

*Fatal Accidents Acts—Damages—Assessment—Widow's desertion of deceased husband five weeks before death—Deceased's instructions to institute divorce proceedings—Reconciliation not probable—Widow's possible dependency—Standard of proof*

F   The plaintiff's husband died in a road accident caused by the defendant's negligence. They had been married for more than 13 years, had no children and no complaint had been made of him as a husband. She had unknown to him while they were living together committed adultery with a fellow-employee. She deserted her husband five weeks before his death and after her desertion he had learnt of her adultery. He was nevertheless most anxious for a reconciliation and at several meetings with her after she had left him he asked her

G   to resume cohabitation, but she did not accept his offer. Shortly before his death he instructed his solicitor to institute divorce proceedings and an inquiry agent on the solicitor's instructions had obtained a confession statement from the fellow-employee. She had refused to make a statement to the inquiry agent.

In an action by the plaintiff as widow and administratrix of

H   the estate under the Fatal Accidents Acts 1846–1959 and the Law Reform (Miscellaneous Provisions) Act 1934, Bridge J. awarded the plaintiff £556 damages under the Act of 1934, but dismissed the claim under the Fatal Accidents Acts 1846–1959 on the ground that she had not shown that a