# Exhibit 16

*Page 1*

## Nokia Corporation (a company incorporated under the laws of Finland) v Interdigital Technology Corporation (a company incorporated under the laws of the State of Delaware, USA)

Case No: HC 04 C01952

High Court of Justice Chancery Division Patents Court

8 December 2004

**Neutral Citation Number: [2004] EWHC 2920 (Pat)**

**2004 WL 3111426**

Before : The Honourable Mr. Justice Pumfrey

Date: Wednesday, 8th December 2004

### Representation

Mr. Michael Silverleaf QC , Mr. Henry Whittle and Mr. Brian Nicholson (instructed by Messrs. Bird & Bird ) for the Claimant.

Mr. Guy Burkill QC and Mr. Colin Birss (instructed by Messrs. Milbank, Tweed, Hadley & McCloy ) for the Defendant.

### APPROVED JUDGMENT

Mr. Justice Pumfrey:

1. In this action Nokia seek revocation of three United Kingdom patents owned by InterDigital Technology Corporation ("InterDigital"). InterDigital is a patent holding and licensing company for InterDigital Communications Corporation ("ICC"). The patents in suit are 2,174,571 ("571"), 2,208,774 ("774") and 2,224,114 ("414"). They relate to aspects of the transmission of telephony signals over a wireless loop using time-division multiplexing techniques.

2. The significance of these patents to Nokia is that at least two of them are alleged by InterDigital to be not only relevant but actually "essential" to the practice of the GSM standards for digital cellular mobile telephones and infrastructure. Nokia are leading manufacturers in this field. These are international standards with which all manufacturers of GSM mobile telephones and associated infrastructure must necessarily comply. ETSI (the European Telecommunication Standards Institute) requires notification to it of any patents believed to be essential for compliance with its standards or proposed standards. InterDigital notified the three patents in suit in 2001 (long after the standard was formulated) but had been asserting them to be essential from about 1993.

3. The three patents in suit have equivalents in numerous territories throughout the world, all of which have been notified by InterDigital to ETSI as essential to GSM. The claimants say that the patents in suit are representative of over 140 corresponding patents (or pending applications) worldwide, which are the core patents of those said to be essential to GSM.

4. There are before me two applications. The first is the case management conference sought by Nokia. The second is an application by InterDigital seeking four heads of relief as set out in the notice of application dated 27th October 2004. The relief sought is:

(a) an injunction to restrain Nokia from pursuing applications made in the US courts under 28 USC, section 1782 for documents and other evidence from Ericsson Inc. and Sony Ericsson Mobile Communications AB;

(b) a declaration that the discovery sought in the above applications is irrelevant to any issue in the present proceedings;

(c) an order striking out parts of the claimant's pleadings which relate to construction of the claims of the patents in suit;

(d) a stay of the proceedings until after the outcome of an ICC arbitration presently taking place between the parties to this action in New York.

5. The background to the action and the present applications may be briefly outlined as follows. As I have indicated, since the early 1990s, InterDigital have been representing to the mobile communications industry that they require licences under InterDigital's patent portfolio for GSM. InterDigital has pursued an aggressive licensing policy, threatening litigation if licences are not taken and making it clear that its portfolio of patents is so geographically and technically extensive that it is uneconomic to resist.

6. After several years of negotiation with InterDigital, Nokia took a lump sum licence in 1999, but is allowed by the terms of the licence to bring this action. The licence is split into two periods — 1 and 2. Period 1 ran up to the end of 2001 and Nokia paid a royalty of $31.5 million for that period. For period 2 (from the beginning of 2002, until the expiry of the licence) no royalty is payable unless certain conditions are satisfied. One of those is that a "major competitor" of Nokia has taken a licence. There is a dispute between the parties as too whether further royalties have become due for period 2 under the licence, and if so what royalties are payable. InterDigital relies, as I understand it, upon a licence taken by Ericsson and a joint venture company, Sony-Ericsson, in settlement of a ten-year long action originally commenced in 1993 between InterDigital and Ericsson in the United States for infringement of a number of InterDigital's patents. One of the terms of the settlement between InterDigital and Ericsson was that Ericsson and its joint venture company took a licence under InterDigital's patent portfolio. This dispute, that is to say the dispute between Nokia and InterDigital as to the payability of royalty, is the subject of an ICC arbitration in New York.

