**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

IN RE APPLICATION OF SHERVIN
PISHEVAR FOR AN ORDER TO TAKE
DISCOVERY FOR USE IN FOREIGN
PROCEEDINGS PURSUANT TO 28
U.S.C. § 1782

Case No.  21-mc-00105-ABJ-RMM

**MEMORANDUM OF LAW IN SUPPORT OF PETITIONER'S OPPOSITION
TO FUSION GPS'S MOTION TO QUASH SUBPOENA FOR
DEPOSITION AND SUBPOENA FOR DOCUMENTS OR,
IN THE ALTERNATIVE, FOR A PROTECTIVE ORDER**

# **TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ........................................................................................1

FACTUAL BACKGROUND ..........................................................................................3

    A.    Marcus Baram Relied on a Forged Police Report Provided By Fusion GPS
When Publishing a Hit Piece on Mr. Pishevar.........................................................3

    B.    Prior to This Case, Mr. Pishevar Initiated Three 1782 Actions to Uncover
the Identities of Those Behind the Forged Police Report .......................................4

    C.    Fusion GPS Instructed Mr. Anson Not to Comply with the C.D. Cal.-
Authorized 1782 Subpoena......................................................................................6

    D.    Mr. Pishevar Filed the Current 1782 Application for Information from
Fusion GPS related to the Smear Campaign............................................................7

    E.    Fusion GPS, Through Counsel, Proposes to Offer a Barebones Declaration
from Mr. Simpson In Lieu of Responding to the Subpoenas ..................................7

    F.    Mr. Anson's Sworn Testimony Further Confirms Fusion GPS was Mr.
Baram's Source........................................................................................................8

    G.    Mr. Pishevar Intends to Bring Civil and Criminal Proceedings in England
and Wales Against Those Behind the Forged Police Report and Hit Pieces.........11

I.    THE COURT ACTED WITHIN ITS STATUTORY AUTHORITY WHEN
GRANTING MR. PISHEVAR'S 1782 APPLICATION ..................................................13

II.    THE *INTEL* FACTORS WEIGH AGAINST QUASHING THE SUBPOENAS
AND IN FAVOR OF FUSION GPS' COMPLYING WITH THE SUBPOENAS...........18

    A.    Fusion GPS will Not Participate in the Contemplated English Proceedings.........19

    B.    Mr. Pishevar's Request for a Deposition Does Not Circumvent English
Proof-Gathering Restrictions .................................................................................21

III.    THE SUBPOENAS ARE NOT UNDULY BURDENSOME AND ARE
PROPORTIONATE TO THE NEEDS OF THE CASE....................................................23

    A.    Glenn Simpson's Declaration is Insufficient to Moot the Subpoenas
Because Fusion GPS Did Not Review Reasonably Accessible Information.........23

    B.    Glenn Simpson's Declaration is Insufficient to Moot the Subpoenas
Because Fusion GPS Did Not Address All Aspects of the Subpoenas..................28

    C.    Fusion GPS has Failed to Demonstrate how the Subpoenas Impose an
Undue Burden on Fusion GPS ...............................................................................29

CONCLUSION..............................................................................................................35

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Application of Furstenberg Fin. SAS v. Litai Assets LLC,*
877 F.3d 1031 (11th Cir. 2017*)* ........................................................... 17

*Azima v. Handjani,*
21-mc-501 (PGG), 2022 WL 2788400 (S.D.N.Y. July 15, 2022) ......................................... 22

*Bean LLC v. Defendant Bank,*
17-cv-02187 (October 19, 2017 D.D.C.) ......................................... 27

*Bravo Express Corp. v. Total Petrochemicals & Ref. U.S.,*
613 F. App'x 319 (5th Cir. 2015) ......................................... 15

*Bush v. Ruth's Chris Steak H., Inc.,*
286 F.R.D. 1 (D.D.C. 2012) ......................................... 24

*Dinkins v. Schinzel,*
No. 17-CV-01089 (JAD) (GWF), 2018 WL 11274497
(D. Nev. June 11, 2018) ......................................... 25

*Est. of Klieman v. Palestinian Auth.,*
293 F.R.D. 235 (D.D.C. 2013) ......................................... 31

*Euromepa S.A. v. R. Esmerian, Inc.,*
51 F.3d 1095 (2d Cir. 1995) ......................................... 18

*Great Am. Ins. Co. of New York v. Vegas Const. Co., Inc.,*
251 F.R.D. 534 (D. Nev. 2008) ......................................... 25

*Huthnance v. D.C.,*
255 F.R.D. 285 (D.D.C. 2008) ......................................... 34

*In re Application of Caratube Int'l Oil Co., LLP,*
730 F. Supp. 2d 101 (D.D.C. 2010) ......................................... 23

*In re Application of Caratube Int'l Oil Co.,* LLP,
730 F.Supp.2d ......................................... 32

*In re Application of CBRE Glob. Inv'rs*
(NL) B.V., 20-MC-315 (VEC), 2021 WL 2894721
(S.D.N.Y. July 9, 2021) ......................................... 18

*In re Application of Furstenberg Fin.* SAS,
334 F. Supp. 3d 616 (S.D.N.Y. 2018) ......................................... 15

*In re Application of Ontario Principals' Council*,
  2:13-MC-120-LKK-KJN, 2013 WL 6844545 (E.D. Cal. Dec. 23, 2013) ............................ 17

*In Re Application of Shervin Pishevar for an Order to Take Discovery for Use in
  Foreign Proceedings Pursuant to 28 U.S.C. 1782,*
  No. 1:19-mc-00503-JGK-SDA (S.D.N.Y.) ..................................................................... 6, 16

*In re Application of Shervin Pishevar for an Order to Take Discovery for use in Foreign
  Proceedings Pursuant to 28 U.S.C. 1782,*
  No. 1:21-mc-00105-ABJ-RMM (D.D.C.) ........................................................................... 16

*In re Application of Shervin Pishevar for an Order to Take Discovery for use in Foreign
  Proceedings Pursuant to 28 U.S.C. 1782,*
  No. 19-mc-00370, (S.D.N.Y.) ........................................................................................... 16

*In Re Application of Shervin Pishevar for an Order to Take Discovery for Use in
  Foreign Proceedings Pursuant to 28 U.S.C. 1782,*
  No. 2:21-mc-00175-JAK-KS (C.D. Cal.) ........................................................................... 16

*In re Barnwell Enterprises Ltd*,
  265 F. Supp. 3d 1 (D.D.C. 2017) ....................................................................................... 32

*In re DiGiulian*,
  314 F. Supp. 3d 1 (D.D.C. 2018) ....................................................................................... 14

*In re Ex Parte Application of Ambercroft Trading Ltd.*,
  No. 18-MC-80074-KAW, 2018 WL 2867744 (N.D. Cal. June 11, 2018) ........................... 15

*\*In re Furstenberg Fin. SAS*,
  16-MC-60266, 2016 WL 10707012 (S.D. Fla. July 27, 2016) ........................................... 17

*\*In re Furstenberg Fin. SAS*,
  785 F. App'x 882 (2d Cir. 2019) ................................................................................. 15, 18

*\*In re Furstenberg Fin. SAS*,
  18-MC-44 (JGK), 2018 WL 3392882 (S.D.N.Y. July 12, 2018) ...................................... 17

*In re Hornbeam Corp.*,
  722 F. App'x 7 (2d Cir. 2018) ......................................................................................... 15

*In re Iraq*,
  2023 WL 2402873 ........................................................................................................... 15

*In re NTL, Inc. Sec. Litig.*,
  244 F.R.D. 179 (S.D.N.Y.2007) ....................................................................................... 24

*In re of Lucille Holdings Pte. Ltd.*,
  1:21-MC-99 (GMH), 2022 WL 1421816 (D.D.C. May 5, 2022) ...................................... 14

*In re Pishevar*,
   1:19-MC-00503 (JGK), 2020 WL 1862586 (S.D.N.Y. Apr. 14, 2020)..................................... 5

*In re Top Matrix Holdings Ltd.*,
   No. 18 MISC. 465 (ER), 2020 WL 248716 (S.D.N.Y. Jan. 16, 2020) .................................. 15

*In re Tovmasyan*,
   557 F. Supp. 3d 348 (D.P.R. 2021)....................................................................................... 22

*\*In re Veiga*,
   746 F. Supp. 2d 8 (D.D.C. 2010) ................................................................................... 13, 32

*In re Vitamins Antitrust Litig.*,
   216 F.R.D. 168 (D.D.C. 2003)............................................................................................... 24

*In re WildBrain Fam. Int'l Ltd.*,
   No. 19-MC-527 (JPO), 2020 WL 6135765 (S.D.N.Y. Oct. 19, 2020)............................ 21, 22

*\*Intel Corp. v. Adv. Micro Devices, Inc.*,
   542 U.S. 241 (2004).......................................................................................................... 14, 21

*Jasso v. Wells Fargo Bank, N.A.*,
   No. 22-CV-00858 (RFB) (BNW), 2021 WL 3549891
   (D. Nev. Aug. 11, 2021) ......................................................................................................... 34

*Loboa v. Women's Health All., P.A.*,
   No. 5:18cv329, 2020 WL 889739 (E.D.N.C. Feb. 24, 2020)................................................. 24

*Low v. Omni Life Sci.*, Inc.,
   No. 21 C 1568, 2022 WL 6751899 (N.D. Ill. Oct. 11, 2022)................................................. 30

*M&S LLC v. M&S LLC*,
   19-MC-80168-DMR, 2019 WL 3891497 (N.D. Cal. Aug. 19, 2019) ................................... 17

*McKinney/Pearl Rest. Partners, L.P. v. Metro. Life Ins. Co.*,
   No. 3:14-CV-2498-B, 2016 WL 2609994 (N.D. Tex. May 6, 2016) ..................................... 30

*Montgomery v. Wal-Mart Stores, Inc.*,
   No. 12-CV-3057-JLS (DHB), 2015 WL 11233390
   (S.D. Cal. Sept. 4, 2015) ........................................................................................................ 34

*Price Waterhouse LLP v. First Am. Corp.*,
   182 F.R.D. 56 (S.D.N.Y. 1998*)* .......................................................................................... 31

*Raymond James & Assocs., Inc v. Terran Orbital Corp.*,
   No. 19-CV-01916, 2020 WL 6083433 (C.D. Cal. June 10, 2020) ........................................ 31

*Rogers v. Giurbino*,
   288 F.R.D. 469 (S.D. Cal. 2012) ........................................................................................... 25

*Thompson v. Doel,*
   513CV80088EJDPSG, 2013 WL 5544607 (N.D. Cal. Oct. 7, 2013) ..................................... 17

*U.S. Dep't of the Treasury v. Pension Benefit Guar. Corp.,*
   301 F.R.D. 20 (D.D.C. 2014) ................................................................................................... 24

*U.S. v. Sussman,*
   21-cr-00582 (April 18, 2022 D.D.C.) ..................................................................................... 26

