# Exhibit 4

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA


************************************)

   IN RE APPLICATION OF SHERVIN    )

   PISHEVAR FOR AN ORDER TO TAKE   )

   DISCOVERY FOR USE IN FOREIGN    ) Misc. Action No.

   PROCEEDINGS PURSUANT TO 28 USC  ) 2:21-mc-000175-JAK-KSx

   SECTION 1782,                      )

              Petitioner       )

************************************)


Remote Videotaped Deposition of

SAM G. ANSON, held at the location of the

deponent, commencing at 12:05 Pacific, on the

14th of March, 2023, before Maureen O'Connor

Pollard, Registered Diplomate Reporter, Realtime

Systems Administrator, California CSR No. 14449,

Notary Public.


– – –

_____

DIGITAL EVIDENCE GROUP

1730 M Street, NW, Suite 812

Washington, D.C. 20036

(202) 232-0646

Page 2

```
 1   REMOTE APPEARANCES:

 2

 3       QUINN EMANUEL URQUHART & SULLIVAN LLP

 4       BY:  LUCAS BENTO, ESQ.

 5            51 Madison Avenue

 6            New York, New York 10010

 7            212-849-7000

 8            lucasbento@quinnemanuel.com

 9            Representing Shervin Pishevar,

10            Petitioner

11

12       RIVERO MESTRE

13       BY:  ANDRES RIVERO, ESQ.

14       BY:  RAQUEL TORAL, ESQ.

15            2525 Ponce de Leon Blvd., Suite 1000

16            Miami, Florida 33134

17            305-445-2500

18            arivero@riveromestre.com

19            Representing Sam Anson, Respondent

20

21   Videographer:  Billy Fahnert

22

23

24

25
```

Page 3

```
 1                         INDEX
 2   EXAMINATION                              PAGE
 3   SAM G. ANSON
 4     BY MR. BENTO                            6
 5
 6                    E X H I B I T S
 7   NO.         DESCRIPTION                  PAGE
 8    Anson         11/8/2017 article, "Smear
 9    Exhibit 1    Campaign" Or Not, Tech
10                 Investor Shervin Pishevar
11                 Really Was Arrested Earlier
12                 This Year.....................10
13    Anson        June 18, 2021 e-mail from
14    Exhibit 2    Andres Rivero to Lucas Bento...17
15
16                    -   -   -
17            DEPOSITION SUPPORT INDEX
18                    -   -   -
19
20   Stipulations
21   PAGE        LINE
22
23      6        17
24
25
```

Page 4

1               P R O C E E D I N G S

2               THE VIDEOGRAPHER:  We are on the

3      record.  This is the remote video

4      deposition of Sam Anson in the matter of

5      In Re Application of Shervin Pishevar for

6      an Order to Take a Discovery for use in

7      Foreign Proceedings, in the United States

8      District Court, Central District of

9      California.

10              My name is Billy Fahnert, I am the

11     video technician today.  The court

12     reporter is Maureen Pollard.  We are here

13     on behalf of Digital Evidence Group.

14              Today's date is March 14, 2023.  The

15     time is 12:05 p.m. Pacific Daylight Time.

16              All parties have stipulated to the

17     witness being sworn in remotely.

18              Will counsel please identify

19     yourselves for the record, and then the

20     witness will be sworn in.

21              MR. BENTO:  Lucas Bento, Quinn

22     Emanuel, for the applicant in this case,

23     Mr. Pishevar.

24              MR. RIVERO:  My name is Andres

25     Rivero, Rivero Mestre, representing Sam

Page 5

1    Anson, who is the respondent in this

2    proceeding.

3         As discussed with Mr. Bento

4    beforehand, I just want to note for the

5    record that Mr. Anson is appearing

6    pursuant to subpoena, therefore under

7    compulsion in the Southern District of

8    California, where he is now present as

9    required by law.

10        And that we've had a discussion that

11   because of potential privilege and

12   confidentiality issues, Mr. Anson will

13   respond to everything relating to a news

14   report of a fraudulent police account --

15   report about Mr. Pishevar, but other

16   subjects would not be gone into.

17        THE STENOGRAPHER:  Do all parties

18   stipulate to the validity of this

19   transcript and remote swearing, and that

20   it will be admissible in the courtroom as

21   if it had been taken following Rule 30 of

22   the Federal Rules of Civil Procedure and

23   the state's rules where this case is

24   pending?

25        MR. RIVERO:  Yes.

Page 6

```
 1              MR. BENTO:  Yes.  Lucas Bento for

 2       petitioner, we consent.

 3                    *   *   *

 4   Whereupon,

 5              SAM G. ANSON,

 6   being first duly sworn to testify to the truth,

 7   the whole truth, and nothing but the truth, was

 8   examined and testified as follows:

 9                   EXAMINATION

10   BY MR. BENTO:

11       Q.   Good afternoon, Mr. Anson.  My name

12   is Lucas Bento, as you know, and I represent the

13   petitioner in this case, Mr. Shervin Pishevar.

14   I'm going to ask you some questions.

15              Could we please start with you

16   stating your full name, please, for the record?

17       A.   Sam Anson, A-N-S-O-N.

18       Q.   And, Mr. Anson, have you ever had

19   your deposition taken before?

20       A.   No.

21       Q.   So before we begin and just to make

22   sure that the deposition proceeds as

23   smoothly and efficiently as possible, I'd just

24   like to set up some basic ground rules, if

25   that's okay.
```

Page 7

 1                    So you understand that you've just

 2    taken an oath to tell the truth?

 3          A.    Yes.

 4          Q.    And you understand that even though

 5    we're doing this deposition remotely, the oath

 6    that you just took is the same as the oath you

 7    would take in court?  Do you understand that?

 8          A.    Yes, I do.

 9          Q.    And you understand that since your

10    answers are being recorded by the court

11    reporter, you must give an audible verbal

12    response?  Do you understand that?

13          A.    Yes, I do.

14          Q.    And for the benefit of the court

15    reporter, and since the court reporter cannot

16    record two people speaking at the same time,

17    this is especially true on Zoom, I'd like to ask

18    you that you please let me finish my question

19    first before you start your answer.

20                    Does that make sense?

21          A.    It does.

22          Q.    And if you don't understand my

23    question, you must tell me.  If you don't, I

24    will assume that you understood it.

25                    Does that make sense?

Page 8

1        A.    It does.

2        Q.    And finally, if you need to take a

3   break, feel free to ask for one.  However, I

4   would only ask that you first answer any pending

5   questions first before you take the break.

6              Does that sound fair?

7        A.    Understood.  Yes.

8        Q.    Great.

9              And since we're doing this on Zoom,

10  I think this is already on the record, but could

11  you just start by telling us where you're

12  located at the moment?

13       A.    I'm in Los Angeles, California.

14       Q.    And is anyone in the room with you

15  today?

16       A.    No.

17       Q.    Great.  So let's get started.

18             Mr. Anson, what is your occupation?

19       A.    I'm a private investigator, and I'm

20  employed by a company called Guidepost

21  Solutions.

22       Q.    And what is your title at Guidepost

23  Solutions?

24       A.    I'm a senior managing director for

25  Guidepost.

Page 9

1          Q.      And as senior managing director,

2     what are your responsibilities?

3          A.      My responsibilities are to originate

4     and manage engagements on behalf of clients in

5     which we provide them with investigation

6     services.

7          Q.      And prior to Guidepost, where were

8     you employed?

9          A.      I was employed by a company called

10    Custom Information Services which I had founded

11    and was one of the partners of.

12         Q.      And how long were you at that

13    company?

14         A.      For approximately ten years.

15         Q.      And prior to that company, where

16    were you employed?

17         A.      Prior to my work for Custom

18    Information Services, I was employed by a

19    company called Kroll, also as a private

20    investigator for approximately ten years.

21         Q.      All right.  And prior to that?

22         A.      Prior to that I was a journalist.

23         Q.      And where were you reporting?

24         A.      I was principally freelance

25    journalist.  I was employed for several years by

Page 10

1    a newspaper in Los Angeles called LA Weekly, and

2    I wrote for many other publications, and did

3    work on television as well.

4          Q.    Do you know what this case is about?

5          A.    Yes, I do.

6          Q.    And what is your understanding of

7    this case?

8          A.    My understanding of this case is to

9    obtain information regarding the source of the

10   document, a forged police report, that was

11   provided to a journalist named Marcus Baram and

12   cited in an article that he published in

13   November of 2017.

14              MR. BENTO:  I'd like to introduce

15         Exhibit 1 in the record.

16                (Whereupon, Anson Exhibit 1 was

17                marked for identification.)

18   BY MR. BENTO:

19         Q.    Mr. Anson, do you recognize

20   Exhibit 1?

21         A.    I do.

22         Q.    And what is it?

23         A.    This is a digital copy of the

24   article that was published by Marcus Baram.  I

25   see the date on there saying November 8, 2017.

1   And this is the article in which the fake police

2   report was cited.

3          Q.     And so would it be fair to say that

4   you read this article before today?

5          A.     Several times, yes.

6          Q.     And do you know who Shervin Pishevar

7   is?

8          A.     I do.

9          Q.     Who is he?

10          A.     He is -- Shervin Pishevar is an

11   investor principally in technology companies.

12   For the case in question now, he was a prominent

13   and high-profile investor in the company Uber

14   before it went public.  And I understand that

15   he's been a venture capitalist and invested in

16   many other companies.

17          Q.     And how long have you known him?

18          A.     I have known him since approximately

19   2020, mid 2020.