7. Some of InterDigital's patents have been the subject of litigation. Action was brought against Motorola who was largely successful in its resistance to the claims. Nokia's contention is that the basket of patents under which a licence is available contains a number that are either invalid or not infringed by a manufacturer who seeks to comply with the GSM standards. Part of the motive for these proceedings is to obtain a judgment on validity which can be deployed in the arbitration; although if the timetable for the arbitration remains as it is, then any use of a putative judgment on invalidity will be impossible. The arbitration is due to be heard in January 2005.

8. Surprisingly, perhaps, for patents of the age of those in suit that have been licensed, the patentee's response to this action is to apply to amend all three. Some of the amendments are not mere deletion of claims accepted to be invalid but involve the rewriting of new claims. Nokia plead a number of grounds they say would justify the court in holding that the amendments should not be allowed in the exercise of the court's discretion. They plead, inter alia, that the patents have been known by InterDigital to be invalid and that the licence with Ericsson (which is, with all the negotiations leading up to it, entirely secret until disclosure in this action) was entered into at least in part in bad faith and with a view to putting Nokia at a disadvantage in the setting of the period 2 royalties which InterDigital publicly estimate to be about $130 million year on the basis of the Ericsson settlement.

## The application for a stay

9. With that brief introduction, I can turn to InterDigital's application for a stay. I can discern no basis for a stay of these proceedings whatever. It is not suggested that these proceedings are subject to a mandatory stay under the Arbitration Act 1996 . It is also accepted that by section 72 of the Patents Act 1977 , any person may bring proceedings to revoke a patent. But it is said that the underlying motive of these proceedings is to produce what InterDigital call an advisory opinion on the validity of the patents, that the court should encourage alternative dispute resolution, and that the arbitration already on foot involves alternative resolution of this dispute without a disproportionately expensive recourse to the court, whose decision cannot much affect the outcome of what is said to be the "real"

*Page 3*

or "commercial" dispute between the parties. InterDigital rely also upon the fact that Nokia decided to take a licence in 1999, albeit one which permitted them to challenge the validity of the patents.

10. There is no dispute that there is a wide power to stay proceedings whenever the court thinks fit. Of course, an action which is an abuse of process will be stayed or struck out. Multiplicity of proceedings will be discouraged if possible and there are numerous specific statutory provisions providing for the staying of proceedings in certain defined circumstances. There is also a long list of specific circumstances in which the CPR provide for a staying of proceedings.

11. The case management powers contained in CPR 3.1(1)(f) apply generally, and these powers must be exercised with a view to achieving the so-called overriding objective. However, when in a properly-constituted action the claimant seeks appropriate relief, the dispute is not the subject to an arbitration agreement and the action itself cannot be said to be an abuse of process, it seems to me that the primary duty of the court is to bring it on for trial as fairly and as quickly as the circumstances permit and not to stay it.

12. Validity and infringement of the three patents in suit were removed from purview of the arbitrators by the agreement of Nokia and InterDigital. Indeed, this appears to have been the result of an objection by InterDigital (see clause 4(vi) of the terms of reference in the arbitration.

13. Having objected to the issues of infringement and validity being considered by the arbitrators in the existing arbitration, InterDigital could not, before me, identify any form of alternative dispute resolution that could even dispose of the issues of infringement and validity inter partes. It goes without saying that in the absence of an agreement to surrender a patent or consent to its revocation, no private dispute resolution could result in revocation of one or more of the patents if it were found to be invalid. There is no offer of any such agreement; so the arguments relating to proportionality and alternative dispute resolution have no foundation and must fail. There is no other basis advanced for a stay.

## The Section 1782 application

14. The application which is made in the appropriate district court in the United States is said to relate to these proceedings. It seeks both evidence on deposition and discovery of documents in specified classes as follows. The application after formal matters proceeds as follows:

> "Nokia is a party to a court proceeding in England before the High Court of Justice, Chancery Division, Patents Court, in which Nokia seeks to revoke certain United Kingdom patents that have been granted to InterDigital Technology Corporation ('InterDigital'). These UK patents are the counterparts of certain US patents that are presently at issue in an arbitration between InterDigital and Nokia in the United States. Nokia believes that Ericsson, a Delaware corporation that is found in this district [the East District of Texas, Sherman Division] has evidence relevant to the validity and scope of the patents that are at issue in the English patent proceeding. Nokia submits this application to obtain this evidence from Ericsson by means of an order for discovery from this Court."