*Ueda v. Cavett & Fulton PC,*
   No. CV-14-02419-TUC-RCC, 2015 WL 13661654
   (D. Ariz. Sept. 16, 2015) ........................................................................................................ 25

*United States ITC v. ASAT, Inc.,*
   411 F.3d 245 (D.C.Cir.2005) ................................................................................................... 24

*United States v. Massachusetts Indus. Fin. Agency,*
   162 F.R.D. 410 (D.Mass.1995) ................................................................................................ 24

*United States v. Taylor,*
   166 F.R.D. 356 (M.D.N.C. 1996) ............................................................................................ 24

*Wall v. Reliance Stand. Life Ins. Co.,*
   341 F.R.D. 1 (D.D.C. 2022) ..................................................................................................... 33

*Weintraub v. Mental Health Auth. of St. Mary's, Inc.,*
   No. DKC 2008-2669, 2010 WL 347882 (D. Md. Jan. 22, 2010) ............................................ 24

*Westjest Airlines, Ltd. v. Lipsman,*
   15-MC-00174-MSK-KMT, 2015 WL 7253043 (D. Colo. Nov. 17, 2015) ............................. 17

*Woznicki v. Raydon Corp.,*
   No. 18-CV-2090, 2020 WL 2562874 (M.D. Fla. May 19, 2020) ............................................ 34

*ZF Automotive U. S., Inc. v. Luxshare, Ltd.,*
   596 U.S. ___ (2022) ................................................................................................................. 23

## **Statutes**

28 U.S.C. § 1782 ........................................................................................................................... 1

Civil Procedure Rule 34.8 ............................................................................................................ 22

Forgery and Counterfeiting Act 1981 .......................................................................................... 16

Fraud Act 2006 ............................................................................................................................. 16

Malicious Communications Act 1988 .......................................................................................... 16

Petitioner Shervin Pishevar respectfully submits this Memorandum of Law in support of his Opposition to Fusion GPS's Motion to Quash Subpoena for Deposition and Subpoena for Documents or, in the Alternative, for a Protective Order (the "Motion" or "Mot.").

## PRELIMINARY STATEMENT

Fusion GPS purports to be a small, meek company with just one employee that would be unduly burdened by responding to three narrowly tailored document requests and a deposition subpoena. However, Fusion GPS is anything but meek. Just a year after commissioning the Steele Dossier during the 2016 Presidential campaign, Fusion GPS again found itself as an intermediary for delivering an unverified—and, in this case, forged—report concerning Mr. Pishevar. Just like with the Steele Dossier, and while there is no evidence that Fusion GPS knew the report was forged, Fusion GPS is now downplaying its role—even asserting that it had no role—in transmitting false information concerning Mr. Pishevar. But Fusion GPS's assertions are not based on even the minimum diligence required of it and are inconsistent with the sworn testimony of Sam Anson, a highly experienced private investigator, whom Fusion GPS has sought to silence in connection with this proceeding.

Mr. Pishevar is the victim of an international conspiracy which sought to destroy his reputation and character. In November 2017, Marcus Baram and Fast Company published an article alleging (inaccurately) the circumstances surrounding Mr. Pishevar's arrest on suspicion of rape. In publishing the article, Mr. Baram relied on what has now been proven to be a forged British police report. Mr. Baram received the Forged Police Report[1] from Fusion GPS. Through his 1782 Application, Mr. Pishevar seeks the identities of those who engaged Fusion GPS to provide services related to Mr. Pishevar, including those who provided Fusion GPS with, or instructed Fusion GPS to obtain, information relating to Mr. Pishevar, including the Forged Police

---

[1]   Unless otherwise defined, capitalized terms have the meanings ascribed to them in Mr. Pishevar's *Ex Parte* Application and Petition for an Order to Conduct Discovery for use in Foreign Proceedings Pursuant to 28 U.S.C. § 1782. ECF No. 1.

Report that was later transmitted to Mr. Baram.  On February 17, 2023, this Court authorized Mr. Pishevar to serve a deposition and document subpoena on Fusion GPS to obtain just that.

After receiving the two Court-authorized subpoenas for testimony and documents, Fusion GPS argues that complying with the Subpoenas would be unduly burdensome because, according to a barebones declaration offered by Glenn Simpson, Fusion GPS "does not recall" receiving the Forged Police Report and is "not aware" of the identity of the UK Source.[2]  Notably, Mr. Simpson makes no representations as to whether Fusion GPS was hired to perform services related to Mr. Pishevar.

Mr. Simpson's half-hearted declaration should be given no credence.  As apparent from the face of the declaration, Mr. Simpson has not consulted with Mr. Peter Fritsch, a former (or potentially current[3]) owner of Fusion GPS, who was responsible for contacting Mr. Baram concerning Mr. Pishevar.  Such a glaring error demonstrates that Mr. Simpson's declaration at best failed to meet even the bare minimum of diligence required of it—and, at worst, intentionally misled the Court.  Accordingly, this Court should require that Fusion GPS review information reasonably accessible to it (including contacting Mr. Fritsch) in responding to the Subpoenas.

Fusion GPS further argues, in effect,[4] that this Court should vacate its order granting Mr. Pishevar's 1782 Application because, according to Fusion GPS, the Court lacked statutory authorization to grant the 1782 Application and the *Intel* factors weigh in favor of quashing the

---

[2]  "UK Source" is defined in the Subpoenas as "the individual(s) who gave, sent, shared, or otherwise communicated a copy of the Forged Police Report to [Fusion GPS]."  ECF No. 1-3 at pdf. 9, 14.

[3]  Less than a year ago, counsel for Fusion GPS represented to this Court that Mr. Fritsch and Mr. Simpson were principals and owners to Fusion GPS.  Supplemental Declaration of Lucas Bento ("Bento Suppl. Decl.") ¶¶ 4–5, Exs. 1–2.X.  Mr. Fritsch's LinkedIn account as of April 17, 2023 indicated that Mr. Fritsch is a current Partner in Fusion GPS.  *Id.*, ¶ 6, Ex. 3.  Despite that, in his declaration, Mr. Simpson asserts that he is the only employee and principal of Fusion GPS.  ECF No. 12-2, Simpson Decl. ¶ 3.

[4]  Although failing to formally move to vacate this Court's February 17, 2023 Order, Fusion GPS makes arguments challenging the basis for granting the 1782 Application.  This is procedurally improper.  However, for the Court's convenience, Petitioner will treat Fusion GPS's arguments as though it had formally moved to vacate.

Subpoenas.  Neither argument has merit.  The Court acted within its authority when granting Mr. Pishevar's 1782 Application because the discovery sought is "for use" in the Contemplated English Proceedings.  And the *Intel* factors weigh in favor of compelling Fusion GPS to comply with the Subpoenas because Fusion GPS is not, nor will become, a participant to the Contemplated English Proceedings, depositions do not circumvent English proof-gathering restrictions, and the Subpoenas are not unduly burdensome.

## **FACTUAL BACKGROUND**

### A.    **Marcus Baram Relied on a Forged Police Report Provided By Fusion GPS When Publishing a Hit Piece on Mr. Pishevar**

In September 2017, Mr. Marcus Baram met with Fusion GPS in a café in Washington, D.C., where an agent for Fusion GPS provided Mr. Baram with a USB pen drive containing a copy of the Forged Police Report.  Bento Decl. Exs. 6, 8, 9; *see* Bento Supp. Decl., Ex. 4. (Anson Dep. Tr 32:16–33:04).  At that meeting, Fusion GPS represented to Mr. Baram that he had obtained the Forged Police Report from a male lawyer in the United Kingdom.  Bento Decl. Ex. 9.  Fusion GPS also relayed additional fabricated information to Mr. Baram, including that Mr. Pishevar allegedly paid the alleged victim money to "drop[ ] the charges," that the "[G]old [C]ommand" of the British Police was allegedly involved, and that the British police were allegedly "outraged" once the charges were dropped.  Bento Decl. Ex. 9.

On November 8, 2017, relying on the information provided by Fusion GPS, Mr. Baram and Fast Company published an article titled "'Smear Campaign' Or Not, Tech Investor Shervin Pishevar Really Was Arrested Earlier This Year" (the "Fast Company Article").  Afia Decl., Ex. 5.  The Fast Company Article referred to details contained in the Forged Police Report, including false information about the circumstances leading to the arrest and was afforded greater credibility because it referred to the details of the Forged Police Report.  Afia Decl. ¶ 21.

The following day, on November 9, 2017, more publications released articles referring to the contents of the Forged Police Report.  The New York Post published an article titled "Billionaire ally of ex-Uber CEO busted on rape charge" which included details from the Forged Police Report.  Afia Decl. ¶ 21.  *Forbes* published an article titled "Shervin Pishevar, arrested but never charged over alleged rape, says he's a victim of 'smear campaign,'" which stated that "a copy of the police report obtained by *Forbes*, confirms the details of the arrest and the identity of the suspect." *Id*.

**B.     Prior to This Case, Mr. Pishevar Initiated Three 1782 Actions to Uncover the Identities of Those Behind the Forged Police Report**

As part of his investigation to identify those behind the Forged Police Report and other misstatements concerning Mr. Pishevar's arrest, Mr. Pishevar initiated three Section 1782 actions: two in New York and one in California.

On August 6, 2019, Mr. Pishevar petitioned the U.S. District Court for the Southern District of New York for an order authorizing him to conduct discovery from Fast Company relating to the Fast Company Article, including the identity of Mr. Baram's source ("First SDNY 1782 Application").  On August 9, 2019, the Magistrate Judge Stewart D. Aaron granted the First Section 1782 Application.  Bento Decl. Ex. 10.  Mr. Pishevar subsequently served subpoenas on Fast Company and Mansueto Ventures LLC (Fast Company's publisher).  Between September 17, 2019 and October 21, 2019, Fast Company/Mansueto produced certain information about the Forged Police Report, but Mr. Baram (through Fast Company) refused to produce information about the identity of his source—Fusion GPS—under the "reporter's privilege."  Bento Decl. Exs. 5, 7.