20          Q.     In what context have you known him?

21          A.     I met Shervin Pishevar because his

22   counsel, I believe Quinn Emanuel, retained

23   Guidepost Solutions to assist in an

24   investigation to -- an investigation of this

25   situation and of the provenance of the police

Page 12

1    report, the fake police report that was

2    published by Marcus Baram, in order to

3    understand who was behind what Mr. Pishevar

4    believed was a concerted campaign to damage his

5    reputation and to discredit him publicly.

6         Q.    So your counsel mentioned earlier in

7    this deposition that you're here under

8    compulsion, correct?

9         A.    Correct.

10        Q.    You're not here voluntarily,

11   correct?

12        A.    That's correct.

13        Q.    Is Mr. Pishevar paying you to be

14   here today?

15        A.    No, he's not.

16        Q.    Is he paying your legal expenses?

17        A.    No, he's not.

18        Q.    Has Mr. Pishevar made any promises

19   relating to your attendance here at this

20   deposition today?

21        A.    He has not.

22        Q.    Mr. Anson, do you know who Marcus

23   Baram is?

24        A.    I do.

25        Q.    Have you met him?

Page 13

1        A.      I met Marcus many times.  We've

2    known each other since the early 2000s.  We were

3    both at the time employed by Kroll in similar

4    jobs, similar capacities.  We were young

5    investigators, and we had both previously been

6    journalists.

7               And so I've known him and spoke to

8    him -- spoken to him -- met him in person and

9    spoken to him many times over the past 20-plus

10   years.

11       Q.     And how would you describe your

12   relationship with Mr. Baram?

13       A.     Friendly.  I mean, we're friends,

14   work friends.  I've never met his family, and

15   he's never met mine though I believe he met my

16   wife once, but we've been work friends

17   and colleagues and people who have worked in

18   similar fields for many years.

19       Q.     Now I'm going to direct you to the

20   middle of the second page of Exhibit 1, and I

21   think it's the fifth paragraph down where it

22   reads, open quote, "The payoff claim is false,

23   according to Pishevar's lawsuit, but it doesn't

24   dispute the sexual assault accusation itself.

25   That's because Pishevar was indeed arrested last

Page 14

1    May on suspicion of rape at the Ned hotel in

2    London, according to his crisis management

3    expert and a copy of a police report seen by

4    Fast Company, though he was never charged with

5    any crime."

6              Do you see that?

7        A.    I do.

8        Q.    And then the next paragraph reads --

9    I'm sorry, the top of that page reads "Editor's

10   Note."  And it states, open quote, "On Monday,

11   we learned that a police report described in

12   this story has been proven false by the City of

13   London police."

14             Do you see that?

15       A.    I do.

16       Q.    And then the first three paragraphs

17   on page 3, which is the next page, and I'm going

18   to read all of those just so that it's in the

19   record.

20       A.    Sure.

21       Q.    It says, open quote, "A City of

22   London police report on the arrest, providing

23   details about what happened that night, has been

24   shared with some reporters."

25             Do you see that?

Page 15

1        A.     I do.

2        Q.     And then it says, open quote,

3    "Update:  As noted above, this report has been

4    proven to be false, according to a letter from

5    the City of London comptroller."

6               Do you see that?

7        A.     I do.

8        Q.     And then it says, "Pishevar was

9    staying in the penthouse suite at the posh Ned

10   hotel in London on May 27, when a young woman

11   walked in to the nearby Bishopsgate police

12   station and alleged that she had been raped,

13   according to the report.  Several police

14   officers went to the hotel, arrested Pishevar,

15   and interviewed and examined the alleged victim,

16   per the report.  She was attended to by a sexual

17   crime unit, paramedics, and a medical

18   practitioner, and officers searched Pishevar's

19   suite."

20              Do you see that?

21       A.     I do.

22       Q.     And finally, this will be the last

23   quote that I read, it says, "The incident was

24   handled by they city's 'gold command,' the

25   highest level of police and emergency service

1   officials, due to Pishevar's high profile,

2   according to the report."  Towards the end of

3   the third paragraph.

4            Do you see that?

5        A.    I do.

6        Q.    So, Mr. Anson, you understand that

7   Mr. Pishevar is seeking to identify who shared

8   this purported police report with Mr. Baram?

9        A.    I do.

10       Q.    And is it your understanding that

11  Mr. Pishevar initiated this case to obtain that

12  information from you?

13       A.    From Guidepost, not from me, yes.  I

14  think when Mr. Pishevar hired Guidepost, or when

15  Quinn Emanuel hired Guidepost on his behalf, he

16  had no idea who I was or what knowledge I had of

17  the situation.

18       Q.    The present case has been initiated

19  to seek information from you personally,

20  correct?

21       A.    Yes, the case that I'm providing a

22  deposition in today.

23       Q.    And in response to one of those

24  subpoenas that was served on you in this case,

25  your attorney, who is present here today,

Page 17

1   produced information on your behalf in response

2   to that subpoena, correct?

3        A.    That's correct.

4             MR. BENTO:  Could we please

5        introduce Exhibit 2 into the record,

6        please?  Thank you.

7             (Whereupon, Anson Exhibit 2 was

8             marked for identification.)

9   BY MR. BENTO:

10       Q.    Now, Mr. Anson, I'm putting on the

11   screen an e-mail, and I will be marking this

12   e-mail as Exhibit 2.

13            Do you recognize Exhibit 2, Mr.

14   Anson?

15       A.    I do.

16       Q.    What is it?

17       A.    It's an e-mail from my lawyer,

18   Andres Rivero, to you dated Friday, June 18,

19   2021, in which he provides a response to the

20   subpoena that was served on me before that.

21       Q.    And you've seen this correspondence

22   before today?

23       A.    I have.

24       Q.    In item 2, the e-mail says,

25   "Mr. Anson has reason to believe that Fusion GPS

Page 18

1   located in Washington, DC provided information

2   to Marcus Baram that was published in his"

3   November article.

4              Do you see that?

5        A.    I do see that, yes.

6        Q.    And this is referring to the article

7   we just reviewed as Exhibit 1?

8        A.    Correct.

9        Q.    What is Fusion GPS?

10       A.    Fusion GPS is a consulting company

11  based in Washington, DC that was founded by two

12  former journalists named Glenn Simpson and Peter

13  Fritsch, and which does specialized research

14  services on behalf of clients.

15       Q.    And do you know any current or

16  former employees of Fusion GPS?

17       A.    Yes.  I know both Glenn and Peter,

18  and have met a number of other people who work

19  for Fusion GPS.

20             I have known Glenn Simpson since

21  approximately 2008 or so, he was -- when he was

22  a journalist.  And he founded a prior consulting

23  company around the same time as I had founded my

24  own company, and we were friends and colleagues,

25  work friends and colleagues from approximately

Page 19

1    2010 onwards.

2              I met Peter Fritsch after Glenn

3    added him as a partner to his company.  I can't

4    recall the exact date that was.  And I've met

5    and spoken with him multiple times over the

6    years.

7              My firm, Custom Information

8    Services, regularly collaborated on projects

9    with Fusion GPS, and we were close professional

10   colleagues.

11        Q.    And you've met Mr. Fritsch both in

12   person and also interacted with him over the

13   phone?

14        A.    That's correct.

15        Q.    Looking at item 2 of Exhibit 2 which

16   we've just reviewed, what is the basis for your

17   belief that Fusion GPS provided information to

18   Mr. Baram that was published in his November

19   article?

20        A.    There are several bases for that

21   belief, and I'll take them one at a time.  And

22   please feel free to interrupt or ask me

23   questions if you have any questions regarding

24   that.

25              In approximately July, mid July,

Page 20

1    possibly early August of 2017, I received a

2    telephone call from Peter Fritsch who, again, is

3    someone who I spoke to regularly on the phone.

4    He explained that Fusion was working on a matter

5    related to Uber and to the ongoing board dispute

6    over Uber, and that he was looking for a

7    referral or an introduction to a journalist who

8    covered the technology sector, and who might

9    have an interest in publishing information that

10   they had developed in the course of their

11   investigation, and asked if I knew anyone who

12   might fit that bill.

13           And I mentioned to him Marcus Baram,

14   who at the time I was aware was working as an

15   editor and writer for the publication Fast

16   Company, which covered technology, and suggested

17   that -- to Peter that I introduce him to Marcus

18   Barum.

19           Peter had heard of Marcus, I think

20   was familiar with him, and he thought that that

21   was a good idea, and asked me to go ahead and

22   make the introduction.

23           And so shortly after that call I

24   spoke or communicated with Marcus to let him

25   know that Pete Fritsch would be in contact with

Page 21

1   him, that he might have a story for him related

2   to Uber and the board fight taking place inside

3   Uber.

4            And Marcus thanked me for the

5   introduction, and that was the end of that

6   episode of the -- of my involvement in it.

7            I did not stay in communication with

8   Pete or Marcus over the coming months about the

9   story, and I was not, in fact, aware, I didn't

10  -- at the time that Marcus had published the

11  story.

12           The next time that Marcus and I

13  spoke about this was in the fall of 2019.  I

14  called Marcus to catch up and talk about work

15  and life, and see how he was doing.

16           And during that call, Marcus

17  explained to me that he had been named in a

18  legal matter by Shervin Pishevar, and that they

19  were seeking information regarding his source

20  for the story that he had published regarding

21  Mr. Pishevar and Mr. Pishevar's arrest in

22  London.

23           Marcus told me the story of how one

24  of the documents that he had published in the

25  story turned out to be a fake document, and now

Page 22

1  he was being -- he had been named in a lawsuit

2  in the United States seeking to compel him to

3  disclose the source of that document that he had

4  published.