15. Without reading through the whole of the application, it is difficult to give a proper flavour of the basis upon which the application is brought, but it is necessary to pay attention first to the description of the Ericsson and InterDigital lawsuit on printed page 3, which is as follows:

> "The Ericsson/InterDigital lawsuit continued following the Motorola verdict. Ericsson and InterDigital eventually settled their dispute, but only after ten years of litigation. During the course of the litigation, the parties extensively litigated the scope of InterDigital's US patents and exchanged evidence regarding the prior art."

16. On printed page 4:

> "InterDigital's patent portfolio includes patents granted by the United Kingdom Patent Office, of which two are counterparts of the US patents involved in the

*Page 4*

Ericsson/InterDigital litigation. On June 14, 2004, Nokia initiated a proceeding before the High Court of Justice, Chancery Division, Patents Court, to revoke these UK patents, together with a third InterDigital patent, the Swedish equivalent of which Ericsson opposed in the Swedish Patent Office. The UK proceeding will address many of the same issues addressed in the litigation and opposition between Ericsson and InterDigital, and in the licensing discussions between Ericsson and InterDigital, namely the scope and validity of InterDigital's patents. InterDigital may try to place some reliance upon the fact that other companies have taken licenses to its patents."

17. Then the application seeks to justify the request on the basis of the terms of section 1782 . On page 12 it says this:

"Allowing Nokia to obtain discovery from Ericsson would equitably and efficiently assist Nokia's efforts in the English proceeding. Nokia seeks to revoke certain of InterDigital's patents that InterDigital contends covered Nokia's technology. During the course of Ericsson's ten years of United States litigation with InterDigital over the validity and scope of InterDigital's US patents together with many years of opposing InterDigital's Swedish patents, and during the licensing discussions with InterDigital, it amassed a universe of knowledge and evidence relevant to the validity and scope of InterDigital's patents. It is undisputable that during the protracted litigation, opposition and licensing discussions with InterDigital, Ericsson either provided or received evidence pertinent to the scope and validity of InterDigital's patents. The patents that were at issue in the Ericsson/InterDigital litigation are the counterparts of the patents Nokia seeks to revoke in the UK revocation proceeding. The third patent at issue in the UK revocation proceeding was opposed by Ericsson in Sweden. Moreover, when the litigation ended in early 2003, Ericsson agreed to licence InterDigital's entire patent portfolio. Ericsson's decision to take a licence to InterDigital's portfolio is, and of itself, a source of evidence material to Nokia's revocation proceeding. Therefore, for all these reasons, Nokia believes that Ericsson has evidence that can assist Nokia.

Nokia's discovery of this evidence will assist Nokia's efforts in the United Kingdom proceeding. Many of the same issues present in the Ericsson/InterDigital lawsuit, or close corollaries, may arise in the context of the UK proceeding. Allowing Nokia's requested discovery will allow the English court, and the parties to that proceeding, to benefit from the ten year effort spent in resolving such issues in the US litigation, the Swedish opposition and from any evidence arising in connection with the licensing discussions. This request also obviates the need for letters rogatory, or other lengthy and cumbersome procedures, to obtain this evidence from Ericsson, a US resident and a non-participant to the UK proceeding."

18. The relief sought in the district court against Ericsson is set out in two exhibits to the application, exhibit A and exhibit B. Exhibit A seeks depositions on certain specified deposition topics in a manner which I understand to be usual in the ordinary United States litigation. As always, it is necessary to read what is already a very broad order with regard to exhibit C, which contains the definitions which render terms which, on their face, are broad into terms which are very wide indeed. The order is to Ericsson to designate one or more officers, directors, or managing agents, or other persons who consent to testify on Ericsson's behalf, with respect to the following matters. Four classes of matter are set out.

"1. Prior art to UK Patent No. 2,174,571, UK Patent No. 2,208,774 or UK Patent 2,224,414 or any prior art to any counterparts within the same patent families of these patents in other jurisdictions, including information concerning the publication date of the said prior art.