On October 31, 2019, Mr. Pishevar filed in the SDNY a Section 1782 application against Mr. Baram to obtain identifying information sufficient to identify Mr. Baram's source ("Second

SDNY 1782 Application").[5]   After Magistrate Judge Stewart Aaron denied Mr. Pishevar's application based on the reporter's privilege, on March 3, 2020, Mr. Pishevar filed a motion for reconsideration.  The court granted the motion for reconsideration but adhered to its prior decision because "Petitioner ha[d] tools available to him to obtain discovery" from three other potential sources.[6]  On September 8, 2020, Petitioner filed a motion to supplement, amend and/or renew his application, which included sworn affidavits from those three potential sources stating in substance that none of these individuals has any knowledge regarding the Respondent or of the provenance of the Forged Police Report.[7]   On October 3, 2020, the court granted Petitioner's renewed application in the Second SDNY 1782 Application and found that for purposes of the reporter's privilege analysis Petitioner had "exhausted reasonable alternative sources of information" and found that "the reporter's privilege has been overcome."[8]  Accordingly, the court ordered Mr. Baram to disclose to Mr. Pishevar the name and location of his source.[9]

On October 19, 2020, Mr. Baram filed objections against the court's October 3, 2020 order.[10]  On November 2, 2020, Petitioner filed his opposition to Mr. Baram's objections.[11]  On January 21, 2021, the court scheduled oral argument for February 12, 2021 ("SDNY Hearing").[12]

Around this time, Mr. Pishevar hired a private investigation firm, Guidepost, to help him investigate the identity of Mr. Baram's source.  When Mr. Pishevar hired Guidepost, he was not aware that Sam Anson, an employee of Guidepost, had knowledge of who provided Mr. Baram with the Forged Police Report.  Bento Supp. Decl., Ex. 4 (Anson Dep. Tr. 16:13–17).  In or around February 9, 2021 Mr. Anson indicated that he knew who Mr. Baram's source was, but insisted that

---

[5]  To be clear, Petitioner does not seek information already produced by Fast Company, Mansueto, or Mr. Baram pursuant to the First Section 1782 Application.

[6]  *In re Pishevar*, 1:19-MC-00503 (JGK), 2020 WL 1862586, at *4-5 (S.D.N.Y. Apr. 14, 2020) (citation omitted).

[7]  *Second SDNY 1782 Application*, ECF 86–92.

[8]  *In re Pishevar*, 1:19-MC-00503 (JGK), 2020 WL 8299764, at *5 (S.D.N.Y. Oct. 3, 2020).

[9]  *Id*.

[10]  *Second SDNY 1782 Application*, ECF 100.

[11]  *Second SDNY 1782 Application*, ECF 101.

[12]  *Second SDNY 1782 Application*, Minute Entry dated January 21, 2021.

a formal subpoena be issued because Mr. Anson believed that he may be bound by a confidentiality agreement.

On February 23, 2021, Mr. Pishevar filed a Section 1782 application in the U.S. District Court for the Central District of California ("C.D. Cal.") seeking documentary and testimonial evidence from Mr. Anson about the identity of Mr. Baram's source ("C.D. Cal. 1782 Action"). On May 25, 2021, the C.D. Cal. granted Mr. Pishevar's application and authorized service of the subpoenas on Mr. Anson.[13]  On June 18, 2021, Mr. Anson via his counsel informed Lucas Bento, Mr. Pishevar's counsel, that Fusion GPS was Mr. Baram's source.[14]

### C.     Fusion GPS Instructed Mr. Anson Not to Comply with the C.D. Cal.-Authorized 1782 Subpoena

Mr. Anson was served with a document and deposition subpoena in the summer of 2021. Bento Supp. Decl., Ex. 4 (Anson Dep. Tr. 29:24–30:08).  Upon receipt of that subpoena, Mr. Anson via his counsel, Andres Rivero, contacted Fusion GPS's counsel to confirm whether complying with the subpoena would implicate an obligation of confidentiality to Fusion GPS.  *Id*. Mr. Rivero asked Fusion GPS's counsel to confirm whether Mr. Anson had a confidentiality agreement with Fusion and if so, to provide Mr. Anson with the copy.  *Id*. at 30:09–12.  Fusion GPS did not do so.  *Id*. at 30:12–13.  Instead, counsel for Fusion GPS sent a letter to Mr. Anson, instructing him to defy the subpoena and not respond to any request for information made pursuant to it.  *Id*. at 30:22–31:01.  Mr. Anson's counsel informed Fusion GPS's counsel that Mr. Anson would not defy the subpoena.  *Id*. at 31:12–17.  On June 18, 2021, Mr. Anson identified Fusion GPS as Mr. Baram's source.

---

[13]     Order to Issue Subpoenas to Mr. Sam Anson Authorizing Discovery Pursuant to 28 U.S. §1782 to Conduct Discovery for Use in Foreign Proceedings, *In Re Application of Shervin Pishevar for an Order to Take Discovery for Use in Foreign Proceedings Pursuant to 28 U.S.C. 1782*, 2:21-mc-00175-JAK-KS (C.D. Cal May 25, 2021), ECF No. 21.

[14]    See Bento Decl., Ex. 12 (Rivero email to Bento dated June 18, 2021).

### D.   Mr. Pishevar Filed the Current 1782 Application for Information from Fusion GPS related to the Smear Campaign

On August 6, 2021, Mr. Pishevar filed the 1782 Application in this Court seeking that Fusion GPS provide him information concerning its involvement with the smear campaign, including revealing who hired Fusion to perform services related to Mr. Pishevar and the identity and location of the UK Source.  ECF No. 1.  Concerned that the statute of limitations for some of his contemplated civil claims was approaching, on December 16, 2022, Mr. Pishevar filed a Motion to Expedite Consideration of his *Ex Parte* Application.  ECF No. 7.  On February 17, 2023, this Court granted Mr. Pishevar's 1782 Application and authorized Mr. Pishevar to serve the Subpoenas.  ECF No. 9.  After a dozen attempts, on February 27, 2023, Mr. Pishevar effectuated service of the Subpoenas on Glenn Simpson.  *See* Bento Supp. Decl., Ex. 11.

### E.   Fusion GPS, Through Counsel, Proposes to Offer a Barebones Declaration from Mr. Simpson In Lieu of Responding to the Subpoenas

On March 2, 2023, Fusion GPS's counsel, Joshua Levy, contacted Lucas Bento requesting to meet and confer concerning the Subpoenas served on Mr. Simpson.  Bento Supp Decl., Ex. 5 at 4.  During that meet and confer, Mr. Levy offered a declaration from Mr. Simpson to the effect that Fusion GPS was unaware of who the UK Source was and is not aware of receiving or sending a copy of the Forged Police Report.  Bento Supp. Decl. ¶ 8. To which, Mr. Bento explained that that information was inconsistent with the facts.  *Id*.  In a follow up email, Mr. Levy represented that his "client ***has no recollection*** of receiving or sending any police report related to your client." Bento Supp. Decl., Ex. 5. at 1 (emphasis added). [15]  Further, Mr. Levy asserted that this declaration would not be inconsistent with Mr. Pishevar's application because "[i]t does not appear that Mr. Anson provided any sworn declaration" or "that Mr. Anson sat for a deposition."  *Id*.  Despite that Petitioner is under no obligation to provide a sworn statement from Mr. Anson explaining the basis for his identification of Fusion GPS as Mr. Baram's source—and in fact, the only reason Mr.

---

[15]   As discussed *infra,* Section III.A, in answering a subpoena, Fusion GPS is required to do more than confirm whether Mr. Simpson recalls a specific event.

Anson insisted on a formal subpoena was to not run afoul of any confidentiality agreement he has with Fusion GPS—to provide the Court comfort, Petitioner's counsel deposed Mr. Anson on March 14, 2023.

> **F.    Mr. Anson's Sworn Testimony Further Confirms Fusion GPS was Mr. Baram's Source**

Mr. Anson testified during his deposition that during the summer of 2017, Peter Fritsch reached out to him for a journalist referral or introduction in connection with the Uber board dispute.  Bento Supp. Decl. Ex. 4 (Anson Depo. Tr. 19:25–20:12).  This was not an unusual occurrence because Mr. Anson has known and worked with Messrs. Simpson and Fritsch since approximately 2008.  *Id*. 18:09–19:14.  During that conversation, Mr. Anson suggested Marcus Baram, with whom Mr. Fritsch was familiar in name, and Mr. Fritsch asked that Mr. Anson make the introduction.  *Id*. at 20:13–22.  Shortly thereafter, Mr. Anson (who has been friends with Mr. Baram for over two decades (*id.* at 12:23–13:14) informed Mr. Baram that Mr. Fritsch would be in contact with him related to a story on the board fight taking place inside Uber.  *Id*. at 20:23–21:03.  By way of background, during this time, Travis Kalanick, Uber's former CEO, was being sued by an early investor in Uber and was ousted from his position as CEO.  *See* Bento Supp. Decl., Ex. 6.  Mr. Pishevar, a former board member and major investor in Uber, was widely publicized as coming to his defense in a strongly written letter to Uber's board of directors.  *Id.*; *see* Bento Supp. Decl., Ex. 4 (Anson Dep. Tr. 11:10–16 ("Shervin Pishevar . . . was a prominent high-profile investor in the company Uber before it went public")).  This letter received national recognition.  *Wired* even referred to Mr. Pishevar as Mr. Kalanick's "Great Defender" in what it described as "a Hell of a Motivational Letter."  *See* Bento Supp. Decl., Ex. 6.  In November 2017, Mr. Baram published the Fast Company Article, relying on the Forged Police Report when inaccurately recounting the circumstances of Mr. Pishevar's arrest and noting that Mr. Pishevar had been in a spat with the board of Uber earlier that year.  Afia Decl., Ex. 5; *see* Bento Supp. Decl., Ex. 4 (Anson Dep. Tr. 34:20–35:06; 22:19–22) (confirming the Uber matter resulted in the article concerning Mr. Pishevar and subsequent 1782 application against Mr. Baram).

Mr. Anson testified that the next time he spoke with Mr. Baram concerning this matter was fall 2019.  Bento Supp. Decl., Ex. 4 (Anson Dep. Tr. 21:12–13).  During this conversation, Mr. Baram explained that Mr. Pishevar named him in a legal matter and was seeking the source that provided him the Forged Police Report and other information concerning Mr. Pishevar's arrest. *Id*. at 21:16–22.  At that time, Mr. Anson was not familiar with Mr. Pishevar—Mr. Baram explained that it was the Uber matter, which Mr. Anson understood to have arisen from his introduction of Messrs. Baram and Fritsch.  *Id*. at 22:05–12.

Mr. Anson and Mr. Baram spoke over 50 times between fall 2019 and present about the 1782 application seeking Mr. Baram's source.  *Id*. at 23:12–14.  During those conversations, although Mr. Baram never explicitly stated that Fusion GPS was his source, the two discussed the topic in a manner that indicated that Fusion GPS was the source of the Forged Police Report.  *Id*. at 23:12–24; Tr. 27:18–28:02 ("we had talked . . . openly about Pete and Glenn as being his source, and him not denying it, and proceeding with the conversation").  For example, Mr. Anson asked Mr. Baram whether Mr. Fritsch acknowledged that the police report he gave to Mr. Baram was fake and Mr. Baram responded along the lines of, no—he didn't.  *Id*. at 24:05–08; 26:03–25; 36:13–18 (also confirming that Mr. Baram and Mr. Fritsch "had a conversation at the time where it emerged that the [Forged Police Report] was a fake, and then subsequently after legal proceedings had been initiated against Mr. Baram.").  Mr. Anson also inquired whether Mr. Fritsch knew the police report he gave to Mr. Baram was fake when he gave it to Mr. Baram and Mr. Baram responded that no, Peter said Fusion GPS believed the document to be authentic.  *Id*. at 24:08–12.  Notably, Mr. Anson also confirmed that Mr. Baram told him that Mr. Baram felt bound to uphold his off-the-record pledge to Fusion GPS "because [Fusion GPS] had stated that [Fusion GPS] had a good faith basis to believe that the [Forged Police Report] was authentic." *Id*. at 26:23–25.[16]

---

[16]   Mr. Baram also never denied that Fusion GPS was his source.  *Id*. at 27:03–05.