5          In the course of this conversation,

6  I initially didn't know who Marcus was talking

7  about, I was not familiar with Mr. Pishevar, and

8  Marcus explained to me that this was the Uber

9  matter, and I came to understand that this was

10  the matter that had arisen out of my

11  introduction of him to Pete Fritsch about two

12  years earlier.

13          Marcus was upset at the time because

14  he -- because the lawsuit was causing him

15  professional difficulties because he didn't

16  think that Fast Company had hired adequate

17  counsel, he thought that counsel for Fast

18  Company was doing a poor job on the matter.

19          And as I said, in the course of that

20  conversation it became apparent to me that he

21  was referring to the matter of the introduction

22  that I made.

23          I asked Marcus whether or not Pete

24  and Glenn or Fusion had offered to help with

25  providing him counsel, and Marcus said that he

Page 23

1    had to be careful how he answered, that he

2    didn't want to disclose his source to me

3    specifically because he had made an off the

4    record pledge to his source, but said that he

5    had not been provided counsel in the case.

6           This was the first of many

7    conversations that I've had with Marcus on the

8    subject since that time.  I tried to help Marcus

9    get additional legal advice and became sort of a

10   sounding board for Marcus over the course of the

11   coming months and years about the case.

12          And we spoke about it over 50 times

13   between that conversation in 2019 and the

14   present.  And in the course of those

15   conversations, Marcus has been careful to not

16   explicitly disclose his source, and he has

17   never, the words -- he has never said the words

18   Fusion gave me the document, or Pete Fritsch

19   gave me the document.  But in the course of

20   those conversations we spoke -- or I spoke

21   openly about Fusion to him, and he -- and in our

22   conversations it was apparent to both of us that

23   we were speaking to Fusion as the source of the

24   document.

25          Q.   So I just want to follow up just on

Page 24

1    that last bit.

2              Mr. Anson, when you say it was

3    apparent to you both, what do you mean?  What is

4    your basis for that?

5         A.    That I would say things like, Did

6    Pete acknowledge to you that the document was a

7    fake?  And Marcus would say things like, No, he

8    didn't.  Did Pete say that he knew the document

9    was fake at the time?  No, Pete said that Fusion

10   believed the document to be authentic.  Did Pete

11   offer to do anything to help you?  No, he said,

12   I was on my own.

13        Q.    And by "Pete," you mean Peter

14   Fritsch?

15        A.    That's correct.

16        Q.    Did you ever speak to Mr. Fritsch

17   after you learned of this information?

18        A.    No, I didn't.  I did have a

19   conversation with Glenn Simpson about this in

20   the fall, I believe it was around November of

21   2020.  The case against Marcus had progressed

22   despite his efforts to invoke journalistic

23   privilege.  He had been given a deadline by the

24   court of a handful of weeks to produce the

25   information or face potential contempt in the

Page 25

1   proceeding.  He asked -- we had a conversation in

2   which he asked if there was anything I could do.

3          I reached out to Glenn Simpson to

4   discuss the matter, and discussed with him that

5   -- the position that Marcus found himself in,

6   and that I thought it was not an appropriate

7   resolution of this case, that for Marcus to be

8   left holding the proverbial bag, and whether

9   Fusion or its client would engage with

10  Mr. Pishevar in some sort of resolution of this

11  matter that didn't -- that would relieve

12  Mr. Baram of his legal obligations and remove

13  him from the case.

14          And Glenn acknowledged the

15  situation, acknowledged my position and my

16  request, and said he would need to discuss it

17  with Pete Fritsch as it had been Pete's matter,

18  and said that he would get back to me.

19          And neither Pete or Glenn got back

20  to me after that, and I haven't spoken to them

21  about it since then.

22      Q.    I want to go back to your

23  conversation with Mr. Baram where he told you

24  that when asking Mr. Fritsch whether he knew the

25  document was authentic, whether it was a fake,

Page 26

1    Mr. Fritsch responded that he didn't know that

2    it wasn't authentic.

3              Just to be clear, what is that

4    document that you were referring to with

5    Mr. Baram?  What was your understanding of the

6    document that he was referring to with

7    Mr. Fritsch?

8        A.    I was speaking with Marcus about the

9    purported London police report that he had cited

10   in his article.  He had provided me a copy of

11   the document that he received, and we had looked

12   at it together and discussed it together many

13   times.  And in the course of one of those

14   conversations, I asked him whether Pete or

15   Fusion -- whether he had asked them or whether

16   they were aware that the document was fake, and

17   he said that they had -- that they had said that

18   they were not aware that it was fake, that they

19   believed it to be authentic, and that that's

20   what they represented to him.  And that he felt

21   bound to uphold his pledge of the -- to them of

22   treating them as an off the record source

23   because they had stated that they had a good

24   faith basis to believe that the document was

25   authentic.

Page 27

```
 1          Q.     And by "they," you mean Fusion GPS?
 2          A.     Correct.
 3          Q.     Did Mr. Baram ever deny that Fusion
 4   GPS was a source?
 5          A.     No.
 6          Q.     Now, going back to that summer of
 7   2017 conversation you had with Mr. Fritsch --
 8          A.     I'm sorry, Lucas, can we just go
 9   back?  I want to be clear that Marcus never
10   denied it, but he also never explicitly stated
11   it.
12          Q.     But was it your understanding as you
13   were speaking with him that you were both
14   referring to Fusion GPS?
15          A.     That was my understanding, yes.
16          Q.     And that understanding was based on
17   what?
18          A.     On the many conversations we had had
19   about it in which, you know, we had talked about
20   the situation of how he had received the
21   document and the nature of the document and the
22   aftermath of him having published the document,
23   and me speaking openly about Pete and Glenn as
24   being his source, and him not denying it, and
25   proceeding with the conversation and having --
```

Page 28

1    and being the counterparty in that conversation

2    with me.

3          Q.     Do you remember specifically when

4    those conversations occurred with Mr. Baram?

5          A.     There were scores of conversations

6    from 2019 to the present, and I don't have a

7    specific accounting of them.  But there have

8    been many of those conversations --

9          Q.     And were they --

10         A.     -- both on the phone and in person.

11         Q.     You answered my next question.

12   Great.

13                Going back to that conversation you

14   had with Mr. Fritsch in the summer of 2017, was

15   that a phone call that you had on your

16   cellphone?

17         A.     I can't recall specifically.

18         Q.     Did you exchange any messages with

19   Mr. Fritsch about his outreach to you?

20         A.     I may have exchanged a message with

21   him.  I'm not sure that they are specifically

22   related to that outreach, but there may be

23   messages back and forth between us at that time.

24         Q.     When he reached out to you to obtain

25   your recommendation or introduction to a

Page 29

1   reporter, did he reach out to you in any other

2   capacity than as an employee of Fusion?

3        A.    I'm not sure I can answer that

4   question of exactly what capacity he was acting

5   in.  I understood him to be -- I understood the

6   call to be Pete Fritsch calling me about a case

7   that he was doing, and he did his cases through

8   Fusion.  But he didn't specifically represent

9   himself, Hey, this is Pete calling and I'm

10  acting on behalf of Fusion on this call.

11             We spoke very regularly and very

12  informally, and we would not have communicated

13  like that to each other.

14       Q.    And when he mentioned the Uber board

15  dispute, did he specifically discuss individuals

16  that were involved in that dispute?

17       A.    No.

18       Q.    Is it your understanding that

19  Mr. Pishevar is or was an investor in Uber?

20       A.    Yes.

21       Q.    And has anyone at Fusion GPS or its

22  attorneys ever asked you not to respond to the

23  subpoena served on you in this case?

24       A.    Yes.  In approximately June of 2021

25  when the first subpoena was served on me in this

Page 30

1    case, it may have been May or June of 2021, I

2    asked my counsel, Andres Rivero, to make contact

3    with counsel for Fusion out of a concern that I

4    may have had an obligation of confidentiality to

5    Fusion, we had a professional relationship and

6    we worked on each others matters at the time,

7    and I wanted Andres to clarify exactly what our

8    obligations were with regard to Fusion.

9            We asked Fusion that if -- to

10   provide a -- if they had a copy of any kind of

11   contract or confidentiality agreement between my

12   firm and Fusion to provide us with one.  They

13   were unable to do so.  But nonetheless, we acted

14   as if there were some obligations in place, and

15   among those obligations was to notify Fusion of

16   any request for information made to me.

17           And since we had been served --

18   since I had been served with a subpoena, Andres

19   notified counsel for Fusion of that, and gave

20   them an opportunity to intervene in the matter

21   if they wished.

22           Counsel for Fusion declined the

23   opportunity to intervene and instead sent a

24   letter to me instructing me to defy the subpoena

25   and to not answer, not respond to any request

Page 31

1  for information made pursuant to it.

2          It is my understanding that the

3  advice I received from -- I'm not sure I can

4  speak about that, but it's my understanding that

5  my lawyer, Andres Rivero, replied to their

6  counsel and stated --

7          MR. RIVERO:  Mr. Anson, do me a

8      favor, don't discuss any advice I gave

9      you.

10          THE WITNESS:  Okay.

11          MR. RIVERO:  Go ahead.

12          THE WITNESS:  That my lawyer responded

13      to their counsel that we were not in a

14      position to defy the subpoena, and again

15      gave them an opportunity to intervene in

16      the matter if they so desired, which they

17      declined to take.

18  BY MR. BENTO:

19      Q.    And in that communication to

20  Fusion's counsel, your attorney referenced

21  Mr. Pishevar, correct?

22      A.    I'm going to defer to Andres for

23  that question.