2. Ericsson's claim construction and invalidity contentions in the Ericsson/InterDigital lawsuit and any oppositions carried out by Ericsson against the counterparts of the UK Patents referred to in paragraph 1 above, and the identity of relevant prior art and factual support for all those contentions.

> 3. The negotiation of the 2003 Patent Licences including efforts by Ericsson, Sony-Ericsson, or InterDigital to negotiate, execute, or structure any agreements that were made in connection with, at the time of, or as part of, the resolution of the Ericsson/InterDigital Lawsuit or the execution of the 2003 Patent Licences.
>
> 4. The performance under the 2003 Patent Licences, including of any amendments or modifications (whether oral, written or by conduct) to the 2003 Patent Licences, to the agreements resolving the Ericsson/InterDigital Lawsuit, or to any other agreements within the scope of topic 3 above."

19. The request for documents, which is contained in exhibit B, is that upon which the discussion before me principally turned, but in fact the documents are complimentary to the depositions which are sought in exhibit A. I need not read paragraph 1, which again seeks prior art in relation to the patents in suit, counterparts of the patents in suit within the same patent families and documents relative to publication dates. Then paragraph 2 specifies certain classes of documents in relation to the Ericsson/InterDigital lawsuit, including witness expert reports and declarations, affidavits or witness statements relating to construction. Paragraph 3 relates to the negotiation and execution of the Ericsson settlement agreement, and paragraph 4 relates to any amendments or modifications, rather surprisingly, whether, oral, written or by conduct, which were made to the patents licences and the agreements resolving the Ericsson lawsuit.

20. I am asked to restrain the claimants from further continuing with this application against Ericsson and Sony Ericsson, or in the alternative for the declaratory relief, which I have already set out, indicating that the classes of documents in question are irrelevant in this action. There is no doubt that I have jurisdiction to restrain the section 1782 proceedings and this jurisdiction is described in the decision of the *House of Lords in South Carolina Insurance Co v Assurantie Maatschappij "De Zeven Provincien NV" [1987] AC 24* . The speech of Lord Brandon, with whom the remainder of their Lordships largely concurred, sets out the principles upon which the English court will interfere by injunction with an application made under the United States provision by a party to litigation in this country, and I am bound by it. Before turning to the principles established by this decision, however, I should briefly refer both to Title 28 section 1782 and to the leading case on the exercise of power arising under section 1782 , the recent decision of the *United States Supreme Court in a case called Intel Corporation v. AMD* .

21. In its present form, what I will call subsection (a) of section 1782 , which has the cross-head "Assistance to foreign and international tribunals and to litigants before such tribunals" is as follows:

> "The district court of the district in which a person resides are is found may order him to give his testimony or statement or to produce a document or other thing for use in a proceeding in a foreign or international tribunal, including criminal investigations conducted before formal accusation. The order may be made pursuant to a letter rogatory issued, or request made, by a foreign or international tribunal or upon the application of any interested person and may direct that the testimony or statement be given, or the document or other thing be produced, before a person appointed by the court. By virtue of his appointment, the person appointed has power to administer any necessary oath and take the testimony or statement. The order may prescribe the practice and procedure, which may be in whole or in part the practice and procedure of the foreign country or the international tribunal, for taking the testimony or statement or producing the document or other thing. To the extent that the order does not prescribe otherwise, the testimony or statement shall be taken, and the document or other thing produced, in accordance with the Federal Rules of Civil Procedure ".

22. *Intel v. AMD* itself concerned an application under section 1782 for documents with a view to providing them to the European Commission for the purpose of a complaint under Articles 81 and 82 of the EC Treaty . Justice Ginsburg delivered the majority opinion. I believe that the following propositions may be derived from that opinion that are directly relevant to the issues which arise before me today.

> (a) Section 1782 authorizes but does not require the federal district court to grant discovery in aid of the foreign proceedings.

(b) The proceeding in question must be within reasonable contemplation, but need not be pending or imminent. I infer from this that the provision may be used to obtain evidence prior to issue of proceedings in this country.

(c) There is no requirement that the discovery sought in section 1782 proceedings be discoverable in the foreign jurisdiction if located there.