Although Mr. Anson never spoke with Mr. Frisch about his provision of the Forged Police Report to Mr. Baram, Mr. Anson did speak to Mr. Simpson in fall 2020 at the request of Mr. Baram. *Id*. at 24:16–25:02. During his conversation with Mr. Simpson, Mr. Anson asked whether Fusion GPS or its client would engage with Mr. Pishevar in some sort of resolution of this matter that would relieve Mr. Baram of his legal obligations and remove him from the case, as he was facing a potential contempt proceeding. *Id*. at 25:03–13. Mr. Simpson acknowledged the situation and explained to Mr. Anson that he needed to discuss it with Mr. Fritsch as it had been "[Mr. Fritsch]'s matter." *Id*. at 25:14–18. Neither Mr. Fritsch nor Mr. Simpson got back to Mr. Anson. *Id*. at 25:19–21. Indeed, the next time Mr. Anson heard from Fusion was when its lawyers asked him to defy Mr. Pishevar's subpoena. *See id*. at 30:22–31:01

Mr. Anson also testified to having a second basis for believing that Fusion GPS was Mr. Baram's source. Mr. Baram suggested to Mr. Anson that Mark Hollingsworth, an investigator and journalist based in London, was someone who might be knowledgeable about the Forged Police Report. *Id*. at 38:02–07. Mr. Anson reached out to Mr. Hollingsworth in the spring of 2021. *Id*. at 38:12–16. Mr. Hollingsworth acknowledged that he was aware of the Forged Police Report and insisted that he had nothing to do with its creation or distribution. *Id*. at 38:17–39:05. Mr. Hollingsworth also noted that he suspected it was a U.S.-based research and investigation firm that had reached out to him and other people in London a few years prior trying to obtain a police report related to Mr. Pishevar's arrest. *Id*. at 38:17–39:05. Mr. Anson asked that Mr. Hollingsworth contact that party. *Id*. at 39:06–11. A few days later, Mr. Anson heard from a mutual friend that Mr. Fritsch and Fusion GPS were upset that Mr. Anson was making inquiries in London concerning this report. *Id*. at 39:12–17. Mr. Anson approached Mr. Hollingsworth again and noted that because Mr. Fritsch had heard of their conversation, Mr. Anson assumed that the investigation firm that had been seeking to obtain the police report was Fusion GPS. *Id*. at 39:25–40:08. Mr. Hollingsworth acknowledged to Mr. Anson that Fusion GPS was the U.S.-based research and investigation firm that he had been referring to. *Id*. at 40:08–09.

**G.      Mr. Pishevar Intends to Bring Civil and Criminal Proceedings in England and Wales Against Those Behind the Forged Police Report and Hit Pieces**

***Contemplated Criminal Proceedings***.  Mr. Pishevar seeks to initiate, either through public or private prosecutions, criminal proceedings in England & Wales against the Forgers[17] for violations of the Forgery and Counterfeiting Act 1981, the Fraud Act 2006, and the Malicious Communications Act 1988 ("Contemplated Criminal Proceedings").   As explained in the Declaration of Lord Macdonald of River Glaven Kt QC—the former Director of Public Prosecutions in England & Wales—the Forgers have contravened the Forgery and Counterfeiting Act 1981 by creating and maliciously disseminating the Forged Police Report—plainly a false instrument under English law and intending by their acts to harm, and harmed, Mr. Pishevar.  ECF No. 1–29, Macdonald Decl. ¶¶ 27–28.  The Forgers also contravened Sections 2, 6, and 7 of the Fraud Act 2006 under English law by intending the Forged Police Report be perceived by its readers as a genuine police report; knowing this was a false representation; and making this false representation to cause loss to Mr. Pishevar.  Similarly, the Forgers contravened the Malicious Communications Act 1988 by conveying the report to others while knowing it contained false information and with full awareness that it would inevitably cause distress and anxiety to Mr. Pishevar.  *Id*. ¶¶ 32–33.

Mr. Pishevar retained Hickman and Rose Solicitors to initiate a criminal action against the author of the Forged Police Report and anyone else with the requisite intent (including potentially

---

[17]      *See* ECF 1, at 8 ("The Respondent therefore has possession, custody, or control of information to identify the UK Source and provenance of the Forged Police Report, including anyone who funded or directed its creation or distribution ("*Forgers*"). Petitioner brings this Application to obtain that information for use in Contemplated Criminal and Civil Proceedings, as defined below, in England against the *Forgers* ("Contemplated English Proceedings")) (emphasis added).

the UK Source). *Id.* ¶ 25.  Hickman and Rose Solicitors have already begun preparing pleadings, including criminal summonses. *Id.* ¶ 24.

     ***Contemplated Civil Proceedings***.  Mr. Pishevar contemplates initiating civil proceedings against the Forgers.  Specifically, Mr. Pishevar intends to bring, *inter alia*, a claim of negligent misstatement against the Forgers on the basis that the Forgers owed Mr. Pishevar a duty of care not to publish private information about him which they knew to be false, yet did so regardless, which information the media (and possibly others) have relied on, thereby causing Petitioner to suffer loss ("Contemplated Civil Proceedings").  Afia Decl. ¶¶ 33– 45.  In the Contemplated Civil Proceedings, Mr. Pishevar also intends to bring libel and/or slander proceedings, as well as a claim of misuse of private information and civil conspiracy in respect of the dissemination of the Forged Police Report which has caused serious harm to his reputation.

     Mr. Pishevar has retained English counsel to pursue civil claims in England & Wales, including (without limitation) negligent misstatement, libel, and/or slander, as well as for misuse of private information and civil conspiracy. *Id.* ¶¶ 33–34, 46–48.  English counsel has begun preparing pleadings to pursue these claims. *Id.*  As clearly noted in Petitioner's 1782 Application, while these claims initially may be brought against Persons Unknown (akin to John Doe defendants in the U.S.), Afia Decl. ¶ 35, Mr. Pishevar has chosen not to file such claims yet because, if Mr. Pishevar fails to serve the Persons Unknown within four to six months (depending on where they are located), Mr. Pishevar's claim will lapse and be rendered void.[18]  Afia Supp. Decl. ¶ 7.  Although an English court can stay the proceeding at its discretion, that is not guaranteed. *Id.*  Thus, in the interests of efficiency and judicial economy, and to fully preserve his

---

[18]   While a court may authorize a Persons Unknown claim to continue, even where the person is not known when service is required to be effectuated, such claims in practical terms render meaningless remedies.  Afia Supp. Decl. ¶ 12.

rights, Mr. Pishevar seeks to obtain the identity of the defendants before filing his lawsuit.  *See In re Veiga*, 746 F. Supp. 2d 8, 17 (D.D.C. 2010) ("courts should look to the statute's twin aims: i.e., to provide fair and ***efficient assistance*** to participants in international litigation and to encourage other countries to provide similar assistance.") (emphasis added).

## ARGUMENT

Although failing to formally do so, Fusion GPS's Motion is effectively seeking to vacate this Court's February 17, 2023 Order (ECF No. 9) by arguing that the Court (1) acted outside of its statutory authority when granting Mr. Pishevar's 1782 Application because the requested discovery is not "for use" in the Contemplated English Proceedings; and (2) should have used its discretion to deny Mr. Pishevar's 1782 Application because the *Intel* factors weigh against granting the 1782 Application.  Neither is correct, and thus the February 17 Order should not be vacated.

Fusion GPS also argues that the Subpoenas should be quashed under Federal Rules of Civil Procedure 45 and 26 because they are unduly burdensome and disproportionate to the needs of the case.  Fusion GPS has failed to identify any meaningful burden, nor is it able to demonstrate that it has done even the bare minimum to confirm that it does not have access to responsive information.  Accordingly, Fusion GPS's request to quash the Subpoenas should be denied and Fusion GPS should be forced to comply with the Subpoenas.

## I.   THE COURT ACTED WITHIN ITS STATUTORY AUTHORITY WHEN GRANTING MR. PISHEVAR'S 1782 APPLICATION

Fusion GPS argues that this Court acted outside of its authority by granting Mr. Pishevar's 1782 Application. Mot. at 18.  According to Fusion GPS, the discovery sought is not "for use" in a foreign proceeding, a statutory requirement of Section 1782.  *Id*.  However, as Fusion GPS acknowledges, Section 1782 does not require the foreign proceedings to be "pending" or

"imminent" but permits courts to authorize discovery provided that the foreign proceedings are "within reasonable contemplation" when the request for judicial assistance is filed.  *In re DiGiulian*, 314 F. Supp. 3d 1, 6 (D.D.C. 2018); *Intel*, 542 U.S. at 258–59.

In arguing that the Contemplated English Proceedings are not within reasonable contemplation, Fusion GPS relies on the holding in *In re of Lucille Holding*.  Mot. at 18–19. However, the facts and circumstances in *In re Lucille Holdings* are nothing like those present here. The court in *In re Lucille Holdings* found that the petitioner had not established that the foreign proceeding was reasonably contemplated because the petitioner in that case provided the court with only "threadbare" representations regarding potential litigation.  *In re of Lucille Holdings Pte. Ltd.*, 1:21-MC-99 (GMH), 2022 WL 1421816, at *14 (D.D.C. May 5, 2022).  The petitioner's application and affixed declaration in that case provided "the most general identification of potential claims and of the many jurisdictions in which such claims might perhaps be brought" while failing to identify "any particulars about what facts support the claims." *Id*.  Moreover, the declaration accompanying the application appeared to have no "familiar[ity] with the laws of the myriad jurisdictions in which litigation was allegedly contemplated or with the procedures of the courts or arbitral forum in which litigation might be brought." *Id*.  The court noted that Lucille's application was "a far cry from, for example, a detailed explanation from legal counsel on the specifics of the contemplated claims and the tribunal where they would be filed." *Id*.  Here, unlike the petitioner in *In re Lucille Holdings,* Mr. Pishevar has retained experienced English counsel who have attested to concrete causes of action they intend to bring, what facts they will be relying on, under what laws they intend to bring Mr. Pishevar's claims, and that the appropriate pleadings are underway.  ECF No. 1, App. at 9–10, *see generally* ECF Nos. 1-15 (Afia Decl.); 1-29 (Macdonald Decl.).  This is more than sufficient. *See e.g., In re Hornbeam Corp*., 722 F. App'x