24          MR. RIVERO:  Mr. Bento, I'm going to

25      stipulate on the record that my

Page 32

1          communications with counsel for Fusion

2          related to Mr. Pishevar.  I don't

3          know if that helps.

4               MR. BENTO:  Okay.  That's fine.

5          Thank you.

6    BY MR. BENTO:

7          Q.    And, Mr. Anson, when you spoke to

8    Mr. Baram about this ordeal, do you know whether

9    his source shared any other information about

10   Mr. Pishevar other than the forged police

11   report?

12         A.    Our conversations were limited

13   principally to the forged police report.  And

14   Marcus, if he received additional information

15   from his source, did not disclose it to me.

16         Q.    And did he ever explain how he

17   received the reports from his source?

18         A.    He did.  He explained, and I believe

19   that in telling me this he was -- this was

20   information provided by his counsel to Quinn

21   Emanuel in the context of his 1782.

22               But he explained that he had

23   travelled in person to Washington, DC and had

24   met with his source in person, and that he was

25   given the police report on a flash drive or some

Page 33

1    sort of external memory device, and that was the

2    document.  He later shared the document with me,

3    and it was an electronic document that he shared

4    with me.

5              MR. BENTO:  Okay.  I'm going to ask

6         to take a quick break, if that's okay,

7         won't be more than five minutes.

8              If we could go off the record.

9              THE VIDEOGRAPHER:  We are going off

10        the record.  The time is 12:44.

11             (Whereupon, a recess was taken.)

12             THE VIDEOGRAPHER:  We are back on

13        the record.  The time is 1:11.

14   BY MR. BENTO:

15        Q.   So, Mr. Anson, I only have a few

16   more questions.  I just wanted to follow up on

17   one of the things you said.

18             When Mr. Fritsch reached out to you

19   seeking an introduction to a reporter in the

20   summer of 2017, did he tell you what the story

21   was about?

22        A.   Not specifically.  I think, as I

23   said previously, he mentioned that it had to do

24   with Uber and a board fight within Uber.  I

25   think he answered that in response to a

Page 34

1  question.

2          I was curious to see whether there

3  was anything we might be able to assist on, but

4  that's sort of outside of our typical

5  investigations that we handle, and so I didn't

6  engage him further in the conversation.

7      Q.   Other than mentioning the board

8  fights in Uber, did he give you a sense of what

9  kind of reporter he would be looking for to

10  write a story on this?

11      A.   A reporter that wrote about the

12  technology sector and that would be open to

13  receiving information developed in the course of

14  Fusion's investigation, and that would

15  presumably assist Fusion's client in the matter.

16      Q.   And when he mentioned a matter, did

17  he tell you on whose behalf Fusion was working

18  for?

19      A.   He did not.

20      Q.   You said earlier that when you were

21  having those conversations with Mr. Baram you --

22  it was apparent to you that you were discussing

23  Fusion because, amongst other things, Baram told

24  you that the fake report issue referred to the

25  Uber matter, is that right?

Page 35

1          A.      In our -- I recall, and again this

2    was some time ago and we've had multiple

3    conversations about this, but when Marcus

4    initially was telling me about this, again I

5    was -- he had to fill in and provide context for

6    me, I was unfamiliar with his article.

7                  I think I recall pulling up his

8    article at the time, you know, as we were having

9    a conversation, and sort of reading it as he was

10   discussing with.  So I was becoming -- so either

11   he said or either I said, Oh, this is the Uber

12   case, and he said, Yes, or he said, This is from

13   the Uber case, I can't remember who exactly

14   initiated the conversation, but we confirmed the

15   understanding between us that this was -- and as

16   it was apparent in his article, the context of

17   this was the ongoing board fight within Uber.

18          Q.      And when Mr. Baram, based on what he

19   told you, reached out to Fusion asking for

20   assistance, he told you that Fusion said he's on

21   his own, correct?

22          A.      Yes, I think that -- Marcus didn't

23   specify that he reached out.  It would have been

24   in response to a question where I said, Did they

25   offer you any assistance with counsel for this,

Page 36

1   and he said, No, they didn't.

2            So it's not clear to me who

3   initiated that conversation, whether -- between

4   him and Fusion, whether it was Marcus who

5   initiated it or Pete Fritsch who had initiated

6   it, but that there had been a conversation with

7   them about the fallout from this.  And, you

8   know, and he said that -- he indicated to me

9   that they had made it clear that he was on his

10  own.

11       Q.    And when was that conversation

12  between Mr. Baram and Mr. Fritsch?

13       A.    I'm not sure exactly.  My

14  understanding from my conversations with Marcus

15  is that they had a conversation at the time where

16  it emerged that the document was fake, and then

17  subsequently after legal proceedings had been

18  initiated against Mr. Baram.

19       Q.    And the document that you just

20  mentioned is the forged police report, right?

21       A.    That's correct.

22            MR. BENTO:  Okay.  Well, thank you

23       very much, Mr. Anson.  I have no more

24       questions.

25            MR. RIVERO:  I don't have any

Page 37

1          questions, so we'll conclude it.

2                    And, Lucas, nice to meet you.

3                    MR. BENTO:  Nice to meet you, too,

4          Andres.

5                    THE VIDEOGRAPHER:  Going off the

6          record.  This deposition is concluded at

7          1:18.

8                    (Whereupon, a recess was taken.)

9                    THE VIDEOGRAPHER:  We are back on

10         the record.  The time is 1:34.

11   BY MR. BENTO:

12         Q.    Mr. Anson, apologies, I have one

13   last question.

14                    Do you have any other basis for your

15   belief that Fusion GPS shared information to

16   Mr. Baram that was used in his November, 2017

17   article?

18         A.    This would be bases over and beyond

19   the conversations I had with Marcus Baram and

20   the conversations that I had with Pete Fritsch

21   and Glenn Simpson about the matter, there is one

22   other set of conversations I had with an

23   individual named Mark Hollingsworth, who is an

24   investigator and journalist based in London.

25   He's someone I first became aware of in my

Page 38

1   conversations with Marcus Baram.

2            Marcus and I discussed a number of

3   times where the fake police report may have come

4   from, how it came into being, and who might have

5   further knowledge of it.  He suggested that Mark

6   Hollingsworth was someone who might be

7   knowledgeable in that area.

8            I -- after doing some open source

9   research on Mark Hollingsworth, I understood

10  that he, in addition to being a journalist, was

11  a -- had been a subcontractor for Fusion GPS.

12            And so I reached out to him through

13  a mutual contact in London, and told him that I

14  was trying to understand where this document,

15  this fake police report, had come from and

16  whether he had any knowledge of it.

17            In that conversation which took

18  place in the spring of 2021, Mark acknowledged

19  that he was aware of the fake police report.  He

20  insisted, off the bat and throughout our

21  discussions, that he had nothing to do with

22  creating or passing on the fake police report,

23  but that he knew who did, and that he was aware

24  that several years prior a research and

25  investigation shop based in the US had reached

Page 39

1    out to him and other people in London trying to

2    obtain a police report related to Mr. Pishevar's

3    arrest, and that he also knew the person who had

4    responded to that request from the US-based firm

5    looking for that police report.

6              After that initial conversation I

7    had with Mark Hollingsworth, I asked him if he

8    would be willing to reach out to the party that

9    he believed had provided the police report to

10   see if they would -- if they would speak to me,

11   and he said he would do that.

12             Within a day or so, I heard from a

13   contact in the United States who was a mutual

14   friend of Pete Fritsch and Fusion GPS that Pete

15   was upset that I was making inquiries in London,

16   and that he was concerned that I was further

17   stirring the pot on this matter.

18             The -- I had not disclosed the name

19   of Fusion GPS to Mark Hollingsworth, I hadn't

20   told anyone else about my conversations with

21   Mark Hollingsworth, and so I thought that the

22   only way that Mark -- that Pete would be aware

23   of my making inquiries in London would have been

24   via Mark himself.

25             So I had the next day spoke with

Page 40

1    Mark Hollingsworth again, told him that I had

2    heard, you know, secondhand about that Pete

3    Fritsch was aware of my having contacted him,

4    and I said that I assumed that the investigation

5    firm that had been seeking to obtain a police

6    report was, in fact, Fusion GPS, and that I was

7    aware that he had worked with Fusion GPS as a

8    subcontractor.  Mark acknowledged that Fusion

9    GPS was the firm that he had been referring to.

10              We also spoke further about who had

11   provided the police report to Fusion GPS, and I

12   mentioned the names of several other people who

13   I thought -- who had also worked with Fusion and

14   who might be in a position to provide them to

15   him, and he acknowledged that those people had

16   indeed worked with Fusion GPS and were the

17   people that he had been planning to reach out to

18   to see if they would speak with me.

19              He was very uncomfortable throughout

20   this entire conversation, and it was, in fact,

21   the last conversation that we had about the

22   subject.  And after that, he ceased

23   communication with me.

24        Q.    Just a follow-up question, who was

25   the mutual friend that you just mentioned?

Page 41

1          A.    I'm not sure --

2          Q.    I'm sorry, the mutual friend that

3     told you that Mr. Fritsch was upset?

4          A.    I'm not sure that's relevant to the

5     point.

6               MR. BENTO:   Okay.   No further

7          questions.   Thank you very much.

8               THE WITNESS:   Thank you.

9               THE VIDEOGRAPHER:   Going off the

10          record.   This deposition is concluded at

11          1:41.

12               (Whereupon, the deposition was

13               concluded.)