(d) Considerations of comity between jurisdictions and parity between litigants may be legitimate touchstones for the district court's exercise of discretion in a particular case, but that is no reason for imposing a general foreign-discoverability rule. For example, a foreign court's reluctance to order discovery of particular documents may be no indication at all of a reluctance to receive them in evidence — the example given by Justice Ginsburg is the South Carolina case itself. The foreign tribunal may itself place such limitations as it thinks appropriate on the admission of material obtained pursuant to section 1782 .

(e) In exercising the discretion, a number of factors need to be borne in mind:

(i) Where the parties to the section 1782 proceedings are the same as those in the foreign proceedings, the need for aid is not as apparent as it is when evidence is sought from a non-participant in the matter arising abroad, when the foreign tribunal can itself decide whether to order the parties to produce evidence.

(ii) The stature of the foreign tribunal, the character of the proceedings underway abroad and the receptivity of the foreign court to federal court judicial assistance must also be considered.

(iii) Whether the section 1782 request "conceals an attempt to circumvent foreign proof-gathering limits or other policies of a foreign country or of the United States is also relevant.

(iv) (iv) Unduly burdensome requests may be rejected or trimmed.

23. It is clear that the jurisdiction will be exercised having regard to the attitude that the foreign court will take to the material produced by the section 1782 request. As is well known, the attitude of this court, that is to say the English court, towards disclosure is regulated by the CPR and the scope of disclosure is essentially circumscribed by the pleaded issues. At the same time, the court is generally indifferent as to the source of admissible material. Let me give a simple example. In a patent action, the validity of the patent is challenged on the grounds of anticipation or obviousness on the basis of a single prior publication. The scope of disclosure is limited to documents advancing the parties' respective cases, including their attacks on the other's case, within the time window of four years around the priority date: see paragraph 5.1(2) of the Practice Direction under Part 63 of the CPR .

24. This means there will be no disclosure relating to other grounds of invalidity, for example, prior use by the patentee, and the defendant must himself uncover at least the possible existence of such prior uses by the patentee for himself before he can obtain the court's assistance in compelling disclosure from the patentee. On the other hand, if he does obtain evidence of prior use by the patentee, the court is not generally concerned as to how that evidence was obtained. As I understand the decision of the House of Lords in the South Carolina case, to which I now turn, one possible route is by way of a section 1782 request.

25. Mr. Silverleaf QC, who appears on behalf of Nokia, submits that the following propositions may be derived from Lord Brandon's speech in the South Carolina case.

(a) The English courts do not, in general, exercise any control over the way in which a party obtains the evidence it wishes to present to support its case: See *[1987] AC 41 G–H* .

(b) If a third party voluntarily assists a party by providing evidence, there can be no objection to that evidence being used by the party. The provision of material in this way does not interfere with the court's control of its own process. (Page 42 A).

(c) Consequently, by exercising a right potentially available to it under US law to obtain documents or evidence from a third party, a party to litigation is not departing from or interfering with the procedure of the English court. (Page 42 C).

(d) Accordingly, a party should normally be permitted to exercise its rights under Title 28 of the US Code section 1782 .

(e) It is for the US court hearing the section 1782 application to decide upon the merits of the application under US law and to determine the nature and scope of the relief to be granted. The fact that a party is enabled by exercising those rights to obtain documents and evidence which would not otherwise be available to it is not a ground for interference by the English court.

(f) Before the court should restrain a party's use of the section 1782 procedure, it has to be satisfied that the use being made is either a breach of some legal or equitable right of the objecting party (page 41, B to C) or is vexatious or oppressive or is in some other way unconscionable. (Page 41 D).

26. This summary seems to me to be correct and it shows why the decision whether or not to restrain section 1782 proceedings is not a mere case management decision. There can be no doubt that leaving express or implied obligations aside, the jurisdiction to interfere is based on the need to show that the application is abusive in its context in the English proceedings. This is confirmed by *Banker's Trust international PLC v PT Dharmala (unreported, 1st December 1995 , Mance J, as he then was)* and *Omega v Viktor Kozeny [2002] CLC 132* (Mr. Peter Gross QC, as he then was). In the former case, the application under section 1782 was made after trial but before judgment, no doubt with a view to improving the evidence in the proceedings and making an application to re-open the trial. Mance J appears to have found little difficulty in concluding that such an application was abusive. In the latter case, Mr. Gross QC was confronted by an application to depose individuals who would be giving evidence in this country, thereby exposing them twice to the burden of cross-examination, which he considered to be abusive in the context of the English proceedings.