14

7, 9–10 (2d Cir. 2018) (finding that statements that represented applicants' intent to litigate and "articulated a theory on which it intended to litigate" provided sufficiently concrete basis); *Bravo Express Corp. v. Total Petrochemicals & Ref. U.S.*, 613 F. App'x 319, 323 (5th Cir. 2015) (finding that the application was for use in a contemplated proceeding where Petitioner filed a "sworn affidavit" from his foreign lawyer that he had "already prepared" the complaint); *In re Application of Furstenberg Fin. SAS*, 334 F. Supp. 3d 616, 619 (S.D.N.Y. 2018), *aff'd sub nom. In re Furstenberg Fin. SAS*, 785 F. App'x 882 (2d Cir. 2019) (finding the application was for use in a contemplated foreign proceeding where petitioner filed a declaration from its foreign lawyer describing the contemplated claims and contractual bases therefor); *In re Top Matrix Holdings Ltd.*, No. 18 MISC. 465 (ER), 2020 WL 248716, at *4 (S.D.N.Y. Jan. 16, 2020) ("sworn statement from [petitioner's] Swiss lawyer attesting to its intent to litigate in Switzerland and providing the legal theories on which it intends to rely" was "objective indicia . . . demonstrating its intent to initiate litigation"); *In re Iraq*, 2023 WL 2402873, at *5 (finding foreign proceeding reasonably contemplated where petitioner "repeatedly affirmed its intent to file a proceeding in the UK," identified a theory of litigation, retained counsel, and began investigation into its claims including through "this application for discovery"); *In re Ex Parte Application of Ambercroft Trading Ltd.*, No. 18-MC-80074-KAW, 2018 WL 2867744, at *3 (N.D. Cal. June 11, 2018) (finding 1782 requirement satisfied where petitioners sent two demand letters to respondent stating they intended to file legal action in the British Virgin Islands and outlining the relief to which petitioners believed they were entitled as well as their legal theories and relevant statutory authority).

As to the Contemplated Civil Proceedings, Fusion GPS further argues that because the statute of limitations for Mr. Pishevar's civil claims is approaching and because Mr. Pishevar has not yet filed his civil claims against "Persons Unknown," that somehow demonstrates that Mr.

Pishevar is still deciding *whether* to file his civil claims.  Mot. at 18–20.  Such is not the case.  Mr.

Pishevar has demonstrated that he is fully committed to pursuing civil claims against the Forgers

for negligent misstatements, libel, slander, misuse of information, and civil conspiracy (ECF No.

1, App. at 10), and criminal claims against the Forgers for violations of the Forgery and

Counterfeiting Act 1981, the Fraud Act 2006, and the Malicious Communications Act 1988 (ECF

No. 1, App. at 9).  Mr. Pishevar has been diligent in seeking to unmask the identities of the Forgers,

undergoing huge legal expense, including having now sought *four* 1782 Applications,[19] obtained

court-ordered discovery from the British Police, [20] and conducted private investigations.

Cognizant of the approaching statute of limitations, Mr. Pishevar even requested that this Court

expedite its consideration of his 1782 Application.  ECF No. 7.  That Mr. Pishevar has not yet filed

a "Persons Unknown" claim is because Mr. Pishevar seeks to preserve his claim.  If he were to file

his civil suit against "Persons Unknown" today, Mr. Pishevar would have to serve the claim on the

unknown persons within four to six months (depending on if the unknown persons are inside or

outside England and Wales).  Afia Supp. Decl. ¶ 7.  If the claims are not served within that time,

Mr. Pishevar's claims would lapse and be rendered void.  *Id.*  Although a court may exercise its

power to stay the proceeding to protect Mr. Pishevar's claim, that is not guaranteed and entirely

---

[19] *See In re Application of Shervin Pishevar for an Order to Take Discovery for use in Foreign Proceedings Pursuant to 28 U.S.C. 1782*, No. 19-mc-00370, (S.D.N.Y.) (1782 Application from Fast Company)*; In Re Application of Shervin Pishevar for an Order to Take Discovery for Use in Foreign Proceedings Pursuant to 28 U.S.C. 1782,* No. 1:19-mc-00503-JGK-SDA (S.D.N.Y.) (1782 Application from Marcus Baram); *In Re Application of Shervin Pishevar for an Order to Take Discovery for Use in Foreign Proceedings Pursuant to 28 U.S.C. 1782*, No. 2:21-mc-00175-JAK-KS (C.D. Cal.) (1782 Application from Sam Anson); *In re Application of Shervin Pishevar for an Order to Take Discovery for use in Foreign Proceedings Pursuant to 28 U.S.C. 1782*, No. 1:21-mc-00105-ABJ-RMM (D.D.C.) (1782 Application from Fusion GPS).

[20] ECF No. 1-29, Macdonald Decl. ¶ 18; ECF No. 1-15, Afia Decl. ¶ 25.

within that court's discretion. *Id*. Thus, Mr. Pishevar will continue to diligently pursue his claims and file in accordance with the guidance of his legal counsel.[21]

As to the Contemplated Criminal Proceedings, Fusion GPS argues that the criminal proceedings are speculative because they rely on a "government entity prior to the commencement of criminal proceedings." Mot. at 21. Notably, Fusion GPS cites no legal authority for such a proposition—simply, because there is none. The plain language of Section 1782 permits applications for use in "criminal investigations conducted before formal accusation." 28 U.S.C. §1782. Courts have held that an intention to file criminal charges satisfies the "liberal construction of Section 1782." *See In re Furstenberg Fin. SAS*, 16-MC-60266, 2016 WL 10707012, at *7 (S.D. Fla. July 27, 2016), *aff'd sub nom. Application of Furstenberg Fin. SAS v. Litai Assets LLC*, 877 F.3d 1031 (11th Cir. 2017*); In re Furstenberg Fin. SAS*, 18-MC-44 (JGK), 2018 WL 3392882, at *4 (S.D.N.Y. July 12, 2018) (holding that for use requirement was been met where petitioners swore that they intended to file a criminal complaint in Luxembourg Criminal Court and articulated a specific legal theory on which they intended to rely). Moreover, that a "magistrate judge may reject an application for summons" (Mot. at 21) if Mr. Pishevar were to bring a private prosecution does not bear on whether Mr. Pishevar met the "for use" requirement of Section 1782.

---

[21] Moreover, courts routinely grant 1782 applications seeking information identifying potential defendants to a defamation lawsuit in a foreign proceeding. *See e.g., M&S LLC v. M&S LLC*, 19-MC-80168-DMR, 2019 WL 3891497, at *3 (N.D. Cal. Aug. 19, 2019) (granting 1782 application seeking identity of anonymous authors to bring a lawsuit alleging defamation); *Westjest Airlines, Ltd. v. Lipsman*, 15-MC-00174-MSK-KMT, 2015 WL 7253043, at *3 (D. Colo. Nov. 17, 2015) (granting 1782 application seeking information on owners, registrants, and administrators of a website for a defamation lawsuit); *In re Application of Ontario Principals' Council*, 2:13-MC-120-LKK-KJN, 2013 WL 6844545, at *1 (E.D. Cal. Dec. 23, 2013) (granting 1782 application seeking documents that identify the names and contact information associated with blog for defamation proceeding); *Thompson v. Doel*, 513CV80088EJDPSG, 2013 WL 5544607, at *3 (N.D. Cal. Oct. 7, 2013) (granting 1782 application for documents sufficient to identify the names and addresses of certain gmail accounts for defamation lawsuit).

Unlike Fusion GPS, Mr. Pishevar has provided sworn evidence from Lord Macdonald—the United Kingdom's former Chief Prosecutor and former director of the UK's national prosecuting authority, the Crown Prosecution Service—in which he explains why summonses will be granted here. ECF No. 1-29 (Macdonald Decl. ¶38) ("I have no doubt that were evidence to be forthcoming to identify the creator of the Forged Police Report, and/or purveyors of the Forged Police Report possessed of the necessary intent, an English court would grant summonses for a private prosecution against those individuals"); *see also id.* ¶36 ("I have no doubt that an English prosecutor would consider it to be very strongly in the public interest to prosecute anyone who concocted a fake law enforcement document for deployment in a dispute, for the obvious reason that a prosecution in these circumstances would be essential to maintain public confidence in the processes and procedures of law enforcement."). In any event, to ask that this Court rule on the likelihood of a magistrate rejecting Mr. Pishevar's claims for private prosecution seeks only to inappropriately "invite the Court to delve into a 'battle-by-affidavit of international legal experts' that turns on a prediction of 'the procedural or substantive law of the foreign jurisdiction,' which is beyond the scope of a Section 1782 inquiry." *See In re Furstenberg Fin. SAS*, 785 Fed. Appx. 882, 884–85 (2d Cir. 2019) (unpublished) (*quoting Euromepa S.A. v. R. Esmerian, Inc*., 51 F.3d 1095, 1100 (2d Cir. 1995)).

## II.    THE *INTEL* FACTORS WEIGH AGAINST QUASHING THE SUBPOENAS AND IN FAVOR OF FUSION GPS' COMPLYING WITH THE SUBPOENAS

"[T]he Court is endowed with 'wide discretion' to authorize discovery to the extent the statutory requirements have been satisfied" and "no single *Intel* factor is alone dispositive." *In re Application of CBRE Glob. Inv'rs* (NL) B.V., 20-MC-315 (VEC), 2021 WL 2894721, at *9 (S.D.N.Y. July 9, 2021). Here, Fusion GPS asserts that this Court should quash the Subpoenas because three of the four discretionary *Intel* factors weigh against Mr. Pishevar's 1782 Application.

However, as detailed below, the *Intel* factors identified by Fusion GPS do, in fact, weigh against

quashing the Subpoenas and in favor of requiring Fusion GPS to comply with the Subpoenas.[22]

### A.      Fusion GPS will Not Participate in the Contemplated English Proceedings

In its analysis of the first *Intel* factor, Fusion GPS simultaneously maintains that it has no

relevant information but anticipates being a participant in the foreign proceedings.  This is a blatant

contradiction.   In any event, Fusion GPS argues that although Mr. Pishevar has explicitly

represented that Fusion GPS will not be a participant to the Contemplated English Proceedings,

this representation should be ignored because prior applications by Mr. Pishevar suggested that

Mr. Pishevar may bring a claim against it.  In so arguing, Fusion GPS relies on *In re Zouzar Bouka;*

*Vision Indian Ocean S.A.*, 22-MC-92 (RA) (GWG), 2022 WL 15527657 (S.D.N.Y. Oct. 28, 2022),

*modified on reconsideration sub nom. In re Bouka*, 22-MC-92 (RA) (GWG), 2023 WL 1490378

(S.D.N.Y. Feb. 3, 2023).  The circumstances in *In re Zouzar Bouka* are dissimilar to those present

here.  The court in *In re Zouzar Bouka* found the first *Intel* factor to weighed against granting the

1782 application as to the French proceeding because the petitioner had represented in its opening

brief that it would not bring a claim against an certain entity, while simultaneously representing in

that same brief that it intended to bring a claim against that same entity.  *Id.* at *12–13.