14

15

16

17

18

19

20

21

22

23

24

25

Page 42

1                    CERTIFICATE OF COURT REPORTER

2

3                    I, MAUREEN O'CONNOR POLLARD,

4    Registered Diplomate Reporter, CSR No. 14449 for

5    the State of California, the officer before whom

6    the foregoing deposition was remotely taken, do

7    hereby certify that the foregoing transcript is

8    a true and correct record of the testimony

9    given; that said testimony was taken by me

10   stenographically and thereafter reduced to

11   typewriting under my direction; and that I am

12   neither counsel for, related to, nor employed by

13   any of the parties to this case and have no

14   interest, financial or otherwise, in its

15   outcome.

16                    Dated this 14th day of March,

17   2023.

18

19

20

21                    *Maureen Pollard*

22                    _____

23                    MAUREEN O'CONNOR POLLARD

24                    CSR No. 14449

25

Page 43

1       Sam G. Anson, c/o

2       RIVERO MESTRE

3       2525 Ponce de Leon Blvd., Suite 1000

4       Miami, Florida 33134

5

6       Case: In Re Application of Shervin Pishevar

        Date of deposition: March 14, 2023

7       Deponent: Sam G. Anson

8

9       Please be advised that the transcript in the above

10      referenced matter is now complete and ready for signature.

11      The deponent may come to this office to sign the transcript,

12      a copy may be purchased for the witness to review and sign,

13      or the deponent and/or counsel may waive the option of

14      signing. Please advise us of the option selected.

15      Please forward the errata sheet and the original signed

16      signature page to counsel noticing the deposition, noting the

17      applicable time period allowed for such by the governing

18      Rules of Procedure. If you have any questions, please do

19      not hesitate to call our office at (202)-232-0646.

20

21

22      Sincerely,

        Digital Evidence Group

23      Copyright 2023 Digital Evidence Group

        Copying is forbidden, including electronically, absent

24      express written consent.

25

Page 44

1        Digital Evidence Group, L.L.C.

2     1730 M Street, NW, Suite 812

3     Washington, D.C. 20036

4     (202) 232-0646

5

6     SIGNATURE PAGE

7     Case: In Re Application of Shervin Pishevar

8     Witness Name: Sam G. Anson

      Deposition Date: March 14, 2023

9

10    I do hereby acknowledge that I have read

      and examined the foregoing pages

11    of the transcript of my deposition and that:

12

13    (Check appropriate box):

      (  ) The same is a true, correct and

14    complete transcription of the answers given by

      me to the questions therein recorded.

15    (  ) Except for the changes noted in the

      attached Errata Sheet, the same is a true,

16    correct and complete transcription of the

      answers given by me to the questions therein

17    recorded.

18

19    _____          _____

20     DATE                      WITNESS SIGNATURE

21

22

23

24    _____          _____

25     DATE                            NOTARY

```
                                                              Page 45

 1        Digital Evidence Group, LLC

 2        1730 M Street, NW, Suite 812

 3        Washington, D.C.  20036

 4        (202)232-0646

 5

 6                        ERRATA SHEET

 7

 8        Case: In Re Application of Shervin Pishevar

 9        Witness Name: Sam G. Anson

10        Deposition Date: March 14, 2023

11        Page No.    Line No.     Change

12

13

14

15

16

17

18

19

20

21        _____        _____

22        Signature                              Date

23

24

25
```

**A**

A-N-S-O-N 6:17
able 34:3
absent 43:23
account 5:14
accounting 28:7
accusation 13:24
acknowledge 24:6 44:10
acknowledged 25:14,15 38:18 40:8,15
acted 30:13
acting 29:4,10
Action 1:8
added 19:3
addition 38:10
additional 23:9 32:14
adequate 22:16
Administrator 1:19
admissible 5:20
advice 23:9 31:3 31:8
advise 43:14
advised 43:9
aftermath 27:22
afternoon 6:11
ago 35:2
agreement 30:11
ahead 20:21 31:11
alleged 15:12,15
allowed 43:17
and/or 43:13
Andres 2:13 3:14 4:24 17:18 30:2 30:7,18 31:5,22 37:4
Angeles 8:13 10:1
Anson 1:15 2:19 3:3,8,13 4:4 5:1 5:5,12 6:5,11 6:17,18 8:18 10:16,19 12:22

16:6 17:7,10,14 17:25 24:2 31:7 32:7 33:15 36:23 37:12 43:1,7 44:8 45:9
answer 7:19 8:4 29:3 30:25
answered 23:1 28:11 33:25
answers 7:10 44:14,16
apologies 37:12
apparent 22:20 23:22 24:3 34:22 35:16
APPEARANC... 2:1
appearing 5:5
applicable 43:17
applicant 4:22
Application 1:6 4:5 43:6 44:7 45:8
appropriate 25:6 44:13
approximately 9:14,20 11:18 18:21,25 19:25 29:24
area 38:7
arisen 22:10
arivero@river... 2:18
arrest 14:22 21:21 39:3
arrested 3:11 13:25 15:14
article 3:8 10:12 10:24 11:1,4 18:3,6 19:19 26:10 35:6,8,16 37:17
asked 20:11,21 22:23 25:1,2 26:14,15 29:22 30:2,9 39:7

asking 25:24 35:19
assault 13:24
assist 11:23 34:3 34:15
assistance 35:20 35:25
assume 7:24
assumed 40:4
attached 44:15
attendance 12:19
attended 15:16
attorney 16:25 31:20
attorneys 29:22
audible 7:11
August 20:1
authentic 24:10 25:25 26:2,19 26:25
Avenue 2:5
aware 20:14 21:9 26:16,18 37:25 38:19,23 39:22 40:3,7

**B**

B 3:6
back 25:18,19,22 27:6,9 28:13,23 33:12 37:9
bag 25:8
Baram 10:11,24 12:2,23 13:12 16:8 18:2 19:18 20:13 25:12,23 26:5 27:3 28:4 32:8 34:21,23 35:18 36:12,18 37:16,19 38:1
Barum 20:18
based 18:11 27:16 35:18 37:24 38:25
bases 19:20 37:18
basic 6:24

basis 19:16 24:4 26:24 37:14
bat 38:20
becoming 35:10
behalf 4:13 9:4 16:15 17:1 18:14 29:10 34:17
belief 19:17,21 37:15
believe 11:22 13:15 17:25 24:20 26:24 32:18
believed 12:4 24:10 26:19 39:9
benefit 7:14
Bento 2:4 3:4,14 4:21,21 5:3 6:1 6:1,10,12 10:14 10:18 17:4,9 31:18,24 32:4,6 33:5,14 36:22 37:3,11 41:6
beyond 37:18
bill 20:12
Billy 2:21 4:10
Bishopsgate 15:11
bit 24:1
Blvd 2:15 43:3
board 20:5 21:2 23:10 29:14 33:24 34:7 35:17
bound 26:21
box 44:13
break 8:3,5 33:6

**C**

C 4:1
c/o 43:1
California 1:2,19 4:9 5:8 8:13 42:5
call 20:2,23 21:16

28:15 29:6,10 43:19
called 8:20 9:9,19 10:1 21:14
calling 29:6,9
campaign 3:9 12:4
capacities 13:4
capacity 29:2,4
capitalist 11:15
careful 23:1,15
case 4:22 5:23 6:13 10:4,7,8 11:12 16:11,18 16:21,24 23:5 23:11 24:21 25:7,13 29:6,23 30:1 35:12,13 42:13 43:6 44:7 45:8
cases 29:7
catch 21:14
causing 22:14
ceased 40:22
cellphone 28:16
Central 1:2 4:8
CERTIFICATE 42:1
certify 42:7
Change 45:11
changes 44:15
charged 14:4
Check 44:13
cited 10:12 11:2 26:9
City 14:12,21 15:5
city's 15:24
Civil 5:22
claim 13:22
clarify 30:7
clear 26:3 27:9 36:2,9
client 25:9 34:15
clients 9:4 18:14
close 19:9
collaborated

19:8
colleagues 13:17
    18:24,25 19:10
come 38:3,15
    43:11
coming 21:8
    23:11
command,' 15:24
commencing
    1:16
communicated
    20:24 29:12
communication
    21:7 31:19
    40:23
communications
    32:1
companies 11:11
    11:16
company 8:20
    9:9,13,15,19
    11:13 14:4
    18:10,23,24
    19:3 20:16
    22:16,18
compel 22:2
complete 43:10
    44:14,16
comptroller 15:5
compulsion 5:7
    12:8
concern 30:3
concerned 39:16
concerted 12:4
conclude 37:1
concluded 37:6
    41:10,13
confidentiality
    5:12 30:4,11
confirmed 35:14
consent 6:2 43:24
consulting 18:10
    18:22
contact 20:25
    30:2 38:13
    39:13
contacted 40:3

contempt 24:25
context 11:20
    32:21 35:5,16
contract 30:11
conversation
    22:5,20 23:13
    24:19 25:1,23
    27:7,25 28:1,13
    34:6 35:9,14
    36:3,6,11,15
    38:17 39:6
    40:20,21
conversations
    23:7,15,20,22
    26:14 27:18
    28:4,5,8 32:12
    34:21 35:3
    36:14 37:19,20
    37:22 38:1
    39:20
copy 10:23 14:3
    26:10 30:10
    43:12
Copying 43:23
Copyright 43:23
correct 12:8,9,11
    12:12 16:20
    17:2,3 18:8
    19:14 24:15
    27:2 31:21
    35:21 36:21
    42:8 44:13,16
correspondence
    17:21
counsel 4:18
    11:22 12:6
    22:17,17,25
    23:5 30:2,3,19
    30:22 31:6,13
    31:20 32:1,20
    35:25 42:12
    43:13,16
counterparty
    28:1
course 20:10
    22:5,19 23:10
    23:14,19 26:13