27. Mr. Burkill's submission on behalf of InterDigital is that the depositions sought on the present application and the classes of documents sought are of undue width and purely fishing. The definitions of the classes make no attempt to distinguish that which is relevant from that which is not, and are for that reason objectionable. The fact that the second, third and fourth classes closely mirror the terms of a subpoena issued by the arbitrators against Ericsson reveals, he submits, that the real purpose of the section 1782 application is to produce documents in aid of the arbitration and that this is confirmed by the unwillingness of Nokia's advisers to agree to protective orders preventing the employment of the documents in the arbitration.

28. Accordingly, he says that the application is oppressive and is an abuse of process and should be restrained by this court.

29. It is necessary to make a number of elementary observations before turning to Mr. Burkill's contentions. First, the issues in the English proceedings are defined by the pleadings. Second, documents and other evidence are not admissible unless either relevant to an issue so defined or (although relevant to the issues in the case) as tending to go impugn the credit of a witness. The court will not compel production of documents going only to credit. Third, disclosure will only be ordered on the basis set out in the CPR , which is to say, that a party will only be required to make a search ultimately as is reasonable and proportionate.

30. I agree with Mr. Burkill that the classes of documents as drawn would not be ordered by way of disclosure in the present proceedings. As he correctly observes, the first class (all prior art to the three patents) covers prior art that has not pleaded and this class is, from the perspective of this

court, too broad. I am equally satisfied, however, that any new prior art discovered could, in principle, be introduced by amendment of the pleadings into the action.

31. If any document obtained in the second, third and fourth categories could be relevant to these proceedings, in the sense that it would be disclosable if in the possession, custody or power of InterDigital, it could only be because it related to Nokia's contention that the court should not exercise its discretion to permit the amendments sought to the three patents in suit. InterDigital is under a duty to disclose documents in its power (a term defined in the relevant provisions of the CPR ) that are disclosable in the light of the pleaded case. While I might be privately sceptical as to the likelihood that the discovery by Ericsson will turn up material in addition to that which must be disclosed in these proceedings in any event, I certainly cannot say that it will not do so.

32. It follows that it cannot be said a priori or that the material which would be obtained on discovery in this case, as sought in the section 1782 proceedings, would not be capable of being deployed in these proceedings. This approach, which is quite different from the approach which I would take to a request for specific disclosure of class of documents in the context of English proceedings, is appropriate for the following reasons:

> (a) Subject to the restrictions placed on the jurisdiction by Federal law, the request is not circumscribed by the issues at stake in the foreign proceedings. There do not even have to be any proceedings on foot for the request to be considered. It is therefore in part investigatory in nature.

> (b) It follows that the English court should not seek to circumscribe the discretion possessed by the district court by imposing its own view as to the appropriateness of the classes of documents sought by reference to the issues in proceedings as they stand. It is legitimate for the requesting party to use the request to ascertain facts and obtain documents of which the requesting party is unaware, but which may be in the future deployed in the English proceedings, if necessary, after appropriate amendment.

> (c) The question of the extent to which the district court should accede to the request is a matter for it alone, on the evidence made available, and the English court should only interfere if the invocation of the jurisdiction is either contrary to some legal or equitable right of the other party to the English litigation or is otherwise oppressive or vexatious or tends to interfere with the due process of the English court. In my judgment it should also, if possible, express a view as to the likely deployability of the documents sought if that is possible and if such an expression will be of assistance to the district court.

> (d) The final decision on admissibility will be in any event for the English court, in the light of the issues as defined in the pleadings, and the English court should not, subject to the caveat set out above, concern itself with the manner in which the material sought matters sought to be admitted is obtained.

> (e) This is a different problem from the problem of ordering disclosure of a class of documents of which it can be said that a substantial proportion are irrelevant. The court will not order disclosure of such a class because the English court will not exercise its coercive powers to compel the production of material irrelevant on the pleadings as they stand. But it is for the district court to form its own view in the United States, having regard to the nature of the jurisdiction and to the fact that it is not circumscribed by the pleaded issues in pending litigation, as to the material the production of which should be compelled.