Fusion GPS attempts to obfuscate Mr. Pishevar's intentions by citing a single (out of

context) sentence in Mr. Pishevar's Motion to Expedite the consideration of its 1782 Application.

In that, Mr. Pishevar noted that "prior Section 1782 applications in New York and California . . .

sought discovery to identify Respondent for use in the same contemplated foreign proceedings and

in relation to these exact same facts at issue here."  Mot. to Expedite (ECF 7).  It is true that Mr.

---

[22]   Because the fourth discretionary factor overlaps substantially with Fusion GPS's claim of
undue burden under Federal Rules of Civil Procedure 45 and 26, we address the fourth factor in
*infra,* Section III.

Pishevar sought the identity of Fusion GPS to obtain information he can use in its foreign proceedings—including how the Forgers published the false accusations concerning Mr. Pishevar by disseminating information through Fusion GPS and Mr. Baram.  However, nothing in that sentence gives rise to a claim that Mr. Pishevar intends to initiate suit against Fusion GPS—only that Mr. Pishevar will use the information learned from those prior Section 1782 applications in support of the Contemplated English Proceedings—as Congress intended.

Further, Fusion GPS points to a statement Mr. Pishevar's experts made ***prior to knowing*** that Fusion GPS was Mr. Baram's source.  Mot. at 23 n.11.  Those statements make clear that Mr. Pishevar will bring an action against "Source 1 ***and/or*** Source 2 as well as the author of the Fake Report (which may be Source 1 and/or Source 2)."  *Id*.  Had it come to light that Fusion GPS was the author of the Fake Report (i.e. the Forged Police Report), Mr. Pishevar would already have initiated an action against it in the Contemplated English Proceedings.  However, such is not the case.  *See* Bento Supp. Decl., Ex. 4 (Anson Dep. Tr. 26:08–25 ("I asked [Mr. Baram] whether Pete or Fusion . . . were aware that the document was fake, and he said that . . . they were not aware that it was fake, that they believed it to be authentic.")).  Accordingly, Fusion GPS is not, nor will be, a participant in the foreign proceeding.

To the extent Fusion GPS is still concerned that it will be the subject to a lawsuit, and provided Fusion GPS provides in full the information sought in the Subpoenas, Petitioner is willing to enter into a protective order with a prosecution bar against Fusion GPS.  While wholly unnecessary for purposes of authorizing discovery under Section 1782, this approach is more than sufficient to address any lingering concerns relating to the use of discovery obtained in this proceeding.

Thus, the first *Intel* factor weighs against quashing the Subpoenas and in favor of compelling Fusion GPS to comply with the Subpoenas in full.

**B.      Mr. Pishevar's Request for a Deposition Does Not Circumvent English Proof-Gathering Restrictions**

The Supreme Court expressly held in *Intel* that a district court's exercise of discretion under Section 1782 is not bound by the discoverability of the evidence under foreign procedures.  *Intel*, 542 U.S. at 262 ("When the foreign tribunal would readily accept relevant information discovered in the United States, application of a foreign-discoverability rule would be senseless.  The rule in that situation would serve only to thwart § 1782(a)'s objective to assist foreign tribunals in obtaining relevant information that the tribunals may find useful but, for reasons having no bearing on international comity, they cannot obtain under their own laws.").  In any event, England and Wales provide for depositions during the normal course (Afia Supp. Decl. ¶ 20); thus, this Court's authorizing such discovery does not circumvent English proof-gathering restrictions (Afia Supp. Decl. ¶¶ 14–15) and supports the U.S. policy underlying Section 1782.

Fusion GPS argues that this third *Intel* factor weighs in favor of quashing the deposition subpoena[23] because, according to Fusion GPS, deposition testimony is inconsistent with English "proof-gathering" policies and restrictions.  Mot. at 24.  In support of its position, Fusion GPS relies on a single case from the Southern District of New York, *In re WildBrain Fam. Int'l Ltd.,* and a declaration offered by the respondent in support of that case.  No. 19-MC-527 (JPO), 2020 WL 6135765, (S.D.N.Y. Oct. 19, 2020).  However, Fusion GPS's interpretation of the breadth of *In re WildBrain* is inappropriate, and the Declaration of Mair Williams (an associate at a firm in London), relied upon by Fusion GPS and the court in *In re WildBrain*, is inaccurate.

---

[23]   Notably, Fusion GPS did not argue that the third *Intel* factor weighed against the Document Subpoena.

As to the first, the court in *In re WildBrain* did not hold that a Section 1782 request for a deposition always circumvents English "proof-gathering" policies and restrictions.  It exercised its discretion to deny a Rule 30(b)(6) deposition because, based on the totality of circumstances, the court considered a deposition not proportional to the needs of that specific case.  *In re WildBrain,* 2020 WL 6135765 *3.  The circumstances in *In re WildBrain* are distinguishable from our own. The underlying foreign proceeding, a proceeding brought before the Business and Property Courts in England and Wales, had already significantly progressed, and the English court in that matter had so-ordered months prior an agreed-upon case management schedule, which set forth the procedural steps of the litigation, including the scope and timing of discovery.  *See* Afia Supp. Decl. ¶¶ 17, 19.  By contrast, there is no case management schedule in this case, similar to that in *In re WildBrain*, limiting the timing and scope of discovery, nor would there be as Mr. Pishevar's Contemplated Civil Proceeding would be in a different English court with different requirements from those in *In re WildBrain.  Id.* at ¶ 19.

As to the second, the Declaration of Mair Williams incorrectly states, and Fusion GPS inappropriately relies upon the incorrect statement (Mot. at 24), that "[d]epositions are not a procedure recognized by the English Court."  English civil procedure rules provide for parties to rely on evidence in depositions under Civil Procedure Rule 34.8.  Afia Supp. Decl. ¶ 20.

Lastly, other district courts, including in the Southern District of New York, have not found *In re WildBrain* persuasive and have since permitted Section 1782 depositions in assistance of English litigations.  *See e.g.*, *Azima v. Handjani*, 21-mc-501 (PGG), 2022 WL 2788400, at *6–7 (S.D.N.Y. July 15, 2022) (granting a Section 1782 deposition in assistance of an English litigation and distinguishing itself from *In re WildBrain*); *In re Tovmasyan*, 557 F. Supp. 3d 348, 357–58 (D.P.R. 2021) ("Absent any such clear indication that the discovery would undermine a specific

policy of the United Kingdom or the United States *or* that the discovery is sought in bad faith, the

third *Intel* discretionary factor also favors authorizing the requested discovery.") (citing a

collection of cases).[24]

## III.   THE   SUBPOENAS   ARE   NOT   UNDULY   BURDENSOME   AND   ARE PROPORTIONATE TO THE NEEDS OF THE CASE

Fusion GPS asserts that the Subpoenas should be quashed under Federal Rules of Civil

Procedure 45 and 26, and under the fourth *Intel* factor as unduly intrusive and burdensome.  Mot.

at 11–18, 24.  In doing so, Fusion GPS asserts, without any basis, that "[e]nforcing the Subpoenas

would provide no benefit to Petitioner but would impose great costs on Fusion GPS."  Mot. at 13.

However, as explained below, Fusion GPS has not completed the requisite diligence to accurately

assess any benefit Mr. Pishevar will obtain from enforcing the Subpoenas.  Moreover, Fusion GPS

has identified no meaningful burden.

### A.    Glenn Simpson's Declaration is Insufficient to Moot the Subpoenas Because Fusion GPS Did Not Review Reasonably Accessible Information

Fusion GPS has failed to do even the bare minimum in determining whether it has

possession, custody, or control of information responsive to the Subpoenas.  In responding to the

Document Subpoena, Fusion GPS was required to review and provide all responsive documents

within its possession, custody, and control.  This court has understood possession, custody, and

control to not be limited by a party having legal ownership or actual physical possession of the

---

[24]   Fusion GPS also cites *In re Application of Caratube Int'l Oil Co., LLP,* for the proposition that a party should first go through the foreign tribunal to obtain discovery.  730 F. Supp. 2d 101, 107–08 (D.D.C. 2010).  *In re Caratube* is inapplicable because, there, the arbitration tribunal had strict rules related to the scope of discovery, including a rule that would require Caratube to request that the tribunal take the necessary steps to request discovery—i.e., those rules required Caratube to request that the tribunal seek the Section 1782 application if it deemed it appropriate.  Setting aside that the recent Supreme Court decision *ZF Automotive U. S., Inc. v. Luxshare, Ltd*., 596 U.S. ___ (2022), disavowing Section 1782 for arbitrations, puts into question whether this is still good law, the circumstances are meaningfully different here; there are no rules preventing Mr. Pishevar from seeking this Section 1782.  Thus, there are no rules Mr. Pishevar is seeking to circumvent.

documents at issue, but rather "the right, authority or practical ability to obtain the documents from a non-party to the action." *Bush v. Ruth's Chris Steak H., Inc*., 286 F.R.D. 1, 5 (D.D.C. 2012) (*citing In re NTL, Inc. Sec. Litig*., 244 F.R.D. 179, 195 (S.D.N.Y.2007) and *United States ITC v. ASAT, Inc*., 411 F.3d 245 (D.C.Cir.2005)).

Similarly, in preparing a corporate representee for the Deposition Subpoena, Fusion GPS was required to review relevant documents and communicate with past employees and other sources that are reasonably available to it. *See In re Vitamins Antitrust Litig*., 216 F.R.D. 168, 173 (D.D.C. 2003) (ordering defendants to educate its corporate designee as to former employee's involvement). Courts have understood this obligation to extend to educating witnesses about actions taken by former employees of the corporation. *See e.g.*, *United States v. Massachusetts Indus. Fin. Agency,* 162 F.R.D. 410, 412 (D.Mass.1995) (rejecting corporations' arguments that it was not required under Rule 30(b)(6) to educate its witness about actions taken by former employees of the corporation).[25] Having no employees at the institution with knowledge of a particular subject is not sufficient to establish an undue burden. *U.S. Dep't of the Treasury v. Pension Benefit Guar. Corp.,* 301 F.R.D. 20, 30 (D.D.C. 2014) (holding argument that no one with institutional knowledge regarding issue being litigated remained at organization is insufficient to establish undue burden to produce discovery from former employees, and ordering that

---

[25] *Loboa v. Women's Health All., P.A*., No. 5:18cv329, 2020 WL 889739, at *4 (E.D.N.C. Feb. 24, 2020) (finding corporation should have interviewed employees and used other "means reasonably available to" it to prepare for Rule 30(b)(6) deposition); *Weintraub v. Mental Health Auth. of St. Mary's, Inc*., No. DKC 2008-2669, 2010 WL 347882, at *4 (D. Md. Jan. 22, 2010)(finding prejudice where corporation later identified another more-knowledgeable individual whom it should have designated as its corporate representative "in the first place"); *United States v. Taylor*, 166 F.R.D. 356, 360–61 (M.D.N.C. 1996) (finding that a corporation is not relieved of its obligations under Rule 30(b)(6) merely because it has lost institutional knowledge held by former employees and must prepare for its deposition by means "reasonably available, whether from documents, past employees, or other sources")

organization attempt to compel, or otherwise demonstrate that it was impossible to compel, discovery from former employees); *Great Am. Ins. Co. of New York v. Vegas Const. Co., Inc.*, 251 F.R.D. 534, 540 (D. Nev. 2008) ("Although adequately preparing a Rule 30(b)(6) deposition can be burdensome, this is merely the result of the concomitant obligation from the privilege of being able to use the corporate form in order to conduct business.").