34:13
court 1:1 4:8,11
    7:7,10,14,15
    24:24 42:1
courtroom 5:20
covered 20:8,16
creating 38:22
crime 14:5 15:17
crisis 14:2
CSR 1:19 42:4,24
curious 34:2
current 18:15
Custom 9:10,17
    19:7

                D
D 4:1
D.C 1:24 44:3
    45:3
damage 12:4
date 4:14 10:25
    19:4 43:6 44:8
    44:20,25 45:10
    45:22
dated 17:18
    42:16
day 39:12,25
    42:16
Daylight 4:15
DC 18:1,11 32:23
de 2:15 43:3
deadline 24:23
declined 30:22
    31:17
defer 31:22
defy 30:24 31:14
denied 27:10
deny 27:3
denying 27:24
deponent 1:16
    43:7,11,13
deposition 1:14
    3:17 4:4 6:19
    6:22 7:5 12:7
    12:20 16:22
    37:6 41:10,12
    42:6 43:6,16

44:8,11 45:10
describe 13:11
described 14:11
DESCRIPTION
    3:7
desired 31:16
despite 24:22
details 14:23
developed 20:10
    34:13
device 33:1
difficulties 22:15
digital 1:23 4:13
    10:23 43:22,23
    44:1 45:1
Diplomate 1:18
    42:4
direct 13:19
direction 42:11
director 8:24 9:1
disclose 22:3
    23:2,16 32:15
disclosed 39:18
Discovery 1:8 4:6
discredit 12:5
discuss 25:4,16
    29:15 31:8
discussed 5:3
    25:4 26:12 38:2
discussing 34:22
    35:10
discussion 5:10
discussions 38:21
dispute 13:24
    20:5 29:15,16
District 1:1,2 4:8
    4:8 5:7
document 10:10
    21:25 22:3
    23:18,19,24
    24:6,8,10 25:25
    26:4,6,11,16,24
    27:21,21,22
    33:2,2,3 36:16
    36:19 38:14
documents 21:24
doing 7:5 8:9

21:15 22:18
    29:7 38:8
drive 32:25
due 16:1
duly 6:6

                E
E 3:6 4:1,1
e-mail 3:13 17:11
    17:12,17,24
earlier 3:11 12:6
    22:12 34:20
early 13:2 20:1
editor 20:15
Editor's 14:9
efficiently 6:23
efforts 24:22
either 35:10,11
electronic 33:3
electronically
    43:23
Emanuel 2:3
    4:22 11:22
    16:15 32:21
emerged 36:16
emergency 15:25
employed 8:20
    9:8,9,16,18,25
    13:3 42:12
employee 29:2
employees 18:16
engage 25:9 34:6
engagements 9:4
entire 40:20
episode 21:6
errata 43:15
    44:15 45:6
especially 7:17
ESQ 2:4,13,14
Evidence 1:23
    4:13 43:22,23
    44:1 45:1
exact 19:4
exactly 29:4 30:7
    35:13 36:13
EXAMINATI...
    3:2 6:9

examined 6:8
   15:15 44:10
exchange 28:18
exchanged 28:20
Exhibit 3:9,14
   10:15,16,20
   13:20 17:5,7,12
   17:13 18:7
   19:15
expenses 12:16
expert 14:3
explain 32:16
explained 20:4
   21:17 22:8
   32:18,22
explicitly 23:16
   27:10
express 43:24
external 33:1

F
face 24:25
fact 21:9 40:6,20
Fahnert 2:21
   4:10
fair 8:6 11:3
faith 26:24
fake 11:1 12:1
   21:25 24:7,9
   25:25 26:16,18
   34:24 36:16
   38:3,15,19,22
fall 21:13 24:20
fallout 36:7
false 13:22 14:12
   15:4
familiar 20:20
   22:7
family 13:14
Fast 14:4 20:15
   22:16,17
favor 31:8
Federal 5:22
feel 8:3 19:22
felt 26:20
fields 13:18
fifth 13:21

fight 21:2 33:24
   35:17
fights 34:8
fill 35:5
finally 8:2 15:22
financial 42:14
fine 32:4
finish 7:18
firm 19:7 30:12
   39:4 40:5,9
first 6:6 7:19 8:4
   8:5 14:16 23:6
   29:25 37:25
fit 20:12
five 33:7
flash 32:25
Florida 2:16 43:4
follow 23:25
   33:16
follow-up 40:24
following 5:21
follows 6:8
forbidden 43:23
foregoing 42:6,7
   44:10
Foreign 1:8 4:7
forged 10:10
   32:10,13 36:20
former 18:12,16
forth 28:23
forward 43:15
found 25:5
founded 9:10
   18:11,22,23
fraudulent 5:14
free 8:3 19:22
freelance 9:24
Friday 17:18
friend 39:14
   40:25 41:2
Friendly 13:13
friends 13:13,14
   13:16 18:24,25
Fritsch 18:13
   19:2,11 20:2,25
   22:11 23:18
   24:14,16 25:17

25:24 26:1,7
   27:7 28:14,19
   29:6 33:18 36:5
   36:12 37:20
   39:14 40:3 41:3
full 6:16
further 34:6 38:5
   39:16 40:10
   41:6
Fusion 17:25
   18:9,10,16,19
   19:9,17 20:4
   22:24 23:18,21
   23:23 24:9 25:9
   26:15 27:1,3,14
   29:2,8,10,21
   30:3,5,8,9,12
   30:15,19,22
   32:1 34:17,23
   35:19,20 36:4
   37:15 38:11
   39:14,19 40:6,7
   40:8,11,13,16
Fusion's 31:20
   34:14,15

G
G 1:15 3:3 4:1
   6:5 43:1,7 44:8
   45:9
give 7:11 34:8
given 24:23
   32:25 42:9
   44:14,16
Glenn 18:12,17
   18:20 19:2
   22:24 24:19
   25:3,14,19
   27:23 37:21
go 20:21 25:22
   27:8 31:11 33:8
going 6:14 13:19
   14:17 27:6
   28:13 31:22,24
   33:5,9 37:5
   41:9
gold 15:24

good 6:11 20:21
   26:23
governing 43:17
GPS 17:25 18:9
   18:10,16,19
   19:9,17 27:1,4
   27:14 29:21
   37:15 38:11
   39:14,19 40:6,7
   40:9,11,16
Great 8:8,17
   28:12
ground 6:24
Group 1:23 4:13
   43:22,23 44:1
   45:1
Guidepost 8:20
   8:22,25 9:7
   11:23 16:13,14
   16:15

H
H 3:6
handful 24:24
handle 34:5
handled 15:24
happened 14:23
heard 20:19
   39:12 40:2
held 1:15
help 22:24 23:8
   24:11
helps 32:3
hesitate 43:19
Hey 29:9
high 16:1
high-profile
   11:13
highest 15:25
hired 16:14,15
   22:16
holding 25:8
Hollingsworth
   37:23 38:6,9
   39:7,19,21 40:1
hotel 14:1 15:10
   15:14

I
idea 16:16 20:21
identification
   10:17 17:8
identify 4:18
   16:7
incident 15:23
including 43:23
INDEX 3:1,17
indicated 36:8
individual 37:23
individuals 29:15
informally 29:12
information 9:10
   9:18 10:9 16:12
   16:19 17:1 18:1
   19:7,17 20:9
   21:19 24:17,25
   30:16 31:1 32:9
   32:14,20 34:13
   37:15
initial 39:6
initially 22:6
   35:4
initiated 16:11
   16:18 35:14
   36:3,5,5,18
inquiries 39:15
   39:23
inside 21:2
insisted 38:20
instructing 30:24
interacted 19:12
interest 20:9
   42:14
interrupt 19:22
intervene 30:20
   30:23 31:15
interviewed
   15:15
introduce 10:14
   17:5 20:17
introduction
   20:7,22 21:5
   22:11,21 28:25
   33:19
invested 11:15

investigation 9:5
11:24,24 20:11
34:14 38:25
40:4
investigations
34:5
investigator 8:19
9:20 37:24
investigators
13:5
investor 3:10
11:11,13 29:19
invoke 24:22
involved 29:16
involvement 21:6
issue 34:24
issues 5:12
item 17:24 19:15

**J**

job 22:18
jobs 13:4
journalist 9:22
9:25 10:11
18:22 20:7
37:24 38:10
journalistic
24:22
journalists 13:6
18:12
July 19:25,25
June 3:13 17:18
29:24 30:1

**K**

kind 30:10 34:9
knew 20:11 24:8
25:24 38:23
39:3
know 6:12 10:4
11:6 12:22
18:15,17 20:25
22:6 26:1 27:19
32:3,8 35:8
36:8 40:2
knowledge 16:16
38:5,16

knowledgeable
38:7
known 11:17,18
11:20 13:2,7
18:20
Kroll 9:19 13:3

**L**

L.L.C 44:1
LA 10:1
law 5:9
lawsuit 13:23
22:1,14
lawyer 17:17
31:5,12
learned 14:11
24:17
left 25:8
legal 12:16 21:18
23:9 25:12
36:17
Leon 2:15 43:3
let's 8:17
letter 15:4 30:24
level 15:25
life 21:15
limited 32:12
Line 3:21 45:11
LLC 45:1
LLP 2:3
located 8:12 18:1
location 1:15
London 14:2,13
14:22 15:5,10
21:22 26:9
37:24 38:13
39:1,15,23
long 9:12 11:17
looked 26:11
looking 19:15
20:6 34:9 39:5
Los 8:13 10:1
Lucas 2:4 3:14
4:21 6:1,12
27:8 37:2
lucasbento@q...
2:8