33. The position in respect of the depositions is more difficult. Experience of the use of transcripts of deposition evidence in other cases suggests that it is most unusual for deposition evidence which is not focused on the issues in the English proceedings to be of any practical utility at all. Again, it is possible, but the possibility is a remote one. In this connection I say nothing about depositions ancillary to the document request whose only purpose is to locate relevant documents.

34. On the whole, I conclude that while it does not seem likely that the material requested in the 1782 proceedings will be of utility in this action, that possibility cannot in any circumstances be excluded. If I am to restrain Nokia from pursuing their request, InterDigital must satisfy me that in the context of these proceedings the request is not merely an of doubtful utility but an abuse of process. If it were the case that the request would be automatically complied with by the district court in the United States, then I would be prepared to confer a wide ambit on the term "abuse of process". But it is clear from the Intel case that the district court is required to exercise a judicial consideration in considering the request and the factors urged on me are equally considerations which can be, and in fact are being, urged upon it as reasons for not exceeding to the request or, in the words of the Supreme Court, trimming it.

35. Accordingly, it seems to me that I must be able to identify abusive behaviour in the sense that the request is intended to, or at least will have the effect of, causing unfair prejudice to the opposing party in the present proceedings. This I cannot do. In this connection, I have not overlooked the question whether the real purpose of the request is to assist in the arbitration. This, it seems to me, is preeminently a matter for the district court. The extent to which a collateral purpose is an objection to a section 1782 request is a matter for the district court in the light of the guidance provided to it by Intel and other cases. It is not a matter for me.

36. Since there is nothing in the request that could be described as abusive in the context of the English proceedings, I must refuse the injunction sought.

37. Finally, I should mention the question of costs of the section 1782 request. Dr. Laakkonen from Nokia suggests in his evidence (for some reason) that if successful Nokia will seek its costs of the section 1782 proceedings from InterDigital. I cannot pre-empt the exercise of this discretion by the judge who ultimately deals with the question, and for present purposes I should only say that this risk is not of itself oppressive of InterDigital and is not enough to justify me in restraining the section 1782 application by injunction.

## Declaratory relief

38. While pressing his application for injunctive relief, Mr. Burkill QC submits that in the alternative I should declare that the classes of documents specified in the 1782 request are irrelevant to the action as presently constituted. For the reasons that I have set out, I agree that the great majority of the documents falling within the second, third and fourth classes are, or are likely to be, irrelevant. But for the reasons I have also stated, I cannot say that they all are. For this reason, I cannot make a declaration in the categorical terms that Mr. Burkill requests. I accept that, as I have indicated, I would not have made an order for disclosure in the current proceedings on the present state of the pleadings of the classes of documents which are specified in the request under section 1782 , but for the reasons that I have also stated, that consideration seems to me to be irrelevant to the present question.

## Amendment

39. I turn, finally, to an application to amend the pleadings which is made by Nokia. As pleaded, it is clear that Nokia's case on invalidity of the patents is in part contingent on the allegation that lies at the commercial heart of this dispute, which is that use of the inventions of the patents in suit, among others, is essential at least to G2 and G2.5 mobile digital cellular telephony. The patents have been notified to ETSI on the basis that the "proprietor believes that the [patents] may be considered essential" to the specified standards. InterDigital say most emphatically that a notification is not an assertion of essentiality, but only of possible or potential essentiality. In my view, something is only possibly or potentially essential to compliance with the standard during the period before the question of essentiality has been determined, whereafter it is either optional or essential.

40. Before me, InterDigital were initially unwilling to state whether they considered that use of any of the inventions the subject matter of the patents in suit was in fact essential to compliance with the relevant standards. In response to a direct question from me, Mr. Burkill QC took instructions and then informed me that essentiality was not asserted in relation to 571, use of which was therefore optional, but was asserted in relation to 774 and 414.