Lastly, a party asserting it has no responsive information must declare so under oath and provide a sufficient description of the search it undertook so that the court may determine that the search was adequate; merely asserting that the party conducted a diligent search is insufficient. *Rogers v. Giurbino*, 288 F.R.D. 469, 485 (S.D. Cal. 2012); *Dinkins v. Schinzel*, No. 17-CV-01089 (JAD) (GWF), 2018 WL 11274497, at *2 (D. Nev. June 11, 2018) (same); *Ueda v. Cavett & Fulton PC*, No. CV-14-02419-TUC-RCC, 2015 WL 13661654, at *3–4 (D. Ariz. Sept. 16, 2015) (requiring a party claiming to not have responsive documents to submit sworn declaration providing the item or category of items sought; that the item is not in his possession, custody, or control; whether the item was ever in his possession, custody, or control; whether he has undergone any procedure to distribute the discovery requests to employees and agents potentially possessing responsive information, including their identities and expected date of receipt; any and all efforts undertaken to retrieve responsive documents no longer in his possession, custody, or control; and all non-parties known to have or have had possession, custody, or control of that item).

The bare, conclusory assertions found in Glenn Simpson's Declaration—which counsel has requested that this Court accept in lieu of formally responding to the Subpoenas—is a far cry from meeting these obligations.  Mr. Simpson asserts that he is the principal and sole employee of Fusion GPS.  ECF No. 12-2, Simpson Decl. ¶ 3.  Mr. Simpson then proceeds to make statements, as though they rely *only* on his personal knowledge.  For example, Mr. Simpson asserts that

"Fusion GPS **is not aware** of the identity of the 'UK Source'" (*id*. at 5); "Fusion GPS **is not aware** of receiving or sending a copy of the document referred to in the Subpoenas as the 'Forged Police Report'" (*id*. at 6); "Fusion GPS **does not recall** receiving or sending any police report related to Mr. Pishevar" (*id*. at 8).   In fact, the only statement that Mr. Simpson can state definitively on behalf of Fusion GPS is that "[a]t no time did Sam Anson do any work for Fusion GPS related to Mr. Pishevar."  *Id*. at 10.   Nowhere does Mr. Simpson indicate that he conducted an investigation into the topics of the Subpoenas and contacted persons with likely relevant knowledge.   Nor does he explain why Fusion GPS would direct Mr. Anson to defy the subpoena seeking the identity of Mr. Baram's source.

Moreover, if Mr. Simpson is truly the sole employee and principal of Fusion GPS, he has not been for long.   On April 26, 2022, during the pendency of Mr. Pishevar's 1782 Application, Joshua Levy and Rachel Clattenburg—Fusion GPS's counsel in this proceeding—represented to this Court that both Peter Fritsch and Glenn Simpson are Fusion GPS's principals and owners. Bento Supp. Decl., Ex. 1 (*U.S. v. Sussman,* 21-cr-00582, Levy Decl., ECF No. 103-1 at ¶ 29 (April 18, 2022 D.D.C.) ("In 2019, Glenn Simpson and Peter Fritsch, two of Fusion GPS's owners, published a book called *Crime in Progress*")); Ex. 2 (Opposition to Motion to Compel, ECF No. 103 at 17 (April 18, 2022 D.D.C.) ("the Government points to *Crime in Progress*, a book published by two Fusion GPS principals, Glenn Simpson and Peter Fritsch.")).   Additionally, Mr. Fritsch's own LinkedIn account still shows him as a Partner of Fusion GPS.   Bento Supp. Decl., Ex. 3 (as of April 17, 2023).   Despite Fusion GPS's counsel, less than a year ago, representing that Mr. Fritsch was an owner and principal to Fusion GPS and despite Mr. Fritsch holding himself out as a partner of Fusion GPS, Mr. Simpson's declaration on behalf of Fusion GPS's knowledge does not mention any measures taken to contact Mr. Fritsch to understand whether he had any

documents or information concerning the Subpoenas.  This becomes all the more surprising when coupled with the fact that Mr. Anson identified Mr. Fritsch as being the Fusion GPS representative in talks with Mr. Baram about the Uber dispute and the Forged Police Report.  Bento Supp. Decl., Ex. 4 (Anson Dep. Tr. 20:01–21:03 ("I received a telephone call from Peter Fritsch . . . [h]e explained that Fusion GPS was working on a matter related to Uber and to the ongoing board dispute over Uber, and that he was looking for a referral or an introduction to a journalist . . . I spoke or communicated with Marcus to let him know that Pete Fritsch would be in contact with him, that he might have a story for him related to Uber and the board fight taking place inside Uber."); *id.* at 24:05–08 (Mr. Baram and Mr. Fritsch discussing whether report was fake or authentic); 26:03–25 (same); 24:08–12 (same); 36:13–18 (conversations between Mr. Baram and Mr. Fritsch regarding fake report and 1782 proceedings resulting therefrom).  And, in a conversation with Mr. Anson, Mr. Simpson indicated to him that the matter relating to Mr. Pishevar—*i.e.*, the Uber matter which formed the basis of the 1782 Application against Mr. Baram—was "Pete's matter."  *Id*. at 25:14–18.

In addition to Mr. Fritsch, Mr. Simpson should have reached out to the two other partners of Fusion GPS at the time of the incident.  Specifically, in October 2017—one month before Mr. Baram's Article—Peter Fritsch submitted a sworn declaration to this Court, declaring that Fusion GPS was a partnership of four individuals.  Bento Supp. Decl., Ex. 7 (*Bean LLC v. Defendant Bank*, 17-cv-02187, Fritsch Decl., ECF No. 2-2 at ¶ 3 (October 19, 2017 D.D.C.)).  Thomas Catan appears to be one of those partners.  Bento Supp. Decl., Ex. 8 (describing Messrs. Fritsch and

Catan as Fusion GPS partners).[26]  In addition to the partners of Fusion GPS, Mr. Simpson should

have also reached out to any sub-contractors Fusion GPS employed during the relevant period.

Fusion GPS's failure to conduct any diligence renders Mr. Simpson's declaration useless.

**B.    Glenn Simpson's Declaration is Insufficient to Moot the Subpoenas Because Fusion GPS Did Not Address All Aspects of the Subpoenas**

Fusion GPS asserts that because it claims not to have information about the identity or

location of the UK Source or the origin of any forged police report, it should be excused from

responding to requests aimed at identifying individuals who retained Fusion GPS to perform

services related to Mr. Pishevar.  Mot. at 14 n.7.  Additionally, Mr. Simpson's Declaration is silent

as to whether any clients retained Fusion GPS relating to allegations made against Mr. Pishevar.

ECF No. 1-3 at 5 ("**DOCUMENT REQUEST NO.** 2.  The identity and location of the Client who

retained you to perform services related to Mr. Shervin Pishevar.").  Mr. Anson has already

testified under oath that Fusion GPS, via Mr. Fritsch, was retained to conduct work related to the

Uber dispute and sought out a journalist to aid it in this endeavour, to which Mr. Anson suggested

Marcus Baram.  Bento Supp. Decl., Ex. 4 (Anson Dep. Tr. 20:01–21:03 ("I received a telephone

call from Peter Fritsch . . . [h]e explained that Fusion GPS was working on a matter related to Uber

and to the ongoing board dispute over Uber, and that he was looking for a referral or an

introduction to a journalist . . . I spoke or communicated with Marcus to let him know that Pete

Fritsch would be in contact with him, that he might have a story for him related to Uber and the

board fight taking place inside Uber.").  Further, Mr. Anson's discussions with Messrs. Baram,

Simpson, and Hollingsworth all indicated that Fusion GPS was providing Mr. Baram with

information concerning Mr. Pishevar.

---

[26]  Notably, Mr. Catan seems to be, and has been for almost the last decade, a D.C.-based research consultant.  *Id.*, Ex. 9 (Mr. Catan's LinkedIn).

Fusion GPS further asserts that because it claims not to have information about the identity or location of the UK Source or the origin of any forged police report, it should be excused from providing information in deposition on its document retention policies.  Mot. at 14 n.7.  However, considering Fusion GPS's alleged lack of documentary evidence (and instruction to Mr. Anson to defy the subpoena seeking the identity of Mr. Baram's source), it is reasonable for Mr. Pishevar to inquire what policies it has in place related to document retention that might explain the gaps in Fusion GPS's records.

Fusion GPS cannot wholesale ignore the requests that it does not wish to respond.  Accordingly, this Court should require that Fusion GPS comply with the Subpoenas.

### C. Fusion GPS has Failed to Demonstrate how the Subpoenas Impose an Undue Burden on Fusion GPS

In what seems a shotgun approach, Fusion GPS asserts a myriad of reasons why it believes that three document requests and a 30(b)(6) deposition are unduly burdensome.  None of them have merit.[27]

*First,* Fusion GPS maintains that the Subpoenas should be quashed because it does not have possession, custody, or control of information responsive to "identifying or locating the UK Source because Fusion GPS does not know the identity of the UK Source."  Mot. at 12.  As explained *supra,* Section III.A, Fusion GPS has not fulfilled its obligations to determine whether

---

[27]  In the footnotes of its Motion, Fusion GPS asserts that the Subpoenas are not identical to those approved by the Court and violate the Court's Order because Mr. Pishevar (1) adjusted the compliance date to one that has not already passed (and thus, one that Fusion GPS would be capable of complying with); and (2) corrected a typo as to the date of publication for Marcus Baram's article—matching the date to what was represented in Mr. Pishevar's application and in the link referenced in the Subpoena (ECF No. 1-2 (Subpoenas defining "Smear Campaign Article" as the article "authored by Marcus Baram" and found at "<https://www.fastcompany.com/40493814/smear-campaign-or-not-tech-investor-shervin-pishevar-really-was-arrested-earlier-this-year>" which is dated November 8 2017).  Mot. at 11, n.5.  Such a view is nonsensical and deserving of no response.

it in fact has possession, custody, or control of such information.  Mr. Simpson has the practical

ability to pick up a phone and contact Mr. Fritsch, Mr. Catan, and any other sub-contractor Fusion

GPS used during the relevant period to inquiry about acts committed on behalf of Fusion GPS.

Moreover, as discussed *supra*, Section III.B, Fusion GPS undoubtably has possession, custody,

and control over information related to the client(s) that retained it to perform services related to

Mr. Pishevar—i.e., the identities of those who commissioned Fusion GPS to conduct opposition

work on him which directly relates to the reputational harm he has suffered.