**M**

M 1:24 44:2 45:2
Madison 2:5
making 39:15,23
manage 9:4
management
14:2
managing 8:24
9:1
March 1:17 4:14
42:16 43:6 44:8
45:10
Marcus 10:11,24
12:2,22 13:1
18:2 20:13,17
20:19,24 21:4,8
21:10,12,14,16
21:23 22:6,8,13
22:23,25 23:7,8
23:10,15 24:7
24:21 25:5,7
26:8 27:9 32:14
35:3,22 36:4,14
37:19 38:1,2
Mark 37:23 38:5
38:9,18 39:7,19
39:21,22,24
40:1,8
marked 10:17
17:8
marking 17:11
matter 4:4 20:4
21:18 22:9,10
22:18,21 25:4
25:11,17 30:20
31:16 34:15,16
34:25 37:21
39:17 43:10
matters 30:6
Maureen 1:17
4:12 42:3,23
mean 13:13 24:3
24:13 27:1
medical 15:17
meet 37:2,3
memory 33:1
mentioned 12:6

20:13 29:14
33:23 34:16
36:20 40:12,25
mentioning 34:7
message 28:20
messages 28:18
28:23
Mestre 2:12 4:25
43:2
met 11:21 12:25
13:1,8,14,15,15
18:18 19:2,4,11
32:24
Miami 2:16 43:4
mid 11:19 19:25
middle 13:20
mine 13:15
minutes 33:7
Misc 1:8
moment 8:12
Monday 14:10
months 21:8
23:11
multiple 19:5
35:2
mutual 38:13
39:13 40:25
41:2

**N**

N 4:1
name 4:10,24
6:11,16 39:18
44:8 45:9
named 10:11
18:12 21:17
22:1 37:23
names 40:12
nature 27:21
nearby 15:11
Ned 14:1 15:9
need 8:2 25:16
neither 25:19
42:12
never 13:14,15
14:4 23:17,17
27:9,10

New 2:6,6
news 5:13
newspaper 10:1
nice 37:2,3
night 14:23
Notary 1:20
44:25
note 5:4 14:10
noted 15:3 44:15
noticing 43:16
notified 30:19
notify 30:15
noting 43:16
November 10:13
10:25 18:3
19:18 24:20
37:16
number 18:18
38:2
NW 1:24 44:2
45:2

**O**

O 4:1
O'Connor 1:17
42:3,23
oath 7:2,5,6
obligation 30:4
obligations 25:12
30:8,14,15
obtain 10:9 16:11
28:24 39:2 40:5
occupation 8:18
occurred 28:4
offer 24:11 35:25
offered 22:24
office 43:11,19
officer 42:5
officers 15:14,18
officials 16:1
Oh 35:11
okay 6:25 31:10
32:4 33:5,6
36:22 41:6
once 13:16
ongoing 20:5
35:17

3/14/2023                    In Re Application of Shervin Pishevar                    Sam G. Anson

Page 5

onwards 19:1
open 13:22 14:10
   14:21 15:2
   34:12 38:8
openly 23:21
   27:23
opportunity
   30:20,23 31:15
option 43:13,14
ordeal 32:8
order 1:7 4:6
   12:2
original 43:15
originate 9:3
outcome 42:15
outreach 28:19
   28:22
outside 34:4

**P**

P 4:1
p.m 4:15
Pacific 1:16 4:15
page 3:2,7,21
   13:20 14:9,17
   14:17 43:16
   44:6 45:11
pages 44:10
paragraph 13:21
   14:8 16:3
paragraphs
   14:16
paramedics
   15:17
parties 4:16 5:17
   42:13
partner 19:3
partners 9:11
party 39:8
passing 38:22
paying 12:13,16
payoff 13:22
pending 5:24 8:4
penthouse 15:9
people 7:16
   13:17 18:18
   39:1 40:12,15

40:17
period 43:17
person 13:8
   19:12 28:10
   32:23,24 39:3
personally 16:19
Pete 20:25 21:8
   22:11,23 23:18
   24:6,8,9,10,13
   25:17,19 26:14
   27:23 29:6,9
   36:5 37:20
   39:14,14,22
   40:2
Pete's 25:17
Peter 18:12,17
   19:2 20:2,17,19
   24:13
petitioner 1:11
   2:10 6:2,13
phone 19:13 20:3
   28:10,15
Pishevar 1:7 2:9
   3:10 4:5,23
   5:15 6:13 11:6
   11:10,21 12:3
   12:13,18 13:25
   15:8,14 16:7,11
   16:14 21:18,21
   22:7 25:10
   29:19 31:21
   32:2,10 43:6
   44:7 45:8
Pishevar's 13:23
   15:18 16:1
   21:21 39:2
place 21:2 30:14
   38:18
planning 40:17
please 4:18 6:15
   6:16 7:18 17:4
   17:6 19:22 43:9
   43:14,15,18
pledge 23:4
   26:21
point 41:5
police 5:14 10:10

11:1,25 12:1
   14:3,11,13,22
   15:11,13,25
   16:8 26:9 32:10
   32:13,25 36:20
   38:3,15,19,22
   39:2,5,9 40:5
   40:11
Pollard 1:18 4:12
   42:3,23
Ponce 2:15 43:3
poor 22:18
posh 15:9
position 25:5,15
   31:14 40:14
possible 6:23
possibly 20:1
pot 39:17
potential 5:11
   24:25
practitioner
   15:18
present 5:8 16:18
   16:25 23:14
   28:6
presumably
   34:15
previously 13:5
   33:23
principally 9:24
   11:11 32:13
prior 9:7,15,17
   9:21,22 18:22
   38:24
private 8:19 9:19
privilege 5:11
   24:23
Procedure 5:22
   43:18
proceeding 5:2
   25:1 27:25
proceedings 1:9
   4:7 36:17
proceeds 6:22
produce 24:24
produced 17:1
professional 19:9

22:15 30:5
profile 16:1
progressed 24:21
projects 19:8
prominent 11:12
promises 12:18
proven 14:12
   15:4
provenance
   11:25
proverbial 25:8
provide 9:5
   30:10,12 35:5
   40:14
provided 10:11
   18:1 19:17 23:5
   26:10 32:20
   39:9 40:11
provides 17:19
providing 14:22
   16:21 22:25
public 1:20 11:14
publication
   20:15
publications 10:2
publicly 12:5
published 10:12
   10:24 12:2 18:2
   19:18 21:10,20
   21:24 22:4
   27:22
publishing 20:9
pulling 35:7
purchased 43:12
purported 16:8
   26:9
pursuant 1:9 5:6
   31:1
putting 17:10

**Q**

question 7:18,23
   11:12 28:11
   29:4 31:23 34:1
   35:24 37:13
   40:24
questions 6:14

8:5 19:23,23
   33:16 36:24
   37:1 41:7 43:18
   44:14,16
quick 33:6
Quinn 2:3 4:21
   11:22 16:15
   32:20
quote 13:22
   14:10,21 15:2
   15:23

**R**

R 4:1
rape 14:1
raped 15:12
RAQUEL 2:14
reach 29:1 39:8
   40:17
reached 25:3
   28:24 33:18
   35:19,23 38:12
   38:25
read 11:4 14:18
   15:23 44:10
reading 35:9
reads 13:22 14:8
   14:9
ready 43:10
Really 3:11
Realtime 1:18
reason 17:25
recall 19:4 28:17
   35:1,7
received 20:1
   26:11 27:20
   31:3 32:14,17
receiving 34:13
recess 33:11 37:8
recognize 10:19
   17:13
recommendation
   28:25
record 4:3,19 5:5
   6:16 7:16 8:10
   10:15 14:19
   17:5 23:4 26:22

www.DigitalEvidenceGroup.com   Digital Evidence Group C'rt 2023   202-232-0646

31:25 33:8,10
33:13 37:6,10
41:10 42:8
**recorded** 7:10
44:14,17
**reduced** 42:10
**referenced** 31:20
43:10
**referral** 20:7
**referred** 34:24
**referring** 18:6
22:21 26:4,6
27:14 40:9
**regard** 30:8
**regarding** 10:9
19:23 21:19,20
**Registered** 1:18
42:4
**regularly** 19:8
20:3 29:11
**related** 20:5 21:1
28:22 32:2 39:2
42:12
**relating** 5:13
12:19
**relationship**
13:12 30:5
**relevant** 41:4
**relieve** 25:11
**remember** 28:3
35:13
**remote** 1:14 2:1
4:3 5:19
**remotely** 4:17
7:5 42:6
**remove** 25:12
**replied** 31:5
**report** 5:14,15
10:10 11:2 12:1
12:1 14:3,11,22
15:3,13,16 16:2
16:8 26:9 32:11
32:13,25 34:24
36:20 38:3,15
38:19,22 39:2,5
39:9 40:6,11
**reporter** 1:18

4:12 7:11,15,15
29:1 33:19 34:9
34:11 42:1,4
**reporters** 14:24
**reporting** 9:23
**reports** 32:17
**represent** 6:12
29:8
**represented**
26:20
**representing** 2:9
2:19 4:25
**reputation** 12:5
**request** 25:16
30:16,25 39:4
**required** 5:9
**research** 18:13
38:9,24
**resolution** 25:7
25:10
**respond** 5:13
29:22 30:25
**responded** 26:1
31:12 39:4
**respondent** 2:19
5:1
**response** 7:12
16:23 17:1,19
33:25 35:24
**responsibilities**
9:2,3
**retained** 11:22
**review** 43:12
**reviewed** 18:7
19:16
**right** 9:21 34:25
36:20
**Rivero** 2:12,13
3:14 4:24,25,25
5:25 17:18 30:2
31:5,7,11,24
36:25 43:2
**room** 8:14
**Rule** 5:21
**rules** 5:22,23
6:24 43:18