41. Once the assertion of essentiality is made, it seems to me that it is open to Nokia to argue that the

contents of the standard will force a particular construction of the claims on the patentee if the invention is to be essential to compliance. Whether the argument is compelling is not for me to say at this stage, but it is clearly possible without the need for examination of any particular embodiment. Where the employment of the invention is alleged to be optional, then if there is an assertion of infringement sufficient to support a prayer for a declaration of non-infringement under the inherent jurisdiction of the court, that may also be sufficient. It depends upon the terms of the assertion

42. Conscious of the difficulties of merely applying to revoke the patents on the basis of a construction which may be disputed in respect of a standard which may or may not be relevant, Nokia seek to amend their claim by adding a declaration of non-infringement in respect (put shortly) of equipment complying with the standards. InterDigital object on the basis that the claims relate to apparatus; that the specifications do not describe apparatus; and that to grant a declaration of non-infringement (or, I suppose, non-essentiality) in respect of the standard is potentially embarrassing

43. The draft pleading is as follows. Passing over the matters which are merely common form, I can pick it up as amended at paragraph 4.

> "4. The Defendant's publicly stated position is that the manufacturer of and commercial dealing in mobile telephone equipment which complies with GSM standards infringes the Patents (and corresponding patents worldwide). 'GSM standards' refers to the standards issued by the European Telecommunications Standards Institute (ETSI) relating to the European digital cellular telecommunications systems, known as Global System for Mobile Communications (GSM).
>
> (i) The Defendant has notified ETSI in accordance with the ETSI IPR Policy, that the Patents are 'Essential IPR' in respect of the GSM standards. A copy of the relevant entries in the database maintained and published by ETSI is attached hereto as Annex 1.
>
> (ii) The Defendant has licensed the Patents (and corresponding patents elsewhere in the world) to manufacturers of equipment falling within the GSM standards, on the basis that such licences are necessary for compliance with those standards. The Claimant, amongst others, has entered into such a licence.
>
> (iii) 'Essential IPR' under the ETSI IPR Policy, a copy of which is attached as Annex 2 hereto, is defined by clause 15(6) thereof in the following terms:
>
> 'ESSENTIAL' as applied to IPR means that it is not possible on technical (but not commercial) grounds, taking into account normal technical practice and the state of the art generally available at the time of standardisation, to make, sell, lease, otherwise dispose of, repair, use or operate equipment or methods which comply with a standards without infringing that IPR. For the avoidance of doubt in exceptional cases where a standard can only be implemented by technical solutions, all of which are infringements of IPR, all such IPRs shall be considered ESSENTIAL.'"

44. The particular (iii) under paragraph 4 which is sought to be added by amendment pleads the meaning of the word "essential" upon which Nokia rely, and paragraph 6, which is added by amendment, seeks in the alternative, or in any event, a declaration of non-infringement in relation to all Nokia equipment complying with the relevant standards. It is claimed that InterDigital have made a general assertion of infringement in relation to all three patents in relation to the handsets and other infrastructure manufactured by Nokia, and it is sought to add to the prayer for relief a declaration that importation, manufacture, sales, supply, offer for sale or supply, and keeping of the relevant hardware in compliance with the specified standards without the consent of the defendant, InterDigital does not require infringement of the identified patents and that the patents in each of them are not essential

IPR for GSM Release 4.

45. That in terms is not a declaration of non-infringement: it is a declaration of non-essentiality. What Nokia are seeking to do is to keep open the possibility which I think Mr. Silverleaf articulated by saying if they are not saying it is essential, we are not worried.

46. I have been in two minds as to whether this is a possible approach to a patent action. However, having regard to the assertion of essentiality which was made to me by Mr. Burkill, I am satisfied, for the reasons that I have endeavoured to express, that the court should, if at all possible, resolve the commercial issue in the terms that it is understood by the parties. The position is far more difficult in relation to the patent whose use is said to be optional. It does seem to me that on ordinary principles the question of non-infringement becomes an entirely theoretical one. Non-essentiality is accepted, and in those circumstances it seems to me that either there must be a clear assertion of infringement identified or a specimen hardware in respect of which InterDigital seek royalty should be identified.

47. It is not clear to me, as at present, whether that has happened and for this reason I will hear further submissions in the light of these observations in relation to the patent whose use is said to be optional. Subject as aforesaid, however, InterDigital's applications fail.

Crown copyright

© 2018 Thomson Reuters