     *Second*, Fusion GPS argues that the Subpoenas impose an undue burden on it because it

"does not know the identity or location of the UK Source, does not recall sending or receiving any

'Forged Police Report,' and has no knowledge of hiring Mark Hollingsworth to do work related

to Mr. Pishevar."  Mot. at 12–13.[28]  As explained *supra*, Section III.A, Fusion GPS is required to

conduct further diligence before it can make such a representation, and the Subpoenas are not

limited to the UK Source's identity and whether Mark Hollingsworth was ever "retained."  Fusion

GPS is required to disclose which clients retained it to perform services related to Mr. Pishevar.

Fusion GPS has demonstrated no burden as to that.

     *Third*, Fusion GPS argues that it has undergone undue burden because it "has already

incurred legal expenses in moving to quash these fishing expeditions" and "engag[ing] in the

discovery process . . . would surely impose significant expenses upon Fusion GPS."  Mot. at 13.

But courts do not consider retention of counsel to respond to a subpoena alone to constitute an

undue burden.  *See e.g.*, *McKinney/Pearl Rest. Partners, L.P. v. Metro. Life Ins. Co.*, No. 3:14-

CV-2498-B, 2016 WL 2609994, at *11 (N.D. Tex. May 6, 2016) (third-party witness did not

---

[28]  Tellingly, Fusion GPS does not say that it has not communicated with Mr. Hollingsworth about Mr. Pishevar, including about the Forged Police Report—only that it never *hired* Mr. Hollingsworth.

establish undue burden where he argued he would be taken away from work and need to retain counsel to represent him at deposition); *Low v. Omni Life Sci.*, Inc., No. 21 C 1568, 2022 WL 6751899, at *4 (N.D. Ill. Oct. 11, 2022) (retention of counsel alone is not an undue burden unless the subpoena itself is sanctionable). This is especially true where, as here, Fusion GPS has the sophistication to protect its own interests, including through its retention of counsel (which it used to attempt to silence Mr. Anson, instructing him to defy the subpoena seeking the identity of Mr. Baram's source). *See e.g., Raymond James & Assocs., Inc v. Terran Orbital Corp.*, No. 19-CV-01916, 2020 WL 6083433, at *3 (C.D. Cal. June 10, 2020) (even though "courts should strive to protect third parties from unnecessary discovery burdens, that interest is not as strong" where the subpoenaed party has sufficient sophistication to retain counsel and protect its own interests).

*Fourth*, Fusion GPS asserts that the Deposition Subpoena imposes an undue burden on it because it "does not have *any* current or former employee, let alone one within a reasonable distance of the district, who has knowledge of the identity or location of the UK Source."[29] Mot. at 13–14. Notably, this is strictly an attorney proffer and is not supported by Mr. Simpson's declaration. In any event, it is untrue. Peter Fritsch—although unclear whether he is a former or current partner of Fusion GPS—has knowledge of the UK Source and resides within a reasonable distance of the district. Public records indicate that Mr. Fritsch lives in Bethesda, Maryland. Bento Supp. Decl., Ex. 10. Additionally, Thomas Catan—a partner of Fusion GPS during the relevant period—resides in the district. Bento Supp. Decl., Ex. 9. In any event, Mr. Simpson has knowledge over which clients retained Fusion GPS to perform services related to Mr. Pishevar.

---

[29] Fusion GPS misstates the holdings in *Est. of Klieman v. Palestinian Auth.*, 293 F.R.D. 235, 239 (D.D.C. 2013) and *Price Waterhouse LLP*, 182 F.R.D. at 63. Those cases are focused on forcing a witness to travel more than 100 miles. Fusion GPS cannot designate a witness outside of the 100 mile-radius to attempt to get around a lawful subpoena.

*Fifth*, Fusion GPS argues that enforcing the Document Subpoena will unduly burden Fusion GPS because it seeks documents that Fusion GPS does not have.  Mot. at 14.  This too is inaccurate.  Fusion GPS does have documents identifying which clients retained it to perform services related to Mr. Pishevar.  Moreover, the documents in Fusion GPS's possession, custody, or control are those that Fusion GPS can reasonably acquire—Fusion GPS has not attempted to do so from, at the very least, Mr. Fritsch.  From Mr. Simpson's declaration, it does not appear that Fusion GPS attempted to do so at all—no searches are attested to have been run and it is unclear what if any documents Mr. Simpson reviewed before preparing his declaration.

*Sixth,* Fusion GPS asserts that the Subpoenas amount to a fishing expedition, to which Mr. Pishevar has less burdensome alternatives.  Mot. at 15–16.  Mr. Anson's testimony on his communications with Mr. Baram, as well as his communications with Fusion GPS (including Fusion GPS's instruction to defy a subpoena) make clear that this is not a fishing expedition.  Moreover, despite Fusion GPS's spilling ink on Mr. Pishevar having less burdensome alternatives, it is unable to identify one.  Fusion GPS shallowly asserts that Mr. Pishevar could use UK proceedings to identify the source but describes no path by which Mr. Pishevar could do so.  Mr. Pishevar already sought and obtained an order from the High Court that required the London police to provide information related to the Fast Company Article and Forged Police Report—although that information was helpful, it failed to assist in identifying the author(s) or distributor(s) of the Forged Police Report.  ECF No. 1-29 (Macdonald ¶¶ 18–20).  Regardless, the law concerning Section 1782 is clear—Mr. Pishevar is not required to exhaust all other available options before obtaining discovery from Fusion GPS.  *See In re Barnwell Enterprises Ltd*, 265 F. Supp. 3d 1, 13 (D.D.C. 2017) ("there is no requirement in the statute that a petitioner exhaust their discovery options in a foreign forum before seeking discovery here"); *In re Application of Caratube Int'l Oil*

*Co*., *LLP*, 730 F.Supp.2d at 107 ("[c]ourts have refused to engraft a quasi-exhaustion requirement onto section 1782 that would force litigants to seek information through the foreign or international tribunal before requesting discovery from the district court.") (citation omitted); *In re Veiga*, 746 F.Supp.2d at 24 ("Section 1782(a) does not incorporate an exhaustion requirement, and an applicant is not required to first seek discovery from the foreign tribunal.").  To require such exhaustion would undermine the twin aims of Section 1782—efficiency and judicial economy. *See id.* at 17.

In any event, all roads lead to Fusion GPS because it was Fusion GPS that supplied Mr. Baram with the Forged Police Report.

*Seventh*, Fusion GPS relies on Federal Rule of Civil Procedure 26 when asserting that requests for information "as they relate to any clients of Respondent are irrelevant." Mot. at 15. Mr. Pishevar has not requested that Fusion GPS provide information concerning **all** clients—Mr. Pishevar has narrowly tailored his request to information concerning clients that retained Fusion GPS to perform services related to Mr. Pishevar—the same services that resulted in the transmittal of the Forged Police Report and eventual publication of the Fast Company Article.  Fusion GPS's work, as an opposition firm, related to Mr. Pishevar is entirely relevant, especially where it is evident that Fusion GPS is playing at semantics.  Fusion GPS cites nothing to the contrary.  Fusion GPS relies on *Wall v. Reliance Stand. Life Ins*. *Co*, which acknowledges that "relevance is construed broadly" and should be limited where it "encompass[es] discovery of information with 'no conceivable bearing on the case.'"  *Wall v. Reliance Stand. Life Ins. Co*., 341 F.R.D. 1, 6 (D.D.C. 2022).  In *Wall*, the court denied discovery into "a decade's-worth of information on [defendant's] use of peer reviews related to long-term disability claims of all [defendant's] insureds and associated legal matters" which has nothing to do with the interpretation of the four-

corners of plaintiff's benefit plan. *Id*. at 7. Here, Mr. Pishevar is asking for the identities of those who commissioned Fusion GPS to conduct opposition work on him, which directly relates to the reputational harm he has suffered.

Further, Mr. Pishevar's request for information concerning Fusion GPS's document retention policy is relevant to explaining why there seem to be gaps in Fusion GPS's data and to confirm whether Fusion GPS put in adequate litigation holds upon learning that information concerning Mr. Pishevar would become relevant. *See Huthnance v. D.C.,* 255 F.R.D. 285, 295 (D.D.C. 2008) ("In light of the District's admission that certain materials are no longer in existence, the District's document retention policies are clearly relevant to plaintiff's case."); *see also Montgomery v. Wal-Mart Stores, Inc.,* No. 12-CV-3057-JLS (DHB), 2015 WL 11233390, at *1 (S.D. Cal. Sept. 4, 2015); *Jasso v. Wells Fargo Bank, N.A.,* No. 22-CV-00858 (RFB) (BNW), 2021 WL 3549891, at *6 (D. Nev. Aug. 11, 2021); *Woznicki v. Raydon Corp.,* No. 18-CV-2090, 2020 WL 2562874, at *4 (M.D. Fla. May 19, 2020) (parties agreed, and court did not dispute, that "a request for document retention policies is relevant and proportional when there is a gap in document production").

*Last*, in the footnotes of its Motion, Fusion GPS asserts that Document Request Nos. 1 and 2 are improper because they seek the identity and location of the UK Source and any Client who retained Fusion GPS to perform services related to Mr. Pishevar. Mot. at 12 n.6. Fusion GPS has argued that these requests are interrogatories and not document requests. But this is nothing more than a red-herring. The subpoena makes clear that it is seeking documents. ECF No. 1-3. The Document requests are clearly entitled "***DOCUMENT*** REQUEST 1" and "***DOCUMENT*** REQUEST 2." ECF No. 1-3, pdf. 5 (emphasis added). Petitioner's attempt to narrowly tailor

those document requests by focusing specifically on the information sought should be welcomed by the Respondent as it eliminates any burden on its end.[30]

## **CONCLUSION**

For the foregoing reasons, Petitioner respectfully requests that the Court deny Fusion GPS's Motion to Quash and require that Fusion GPS comply with the Subpoenas.

---

[30] In any event, had Fusion GPS sought to address this issue with counsel, counsel for Mr. Pishevar would have (and is still willing to) revised this request by seeking "Documents sufficient to show" the information sought in Document Requests Nos. 1 and 2, though for the reasons stated above, that is wholly unnecessary.

Dated:  Washington, D.C.
       April 17, 2023

Respectfully submitted,

*/s/ Valerie J. Ramos*

Valerie J. Ramos (D.C. Bar No. 241050)
Jan-Philip (JP) Kernisan (DC Bar No. 1000895)
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
1300 I Street, NW Suite 900
Washington, D.C. 20005
Telephone: (202) 538-8000
Fax: (202) 538-8100
jpkernisan@quinnemanuel.com
valerieramos@quinnemanuel.com

Lucas V.M. Bento (*pro hac vice granted*)
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
51 Madison Ave., Floor 22
New York, NY 10010
Telephone: (212) 849-7000
Facsimile: (212) 849-7100
lucasbento@quinnemanuel.com

*Attorneys for Petitioner Shervin Pishevar*

36