**S**

**S** 3:6 4:1
**Sam** 1:15 2:19
3:3 4:4,25 6:5
6:17 43:1,7
44:8 45:9
**saying** 10:25
**says** 14:21 15:2,8
15:23 17:24
**scores** 28:5
**screen** 17:11
**searched** 15:18
**second** 13:20
**secondhand** 40:2
**SECTION** 1:10
**sector** 20:8 34:12
**see** 10:25 14:6,14
14:25 15:6,20
16:4 18:4,5
21:15 34:2
39:10 40:18
**seek** 16:19
**seeking** 16:7
21:19 22:2
33:19 40:5
**seen** 14:3 17:21
**selected** 43:14
**senior** 8:24 9:1
**sense** 7:20,25
34:8
**sent** 30:23
**served** 16:24
17:20 29:23,25
30:17,18
**service** 15:25
**services** 9:6,10
9:18 18:14 19:8
**set** 6:24 37:22
**sexual** 13:24
15:16
**shared** 14:24
16:7 32:9 33:2
33:3 37:15
**sheet** 43:15 44:15
45:6
**Shervin** 1:6 2:9
3:10 4:5 6:13

11:6,10,21
21:18 43:6 44:7
45:8
**shop** 38:25
**shortly** 20:23
**sign** 43:11,12
**signature** 43:10
43:16 44:6,20
45:22
**signed** 43:15
**signing** 43:14
**similar** 13:3,4,18
**Simpson** 18:12
18:20 24:19
25:3 37:21
**Sincerely** 43:22
**situation** 11:25
16:17 25:15
27:20
**Smear** 3:8
**smoothly** 6:23
**Solutions** 8:21,23
11:23
**sorry** 14:9 27:8
41:2
**sort** 23:9 25:10
33:1 34:4 35:9
**sound** 8:6
**sounding** 23:10
**source** 10:9
21:19 22:3 23:2
23:4,16,23
26:22 27:4,24
32:9,15,17,24
38:8
**Southern** 5:7
**speak** 24:16 31:4
39:10 40:18
**speaking** 7:16
23:23 26:8
27:13,23
**specialized** 18:13
**specific** 28:7
**specifically** 23:3
28:3,17,21 29:8
29:15 33:22
**specify** 35:23

**spoke** 13:7 20:3
20:24 21:13
23:12,20,20
29:11 32:7
39:25 40:10
**spoken** 13:8,9
19:5 25:20
**spring** 38:18
**start** 6:15 7:19
8:11
**started** 8:17
**State** 42:5
**state's** 5:23
**stated** 26:23
27:10 31:6
**states** 1:1 4:7
14:10 22:2
39:13
**stating** 6:16
**station** 15:12
**stay** 21:7
**staying** 15:9
**STENOGRAP...**
5:17
**stenographically**
42:10
**stipulate** 5:18
31:25
**stipulated** 4:16
**Stipulations** 3:20
**stirring** 39:17
**story** 14:12 21:1
21:9,11,20,23
21:25 33:20
34:10
**Street** 1:24 44:2
45:2
**subcontractor**
38:11 40:8
**subject** 23:8
40:22
**subjects** 5:16
**subpoena** 5:6
17:2,20 29:23
29:25 30:18,24
31:14
**subpoenas** 16:24

**subsequently** 36:17
**suggested** 20:16 38:5
**suite** 1:24 2:15 15:9,19 43:3 44:2 45:2
**SULLIVAN** 2:3
**summer** 27:6 28:14 33:20
**SUPPORT** 3:17
**sure** 6:22 14:20 28:21 29:3 31:3 36:13 41:1,4
**suspicion** 14:1
**swearing** 5:19
**sworn** 4:17,20 6:6
**Systems** 1:19

**T**

**T** 3:6
**take** 1:7 4:6 7:7 8:2,5 19:21 31:17 33:6
**taken** 5:21 6:19 7:2 33:11 37:8 42:6,9
**talk** 21:14
**talked** 27:19
**talking** 22:6
**Tech** 3:9
**technician** 4:11
**technology** 11:11 20:8,16 34:12
**telephone** 20:2
**television** 10:3
**tell** 7:2,23 33:20 34:17
**telling** 8:11 32:19 35:4
**ten** 9:14,20
**testified** 6:8
**testify** 6:6
**testimony** 42:8,9
**thank** 17:6 32:5 36:22 41:7,8

**thanked** 21:4
**things** 24:5,7 33:17 34:23
**think** 8:10 13:21 16:14 20:19 22:16 33:22,25 35:7,22
**third** 16:3
**thought** 20:20 22:17 25:6 39:21 40:13
**three** 14:16
**time** 4:15,15 7:16 13:3 18:23 19:21 20:14 21:10,12 22:13 23:8 24:9 28:23 30:6 33:10,13 35:2,8 36:15 37:10 43:17
**times** 11:5 13:1,9 19:5 23:12 26:13 38:3
**title** 8:22
**today** 4:11 8:15 11:4 12:14,20 16:22,25 17:22
**Today's** 4:14
**told** 21:23 25:23 34:23 35:19,20 38:13 39:20 40:1 41:3
**top** 14:9
**TORAL** 2:14
**transcript** 5:19 42:7 43:9,11 44:11
**transcription** 44:14,16
**travelled** 32:23
**treating** 26:22
**tried** 23:8
**true** 7:17 42:8 44:13,15
**truth** 6:6,7,7 7:2
**trying** 38:14 39:1
**turned** 21:25

**two** 7:16 18:11 22:11
**typewriting** 42:11
**typical** 34:4

**U**

**Uber** 11:13 20:5 20:6 21:2,3 22:8 29:14,19 33:24,24 34:8 34:25 35:11,13 35:17
**unable** 30:13
**uncomfortable** 40:19
**understand** 7:1,4 7:7,9,12,22 11:14 12:3 16:6 22:9 38:14
**understanding** 10:6,8 16:10 26:5 27:12,15 27:16 29:18 31:2,4 35:15 36:14
**understood** 7:24 8:7 29:5,5 38:9
**unfamiliar** 35:6
**unit** 15:17
**United** 1:1 4:7 22:2 39:13
**Update** 15:3
**uphold** 26:21
**upset** 22:13 39:15 41:3
**URQUHART** 2:3
**US-based** 39:4
**USC** 1:9
**use** 1:8 4:6

**V**

**validity** 5:18
**venture** 11:15
**verbal** 7:11
**victim** 15:15

**video** 4:3,11
**Videographer** 2:21 4:2 33:9 33:12 37:5,9 41:9
**Videotaped** 1:14
**voluntarily** 12:10

**W**

**waive** 43:13
**walked** 15:11
**want** 5:4 23:2,25 25:22 27:9
**wanted** 30:7 33:16
**Washington** 1:24 18:1,11 32:23 44:3 45:3
**wasn't** 26:2
**way** 39:22
**we'll** 37:1
**we're** 7:5 8:9 13:13
**we've** 5:10 13:1 13:16 19:16 35:2
**Weekly** 10:1
**weeks** 24:24
**went** 11:14 15:14
**wife** 13:16
**willing** 39:8
**wished** 30:21
**witness** 4:17,20 31:10,12 41:8 43:12 44:8,20 45:9
**woman** 15:10
**words** 23:17,17
**work** 9:17 10:3 13:14,16 18:18 18:25 21:14
**worked** 13:17 30:6 40:7,13,16
**working** 20:4,14 34:17
**write** 34:10
**writer** 20:15

**written** 43:24
**wrote** 10:2 34:11

**X**

**X** 3:6

**Y**

**Year** 3:12
**years** 9:14,20,25 13:10,18 19:6 22:12 23:11 38:24
**York** 2:6,6
**young** 13:4 15:10

**Z**

**Zoom** 7:17 8:9

**0**

**1**

**1** 3:9 10:15,16,20 13:20 18:7
**1:11** 33:13
**1:18** 37:7
**1:34** 37:10
**1:41** 41:11
**10** 3:12
**1000** 2:15 43:3
**10010** 2:6
**11/8/2017** 3:8
**12:05** 1:16 4:15
**12:44** 33:10
**14** 4:14 43:6 44:8 45:10
**14449** 1:19 42:4 42:24
**14th** 1:17 42:16
**17** 3:14,23
**1730** 1:24 44:2 45:2
**1782** 1:10 32:21
**18** 3:13 17:18

**2**

**2** 3:14 17:5,7,12 17:13,24 19:15 19:15

**2:21-mc-00017...**
  1:9
**20-plus** 13:9
**2000s** 13:2
**20036** 1:24 44:3
  45:3
**2008** 18:21
**2010** 19:1
**2017** 10:13,25
  20:1 27:7 28:14
  33:20 37:16
**2019** 21:13 23:13
  28:6
**202** 1:25 44:4
**202)-232-0646**
  43:19
**202)232-0646**
  45:4
**2020** 11:19,19
  24:21
**2021** 3:13 17:19
  29:24 30:1
  38:18
**2023** 1:17 4:14
  42:17 43:6,23
  44:8 45:10
**212-849-7000** 2:7
**232-0646** 1:25
  44:4
**2525** 2:15 43:3
**27** 15:10
**28** 1:9

        **3**
**3** 14:17
**30** 5:21
**305-445-2500**
  2:17
**33134** 2:16 43:4

        **4**

        **5**
**50** 23:12
**51** 2:5

        **6**
**6** 3:4,23

        **7**

        **8**
**8** 10:25
**812** 1:24 44:2
  45:2